1  **KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
2  Ramzi Abadou (Bar No. 222567)
3  580 California Street, Suite 1750
   San Francisco, CA 94104
4  Telephone: (415) 400-3000
   Facsimile: (415) 400-3001
5  rabadou@ktmc.com

6  -and-

7  **KESSLER TOPAZ**
8  **MELTZER & CHECK, LLP**
   Joseph H. Meltzer
9  Edward W. Ciolko
   Terence S. Ziegler
10 Joseph A. Weeden
   280 King of Prussia Road
11 Radnor, PA 19087
   Telephone: (610) 667-7706
12 Facsimile: (610) 667-7056
   jmeltzer@ktmc.com
13 eciolko@ktmc.com
   tziegler@ktmc.com
14 jweeden@ktmc.com

15 *Counsel for Plaintiff*

16 *[Additional counsel listed on signature page]*

17             **UNITED STATES DISTRICT COURT**

18             **NORTHERN DISTRICT OF CALIFORNIA**

19 PATRICIA MCNEARY-CALLOWAY,                Civil Action No.
20 individually and on behalf of all others similarly
   situated,                                 N 1 1    3 0 5 8
21
22              Plaintiff,                    **CLASS ACTION COMPLAINT**

23         v.

24 JPMORGAN CHASE BANK, N.A. and CHASE       JURY TRIAL DEMANDED
   BANK USA, N.A.
25
26              Defendants.

27

28

**FILED**

**JUN 2 0 2011**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

1

**INTRODUCTION**

2      1.      This is a proposed class action brought by Plaintiff Patricia McNeary-Calloway
3  (herein as "Plaintiff") on behalf of herself and all other similarly situated homeowners who have
4  or had residential mortgage loans originated and/or serviced by Defendants JPMorgan Chase
5  Bank, N.A. ("JPMorgan"), Chase Bank USA, N.A. ("Chase Bank") and/or non-Defendant Chase
6  Home Finance, LLC[1] ("Chase Home Finance") between June 16, 2007 and the present (the Class
7  Period") and, in connection therewith, were required to pay for "force-placed" hazard insurance
8  policies.

9      2.      In the event that borrowers fail to maintain their hazard insurance policies, rather
10  than attempt to maintain delinquent borrowers' *existing* policies, Defendants commonly choose
11  to replace borrowers' insurance policies with more expensive ones, known as "force-placed"
12  insurance policies. Such policies provide less coverage and are substantially more costly than
13  the borrowers' original policies, while providing lucrative financial benefits to servicers and/or
14  their affiliates. Further, such policies often provide unnecessary or duplicative coverage, in that
15  they are improperly backdated to collect premiums for time periods during which the mortgagor
16  has absolutely no risk of loss.

17      3.      Throughout the Class Period, Defendants have engaged in unlawful, abusive and
18  unfair practices with respect to force-placed insurance, including, among others and as described
19  in further detail below: (a) receiving fees, payments, commission, improper reinsurance
20  premiums and/or other things of value from providers of force-placed insurance; (b) providing

21

22
23
24
25
26

[1] Chase Home Finance, previously a wholly-owned subsidiary of Defendant JPMorgan has served as the primary servicing unit for loans originated and/or acquired by affiliates of ultimate parent JPMorgan Chase & Co. Upon information and belief, on or about May 1, 2011, Chase Home Finance was merged with and into Defendant JPMorgan, with Defendant JPMorgan as the surviving entity. Accordingly, as described herein, Defendant JPMorgan is named as a defendant in this action both in its own capacity and as successor-in-interest to Chase Home Finance.

27
28                                                                    1

CLASS ACTION COMPLAINT

1  force-placed insurance from their own affiliates at a substantial, improperly high cost to the
2  borrower; and (c) forcing borrowers to pay for unnecessary insurance.

3  4.  Defendants' unlawful actions include, *inter alia*, purchasing unconscionably high-
4  priced insurance policies, having pre-arranged agreements to purchase force-placed insurance
5  from a single company without seeking competitive bids on the open market to maximize their
6  own profits, backdating the force-placed policies to charge for retroactive coverage, and giving
7  and receiving "commissions" or "kickbacks" for the procurement of the force-placed policies.
8  These actions constitute a pattern of exploitative profiteering and self-dealing against the interest
9  of Plaintiff and the Class members.

10  5.  Defendants have effectuated a captive reinsurance scheme whereby, in violation
11  of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral payments in
12  the form of purported reinsurance premiums are paid by force-placed insurance providers to
13  Defendants' own subsidiary/affiliate; and (b) Defendants receive an unlawful split of insurance
14  premiums paid by borrowers.

15  6.  Upon information and belief, Defendants have also negotiated deals with force-
16  placed insurance providers, pursuant to which Defendants receive a percentage of the cost of the
17  premiums of each force-placed insurance policy purchased for a borrower. This commission or
18  kickback encourages the Defendants to select an expensive insurance policy at the expense of the
19  borrower.

20  7.  This scheme constitutes disguised, unlawful referral fees in violation of RESPA's
21  anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of
22  settlement-service fees other than for services actually performed.

23  8.  In this action, Plaintiff challenges Defendants' unlawful conduct and seek
24  statutory and compensatory damages, as well as restitution for Defendants' unjust enrichment.

25  JURISDICTION AND VENUE

26  9.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
27  §§ 1331 and 1367 and 12 U.S.C. § 2614.

28

2

CLASS ACTION COMPLAINT

1        10.    This Court also has original diversity jurisdiction pursuant to the Class Action
2  Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff is a citizen of the State of California.
3  Defendants are citizens of different states. The amount in controversy in this action exceeds
4  $5,000,000, and there are more than 100 members in each of the classes.

5        11.    In addition, this Court has diversity jurisdiction over Plaintiff's state law claims
6  pursuant to 28 U.S.C. § 1332(a). The matter in controversy is greater than $75,000 and this
7  matter is between citizens of different states. This Court also has supplemental jurisdiction over
8  Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9        12.    Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614
10  because the real property involved in Plaintiff's mortgage loan transaction is located in this
11  district, Plaintiff resides in this district, Defendants regularly conduct business in this district,
12  and/or a substantial part of the events giving rise to the claims occurred in this district.

13  PARTIES

14      **Plaintiff**

15        13.    Plaintiff Patricia McNeary-Calloway resides in Oakland, CA. On or about
16  September 13, 2007, Plaintiff McNeary-Calloway and her husband, James B. Calloway, Jr.,
17  obtained a $540,000 refinance mortgage loan from Chase Bank, secured by their primary
18  residence. *See* Calloway Deed of Trust, attached as Exhibit A hereto.

19        14.    In connection with their mortgage loan, Plaintiff McNeary-Calloway and her
20  husband obtained a hazard insurance policy from California Casualty with an annual premium of
21  $1,640.00. The policy provided the following coverage: (a) dwelling--$341,000; (b) other
22  structures--$34,100; (c) personal property--$170,500; (d) loss of use--$102,300. *See* Exhibit B,
23  attached hereto.

24      **Ms. McNeary-Calloway's First Force-Placed Insurance Policy**

25        15.    On July 4, 2009, Mr. Calloway passed away due to complications from a serious
26  illness. During Mr. Calloway's illness and following his death, Plaintiff McNeary-Calloway

27

28                                3

CLASS ACTION COMPLAINT

1 | faced financial difficulties and had trouble making her homeowner's insurance payment.
2 | Consequently, her hazard insurance policy lapsed effective August 26, 2009.

3 |     16.    Subsequently, Chase Home Finance purchased on her behalf a one-year insurance
4 | policy with American Security Insurance Company ("American Security"), backdated to August
5 | 26, 2009, with an annual premium of $4,233.

6 |     17.    Notably, while the premium for the force-placed insurance policy was 2 and ½
7 | times her prior premium, the policy provided substantially less coverage, in that it protected
8 | Chase Home Finance only and covered only the structure of the home.

9 |     18.    Chase Home Finance then established for Plaintiff McNeary-Calloway an escrow
10 | account with an initial balance of negative $4,233. Additionally, Chase Home Finance added
11 | $887 to Plaintiff McNeary-Calloway's monthly payment, raising it from $2,716 to
12 | approximately $3600 per month.

13 | **Ms. McNeary-Calloway's Second Force-Placed Insurance Policy**

14 |     19.    In September 2010, Plaintiff McNeary-Calloway received from the Chase Home
15 | Finance "Insurance Processing Center" a letter dated September 5, 2010, entitled "Notice of
16 | Placement of Insurance," a copy of which is attached as Exhibit C hereto. The letter stated that,
17 | effective August 26, 2010, Chase Home Finance had renewed the force-placed insurance policy
18 | with American Security for another year, with a premium of $4,233, again charged to Plaintiff
19 | McNeary-Calloway's escrow account. A copy of the force-placed insurance policy is attached as
20 | Exhibit D hereto.

21 |     20.    Following receipt of the September 5, 2010 letter entitled "Notice of Placement of
22 | Insurance," Plaintiff McNeary-Calloway obtained her own insurance policy from Farmers
23 | Insurance Group with an annual premium of $1,103 and an effective date of September 1, 2005.
24 | The Farmers policy provided the following coverage: (a) dwelling--$341,000; (b) other
25 | structures--$34,100; (c) personal property--$255,750; (d) loss of use--$136,400; (e) medical
26 | payment to others--$1,000/person; (f) personal liability--$300,000/occurrence; (g) extended

27 |
28 |                                       4

CLASS ACTION COMPLAINT

1    replacement cost--$85,250; and (h) identify fraud--$30,000. The policy's effective date is
2    September 1, 2010. *See* Exhibit E, attached hereto.

3          21.    After receiving notice of this policy, Chase Home Finance sent a letter to Plaintiff
4    McNeary-Calloway, stating that it had canceled the force-placed insurance policy effective
5    September 1, 2010, but charged Plaintiff McNeary-Calloway's escrow account for retroactive
6    coverage for the period extending cover from August 26, 2010 (date the first force-placed policy
7    expired) and September 1, 2010 (date Plaintiff McNeary-Calloway's policy began). *See* Exhibit
8    F, attached hereto.

9          **Defendants**

10        22.    Defendant JPMorgan, a subsidiary of JPMorgan Chase & Co., is a national
11    banking association that conducts in California and other states throughout the United States.
12    Non-party Chase Home Finance, LLC ("Chase Home Finance") is a Delaware limited liability
13    company that, during the relevant time period, served as the primary servicing unit for loans
14    originated and/or acquired by affiliates of ultimate parent JPMorgan Chase & Co. On or about
15    May 1, 2011, Chase Home Finance was merged with and into Defendant JPMorgan, with
16    Defendant JPMorgan as the surviving entity. Accordingly, Defendant JPMorgan is named as a
17    defendant in this action both in its own capacity and as successor-in-interest to Chase Home
18    Finance.

19        23.    Defendant Chase Bank, a subsidiary of JPMorgan Chase & Co., is a national
20    banking association that conducts in California and other states throughout the United States.

21        24.    In all of its actions described herein, Chase Home Finance acted on its own behalf
22    and as the duly authorized agent of Defendants JPMorgan and Chase Bank or other owners of the
23    underlying notes and mortgage agreements. Defendants were contractually obligated to service
24    the loans at issue pursuant to the terms of the mortgage contracts.

25

26

27

28                                    5

1 | FACTUAL ALLEGATIONS

2 | **Defendants' Operations**

3      25.     Defendants JPMorgan and Chase Bank originate mortgage loans and acquire
4 | loans from other lenders. Each such loan is secured by a deed of trust on the underlying
5 | property. Prior to its merger into Defendant JPMorgan, Chase Home Finance acted as the
6 | servicer of these loans.

7      26.     Upon information and belief, Defendants have a significant indirect financial
8 | stake in American Security, a company that issues force-placed flood insurance policies for
9 | Defendants. Specifically, American Security is a wholly-owned subsidiary of Assurant, Inc.
10 | ("Assurant"). *See* Assurant, Inc., Annual Report (Form 10-K), Exhibit 21 (February 23, 2011).
11 | As of January 19, 2010, JPMorgan Chase & Co. (the parent company of each of the Defendants)
12 | held 3,829,722 shares in Assurant through JPMorgan and other affiliates. *See* JPMorgan Chase
13 | & Co., Statement of Acquisition of Beneficial Ownership (Schedule 13G/A) (January 19, 2010).

14 | **Force-placed Insurance**

15      27.     In order to protect the mortgagee's interest in the secured property, mortgage loan
16 | contracts typically allow the lender or third party servicer to "force-place insurance" when the
17 | homeowner fails to maintain the insurance.

18      28.     The mortgage contract does not disclose, however, that the lender or other
19 | servicer will receive a commission or reinsurance premium from force-placed insurance
20 | providers for purchasing the insurance from them. The mortgage contract also does not disclose
21 | that this payment will be based upon a percentage of the cost of the premium of the force-placed
22 | insurance. Instead, the contract misrepresents to borrowers that the cost of the force-placed
23 | insurance is necessary to protect the lender's interest in the secured property.

24      29.     Borrowers are often unaware that the force-placed policy often covers only the
25 | loan amount, rather than the full value of the home. Because, most forced placed insurance
26 | policies do not insure the contents of the property, the borrower could sustain a substantial loss if
27 | the home is damaged or destroyed. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage*

28

6

CLASS ACTION COMPLAINT

1    *Servicers in More Trouble*, American Banker (November 10, 2010), available at:
2    http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-
3    1.html (referred to herein as "Ties to Insurers").

4       30.      These lender-placed or "force-placed" insurance policies are almost always more
5    expensive than standard insurance coverage. Reportedly, such policies can cost as much as ten
6    times more than standard policies. While the force-placed insurance policy is for the benefit of
7    the lender, the cost is passed on to the borrower (or passed on to holders of mortgage-backed
8    securities). *See Id.*

9       31.      Once a servicer receives evidence that a borrower has obtained his/her own
10    insurance policy, the forced placed coverage is (or should be) fully or partially canceled.

11      **Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged**
      **Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**
12

13       32.      The force-placing of insurance policies can be a very business lucrative for
14    servicers. Mortgage servicers routinely receive kickbacks and commissions from insurance
15    companies for placing borrowers into force-placed insurance, totaling as much as 40% of the
16    premiums paid by homeowners. Commonly, the servicer selects the provider in accordance with
17    a pre-arranged agreement and force-places the policy in such a way as to receive a financial
18    benefit. The servicer benefits by placing the policy either: (a) with an affiliate or (b) with a third
19    party provider who has already agreed to share revenue with the servicer in the form a direct
20    commission payment or through "reinsurance" premiums ceded to a subsidiary/affiliate of the
21    servicer (a "captive reinsurance arrangement").

22       33.      Under the commission arrangement, the provider of the force-placed insurance
23    policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance
24    "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance
25    agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the
26    kickbacks or commissions collected from the force-placed insurance provider.

27

28                                        7

34.    Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer.  In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.  For example, the nation's largest provider of force-placed insurance has admitted that its force-placed insurance division "writes[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients." *See* Assurant, Inc., Annual Report (Form 10-K), at 81 (February 25, 2010).

35.    Illustrative of the arrangements is the following graphic from *American Banker*:

# Sharing in the Profits

How servicers make money arranging force-placed coverage

| Commissions | Reinsurance |
|---|---|
| **To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer** | **To replace lapsed coverage, servicer buys policy on home from insurer** |
| **Servicer advances premiums to insurer** | **Servicer advances premiums to insurer** |
| **Insurer pays portion of premium back to subsidiary as a commission** | **Subsidiary of servicer reinsures part of the policy, gets a cut of premiums** |
| **Servicer bills borrower for the policy** | **If necessary, subsidiary buys letter of credit from another party** |
| **If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale** | **Servicer bills borrower for the policy** |
| | **If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale** |





36.    Borrowers have no opportunity to comparison-shop for force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are

8

1 | determined by the servicer and the insurer, rather than negotiated between the borrower and the
2 | insurer.

3 |      37.   For their part, servicers have no incentive to comparison shop for the best rate.
4 | Rather, servicers are financially motivated to refer borrowers to the provider that will provide the
5 | best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

6 |      38.   Commonly, a mortgage loan servicer enters into an agreement with a provider,
7 | pursuant to which it refers borrowers exclusively to the provider for force-placed insurance. For
8 | example, in its public filings, Assurant, Inc. ("Assurant")—the nation's largest provider of force-
9 | placed insurance policies and the parent of American Security—states that it establishes "long-
10 | term relationships" with leading lenders and servicers and that the majority of its lender-placed
11 | agreements are exclusive. *See* Assurant, Inc., Annual Report (Form 10-K), at 5 (February 23,
12 | 2011) ("The majority of our lender-placed agreements are exclusive.").

13 |      39.   Force-placed insurance policies are not underwritten on an individual policy
14 | basis. Rather, upon information and belief, servicers' contracts with force-placed insurance
15 | providers require or at least permit the insurer to automatically issue these policies when a
16 | borrower's insurance coverage is not maintained.

17 |      40.   Servicers often go so far as to actually outsource their insurance processing to the
18 | force-placed insurance provider. The provider then continuously monitors the servicer's
19 | mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the
20 | event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an
21 | insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where
22 | these servicers receive commissions from force-placed insurance providers (which are ultimately
23 | charged to borrowers), they are performing no service for the commissions they receive other
24 | than simply providing the referral. *See* Ties to Insurers, *supra*.

25 |      41.   While servicers profit greatly from the business of force-placed insurance, upon
26 | information and belief, they maintain a shroud of secrecy and do not separately report their
27 | income from payments received from providers of force-placed insurance. However, according

28 |                                        9

CLASS ACTION COMPLAINT

1  to recent article published by *American Banker*, "a cursory review of force-placed insurers'
2  financials suggests that the business brings servicers hundreds of millions of dollars every year."
3  *See* Ties to Insurers, *supra* (noting that servicers demand generous commissions and other
4  payments in return for their referrals).

5      42.    Servicers commonly attempt to justify the high price of force-placed insurance
6  policies by pointing to the higher risk associated with the lack of individual policy underwriting.
7  However, as *American Banker* noted:

8
9
10
> Though part of the extra expense can be explained by the higher
> risks associated with insuring the homes of delinquent borrowers,
> force-placed policies generate profit margins unheard of elsewhere
> in the insurance industry — even after accounting for the generous
> commissions and other payments that servicers demand.

11  *See* Ties to Insurers, *supra*.

12      43.    Servicers also attempt to blame the exorbitant cost of force-placed insurance on
13  the fact that the policy is issued without the benefit of a prior inspection of the property.
14  However, according to the National Consumer Law Center, as a general matter, insurers do not
15  routinely inspect residential properties in the course of underwriting. *See Id.*

16      **Defendants Require Redundant or Otherwise Unnecessary Insurance**

17      44.    Unnecessary or inappropriately priced hazard insurance arises when a servicer
18  forces borrowers to purchase and maintain hazard insurance for their property that is
19  unnecessary, duplicative and/or in amounts greater than required by law or their mortgage
20  agreements.

21      45.    Motivated by the lucrative financial incentive associated with force-placing
22  insurance, upon information and belief, Defendants have commonly required borrowers to pay
23  for unnecessary insurance coverage. Such examples include, without limitation: (a) requiring
24  borrowers to pay for insurance coverage that exceeds the amount necessary to protect the
25  mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus
26  requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and
27  no risk of loss exists for such period; and (c) requiring borrowers to pay for force-placed

28      10

1    insurance policies despite the existence of a Lender's Loss Payable Endorsement that already
2    protects the lender's interest in the property.

3         46.    Simply put, force-placed hazard insurance policies should not be backdated. The
4    National Association of Insurance Commissioners ("NAIC") has indicated that insurance is
5    "prospective in nature." Requiring borrowers to pay for backdated insurance coverage to cover
6    time periods during there is already no risk of loss is improper. *See, e.g.*, Ties to Insurers, *supra*
7    (quoting the NAIC as stating that insurance policies "'should not be back-dated to collect
8    premiums for a time period that has already passed'").

9         47.    Moreover, many hazard insurance policies contain a Lender's Loss Payable
10   Endorsement. This endorsement typically protects the lender for a period of at least ten days
11   after the termination of the insurance policy. Accordingly, force-placing insurance policies
12   effective immediately following the termination of the borrower's policy and charging borrowers
13   expensive premiums for such insurance is unlawful and unfair because borrowers are charged for
14   needless and duplicative insurance coverage.

15        **Government Response**

16        48.    State attorneys general are cognizant of and have taken action concerning
17   servicers' abusive practices concerning force-placed insurance. Recently, a coalition of all 50
18   state attorneys general proposed a settlement agreement with servicers to address numerous
19   problems that have surfaced during the foreclosure crisis. *See* Jeff Horowitz, *Attorneys General*
20   *Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (March 11, 2011),
21   available    at:    http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-
22   1034213-1.html.

23        49.    Among other terms, the proposed settlement would essentially prohibit servicers
24   from profiting from force-placed insurance. Specifically, under the proposed settlement,
25   mortgage servicers: (a) are prohibited from force-placing insurance when the servicer knows or
26   has reason to know that the borrower has a policy in effect that meets the minimum requirement
27   of the loan documents; (b) cannot force-place insurance that is in excess of the replacement cost

28                                                    11

1  of the improvements on the secured property; (c) are prohibited from purchasing the force-placed

2  insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d)

3  are prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting

4  anything of value in relation to the purchase or placement of the force-placed insurance; (e) must

5  make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if

6  there is a lapse in payment; and (f) must purchase the force-placed insurance for a commercially

7  reasonable price. *See* Proposed Settlement Agreement, attached as Exhibit G hereto.

8  **RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Forced-**
9  **placed Insurance Policies**

10  50.      As Brian Sullivan, spokesman for the Department of Housing and Urban

11  Development ("HUD"), has opined, "It is clear that RESPA prohibits fee splitting and unearned

12  fees for services that are not performed." *See* Ties to Insurers, *supra*.

13  51.      RESPA is the primary federal law regulating residential mortgage settlement

14  services.  HUD is charged with enforcing RESPA and has promulgated the implementing rules

15  for RESPA.  See Regulation X, 24 C.F.R. § 3500.

16  52.      RESPA was enacted, in part, to curb the problem of kickbacks between real estate

17  agents, lenders and other real estate settlement service providers.  "It is the purpose of this

18  chapter to effect certain changes in the settlement process for residential real estate that will

19  result...in the elimination of kickbacks or referral fees that tend to increase unnecessarily the

20  costs of certain settlement services."  12 U.S.C. § 2601(b).

21  53.      A key component of RESPA is its dual prohibition of referral fees and fee-

22  splitting between persons involved in real estate settlement services.

23  54.      The term "settlement service" is liberally defined in RESPA and Regulation X

24  and includes the provision of services involving hazard, flood, or other casualty insurance.  24

25  C.F.R. § 3500.2(b).

26              RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:
            No person shall give and no person shall accept any fee, kickback,
27              or thing of value pursuant to any agreement or understanding, oral

28                                         12

> or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

> RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:
> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

55. Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

56. The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity…The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money. 24. C.F.R. § 3500.14(d).

57. Force-placed insurance business referred to insurers by a lender or servicer constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a). Under RESPA, therefore, Defendants are prohibited from accepting referral fees from force-placed insurance providers or from splitting insurance premiums with the insurer other than for services actually performed by the captive reinsurer.

**Reinsurance Industry**

58. Reinsurance arrangements for force-placed insurance policies can generally take one of two forms: (a) "quota share" or (b) "excess of loss."

59. In a quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the primary insurer's insured losses. Thus, if the primary insurer experiences

13

1 losses, the reinsurer is expected to experience losses in the percentage agreed upon in the
2 reinsurance agreement.

3    60.    Unlike the quota share arrangement, however, the excess of loss method does not
4 necessarily result in any actual "losses" being shifted to the reinsurer.

5    61.    This is because, in an excess of loss reinsurance arrangement, the reinsurer is
6 liable only for a specified corridor or "band" of loss, with the losses below and above the band
7 being covered by the force-placed insurance provider. In other words, the reinsurer is liable only
8 for claims, or a percentage thereof, above a particular point, commonly known as an attachment
9 or entry point, and subject to a ceiling, commonly known as a detachment or exit point. Under
10 this structure, then, the reinsurer's liability begins, if ever, only when the force-placed insurance
11 provider's incurred losses and expenses reach the attachment point and ends when such losses
12 reach the detachment point.

13    62.    The likelihood of the reinsurer experiencing any real losses under this
14 arrangement depends not only on the amount of losses paid by the force-placed insurer in the
15 event of a claim, but also on whether the reinsurance agreement between the reinsurer and the
16 force-placed insurance provider constitutes real or commensurately priced reinsurance such that
17 the reinsurer is *required* to contribute its *own* money when called upon by the force-placed
18 insurance provider to pay for its share of losses.

19    **Captive Reinsurance Arrangements and HUD's Concern About RESPA Anti-
      kickback Violations Under Such Arrangements**
20

21    63.    Upon information and belief, Defendants entered into "excess of loss" captive
22 reinsurance arrangements with force-placed insurance providers.

23    64.    Under "captive reinsurance arrangements," the servicer refers its borrowers to a
24 force-placed insurance provider who agrees to reinsure with the servicer's captive reinsurer.
25 These arrangements require the force-placed insurance provider to cede a percentage of the
26 borrowers' premiums to the servicer's captive reinsurer under an excess-of-loss agreement.

27

28                                             14
CLASS ACTION COMPLAINT

1    65.    Concerned that captive reinsurance arrangements in the realm of RESPA
2  settlement services would be designed to disguise a funneling of unlawful referral fees, HUD
3  issued a letter dated August 6, 1997 ("HUD letter") addressing the substantially similar problem
4  of captive reinsurers in the private mortgage insurance industry. *See* HUD Letter, attached as
5  Exhibit H hereto.

6    66.    The HUD letter concluded that captive reinsurance arrangements were
7  permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance
8  services 'actually furnished or for services performed' and (2) are bona fide compensation that
9  does not exceed the value of such services" (emphasis in original). *See Id.*

10    67.    The HUD letter focuses the RESPA anti-kickback analysis on whether the
11  arrangement between the lender's captive reinsurer and the insurer represents "a real transfer of
12  risk." HUD warned that "The reinsurance transaction cannot be a sham under which premium
13  payments . . . are given to the reinsurer even though there is no reasonable expectation that the
14  reinsurer will ever have to pay claims." *Id.*

15    68.    The HUD letter also states "This requirement for a real transfer of risk would
16  clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to
17  participate pro rata in every claim" (emphasis in original).[2]  *Id.*

18    69.    The HUD letter contrasts excess of loss method reinsurance arrangements. HUD
19  states that excess of loss reinsurance contracts can escape characterization as an unlawful referral
20  fee or fee-split only:

21                     . . . if the band of the reinsurer's potential exposure is such that a
22        reasonable business justification would motivate a decision to
              reinsure that band. Unless there is a real transfer of risk, no real

23

24  [2]    However, quota share arrangements do not constitute real or commensurately priced
    reinsurance if provisions in the reinsurance agreement limit the reinsurer's liability to pay claims
25  to the assets held in the trust accounts established for each mortgage insurer into which the
    mortgage insurer deposits the contractually-determined ceded portion of the premiums that it
26  collects from borrowers.

27

28                                              15

CLASS ACTION COMPLAINT

reinsurance services are actually being provided. In either case, the premiums paid...must be commensurate with the risk.

*Id.*

70. Upon information and belief, Defendants' captive reinsurance arrangements with force-placed insurance providers: (a) do not provide actual reinsurance services and, in any event (b) provide for the payment to the captive reinsurer premiums that are not commensurate with the risk, if any, assumed by the captive reinsurer.

71. The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is likely unnecessary. For example, during 2009, Assurant collected approximately $2.7 billion of premiums through its Specialty Insurance Division, which is overwhelmingly devoted to force-placed insurance. Notably, this insurer paid out only 36% of this amount in claims—though in the company's other lines of business, a 70% claims-to-premiums ratio is the norm. Not surprisingly, force-placed insurance is this insurer's most profitable product. *Id.*

72. Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry—which also had a relatively low level of losses—as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.*, Broderick Perkins, *Title Insurance Industry in Hot Water with Regulators Again*, San Jose Business Journal (May 22, 2005), available at: http://www.bizjournals.com/sanjose/stories/2005/05/23/story4.html.

73. Indeed, while announcing a $37.8 million settlement with nine title insurers, then California Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery." *See* Press Release, California Department of Insurance (July 20, 2005), available at: http://www.departmentofinsurance.ca.gov/0400-news/0100-press-releases/0080-2005/release069-05.cfm. As a result, a number of providers have abandoned such arrangements altogether.

16

CLASS ACTION COMPLAINT

74. As HUD noted during testimony by Assistant Secretary for Regulatory Affairs and Manufactured Housing Gary M. Cunningham before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

75. In reality, Defendants' captive reinsurance arrangements with force-placed insurance providers were and are sham transactions for collecting illegal kickbacks in return for referring force-placed insurance business to certain insurers.

76. The money Defendants collected from force-placed insurers through "reinsurance" premiums and/or commission payments far exceeded the value of the services, if any, it performed. The amounts paid were simply disguised kickbacks to Defendants for the referral of borrowers to force-placed insurance providers.

77. Further, with respect to the legitimacy of substantially similar captive reinsurance arrangements in the private mortgage insurance industry, HUD has clearly stated that consumers should be provided with adequate disclosure, finding that "consumers would be well served by a meaningful disclosure and a meaningful choice for consumers having their loans included in a captive reinsurance program." HUD defined a "meaningful disclosure" as one that "would reveal that the captive reinsurance arrangement exists, that the lender stands to gain financially under the arrangement, and that the consumer may choose not to have his or her insurance provided by an insurer in such an arrangement." HUD defined a "meaningful choice" as one that "would provide the consumer an easy, non-burdensome opportunity to opt out by, for example, indicating a preference one way or the other on a form."

78. Plaintiff contends that the same is true with respect to captive reinsurance arrangements relating to force-placed insurance. Defendants, however, failed to provide adequate disclosure and, further, failed to provide borrowers with any opportunity whatsoever to

17

CLASS ACTION COMPLAINT

1  opt out of having his/her force-placed insurance policy provided by an insurer with whom
2  Defendants had a captive reinsurance arrangement.

### Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance

4      79.    By retaining a commission or participating in a captive reinsurance arrangement,
5  the servicer forces the borrower to pay for both the *actual* cost of the insurance policy and the
6  cost of the kickback. As American Banker observed, "[w]hile servicers that partner with force-
7  placed insurers customarily perform little of the work in monitoring their portfolios for lapses
8  and writing policies, payments to them are simply a cost of doing force-placed business." *See*
9  Ties to Insurers, *supra*. These costs are ultimately paid by the borrowers.

10     80.    Notably, Assurant's public filings indicate that approximately 40% of its force-
11 placed insurance division's revenue is allocated to pay for "general expenses." This category
12 includes commissions/referral fees paid to lenders and, further, in other lines of insurance,
13 overhead and expenses are usually a much smaller fraction of policyholder claims. *See Id.*

14     81.    Indeed, industry analysts have opined that referral fees, commissions and other
15 payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to
16 borrowers, is higher — implying paydays for servicers amounting to hundreds of millions of
17 dollars per year. *Id.*

18     82.    Thus, Defendants' kickback arrangements with force-placed insurance providers
19 tend to keep premiums for force-placed insurance artificially inflated over time because a
20 percentage of borrowers' premiums are not actually being paid to cover actual risk, but are
21 simply funding illegal kickbacks to lenders. Amounts paid to servicers as sham reinsurance
22 premiums and commissions have become a part of the cost of doing business for force-placed
23 insurance providers. As a result, force-placed insurance premiums incorporate the payment of
24 such kickbacks—to the detriment of consumers.

25     83.    Defendants' conduct has threatened and, indeed, stifled competition. As the
26 NAIC recently opined when asked whether pricing in the area of force-placed insurance industry
27 is competitive, servicers have "no incentive to select a competitively priced product, but instead

28                                                18
CLASS ACTION COMPLAINT

1  would be more concerned with selecting one they know best protects the bank's interests or one

2  where they are provided with an incentive or inducement to enter into the transaction." *See* Ties

3  to Insurers, *supra*.

4  CLASS ACTION ALLEGATIONS

5      84.   Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and

6  23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes:

7
8
9
10
> a nationwide class consisting of all persons who have or had a residential mortgage loan or line of credit with JPMorgan, Chase Bank or Chase Home Finance and had hazard insurance force-placed upon the secured property by JPMorgan, Chase Bank or Chase Home Finance, between June 16, 2007[3], and the date of final disposition of this action; and

11
12
13
14
> a California subclass consisting of all persons who have or had a residential mortgage loan or line of credit with JPMorgan, Chase Bank or Chase Home Finance secured by property located in the State of California and had hazard insurance force-placed upon the secured property by JPMorgan, Chase Bank or Chase Home Finance between June 16, 2007, and the date of final disposition of this action.

15
16      85.   The Classes exclude Defendants and any entity in which Defendants have a

controlling interest, and their officers, directors, legal representatives, successors and assigns.

17      86.   The Classes are so numerous that joinder of all members is impracticable.

18      87.   A Class action is superior to all other available methods for the fair and efficient

19  adjudication of this controversy.

20      88.   Plaintiff's claims are typical of the claims of the Classes.

21      89.   There are questions of law and fact common to the Classes, including but not

22  limited to:

23
24

25  [3] Plaintiff reserves her right to seek modification of the Class Period definition in the likely event

26  that further investigation/discovery reveals a more appropriate and broader time period.

27

28                          19

CLASS ACTION COMPLAINT

90.     Whether Defendants had captive reinsurance arrangements with force-placed insurance providers and, if so, whether such arrangements involved sufficient transfer of risk and whether premiums ceded under such arrangements were *bona fide* compensation and solely for services actually performed;

(a)     Whether Defendants received commission payments from force-placed insurance providers;

(b)     Whether Defendants received payments from force-placed insurance providers that exceeded the value of any services actually performed;

(c)     Whether Defendants wrongfully backdated forced-placed insurance policies;

(d)     Whether Defendants' conduct constituted an unfair business practice;

(e)     Whether Defendants violated their implied covenant of good faith and fair dealing;

(f)     Whether Defendants have been unjustly enriched; and

(g)     Whether Defendants are liable to Plaintiff and the Classes for damages and, if so, the measure of such damages.

91.     These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Classes members.

92.     The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by Defendants.

93.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiff has no claims antagonistic to those of the Classes. Plaintiff has retained counsel competent and experienced in complex nationwide Classes actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Classes.

94.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

20

CLASS ACTION COMPLAINT

1       95. Class action status is also warranted under Rule 23(b)(1)(B) because the

2 prosecution of separate actions by or against individual members of the Classes would create a

3 risk of adjudications with respect to individual members of the Classes which would, as a

4 practical matter, be dispositive of the interests of the other members not parties to the

5 adjudications or substantially impair or impede their ability to protect their interests.

6       96. Class action status is also warranted under Rule 23(b)(2) because Defendants

7 have acted or refused to act on grounds generally applicable to the Classes, thereby making

8 appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes

9 as a whole.

10      97. Class action status is also warranted under Rule 23(b)(3) because questions of law

11 or fact common to the members of the Classes predominate over any questions affecting only

12 individual members, and a class action is superior to other available methods for the fair and

13 efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT ONE

### VIOLATION OF RESPA, 12 U.S.C. § 2607
### (ON BEHALF OF THE NATIONWIDE CLASS)

98. Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

99. Throughout the Class Period, Defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

100. The amounts received by Defendants through their arrangements with force-placed insurance providers constituted "things of value" within the meaning of RESPA § 2602(2).

21

CLASS ACTION COMPLAINT

1     101.    Pursuant to captive reinsurance arrangements, Defendants arranged for an
2   unlawfully excessive split of borrowers' premiums to be ceded to Defendants' captive reinsurer
3   under carefully crafted excess of loss reinsurance agreements.

4     102.    Further, pursuant to pre-arranged commission agreements with force-placed
5   insurance providers, Defendants arranged to receive and did, in fact, receive commission
6   payments from force-placed insurance providers.  Upon information and belief, such commission
7   payments were based upon a percentage of the premiums charged to borrowers for force-placed
8   insurance coverage.

9     103.    The reinsurance premiums and commission payments Defendants accepted from
10   force-placed insurance providers: (a) were not for services actually furnished or performed;
11   and/or (b) exceeded the value of such services.

12     104.    Further, such amounts constituted fees, kickbacks or things of value pursuant to
13   agreements with force-placed insurance providers that business incident to real estate settlement
14   services involving federally-related mortgage loans would be referred to such insurers.  Such
15   practice violated RESPA, 12 U.S.C. 2607(a).

16     105.    Plaintiff and the Class members were, in fact, harmed by Defendants' unlawful
17   kickback scheme.

18     106.    First, Plaintiff and the Class members were, as a matter of law, entitled to
19   purchase settlement services from providers that did not participate in unlawful kickback and/or
20   fee-splitting schemes.  Congress has expressly provided for private enforcement of this protected
21   right by empowering consumers to recover statutory damages from offending parties without
22   proof of an overcharge.  The plain, unambiguous language of RESPA section 8(d)(2) indicates
23   that damages are based on the settlement service amount with no requirement that there have
24   been an overcharge.    Plaintiff alleges that Defendants have accepted unlawful kickback
25   payments and/or an unearned portion of settlement service charges in violation of RESPA—
26   allegations and claims completely distinct and separate from whether the price they paid for
27   settlement services was excessive.

28                                    22

CLASS ACTION COMPLAINT

1    107.    Second, through not necessary to prevail on their claims, Plaintiff and the Class
2    members were, in fact, overcharged for force-placed insurance.    Congress has already
3    determined that the *aggregate* effect of an unlawful kickback/referral arrangement is to
4    unnecessarily inflate the costs consumers pay for real estate settlement services and/or reduce
5    competition among settlement service providers.    Thus, kickbacks and unearned fees
6    unnecessarily and artificially inflate settlement service charges. Under Defendants' scheme, the
7    force-placed insurance premiums paid by Plaintiff and the Class necessarily and wrongly
8    included payments for both: (a) actual insurance services; and (b) payments unlawfully kicked
9    back to Defendants' captive reinsurer that far exceeded the value of any services performed and,
10   were also, in fact, illegal referral fees.

11   108.    Defendants therefore violated RESPA, 12 U.S.C. 2607.  Pursuant to RESPA, 12
12   U.S.C. 2607(d), Defendants are liable to Plaintiff and the Class members in an amount equal to
13   three times the amounts they have paid or will have paid for force-placed insurance as of the date
14   of judgment.

15   109.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiff also seeks attorneys' fees
16   and costs of suit.

17                                    **COUNT TWO**

18                              **BREACH OF CONTRACT**
     **(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
19                      **ON BEHALF OF THE NATIONWIDE CLASS)**

20   110.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they
21   were fully set forth herein.

22   111.    Every contract contains an implied covenant of good faith and fair dealing.

23   112.    The mortgage contracts of Plaintiff and the Class members contained an implied
24   covenant of good faith and fair dealing, pursuant to which Defendants were bound to perform
25   their obligations in good faith and to deal fairly with Plaintiff and the Class members.

26   113.    To the extent that the mortgage contracts of Plaintiff and the Class members
27   permitted Defendants to unilaterally "force-place" insurance, Defendants were obligated not to

28                                          23

CLASS ACTION COMPLAINT

1 exercise their discretion to do so capriciously and in bad faith (for their own financial gain for
2 the purposes of maximizing profits at borrowers' expense.

3     114. Defendants breached their duties of good faith and fair dealing in at least the
4 following respects, among others:

5          A.     Failing to make any effort whatsoever to maintain borrowers' existing
6 insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing
7 borrowers to pay for insurance policies from providers of Defendants' choice. These policies
8 needlessly came with substantially greater premiums, while providing less coverage than
9 borrowers' existing policies;

10          B.     Using their discretion to choose a force-placed insurance provider and
11 policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully
12 forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the
13 property and (ii) the cost of the commissions/reinsurance premiums Defendants accepted from
14 the force-placed insurance provider;

15          C.     Failing to seek competitive bids on the open market and instead selecting
16 force-placed insurance providers according to pre-arranged secret deals whereby the insurance
17 policies are continually purchased through the same companies;

18          D.     Assessing excessive, unreasonable, and unnecessary insurance policy
19 premiums against Plaintiff and Class and misrepresenting the reason for the cost of the policies;

20          E.     Collecting a percentage of the force-placed premiums charged to Plaintiff
21 and the Class and not passing that percentage on to the borrower, thereby creating the incentive
22 to seek the highest-priced premiums possible;

23          F.     Accepting purported reinsurance premiums and/or commissions in return
24 for placing borrowers with force-placed insurance providers, despite the fact that Defendants
25 actually incur, if any, expense because: (i) the force-placed insurance policies are automatically
26 issued pursuant to pre-arranged agreements with providers; and/or (b) Defendants' captive
27 reinsurance agreements provide for little or no actual transfer of risk;

28                                          24
CLASS ACTION COMPLAINT

G.    Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

H.    Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss Payable Endorsement;

I.    Procuring force-placed insurance policies to cover time periods during the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

J.    Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a commission and/or captive reinsurance arrangement.

115.    As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class members have suffered damages.

116.    Plaintiff and the Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

**COUNT THREE**

**BREACH OF CONTRACT**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

117.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

118.    Defendants have serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

119.    To the extent that the mortgage contracts of Plaintiff and the Class permitted Defendants to unilaterally "force-place" insurance, Defendants were contractually permitted to do so only to the extent reasonably necessary to protect the mortgagee's interest in the secured property.

25

CLASS ACTION COMPLAINT

1       120.   Nonetheless, Defendants have imposed or collected amounts that exceeded the

2 amounts necessary to protect the mortgagee's interest in the policy. Such practices have

3 included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds

4 the amount necessary to protect the mortgagee's interest in the secured; (b) backdating force-

5 placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the

6 fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring

7 borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss

8 Payable Endorsement that already protects the lender's interest in the property.

9       121.   Defendants have thus breached the mortgage contracts of Plaintiff and the Class

10 members.

11      122.   Plaintiff and the Class members have been damaged as a direct and proximate

12 result of Defendants' breach and are entitled to damages.

13 **COUNT FOUR**

14
15 **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
(VIOLATION OF BUSINESS AND PROFESSIONAL CODE §§ 17200 *ET SEQ.* ON
BEHALF OF THE PROPOSED CALIFORNIA SUBCLASS)**

16      123.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they

17 were fully set forth herein.

18      124.   Throughout the Class Period, Defendants have regularly conducted business

19 throughout the State of California.

20      125.   California Business & Professions Code §§ 17200 *et seq.* prohibits acts of unfair

21 competition, including any "unlawful, unfair or fraudulent business act or practice."

22      126.   Defendants engaged in unfair, unlawful or fraudulent business acts and practices

23 in violation of California Business & Professions Code §§ 17200, et seq., in that: (a) Defendants'

24 conduct is unlawful in that it is in violation of RESPA; (b) Defendants' practices and conduct are

25 immoral, unethical, oppressive and substantially harmful to Plaintiff and the members of the

26 Class; (c) the justification for Defendants' practices and conduct is outweighed by the gravity of

27 the injury to Plaintiff and the Class; (d) Defendants' practices constitute unfair, fraudulent,

28 26

1  untrue or misleading actions in that such conduct is likely to deceive and, in fact, did deceive

2  members of the public.

3      127.  Defendants' unlawful, unfair, and/or fraudulent business practices are described

4  herein and include, without limitation:

5      A.    Failing to make any effort whatsoever to maintain borrowers' existing

6  insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing

7  borrowers to pay for insurance policies from providers of Defendants' choice.  These policies

8  needlessly came with substantially greater premiums, while providing less coverage than

9  borrowers' existing policies;

10      B.    Using their discretion to choose a force-placed insurance provider and

11  policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully

12  forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the

13  property and (ii) the cost of the commissions/reinsurance premiums Defendants accepted from

14  the force-placed insurance provider;

15      C.    Failing to seek competitive bids on the open market and instead selecting

16  force-placed insurance providers according to pre-arranged secret deals whereby the insurance

17  policies are continually purchased through the same companies;

18      D.    Assessing excessive, unreasonable, and unnecessary insurance policy

19  premiums against Plaintiff and the Class and misrepresenting the reason for the cost of the

20  policies;

21      E.    Collecting a percentage of the force-placed premiums charged to Plaintiff

22  and the Class and not passing that percentage on to the borrower, thereby creating the incentive

23  to seek the highest-priced premiums possible;

24      F.    Accepting purported reinsurance premiums and/or commissions in return

25  placing borrowers with force-placed insurance providers, despite the fact that Defendants

26  actually incur, if any, expense because: (i) the force-placed insurance policies are automatically

27

28                                    27

CLASS ACTION COMPLAINT

1 issued pursuant to pre-arranged agreements with providers; and/or (b) Defendants' captive
2 reinsurance agreements provide for little or no actual transfer of risk;

3         G.     Backdating force-placed insurance policies to cover time periods which
4 have already passed and for which there is absolutely no risk of loss;

5         H.     Procuring force-placed insurance policies to cover time periods during the
6 mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement;

7         I.     Misrepresenting in their force-placed insurance notices that borrowers
8 were obligated to pay for backdated insurance coverage for periods during which the lender had
9 no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss
10 Payable Endorsement;

11         J.     Purchasing force-placed insurance coverage through and/or from related
12 entities at inflated premiums instead of through disinterested brokers and/or insurance carriers,
13 thereby depriving borrowers of the benefit of price competition;

14         K.     Failing to provide borrowers with any opportunity whatsoever to opt out
15 of having their force-placed insurance policies provided by an insurer with whom Defendants
16 had a commission and/or captive reinsurance arrangement; and

17         L.     Engaging in other unfair and/or unlawful conduct as described in this
18 Complaint.

19     128.     The foregoing acts and practices have detrimentally impacted competition and
20 caused substantial harm to Plaintiff and the members of the Class. Plaintiff has suffered injuries
21 in fact and has lost money or property as a result of Defendants' conduct.

22     129.     By reason of the foregoing, Defendants should be required to pay damages in an
23 amount to be proven at trial, disgorge their illicit profits and/or make restitution to the Plaintiff,
24 the general public, and the members of the Class, and/or be enjoined from continuing in such
25 practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

26

27

28                                   28

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT FIVE

### UNJUST ENRICHMENT/DISGORGEMENT
### (ON BEHALF OF THE NATIONWIDE CLASS)

130. Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

131. Plaintiff and the members of the Class have conferred a substantial benefit upon Defendants which has been appreciated by Defendants. During the Class Period, Defendants have wrongfully collected millions of dollars in purported commission payments and reinsurance premiums and derived from the force-placed insurance premiums paid by Plaintiff and the putative Class members.

132. These payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and the members of the Class.

133. As a result of Defendants' unjust enrichment, Plaintiff and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

134. Further, Plaintiff and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## COUNT SIX

### DECLARATORY AND INJUNCTIVE RELIEF
### (ON BEHALF OF THE NATIONWIDE CLASS)

135. Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

136. On each cause of action stated above, Plaintiff and the Class will be irreparably injured in the future by the Defendants' misconduct.

29

CLASS ACTION COMPLAINT

1      137.    Plaintiff, on behalf of herself and all Class members, seeks a judgment declaring
2 that Defendants must cease the activities described herein, provide Class members with adequate
3 remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or
4 otherwise improper force-placed insurance premiums and provide for adequate procedures and
5 policies to ensure that Defendants' unlawful conduct does not continue.  Such policies and
6 procedures include, without limitation, that Defendants: (a) are prohibited from force-placing
7 insurance when the servicer knows or has reason to know that the borrower has a policy in effect
8 that meets the minimum requirement of the loan documents; (b) cannot force-place insurance
9 that is in excess of the replacement cost of the improvements on the mortgaged property; (c) are
10 prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity
11 in which they have an ownership interest; (d) are prohibited from splitting fees, giving or
12 accepting kickbacks or referral fees, or accepting anything of value in relation to the purchase or
13 placement of the force-placed insurance; (e) must make reasonable efforts to continue or
14 reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (f) must
15 purchase any force-placed insurance for a commercially reasonable price.

16      138.    Plaintiff and the Class members do not have a plain, adequate, speedy, or
17 complete remedy at law to address the wrongs alleged in this Complaint, and will suffer
18 irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory
19 relief is granted.

20      139.    By reason of the foregoing, Plaintiff and the Class members are entitled to
21 declaratory and injunctive relief as set forth herein.

22                **PLAINTIFF'S RESPA CLAIM IS TIMELY**

23      140.    Plaintiff McNeary-Calloway's RESPA claim is timely because, among other
24 reasons, Defendants subjected her to a force-placed insurance policy on or about September 5,
25 2010.  Notwithstanding the foregoing, to the extent that any of Plaintiff's or the putative Class
26 members' RESPA claims accrued prior to one year preceding the commencement of this action,
27 equitable tolling is available under RESPA and should apply.  Plaintiff and the members of the

28                    30
CLASS ACTION COMPLAINT

1 putative Class could not, despite the exercise of due diligence, have discovered the underlying
2 basis for their claims. Further, Defendants knowingly and actively concealed the basis for
3 Plaintiff's claims by engaging in a scheme that was, by its very nature and purposeful design,
4 self-concealing. For these reasons, any delay by the members of the putative Class whose claims
5 accrued prior to one year preceding the commencement of this action was excusable.

6      141.    Due to the complex, undisclosed and self-concealing nature of Defendants'
7 scheme to collect illegal kickbacks from force-placed insurance providers, Plaintiff and the
8 putative Class members whose RESPA claims accrued prior to one year preceding the
9 commencement of this action did not possess sufficient information or possess the requisite
10 expertise in order to enable them to discover the true nature of Defendants' unlawful kickback
11 arrangements.

12      142.    Plaintiff was able to discover the underlying basis for the claims alleged herein
13 only with the assistance of counsel and only following the well-publicized American Banker
14 exposé first published on November 10, 2010. *See* Ties to Insurers, *supra*. Prior to November
15 10, 2010, Plaintiff and the putative Class members had no basis upon which to investigate the
16 validity of any commission and/or reinsurance payments to Defendants and Defendants'
17 affiliates.

18      143.    Indeed, Plaintiff's and the putative Class members' delay was excusable because
19 they did not discover, and reasonably could not have discovered Defendants' conduct as alleged
20 herein absent specialized knowledge and/or assistance of counsel until, at the very earliest,
21 November 10, 2010, when the basis for Plaintiff's claim was exposed by American Banker.
22 Indicative of this is the fact that American Banker recently won a Society of American Business
23 Editors and Writers award for its investigative story published on November 10, 2010, exposing
24 mortgage servicers' previously secret force-placed insurance practices. *See, e.g.*, *American*
25 *Banker Wins Investigative Journalism Award*, American Banker (March 21, 2011), attached as
26 Exhibit I hereto.

27

28                                                    31

144.    Further, Defendants engaged in affirmative acts to conceal the facts and circumstances giving rise to the claims asserted herein. For example, in a form document sent to Plaintiff McNeary-Calloway, a substantially similar version of which was provided to the other Class members, Chase Home Finance stated:

> When Chase purchases insurance for you, an affiliate of Chase may receive an economic benefit. This may occur because the insurance company will transfer some or all of the risk under the policy to a Chase affiliate in return for a portion of the insurance premium. This is called reinsurance and may result in a financial gain to the Chase affiliate. The reinsurance agreement will not affect your insurance premium.

*See* Exhibit C, attached hereto. Defendants used such form documents to affirmatively mislead borrowers about Defendants' relationships with force-placed insurance providers and to represent that, rather than a kickback or unearned fee, any payments received from such providers were for actual services rendered and, further, had no impact upon the borrowers' costs.

145.    Plaintiff and the Class did not possess sufficient information to even put them on notice of the true nature of Defendants' captive reinsurance arrangements.    The average homebuyer is not an insurance expert. Simply being told that Defendants' selected force-placed insurance provider may "reinsure" with an affiliate of Defendants is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his/her rights under RESPA may be violated. Defendants intentionally designed any disclosure provided to its borrowers in such a manner as to conceal from them information sufficient to put them notice of the underlying basis for their claims.

146.    Additionally, information concerning Defendants' collection of kickbacks from force-placed insurance providers has not been publicly available. As American Banker noted, "banks do not report how much they collect from such payments," and, further, force-placed

CLASS ACTION COMPLAINT

1 insurance has been "historically an overlooked niche in the mortgage servicing industry." *See*
2 *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, *supra*.

3     147. Further, Plaintiff and the Class members would have been more than hard pressed
4 to fully discover the true contours of Defendants' multifarious scheme because, upon
5 information and belief, captive reinsurance companies are often not required to file with the
6 NAIC the type of detailed annual reports usually required of commercial insurance companies.
7 *See, e.g.,* Janis Mara, *Industry News, Wells Fargo, Citibank Under Investigation in Alleged*
8 *Kickback Schemes*, March 7, 2005, http://www.alta.org/indynews/news.cfm?newsID=2571
9 ("The annual reports and actuarial reports of Vermont captives are protected by the state's
10 confidentiality laws and cannot be accessed without a court order by anyone other than a
11 regulator."). Thus, even the most sophisticated borrower could not, for example, simply contact
12 the NAIC to obtain information on Defendants' affiliated captive reinsurer. One would need a
13 subpoena to obtain such information; and to obtain a subpoena, one would have to file a case.

14     148. Because of Defendants' actions and because of the nature of the reinsurance
15 scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing
16 despite exercising due diligence.

17     149. Any delay by the absent putative Class members is excusable and, accordingly,
18 Plaintiff and the Class contend that it would be inequitable for the Court to apply the one-year
19 limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the
20 claim of Plaintiff or any Class member.

21 **PRAYER FOR RELIEF**

22     WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and
23 in favor of Plaintiff and the Classes and award the following relief:

24     A. That this action be certified as a class action pursuant to Rule 23 of the Federal
25 Rules of Civil Procedure, declaring Plaintiff as representative of the Classes and Plaintiff's
26 counsel as counsel for the Classes;

27     B. That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

28                                       33

CLASS ACTION COMPLAINT

1      C.    Plaintiff and the Classes be awarded statutory damages pursuant to RESPA §

2  8(d)(2), 12 U.S.C. § 2607(d)(2);

3      D.    Compensatory, consequential, and general damages in an amount to be

4  determined at trial;

5      E.    Costs and disbursements of the action;

6      F.    Restitution and/or disgorgement of Defendants' ill-gotten gains, and the

7  imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

8      G.    Pre- and post-judgment interest;

9      H.    Reasonable attorneys' fees; and

10      I.    Such other and further relief as this Court may deem just and proper.

11                  **DEMAND FOR JURY TRIAL**

12  Plaintiff hereby demands a trial by jury as to all claims in this action.

13  Dated: June 20, 2011                      Respectfully submitted,

14

15                                 **KESSLER TOPAZ**
                               **MELTZER & CHECK, LLP**

16

17                                 Ramzi Abadou (Bar No. 222567)
                               580 California Street, Suite 1750

18                                 San Francisco, CA 94104
                               Telephone: (415) 400-3000

19                                 Facsimile: (415) 400-3001

20                                 -and-

21                                 Joseph H. Meltzer

22                                 Edward W. Ciolko
                               Terence S. Ziegler

23                                 Joseph A. Weeden
                               280 King of Prussia Road

24                                 Radnor, PA 19087
                               Telephone: (610) 667-7706

25                                 Facsimile: (610) 667-7056

26

27                                 **NIX PATTERSON & ROACH, LLP**
                               Jeffery J. Angelovich

28                                 34

Michael B. Angelovich
Brad Seidel
205 Linda Drive
Daingerfield, TX 75638
Telephone: (903) 645-7333
Facsimile: (903) 645-4415

**SALPETER GITKIN, LLP**
James P. Gitkin
Eric T. Salpeter
Museum Plaza – Suite 503
200 South Andrews Avenue
Fort Lauderdale, FL 33301
Telephone: (954) 467-8622
Facsimile: (954) 467-8623

*Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

35

CLASS ACTION COMPLAINT