**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou (SBN 222567)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

- and -

Edward W. Ciolko
Peter A. Muhic
Donna Siegel Moffa
Amanda R. Trask
Jesse C. Klaproth
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiffs*
*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| | Civil Action No. CV-11-03058-JCS |
| In Re JPMorgan Chase LPI Hazard Litigation | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      This is a proposed class action brought by Plaintiffs Patricia McNeary-Calloway, Colin MacKinnon, Terrie MacKinnon, Andrea North, Sheila M. Mayko, Patricia A. Leger, Leamon E. Leger, Jr,, Garry ("Mitch") Mitchell Varnes, Kathryn A. Varnes, Chad Knox, Leonard Jelks, Jr., Jack E. Brooks, Tami Brooks and Achikam Yogev (herein referred to collectively as "Plaintiffs") on behalf of all persons who have or had a residential mortgage loan or line of credit originated and/or serviced by Defendants JPMorgan Chase Bank, N.A. ("JPMorgan"), Chase Bank USA, N.A. ("Chase USA"), and/or non-Defendant Chase Home Finance, LLC[1] ("Chase Home Finance") (together "JPMorgan Chase") Chase Insurance Agency, Inc. ("CIA")[2] and Banc One Insurance Co. ("BOIC") (together with JPMorgan, Chase USA and Chase Home Finance, "Chase") and, in connection therewith were required to pay for lender-placed or "force-placed" hazard insurance policies provided by Assurant, Inc. ("Assurant, Inc."), American Security Insurance Company ("ASIC"), and Standard Guaranty Insurance Company ("SGIC") (together "Assurant") and/or other force-placed insurance provider subsidiaries of Defendant Assurant, Inc. (collectively, "Defendants") (the "Class").

2.      In this action, Plaintiffs challenge, as further described herein, Chase's practice of purchasing force-placed hazard insurance from Assurant and its subsidiaries, including ASIC and SGIC, pursuant to agreements that return a financial benefit to Chase or its affiliates that is unrelated to any contractual or other bona fide interest in protecting the lender's interest in the

---

[1]      Chase Home Finance, previously a wholly-owned subsidiary of Defendant JPMorgan, has served as the primary servicing unit for loans originated and/or acquired by affiliates of ultimate parent JPMorgan Chase & Co. On or about May 1, 2011, Chase Home Finance was merged with and into Defendant JPMorgan, with Defendant JPMorgan as the surviving entity. Accordingly, Defendant JPMorgan is named as a Defendant in this action both in its own capacity and as successor-in-interest to Chase Home Finance.

[2]      Chase Insurance Agency and JPMorgan Insurance Agency, Inc. merged on December 31, 2008. *See* Merger Agreement attached as Exhibit 1.

1

1    loan, and which results in unauthorized, unjustified and unfairly inflated costs to the borrower for

2    force-placed hazard insurance in violation of law.

3        3.    Defendants acted together to exploit Chase's ability to force-place insurance to

4    reap additional, unjustified profits in the form of fees, commissions, rebates, ceded reinsurance

5    premiums and other forms of consideration at the expense of borrowers whose hazard insurance

6    was force-placed. These fees and charges were not legitimately related to the cost of the force-

7    placed insurance or to the purposes for which force-placed insurance is purchased – to protect

8    the lender's interest in the property.

9        4.    As a condition to funding borrower's loan, JPMorgan Chase requires that

10   borrowers purchase and agree to maintain hazard insurance coverage on the secured property.

11   All Plaintiffs were required to obtain and maintain hazard insurance as a condition of their

12   mortgages.   *See, e.g.*, Patricia McNeary-Calloway Deed of Trust ("McNeary-Calloway

13   Mortgage") attached as Exhibit 2; Colin and Terry MacKinnon Deed of Trust ("MacKinnon

14   Mortgage") attached as Exhibit 3; Andrea North Deed of Trust ("North Mortgage") attached as

15   Exhibit 4; Sheila M. Mayko Mortgage ("Mayko Mortgage") attached as Exhibit 5; Leamon E.

16   Leger, Jr. and Patricia A. Leger Mortgage ("Leger Mortgage") attached as Exhibit 6; Gary

17   Mitchell Varnes, Jr. and Kathryn Varnes ("Varnes Mortgage") attached as Exhibit 7; Chad Knox

18   Mortgage ("Knox Mortgage") attached as Exhibit 8;  Leanord Jelks, Jr. Mortgage ("Jelks

19   Mortgage") attached as Exhibit 9; Jack E. Brooks and Tami J. Brooks Mortgage ("Brooks

20   Mortgage") attached as Exhibit 10; Achikam Yogev Mortgage ("Achikam Mortgage") attached

21   as Exhibit 11.

22       5.    When borrowers failed to maintain their hazard insurance policies, Defendants

23   replaced those policies with more expensive policies, known as "force-placed" or "lender-

24   placed" policies. Assurant, Inc., by one of its subsidiaries and/or affiliates, have entered into an

25   exclusive contract that establishes that Assurant, Inc., through its subsidiaries ASIC, provides

26   these policies pursuant to an exclusive contract. *See, e.g.*, Written Testimony of Robert A.

27                                    2

1    Segnini dated May 3, 2012 submitted to NYDFS, Financial Frauds & Consumer Protection

2    Division ("Chase NYDFS Testimony") at 4 attached hereto as Exhibit 12; *See also* Assurant,

3    Inc., 2012 Annual Report (Form 10-K), at 5 (Feb. 20, 2013) ("The majority of our lender-placed

4    agreements are exclusive.") ("Assurant 2012 10-K") attached as Exhibit 13.

5         6.    Chase forces the borrowers to pay for the force-placed policies by diverting the

6    monthly mortgage payments and/or debiting the borrowers' escrow accounts.

7         7.    Such policies almost always provide less coverage and are substantially more

8    costly than the borrowers' original policies, with the additional expense being directly related to

9    perverse incentives and lucrative financial benefits that are shared between Chase and Assurant.

10        8.    In some instances borrowers are charged retroactively for coverage before the

11   borrower is notified of the force-placement of the coverage.

12        9.    Further, such policies often provide unnecessary or duplicative coverage, because

13   they are improperly backdated to collect premiums for time periods during which the mortgagor

14   has absolutely no risk of loss.

15        10.   In addition, the premiums paid by and/or assessed to Plaintiffs and Members of

16   the Classes also included amounts not attributable to the cost of providing force-placed insurance

17   but, instead, constituted expenses associated with servicing all the loans serviced by JPMorgan

18   Chase.  For example, while loan servicers are compensated for tracking and monitoring loan

19   portfolios as part of their servicing agreements, many servicers have outsourced such portfolio

20   monitoring and tracking services to force-placed insurance providers, such as the Assurant

21   Defendants, at below market rates – effectively providing kickbacks to JPMorgan Chase in the

22   form of subsidies paid by force-placed borrowers.  The small percentage of borrowers who paid

23   for force-placed insurance shouldered the costs of monitoring JPMorgan Chase's entire loan

24   portfolio – effectively providing kickbacks to JPMorgan Chase in the form of subsidies paid by

25   borrowers whose insurance was force-placed.  *See* Testimony of Birny Birnbaum of Behalf of

26

27                                                3

28                                                    Case No. CV-11-03058-JCS
                                                     Consolidated Amended Class Action Complaint

1  the Center for Economic Justice for the Florida Office of Insurance Regulation (July 3, 2012),
2  attached hereto as Exhibit 14 ("Birnbaum Florida Testimony").

3      11.     Assurant, Inc. through its subsidiaries and affiliates, including ASIC and SGIC,
4  also agrees to reinsure the hazard insurance policies that it force-placed on behalf of JPMorgan
5  Chase with BOIC, a wholly owned subsidiary of JPMorgan Chase & Co. effectively funneling
6  money, in the form of ceded premiums to Chase.

7      12.     While reinsurance can, and often does, serve a legitimate purpose, here it does
8  not.

9      13.     BOIC is Assurant's exclusive provider of "reinsurance" for the insurance force-
10 placed on JPMorgan Chase borrowers. Pursuant to this reinsurance agreement, all force-placed
11 insurance policies assigned to JPMorgan Chase by Assurant, Inc. and/or ASIC and SGIC will be
12 reinsured with BOIC. *See* Chase NYDFS Testimony at 4. *See* Consent Order, In the Matter of
13 American Security Insurance Company, American Bankers Insurance Company of Florida, and
14 Assurant, Inc. at 6 ("NYDFS Consent Order") attached as Exhibit 15.

15     14.     The Reinsurance Agreements provide that the Assurant provider of force-placed
16 hazard insurance policies for JPMorgan Chase will return the lion's share - as much as 75% - of
17 the premiums charged to borrowers for the force-placed insurance to Chase by way of ceded
18 "reinsurance" premiums to BOIC. In effect, the ceded premiums represent a kickback to
19 JPMorgan Chase and a method for JPMorgan Chase and Assurant, Inc. to profit from the force-
20 placement of borrower's hazard insurance. JPMorgan Chase has earned approximately $600
21 million nationally through this reinsurance arrangement. *Id.*

22     15.     However, while BOIC purportedly provided reinsurance, it did not assume any
23 real risk, making those contracts illegitimate and designed solely for the purpose of funneling a
24 significant portion of the force-placed insurance premiums paid by borrowers back to JPMorgan
25 Chase.

26
27                                              4
28                                                    Case No. CV-11-03058-JCS
                                                    Consolidated Amended Class Action Complaint

1    16.    Borrowers have no say in the selection of the carrier or terms of the force-placed

2  insurance policies. Borrowers also have no opportunity to comparison-shop for force-placed

3  insurance policies. The terms and conditions of the insurance policy, as well as the cost of the

4  policy, are determined by the servicer and the insurer, rather than negotiated between the

5  borrower and the insurer. *See* Testimony of J. Robert Hunter, of the Consumer Federation of

6  America dated May 17, 2012 at 10 ("Hunter NYDFS Testimony") attached as Exhibit 16.

7    17.    For their part, servicers like JPMorgan Chase have no incentive to shop for the

8  best rate. Rather, servicers are financially motivated to refer borrowers to the provider that

9  offers the best financial benefit to the servicer in terms of commission and/or ceded reinsurance

10  premiums that are established as part of the secret arrangements between providers and affiliates.

11  Further, because the servicer's "commission" and/or reinsurance premium is directly tied to the

12  size of the policy, the servicer actually has an incentive to purchase the highest priced insurance,

13  an interest diametrically opposed to that of the borrower who is being charged for the insurance.

14  *See, e.g.*, Hunter NYDFS Testimony at 1.

15    18.    As noted by Birny Birnbaum

> [t]he incentives and potential for abuse in the administration of LPI are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI [lender placed insurance] is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage."

*See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services, attached as Exhibit 17

19.    Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance. For example, in its public filings, Assurant, Inc.—the nation's largest provider of force-placed

5

1   insurance policies and the parent of ASIC and SGIC—states that it establishes "long-term

2   relationships" with leading lenders and servicers and that the majority of its lender-placed

3   agreements are exclusive. *See* Assurant 2012 10-K at 5 ("The majority of our lender-placed

4   agreements are exclusive.").

5        20.   Servicers often go so far as to actually outsource their insurance processing to the

6   force-placed insurance provider. The provider then continuously monitors the servicer's

7   mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the

8   event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an

9   insurance certificate on the property on behalf of and for the benefit of the servicer. Thus, where

10   these servicers receive commissions from force-placed insurance providers (which are ultimately

11   charged to borrowers), they are performing no service for the commissions they receive other

12   than simply providing the referral. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage*

13   *Servicers in More Trouble*, American Banker (Nov. 10, 2010, 12:00 pm),

14   http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-028474-

15   1.html (referred to herein as "Ties to Insurers") (last visited Apr. 12, 2013).

16        21.   The web of relationships among the Defendants and the arrangements between

17   them served to funnel profits to Chase, Assurant, Inc., its subsidiaries and affiliates including

18   ASIC and SGIC, which were generated through their collusive activities. Each defendant

19   participated in the scheme with the knowledge and collusion of the other participants as

20   described in greater detail herein.

21        22.   As one journalist recently observed:

22           In the pantheon of modern-day mortgage abuses, force-placed
            insurance hasn't attracted much attention. But it generates

23           hundreds of millions of dollars a year in fees and commissions for
            insurance companies, banks and other financial institutions.

24           Policies are sometimes backdated to cover periods that have
            already passed.

25

26           In essence, critics say, high-priced insurance policies cover a time
            when no events happened. And often, the mortgage company and

27                            6

28                                       Case No. CV-11-03058-JCS

> the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that."

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star-Telegram (Oct. 1, 2011) attached as Exhibit 19.

23.     These very practices have drawn the scrutiny of state and federal bodies charged with the oversight of force-placed insurance. In October 2011, a number of mortgage servicers and insurers, including Defendants, received subpoenas from the New York Department of Financial Services ("NYDFS") with respect to lender-placed insurance activities dating back to September 2005. Assurant 2012 10-K at 31. In connection with these subpoenas, Defendants have produced thousands and thousands of pages to the NYDFS and provided both written and oral testimony for the NYDFS.

24.     The NYDFS conducted hearings on May 17, 18 and 21, 2012 during which the force-placed insurance practices of Defendants, their affiliates, subsidiaries and bank partners were among the topics addressed by witnesses and in written testimony. Superintendent Benjamin Lawsky noted in his opening statement that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums for force-placed insurance than regular homeowners insurance; 2) extraordinarily low loss ratios; 3) harm to distressed borrowers; 4) lack of competition in the market; 5) force-placed insurance has become a major profit center for both banks and insurers; and 6) "tight relationships between banks, their subsidiaries and insurers." As Superintendent Lawsky summarized the net result of these practices:

> Take the form of large commissions being paid by insurers to the banks for what appears to be very little. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.

*             *             *             *

7

> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions....

Opening Statement of Benjamin M. Lawsky, Superintendent of NYDFS, May 17, 2012 attached as Exhibit 20.

25.     The NYDFS heard testimony from several of the Defendants as well as noted experts in the course of its force-placed insurance investigation. *See, e.g.*, Chase NYDFS Testimony; Testimony of John Frobose, President of ASIC ("ASIC NYDFS Testimony") submitted to the NYDFS attached as Exhibit 21; Testimony of Birny Birnbaum on behalf of the Center for Economic Justice, Public Hearing on Force-Placed Insurance before the New York Department of Financial Services, May 21, 2012 ("Birnbaum NYDFS Testimony") attached as Exhibit 14.1 and Hunter NYDFS Testimony.

26.     As a result of its investigation, NYDFS found:

> that insurers and banks built a network of troubling relationships and payoffs that helped drive premiums sky high. Those improper practices created significant conflicts of interest and saddled homeowners, taxpayers, and investors with millions of dollars in unfair and unnecessary costs.
>
> *        *        *
>
> Indeed, even though banks and servicers are the ones who choose which force-placed insurance policy to purchase, the high premiums are ultimately charged to homeowners, and, in the event of foreclosure ...

*See* New York Department of Financial Services Press Release dated March 21, 2013 ("NYDFS March 21, 2013 Press Release") attached as Exhibit 22.

27.     The NYDFS investigation further found that these practices resulted in a market characterized by "reverse competition." The insurers competed by offering servicers and lenders a share in the profits, rather than by offering lower prices. *Id*

28.     As a result of the NYDFS investigation into force-placed insurance practices, the NYDFS and Assurant, Inc. and its subsidiaries ASIC and American Bankers Insurance Company

8

1  of Florida entered into a Consent Order pursuant to which Assurant, Inc. and its subsidiaries
2  agreed to make changes in their force-placed insurance practices and to reduce the rates charged
3  to Chase borrowers whose insurance was force-placed. Chase borrowers whose insurance was
4  force-placed will be entitled to restitution of a portion of the force-placed premium which they
5  paid. Assurant, Inc. and its subsidiaries also agreed to pay the sum of fourteen million dollars
6  ($14,000,000) to the NYDFS. *See* NYDFS Consent Order.

7       29.    The National Association of Insurance Commissioners ("NAIC") is the standard-
8  setting and regulatory support organization created and governed by the chief insurance
9  regulators from the 50 states, the District of Columbia and five U.S. territories. The NAIC
10  establishes standards and best practices, conducts peer review, and coordinates regulatory
11  oversight. Pursuant to these duties, NAIC also investigated the force-placed insurance industry
12  and found those practices so troubling that it held its own public hearings on August 9, 2012.
13  *See* NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules attached
14  hereto as Exhibit 23. The NAIC, like the NYDFS, found there to be enough troublesome
15  information regarding the force-placed insurance industry and its associated practices to warrant
16  its full attention.

17       30.    The NAIC includes a discussion of "reverse competition" and lender-placed
18  insurance on its website:

19      A key regulatory concern with the growing use of lender-placed
    insurance is "reverse competition," where the lender chooses the
20      coverage provider and amounts, yet the consumer is obligated to
    pay the cost of coverage. Reverse competition is a market
21      condition that tends to drive up prices to the consumers, as the
    lender is not motivated to select the lowest price for coverage since
22      the cost is born by the borrower. Normally competitive forces tend
    to drive down costs for consumers. However, in this case, the
23      lender is motivated to select coverage from an insurer looking out
24      for the lender's interest rather than the borrower.

25  http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm (last visited
26  Apr. 12, 2013).

27                                  9

28                             Case No. CV-11-03058-JCS
                         Consolidated Amended Class Action Complaint

31.     Throughout the Class Period, Defendants have engaged both individually and in concert with one another, unlawful, abusive and unfair practices with respect to force-placed insurance, including, among others and as described in further detail below: (a) force-placing insurance according to pre-arranged agreements between the Defendants at a substantially higher cost to the borrower than is necessary or commercially reasonable; (b) charging class members unreasonably high amounts for force-placed insurance, which amounts include unreasonable expenses unrelated to the provision of force-placed insurance and which result from collusion among Defendants and their affiliates which are involved in the force-placed insurance and "reinsurance" process; (c) receiving fees, payments, and unearned commissions in connection with the provision of force-placed insurance; (d) forcing borrowers to pay for duplicative insurance coverage; (e) forcing borrowers to pay for unnecessary insurance; (f) entering into captive reinsurance arrangements designed to funnel premiums to Defendants rather than as a vehicle to transfer risk and protect the interests of the lender; (g) improperly exploiting their ability to manage and gain access to escrow funds in breach of fiduciary obligations to increase profits to lenders, servicers and insurance providers; (h)  using the mail and wires to conduct a scheme to defraud Plaintiffs and the Class by taking advantage of the lender's contractual authority to force-place hazard insurance and to create and manage escrow funds; (i) misrepresenting that Defendants were force-placing hazard insurance on Plaintiffs and Class members' properties to secure their interests and failing to inform Plaintiffs and the Class that they were force-placing hazard insurance on their homes to not only protect the lender's interest, as contemplated by the mortgage contracts, but in such a manner as to generate an unreasonable and unwarranted profit for each of the Defendants in violation of the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(c); and (j) conspiring to take advantage of their contractual authority to force-place Plaintiffs' and Class members' hazard insurance pursuant to pre-arranged agreements that return an undisclosed and improper financial benefit to each Defendants, their affiliates and subsidiaries in violation of RICO, 18 U.S.C. 1962(d).  These

10

1  actions are not to be considered as individual, discreet actions, but rather as a part of a larger
2  scheme to extract unwarranted and improper profits from Class Members through Defendants'
3  force-placed insurance practices.

4      32.    Chase's unlawful actions executed in concert with the other defendants herein,
5  include as described in further detail below, *inter alia:* (a) designing and implementing a scheme
6  between itself and its affiliates to use its authority to force-place hazard insurance to generate
7  unjustified profits for itself and other scheme members which were not disclosed to borrowers
8  whose insurance was force-placed; (b) electing to purchase higher-priced insurance policies from
9  its exclusive force-placed insurance providers and fellow scheme member(s) for their mutual
10  benefit; (c) entering into pre-arranged collusive agreements to acquire high priced, force-placed
11  insurance from Assurant, Inc., ASIC, SGIC or their subsidiaries and/or affiliates thereby
12  diminishing any benefit to be gained by borrowers through open market or competitive
13  purchasing environment; (d) entering into pre-arranged agreements with fellow scheme members
14  designed to yield exorbitant force-placed insurance charges to class members in order to
15  maximize their own profits without any regard whatsoever for competitive pricing to the
16  detriment of borrowers; (e) working with fellow scheme members to backdate the force-placed
17  insurance policies to charge for retroactive and unnecessary coverage; (f) giving and receiving
18  "kickbacks" among scheme members in the form of purported fees, payments, unearned
19  commissions, "rebates" and/or other things of value from providers of force-placed insurance
20  (including Assurant, Inc., ASIC, SGIC and their subsidiaries and affiliates) for the procurement
21  of the force-placed policies (g) improperly exploiting their ability to manage and gain access to
22  escrow funds in breach of fiduciary obligations relating to the management of escrow funds in
23  order to increase profits to itself and fellow scheme members; (h) using and agreeing to the use
24  the mail and wires to execute a scheme to defraud borrowers through the force-placed insurance
25  scheme; (i) misrepresenting the reasons for the high cost of force-placed insurance to Plaintiffs
26  and Class members; (j) omitting to inform Plaintiffs and Class members that force-placed

27

11

28

insurance practices did not only protect its interest in Plaintiffs' and Class members' properties but also generated unwarranted profits for itself and fellow scheme members; (k) misrepresenting that force-placed hazard insurance costs more because it is provided without underwriting; and (l) conspiring with co-Defendants Assurant, Inc., SGIC, ASIC and their subsidiaries and/or affiliates to improperly profit from Chase's right to force-place Plaintiffs and Class members' hazard insurance. These actions constitute a pattern and scheme of exploitative profiteering and self-dealing engaged in by Chase and its Co-Defendants, acting in concert, against the interests of Plaintiffs and the Classes.

33.     Plaintiffs assert herein the following claims against Chase: (1) state/common law claims against Chase for breach of its contractual obligations, including its implied covenant of good faith and fair dealing, owed to Plaintiffs and the other Class members; (2) state/common law claims against Chase for breach its fiduciary duties/misappropriation of escrow funds held and managed by Chase for the purpose of paying Escrow Items in accordance with the terms of Plaintiffs' mortgages; (3) claims for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), as further described below; (4) claims for engaging in a conspiracy to defraud Plaintiffs and the Classes in violation of RICO 18 U.S.C §1962(d)(5) claims for violation of California Business & Professions Code ("UCL") §§ 17200, et seq.; (6) claims for violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:2 et seq.; (7) claims for violation of Florida Consumer Collections Practices Act ("FCCPA"); and (8) claims for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq.; Chase was an integral part of the force-placed insurance scheme described herein and was aware, at all times, of the roles and actions taken by other scheme members in pursuit of the improper goal of the scheme.

34.     Defendants Assurant Inc., SGIC and ASIC's unlawful actions include: (a) devising and colluding in Defendants' unlawful scheme to defraud Plaintiffs and the Classes; (b) aiding and abetting Chase's breach of fiduciary duty pursuant to which they sold unconscionably

12

1  high-priced, unnecessary and duplicative force-placed hazard insurance coverage and related
2  services, including tracking Chase's loan portfolio and binding and obligating Plaintiffs and
3  Class members, through the improper utilization of access to escrow funds, to pay for the
4  improper force-placed insurance to maximize Defendants' profits to the detriment of borrowers;
5  (c) using and agreeing to the use of mails and wires in furtherance of the scheme to defraud; (d)
6  misrepresenting the reasons for the high cost of force-placed insurance; (e) failing to inform
7  Plaintiffs and Class members that the scheme participants would be improperly profiting from
8  the force-placed insurance; (f) misrepresenting to Plaintiffs and Class Members that they were
9  authorized to force-place high cost, unnecessary, and duplicative insurance in the manner
10 described herein; and (g) conspiring with co-defendants BOIC and Chase Insurance Agency and
11 their subsidiaries and/or affiliates to improperly profit from Chase's right to force-place Plaintiffs
12 and Class members' hazard insurance. Assurant, Inc., ASIC and SGIC were aware, at all times,
13 of the true nature and purpose of the scheme described herein and took action, along with all
14 other Defendants, in furtherance of the improper goal of the scheme.

15      35.    Plaintiffs herein assert the following claims against Assurant, Inc., SGIC, ASIC
16 and their subsidiaries and affiliates: (1) claims for aiding and abetting Chase's breach of
17 fiduciary duty; (2) claims for violation of California Business & Professions Code §§ 17200, *et*
18 *seq.*; (3) claims for violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:2 *et seq.* ; (4)
19 claims for violation of Florida Consumer Collections Practices Act;  and (5) claims for violation
20 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;
21 (6) claims for using the mail and wires to execute a scheme to defraud Plaintiffs and the Classes
22 in violation of RICO, 18 U.S.C. § 1962 (c) and claims under 18 U.S.C. §  1962(d) for conspiring
23 with Chase to devise and execute a scheme to defraud Plaintiffs and the Classes; and (7)
24 Sate/common law claims for restitution/unjust enrichment and disgorgement and declaratory
25 relief.  Assurant, Inc. SGIC and ASIC knowingly participated in the scheme described herein

26

27                                                    13

28

1 and, along with all other Defendants, and took action in furtherance of the improper goal of the
2 scheme.

3      36.    In this action, Plaintiffs do not challenge the rates of their force-placed hazard
4 insurance as excessive. Rather, Plaintiffs challenge, among other things, and as further described
5 herein, Defendants' *decision to purchase* force-placed hazard insurance from insurers that
6 provide a financial benefit to Defendants and/or their affiliates and at rates that far exceed
7 borrower-purchased hazard insurance (while providing substantially less coverage) and seek
8 statutory and compensatory damages, as well as restitution/disgorgement for Defendants' unjust
9 enrichment.

10      37.    Defendants' scheme required the participation, knowledge and cooperation of
11 each of the Defendants. The task of each individual Defendant was streamlined due to the close
12 relationship of each of the Defendants and each task was calculated to effectuate the scheme in
13 an efficient manner, maximizing the benefits that could be achieved through the scheme.
14 Further, each Defendant affirmatively acted to conceal the true nature and purpose of the scheme
15 from borrowers and regulators alike, while also purposefully choosing not to act when such
16 action would expose the true nature and purpose of the scheme to borrowers and regulators.

17      38.    In all respects, this conduct attributable to all Defendants herein is without
18 justification, serving only to enrich Defendants at a significant cost to the borrowers who were
19 required to purchase force-placed insurance.

20                         **JURISDICTION AND VENUE**

21      39.    This Court has jurisdiction over the subject matter of this action pursuant to 18.
22 U.S.C. §§ 1961, 1962 and 1964. This Court has original diversity jurisdiction pursuant to the
23 Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiffs are citizens of different
24 states. Defendants are citizens of different states. The amount in controversy in this action
25 exceeds $5,000,000, and there are more than 100 members in the Classes.

26

27                             14

28                                           Case No. CV-11-03058-JCS
                                 Consolidated Amended Class Action Complaint

40.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

41.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiff McNeary-Calloway's mortgage loan transaction is located in this district, Plaintiff McNeary-Calloway resides in this district, Defendants regularly conduct business in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

**Plaintiffs**

### Patricia McNeary-Calloway

42.     Plaintiff Patricia McNeary-Calloway resides in Oakland, CA.   On or about September 13, 2007, Ms. McNeary-Calloway and her husband, James B. Calloway, Jr., obtained a $540,000 refinance mortgage loan from Chase Bank, secured by their primary residence. *See* McNeary-Calloway Mortgage.

43.     In connection with their mortgage loan, Ms. McNeary-Calloway and her husband obtained a hazard insurance policy from California Casualty with an annual premium of $1,640.00.   The policy provided the following coverage: (a) dwelling--$341,000; (b) other structures--$34,100; (c) personal property--$170,500; (d) loss of use--$102,300. *See* Exhibit 24.

### Ms. McNeary-Calloway's First Force-Placed Insurance Policy

44.     On July 4, 2009, Mr. Calloway passed away due to complications from a serious illness.   During Mr. Calloway's illness and following his death, Ms. McNeary-Calloway faced financial   difficulties   and   had   trouble   making   her   homeowner's   insurance   payment. Consequently, her hazard insurance policy lapsed effective August 26, 2009.

45.     Subsequently, on or about January 8, 2010, Chase Home Finance purchased a one-year insurance policy with ASIC, backdated to August 26, 2009, with an annual premium of $4,233 that was charged to Ms. McNeary-Calloway's escrow account.   The policy was

15

1  backdated, despite the fact that there was no damage to the property or claims arising out of the
2  property for the lapse period.

3      46.    Notably, while the premium for the force-placed insurance policy was 2 and ½
4  times the amount of her prior premium, the policy provided substantially less coverage, in that it
5  covered only the structure of the home.

6      47.    Chase Home Finance then established for Ms. McNeary-Calloway an escrow
7  account with an initial balance of negative $4,233. Additionally, Chase Home Finance added
8  $887 to Ms. McNeary-Calloway's monthly payment, raising it from $2,716 to approximately
9  $3600 per month.

10              **Ms. McNeary-Calloway's Second Force-Placed Insurance Policy**

11     48.    In September 2010, Ms. McNeary-Calloway received from Chase Home Finance
12 "Insurance Processing Center" a letter dated September 5, 2010, entitled "Notice of Placement of
13 Insurance," a copy of which is attached as Exhibit 25. The letter stated that, effective August 26,
14 2010, Chase Home Finance had renewed the force-placed insurance policy with ASIC for
15 another year, with a premium of $4,233, again charged to Ms. McNeary-Calloway's escrow
16 account. A copy of the force-placed insurance policy is attached as Exhibit 26.

17     49.    Following receipt of the September 5, 2010 letter entitled "Notice of Placement of
18 Insurance," Ms. McNeary-Calloway obtained her own insurance policy from Farmers Insurance
19 Group with an annual premium of $1,103. The Farmers policy provided the following coverage:
20 (a) dwelling--$341,000; (b) other structures--$34,100; (c) personal property--$255,750; (d) loss
21 of use--$136,400; (e) medical payment to others--$1,000/person; (f) personal liability--
22 $300,000/occurrence; (g) extended replacement cost--$85,250; and (h) identify fraud--$30,000.
23 The policy's effective date is September 1, 2010. *See* Exhibit 27.

24     50.    After receiving notice of this policy, Chase Home Finance sent a letter to Ms.
25 McNeary-Calloway, stating that it had canceled the force-placed insurance policy effective
26 September 1, 2010, but charged Ms. McNeary-Calloway's escrow account for the lapse period of

27                                        16

28                                                    Case No. CV-11-03058-JCS
                                            Consolidated Amended Class Action Complaint

1  August 26, 2010 (date the first force-placed policy expired) to September 1, 2010 (date Ms.
2  McNeary-Calloway's policy began). *See* Exhibit 28.

3  **Colin and Terrie MacKinnon**

4  51.    Plaintiffs Colin and Terrie MacKinnon, husband and wife (the "MacKinnons"),
5  reside in San Diego, California. The MacKinnons purchased their home in 1994 with a loan
6  from Royal Bank of Canada. In July 2005, they refinanced through an online mortgage broker
7  and Chase Home Finance purchased the loan very shortly after closing. *See* the Mackinnon
8  Mortgage.    The MacKinnons had a homeowners' insurance policy through AAA with
9  Interinsurance Exchange of the Automobile Club with an annual premium of $440. *See* Exhibit
10  29.

11  52.    Unbeknownst to them, the MacKinnons' homeowners' insurance policy lapsed on
12  July 20, 2008. The MacKinnons believe that the lapse was due to a computer error on the part of
13  AAA.

14  53.    On November 5, 2010, Chase Home Finance sent to the MacKinnons a document
15  entitled "Notice of Placement of Hazard Insurance." The notice stated that a lender-placed
16  policy had been purchased from ASIC with an annual premium of $1,782, backdated to cover the
17  period between August 18, 2009 and August 18, 2010. A copy of the policy was included. *See*
18  Exhibit 30.

19  54.    While the MacKinnons do not recall seeing this notice at the time, they
20  discovered the lapse in their homeowners' insurance in December 2010 when they visited a local
21  AAA branch office to address an issue with one of their automobiles. Once they discovered the
22  lapse in their insurance coverage in December 2010, they immediately reinstated their policy,
23  effective December 10, 2010.

24  55.    In January 2011, the MacKinnons noticed two substantial charges to their escrow
25  account for force-placed homeowners' insurance. Specifically, on October 27, 2010, Chase
26  Home Finance charged the MacKinnons a premium of $1,782 for a force-placed insurance policy

27

28

17

1  backdated to cover the period from August 18, 2009 to August 18, 2010. Just three days later, on

2  October 30, 2010, Chase Home Finance charged the MacKinnons a premium of $1,782 for a

3  force-placed insurance policy backdated to cover the period from August 18, 2010 to August 18,

4  2011. *See* Exhibit 31.

5       56.    Once Chase Home Finance received proof of the MacKinnons' insurance policy,

6  reinstated as of December 10, 2010, it provided a pro-rated refund of $1,226.00 for the period of

7  December 10, 2010 through August 18, 2011. *See* correspondence dated March 9, 2011,

8  attached as Exhibit 32. Accordingly, the MacKinnons were charged a total of at least $2,338 for

9  force-placed insurance policies – the great majority of which was retroactive coverage for a

10  period Defendants knew or should have known resulted in no damage from which a claim would

11  be made.

12       57.    After being charged for the force-placed insurance policies, the MacKinnons fell

13  behind on their mortgage. After unsuccessfully attempting to obtain a suitable loan modification

14  from Chase Home Finance, the MacKinnons eventually paid Chase Home Finance by obtaining

15  a reverse mortgage through MetLife.

16      **Andrea North**

17       58.    Plaintiff Andrea North resides in Yorba Linda, CA. On or about April 3, 2008,

18  Ms. North obtained a loan from JPMorgan for the purchase of her home.[3] Ms. North obtained a

19  homeowner's insurance policy from State National Insurance Co. with an annual premium of

20  $1,084. However, after Ms. North became seriously ill in 2009, her homeowner's insurance

21  policy was canceled effective April 23, 2009 for non-payment of the premium. *See* Exhibit 33.

22       59.    On December 8, 2009, Chase Home Finance charged Ms. Woo and Ms. North

23  $5,377 (*see* Exhibit 34) for a force-placed insurance policy from ASIC, backdated to April 23,

24

25  [3]    Ms. North's mother, Helen Woo, was a co-signer on the note, but was not a party to the

26  mortgage contract.

27               18

28                                  Case No. CV-11-03058-JCS

1 │ 2009. Ms. North's force-placed insurance policy was backdated, despite the fact that there was
2 │ no damage to the property or claims arising out of the property for the lapse period.

3 │     60.    On May 2, 2010, Chase Home Finance sent to Ms. Woo and Ms. North a letter
4 │ stating that it had renewed the policy for another $5,377, effective April 23, 2010. *See* Exhibit
5 │ 35.

6 │     61.    Subsequently, Ms. Woo and Ms. North obtained their own insurance policy from
7 │ Towers Select Insurance Co., effective as of June 8, 2010, for an annual premium of $1,134 (*see*
8 │ Exhibit 36) and refinanced their loan with JPMorgan.

9 │     62.    Chase Home Finance canceled the second force-placed policy effective June 8,
10 │ 2010, but did not refund the initial $5,377 for the first force-placed policy or the amount charged
11 │ for the second force-placed policy in effect from April 23, 2010 until June 8, 2010. *See* Exhibit
12 │ 37.  On or about January 21, 2011, Ms. North refinanced her JPMorgan loan with American
13 │ Internet Mortgage, Inc. and paid to JPMorgan the outstanding balance of her loan, including the
14 │ amounts charged for force-placed insurance.

15 │ **Sheila M. Mayko**

16 │     63.    Plaintiff Sheila M. Mayko resides in Riverside, NJ.  On or about January 11,
17 │ 2002, Mayko and her husband at that time, James Nichols, purchased a residence in Riverside,
18 │ NJ with a loan obtained from Chase Manhattan Mortgage Corporation.  On or about June 30,
19 │ 2003, Mayko and Nichols obtained a $135,209.00 refinance loan with Chase Bank secured by
20 │ their property. *See* Mayko Mortgage.

21 │     64.    On August 10, 2009, Ms. Mayko and Nichols stopped making principal, interest
22 │ and escrow payments on their mortgage.

23 │     65.    When the 2010 hazard insurance premium payment of $1,064.00 became due in
24 │ January 2010, Ms. Mayko's escrow account had a negative balance.  Thus, the insurance
25 │ premium payment was not made from the escrow account.

26 │
27 │                     19
28 │

66. On January 19, 2010, Ms. Mayko's hazard insurance company (Preferred Mutual Insurance Company) sent a notice of cancellation stating that the policy would be cancelled effective February 23, 2010 if payment was not made. *See* Mayko Cancellation Notice, attached as Exhibit 38.

67. On January 26, 2010, Chase paid Mayko's annual premium of $1064.00 to Preferred Mutual from Mayko's escrow account, leaving that account with a negative balance. *See* Mayko Account Statement, attached as Exhibit 39. The Preferred Mutual policy provided $328,000 of coverage on Mayko's dwelling, $32,000 on other structures, $229,600 of coverage on Mayko's personal property and $300,000 in personal liability insurance, among other items. *See* Preferred Mutual Homeowners Declaration, attached as Exhibit 40.

68. Chase Home Finance was the servicer of Ms. Mayko's loan.

69. Nonetheless, although the property was already adequately insured, sometime in April 2010 Chase force-placed coverage with its preferred carrier.

70. On July 23, 2010, Chase Home Finance sent to Ms. Mayko a letter informing her that it had force-placed a one-year home owner's insurance policy on her property with ASIC with a premium of $3,177.34, a cost nearly three times the premium of the prior insurance. The insurance premium payment was charged against Ms. Mayko's escrow account. *See* Mayko Force-Placed Notice, attached at Exhibit 41.

71. Notably, while the premium for the force-placed insurance policy was three times Ms. Mayko's prior premium, the policy provided substantially less coverage, because it only protected Chase Home Finance and only covered the structure of the home.

72. Additionally, Mayko's dwelling was insured for precisely the same amount under the force-placed policy as it was under Mayko's existing policy ($328,000). This fact alone confirms that the prior insurance coverage was adequate to protect Chase and the mortgage holder, while at the same time suggesting that ASIC did nothing to evaluate its risk, aside from continuing the same coverage on the structure at three times the price.

20

73.   Moreover, although the policy was not purchased until July 23, 2010, it was backdated to May 13, 2010, notwithstanding the fact that there was no damage to the property or claims arising out of the property for that period.

74.   In an attempt to save her home from foreclosure, Mayko began the process of seeking a home loan modification.  By December 2010, Mayko completed a loan modification application with Chase Home Finance.

75.   On or about February 14, 2011, while the loan modification application was pending, Nichols transferred his ownership in 200 Heulings Avenue to Ms. Mayko via a quitclaim deed.  *See* Quitclaim Deed, attached as Exhibit 42.

76.   On March 4, 2011, Chase informed Ms. Mayko that her application for a loan modification had been accepted and sent Ms. Mayko a loan modification agreement.  Under the loan modification agreement, the unpaid principal was stated as $123,122.31.

77.   The modification also added to that unpaid principal balance roughly $11,754.51 for advances from her escrow fund.  The escrow account advances included $3,177.34 that was paid by Chase for the force-placed insurance premium on July 17, 2010.

**Patricia and Leamon Leger**

78.   Plaintiffs Patricia A. Leger and Leamon E. Leger, Jr. are husband and wife "(the Legers"), and reside in the State of Florida.

79.   On or about June 15, 2007, the Legers obtained a $100,000 mortgage loan from Chase.  *See* the Leger mortgage.

80.   As required by their mortgage loan, the Legers maintained a hazard insurance policy that was eventually canceled and which provided dwelling coverage, as well as coverage for personal property, loss of use, personal liability, and medical payments.

81.   Subsequently, on or about September 27, 2009, Chase Home Finance purchased a one-year insurance policy with ASIC, backdated to January 14, 2009, with an annual premium of $3,808.76 charged to the Legers' escrow account.  The policy was backdated despite the fact that

21

1 there was no damage to the property and/or claims arising out of the property for the lapse
2 period.

3      82.    Notably, while the premium for the force-placed insurance policy was nearly
4 double the Legers' prior premium, the policy provided substantially less coverage, in that it
5 covered only the structure of the home.

6      83.    Chase Home Finance amortized the premium, raising the Legers' monthly
7 payment.

8      84.    On January 19, 2010, Chase Home Finance renewed the force-placed insurance
9 policy with ASIC for another year, with another premium of $3,808.26, and again charged to the
10 Legers' escrow account.

11      85.    The Legers had been paying their mortgage through ACH, which debited the
12 payments out of a bank account the Legers had with Wachovia Bank. As of August 4, 2009, the
13 ACH debits were in the amount of $719.03. However, on April 5, 2010, Defendants debited
14 $1,735.48 out of Plaintiffs' Wachovia Bank account.

15      86.    On July 28, 2010, the Collection Department of Chase Home Finance wrote to the
16 Legers stating that they were in default, they would have to pay $3,569.51 by September 2, 2010
17 in order to cure the default, and that it would accelerate the maturity of the loan, declare all sums
18 secured immediately due and payable, and commence foreclosure proceedings without further
19 notice, which would also entitle it to collect expenses, including foreclosure/attorney fees. A
20 copy of the July 28, 2010 letter is attached as Exhibit 43.

21      87.    On August 4, 2010, the Collection Department of Chase Home Finance again
22 wrote to the Legers stating that they were in default, demanding $3,569.51. A copy of the
23 August 4, 2010 letter is attached as Exhibit 44.

24      88.    On January 18, 2011, Chase Home Finance renewed the force-placed insurance
25 policy with ASIC for another year with a premium of $4,031.57 charged to the Legers' escrow
26 account. A copy of the declarations page for the policy is attached as Exhibit 45.

27

22

28

1    89.    On August 17, 2011, Plaintiff Patricia Leger went to a Chase branch to make a

2 payment toward the mortgage note, but not one of Defendants' representatives told her that

3 Defendants would not accept the payment and that she would have to deal with attorneys

4 representing Defendants in order to obtain a reinstatement amount.

5    90.    Defendants' attorneys subsequently told Ms. Leger that the Legers owed

6 $9,577.90 plus attorneys' fees and late fees of $1,349.80, for a total of $10,927.70.

7    91.    Through written correspondence from counsel on counsel's letterhead containing

8 counsel's name, address, and other contact information, the Legers disputed the charges directly

9 with Defendants, but Defendants have nonetheless persisted in repeatedly initiating collection

10 calls to the Legers, despite neither having consent from the Legers' attorney nor having first tried

11 contacting the Legers through their attorney.

12    92.    In January 2012, the Legers received a letter dated January 19, 2012 and titled

13 "Notice of Placement/Renewal of Hazard Insurance" from JPMorgan "Insurance Center," a copy

14 of which is attached as Exhibit 46. The letter stated that, effective January 14, 2012, JPMorgan

15 had renewed the force-placed insurance policy with ASIC for another year, with a premium of

16 $3,988.68, again charged to the Legers' escrow account. A copy of the force-placed insurance

17 policy is attached as Exhibit 47.

18    **Mitch and Kathryn Varnes**

19    93.    Plaintiffs Garry ("Mitch") Mitchell Varnes, Jr. and Kathryn A. Varnes are

20 husband and wife ("the Varneses"), and reside in the State of Florida.

21    94.    On or about March 16, 2004, the Varneses obtained a $430,000 construction

22 mortgage loan from The Bank Brevard. *See* the Varnes mortgage.

23    95.    On January 4, 2005, upon completion of the construction of their home, the

24 Varneses entered into a Loan Modification and Extension Agreement with JPMorgan Chase

25 Bank, N.A., amending and supplementing the March 16, 2004 mortgage in the amount of

23

1  $430,000 and incorporating the terms of the Varneses' mortgage loan. A copy of the Loan
2  Modification and Extension Agreement is attached as Exhibit 48.

3      96.    On January 31, 2006, the Varneses took out a second lien mortgage which was
4  later modified on July 20, 2006. That loan has been paid in full.

5      97.    As required by the terms of their mortgage loan, the Varneses maintained a hazard
6  insurance policy on the property secured by their mortgage, but eventually experienced a lapse in
7  hazard insurance coverage. Immediately prior to the lapse, the Varneses had a policy with
8  Frontline Homeowner's Insurance for the period covering February 11, 2010 – February 11,
9  2011. A copy of the declaration page for the policy is attached as Exhibit 49. The total annual
10  premium for this policy was $1,607. *Id.* That policy provided coverage for the Varneses' home,
11  its contents, loss of use, personal liability and medical payments to others.

12      98.    On February 21, 2012 and again on March 22, 2012, JPMorgan Chase (through
13  the Chase Insurance Processing Center) notified the Varneses that it had not received evidence of
14  homeowner's insurance for the period beginning February 11, 2011 (almost a year after the date
15  of the lapse) and that it had purchased homeowner's insurance on their behalf for the period of
16  February 17, 2011 through February 17, 2012 for an annual premium of $9,866.50, a premium
17  approximately six times more than that of their Frontline policy.[4] A copy of the May 2, 2012
18  letter is attached as Exhibit 50.

19      99.    On May 3, 2012, JPMorgan Chase sent the Varneses a Notice of Replacement
20  Hazard Insurance, notifying them that it had force-placed insurance on their property effective
21  February 17, 2011, and had charged the premium to their escrow account.[5] This letter also

22

23  [4]    The correspondence sent to the Varneses referenced a First Protective Insurance Policy.
   Frontline Homeowners Insurance is a member of a group of independent insurance companies
24  that insures homeowners in the coastal areas of the southeastern United States and provides
   insurance through First Protective.
25  [5]    The Varneses did not have an escrow account prior to JPMorgan Chase's force-
26  placement of their hazard insurance. It established an account for the purpose of paying the

27                                              24

28                                                        Case No. CV-11-03058-JCS
                                              Consolidated Amended Class Action Complaint

1 stated that their force-placed hazard insurance would be reinsured with a Chase affiliate. A copy
2 of the May 3, 2012 letter is attached as Exhibit 51.

3     100.    The force-placed policy for the period February 17, 2011 – February 17, 2012
4 obtained by JPMorgan Chase was issued on May 3, 2012 by ASIC. A copy of the declarations
5 page is attached as Exhibit 52.

6     101.    The policy was backdated despite the fact that there was no damage to the
7 property and/or claims arising out of the property for the lapse period.

8     102.    Notably, while the premium for the force-placed insurance policy was nearly six
9 times the Varneses' prior premium, the policy provided substantially less coverage in that it
10 covered only the structure of the home.

11     103.    Assurant, Inc.'s subsidiary, ASIC, issued a renewal policy on May 14, 2012 for
12 the period covering February 17, 2012 – February 17, 2013, for an annual premium of $9,763.51.
13 A copy of the declarations page is attached as Exhibit 53. This policy, too, was backdated,
14 despite the fact that there was no damage to the property.

15     104.    By letter dated May 14, 2012, JPMorgan Chase notified the Varneses that their
16 escrow account was charged for the full amount of the premium. A copy of the May 14, 2012
17 letter is attached as Exhibit 54.

18     105.    The Varneses provided proof of hazard insurance coverage to JPMorgan Chase,
19 supplying it with evidence of their hazard insurance policy with Citizens Property Insurance for
20 the period covering March 30, 2012 – March 30, 2013. The annual premium for that policy was
21 $3,468. A copy of the Citizens Homeowners Application is attached as Exhibit 55.

22     106.    By letter dated May 14, 2012, JPMorgan Chase acknowledged receipt of proof of
23 evidence of hazard insurance coverage. JPMorgan Chase refunded a portion of the premium
24 charged to the Varneses' escrow account, $1,123.25, representing the cost of coverage for the

26 force-placed insurance premiums.

25

1  period from February 17, 2012 – March 30, 2012. A copy of the May 14, 2012 letter is attached
2  as Exhibit 56.

3        107.   As a result of the force-placement of their hazard insurance, the Varneses were
4  charged a total of $10,991.75. A copy of the May 28, 2012 Annual Escrow Statement is attached
5  as Exhibit 57.

6        **Chad Knox**

7        108.   Plaintiff Chad Knox obtained a mortgage from Washington Mutual Bank secured
8  by a parcel of real property in Brevard County, Florida. The loan was serviced by JPMorgan and
9  Chase Bank who are also the successor in interest and/or assign of the mortgage. *See* the Knox
10  Mortgage.

11        109.   Mr. Knox maintained in full force and effect the insurance required by the
12  mortgage contract. As his current policy was approaching its termination date, Mr. Knox began
13  shopping for new insurance coverage. A short time later, Mr. Knox, after a diligent effort to do
14  so, secured new hazard insurance for the property. However, in December 2010, there was a
15  brief 14-day gap in coverage.

16        110.   Defendants, without seeking competitive bids on the open market or attempting to
17  re-establish Mr. Knox's prior insurance with funds that were presently held in Mr. Knox's
18  escrow account specifically for this purpose, capriciously exercised their discretion in choosing
19  an insurance policy and contracted with Assurant to obtain surplus-line, force-placed, insurance
20  for Mr. Knox's property and take advantage of the scheme of kickbacks and commissions
21  described herein.

22        111.   On January 3, 2011, Chase notified Mr. Knox that it was force-placing an
23  insurance policy on him for a period starting on December 21, 2010. The cost of the force-
24  placed policy from December 21, 2010 through the date of the letter was $583.54. *See* Letter
25  from Chase Home Finance, LLC dated January 3, 2011 attached as Exhibit 58.

26
27                                        26
28                                                          Case No. CV-11-03058-JCS
                                               Consolidated Amended Class Action Complaint

112. Despite being purchased in January 2011, the insurance policy - secured from Assurant, Inc. subsidiary, ASIC - was backdated notwithstanding the fact that there was no damage to the property or claims arising out of Mr. Knox's property for that period.

113. Defendants JPMorgan Chase notified Mr. Knox that the force-placed insurance policy had been secured and retroactively placed.

114. The cost of the annual premium of the force-placed insurance policy through Assurant, Inc. subsidiary ASIC totaled $2,411. This is nearly five times the amount of the premium now paid by Mr. Knox.

115. On or around December 21, 2010, on January 3, 2011, Chase created an "escrow/impound account . . . for payment of future renewals of [Mr. Knox's] policy" as a result of Chase having to force-place insurance due to the 14-day lapse period.

116. Mr. Knox faithfully paid, and continues to faithfully pay, his mortgage payment, including his escrow payment, to Defendants.

117. On February 29, 2012, Mr. Knox received another letter from Defendants stating that Mr. Knox's hazard insurance had expired on December 21, 2011. Instead of using Mr. Knox's escrow money that Defendants' had been collecting throughout 2011 "for future renewals of [Mr. Knox's] policy," Defendants chose, in bad faith, to again force-place their own insurance policy for Mr. Knox's property and increase Mr. Knox's mortgage payment as a result thereof.

118. The premiums charged to Mr. Knox were exorbitant and illegal due to the Defendants' practices as described herein.

119. Upon filing this lawsuit, Mr. Knox has now encountered multiple obstacles created by Chase as a result of the force-placement which include difficulty making his mortgage payments.

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

**Leonard Jelks, Jr**

120.    On or around November 1992, Mr. Jelks obtained a mortgage secured by a parcel of real property in Spring, Texas. *See* Jelks' Mortgage. The servicing rights to the Jelks Mortgage were ultimately transferred to JP Morgan.

121.    Mr. Jelks obtained homeowner's insurance policy with State Farm Fire and Casualty Company ("State Farm"). This policy included coverage in the amount of $190,000.

122.    JPMorgan Chase force-placed homeowner's insurance on Mr. Jelk's home for the period beginning on October 29, 2004 with successive annual renewals through May 11, 2012. In connection with the force-placement of his homeowner's insurance, JPMorgan sent correspondence relating to the force-placement of his insurance. These communications were essentially the same for this period of time. As an example, in November 2011, Mr. Jelks received a notice purportedly from JP Morgan that informed him that insurance had been unilaterally purchased on his behalf and retroactively placed on his property. This force-placed insurance policy was issued by SGIC and had a one-year policy period from October 29, 2011 to October, 29, 2012. *See* Exhibit 59, Letter dated November 2, 2011 from JPMorgan Chase to Leonard Jelks.

123.    The annual cost of the insurance purchased by JP Morgan was $2,440.91, which far-exceeded the annual cost of the State Farm policy that Mr. Jelks historically paid.

124.    Despite the extraordinary cost of this force-placed insurance policy, the policy actually insured far less than the State Farm policy.

125.    JP Morgan never disclosed that the premium's excessive price included costs for the kickbacks and unearned commissions, the offset of administrative costs performed by the vendor, and the captive reinsurance arrangement. Indeed, the form letters and other documents sent to Mr. Jelks that JPMorgan had (i) purchased bona fide reinsurance, when it did not; and (ii) represented that the policy obtained and the premium paid was for insurance in the amount of $116, 400 when the premium paid included amounts representing improper kickbacks to Chase

28

1 | in the form of sham reinsurance, commissions, hidden arrangements between Chase and
2 | Assurant and for duplicative, unnecessary and back dated coverage.

3 |     126.    The charges for the force-placed insurance were unilaterally charged to Mr. Jelks'
4 | escrow account and added to his monthly mortgage statement thereby increasing his monthly
5 | payment. Mr. Jelks was required to pay these charges, otherwise his loan would be considered in
6 | default.

7 |     127.    Subsequently, on or around May 2012, Mr. Jelks' home was destroyed by a fire.
8 | Mr. Jelks previous homeowners' insurance policy included coverage in the amount of $190,000,
9 | the estimated replacement value of the home.  Even though the premium for JP Morgan's force-
10 | placed insurance policy far exceeds the price of Mr. Jelks' previous homeowner's insurance
11 | policy, JP Morgan refused to provide Mr. Jelks with the funds adequate to rebuild his home, or
12 | comparable to the coverage historically provided under his own policy.

13 | **Jack E. Brooks and Tami Brooks**

14 |     128.    Plaintiffs, Jack E. Brooks and Tami Brooks ("Plaintiffs") reside in Cahokia,
15 | Illinois.  On or about August 28, 2009, Plaintiffs obtained a mortgage loan in the amount of
16 | $68,000 from Mortgagee Electronic Registration Systems, Inc., secured by their primary
17 | residence. *See* Brooks Mortgage.

18 |     129.    This mortgage loan or the servicing rights with respect to the mortgage were
19 | subsequently sold to Chase.

20 |     130.    As required by their mortgage loan, Plaintiffs maintained a hazard insurance
21 | policy from Foremost Insurance Co. to protect the dwelling as well as other structures, personal
22 | property and liability. That policy had an annual premium of $1,194.00 for the period November
23 | 2006 through October 2007. *See e.g.*, Exhibit 60, Foremost Insurance Company Policy.
24 | Plaintiffs thereafter received notice from Foremost Insurance Co. that their policy would not be
25 | renewed and would expire.

26 |
27 | 29
28 |

1    131.    Chase subsequently force-placed a hazard insurance policy in or around October

2  31, 2010 and Plaintiffs have been paying the premiums on that force-placed policy ever since.

3    132.    Most recently, Chase, has force-placed a hazard insurance policy issued by ASIC,

4  effective from October 31, 2011 through October 31, 2012, with an annual premium of

5  $1,980.00. *See* American Security Insurance Policy provided to the Brookses Exhibit 61.

6         **Achikam Yogev**

7    133.    Plaintiff Achikam Yogev obtained a mortgage from Washington Mutual Bank

8  secured by a parcel of real property in Miami-Dade County, Florida. The loan was serviced by

9  JPMorgan and Chase Bank who are also the successor in interest and/or assign of the mortgage.

10  *See* Achikam Mortgage.

11    134.    As required by the terms of his mortgage loan, Yogev maintained a hazard

12  insurance policy on the property secured by his mortgage, but eventually experienced a lapse in

13  hazard insurance coverage. Immediately prior to the lapse, Yogev had a policy with Citizens

14  Property Insurance Company ("Citizens") for the period covering February 2010 through

15  February 2011. That policy provided coverage for Yogev's' home, its contents, loss of use,

16  personal liability, and medical payments to others.

17    135.    On February 17, 2011, JPMorgan Chase (through the Chase Insurance Processing

18  Center) notified Yogev that it had not received evidence of homeowner's insurance for the

19  period beginning May 15, 2010 through August 8, 2010, and that it had purchased homeowner's

20  insurance on his behalf for that time period for a premium of $2,767.91. Exhibit 62.

21    136.    The force-placed policy was backdated despite the fact that there was no damage

22  to the property and/or claims arising out of the property for the lapse period.

23    137.    Notably, while the premium for the force-placed insurance policy was Yogev's

24  prior premium, the policy provided substantially less coverage in that it covered only the

25  structure of the home.

26

27                                                30

28                                                          Case No. CV-11-03058-JCS
                                                   Consolidated Amended Class Action Complaint

1    138.    By letter dated February 17, 2011, JPMorgan Chase notified Yogev that his
2    escrow account was charged for the full amount of the premium. *Id.*

3    139.    As a result of the force-placement of his hazard insurance, Yogev was charged a
4    total of $2,767.91.

5    **Defendants**

6    140.    Defendant JPMorgan Chase Bank, National Association, the principal bank
7    subsidiary of JPMorgan Chase & Co., conducts business in California and throughout the United
8    States.

9    141.    Chase Home Finance, LLC ("Chase Home Finance") is a Delaware limited
10   liability company that, during the relevant time period, served as the primary servicing unit for
11   loans originated and/or acquired by affiliates of ultimate parent, JPMorgan Chase & Co. On or
12   about May 1, 2011, Chase Home Finance was merged with and into Defendant JPMorgan, with
13   Defendant JPMorgan as the surviving entity. Accordingly, Defendant JPMorgan is named as a
14   Defendant in this action both in its own capacity and as successor-in-interest to Chase Home
15   Finance.

16   142.    In all of its actions described herein, Chase Home Finance acted on its own behalf
17   and as the duly authorized agent of Defendants JPMorgan and Chase Bank or other owners of the
18   underlying notes and mortgage agreements. Defendants were contractually obligated to service
19   the loans at issue according to the terms of the mortgage agreements.

20   143.    Defendant Chase Bank USA, National Association, is a subsidiary of JPMorgan
21   Chase & Co., and conducts business in the State of California and throughout the United States.

22   144.    Defendant Banc One Insurance Company is an active Vermont Corporation and a
23   subsidiary of JPMorgan Chase & Co. It reinsures hazard policies placed on properties serviced
24   by JPMorgan Chase.

25   145.    Defendant Chase Insurance Agency, Inc. is a subsidiary of JPMorgan Chase &
26   Co. and conducts business in the State of California and throughout the United States. While a

27                                              31

28                                              Case No. CV-11-03058-JCS
                                                Consolidated Amended Class Action Complaint

1  representative of CIA has testified that CIA "provides insurance agency services in connection
2  with LPI (Chase NYDFS Testimony at 1), CIA did not provide such services or earn
3  commissions or other value paid to it for such services in connection with the force-placement of
4  Plaintiffs and Class Members force-placed insurance.

5       146.   Defendant Assurant, Inc., a Delaware corporation, "is a provider of specialized
6  insurance products and related services in North America and selects worldwide markets."
7  Assurant, Inc. has four operating segments—Assurant Solutions, Assurant Specialty Property,
8  Assurant Health, and Assurant Employee Benefits. Assurant, Inc. is a provider of specialized
9  insurance products including "lender-placed" homeowners insurance or FORCE-PLACED
10  INSURANCE. According to Assurant 2012 10-K at 5, "the majority of [Assurant Inc.'s] lender-
11  placed agreements are exclusive" and those agreements require the Assurant Defendants to
12  "automatically issue these policies when a borrower's insurance coverage is not maintained."
13  Assurant, Inc. has four operating segments – Assurant Solutions, Assurant Specialty Property,
14  Assurant Health, and Assurant Employee Benefits.

15       147.   Assurant Specialty Property is the Assurant, Inc. division which deals with the
16  force-placement of borrower's homeowner's insurance, including specifically, hazard insurance.
17  Assurant, Inc. "offers" lender placed homeowner's insurance. Assurant 2012 10-K at 3.
18  Assurant, Inc. offers its force-placed ("lender-placed") insurance products through the Assurant
19  Specialty Property segment. "The largest product line within Assurant Specialty Property is
20  homeowners insurance, consisting principally of fire and dwelling hazard insurance offered
21  through [Assurant's] lender-placed programs." *Id.* at 4. Assurant uses "a proprietary insurance-
22  tracking administration system linked with the administrative systems of our clients to
23  continuously monitor the clients' mortgage portfolios to verify the existence of insurance on
24  each mortgaged property and identify those that are uninsured" and when a lapse is confirmed,
25  "a lender-placed policy is procured by the lender." *Id. See also,* Chase NYDFS Testimony at 4,
26  n.4.

27

28

148.    Assurant, Inc. is one of the two dominant providers of force placed insurance in the United States.  NYDFS Consent Order at 3.

149.    Defendant ASIC is a Delaware corporation with its principal place of business in Atlanta, Georgia and is a subsidiary of Assurant, Inc. that does business throughout the United States.  Assurant 2012 10-K at Exhibit 21.1.  ASIC writes force-placed insurance policies in all fifty states and the District of Columbia.  Upon information and belief, ASIC provides services to Chase in relation to its force-placed insurance practices, including, but not limited to:  (1) tracking borrower's loans to determine the existence of hazard insurance; (2) placing force-placed insurance for JPMorgan Chase when there has been a lapse, and (3) handling all customer service duties related to force-placed insurance. Plaintiffs' force-placed insurance policies were issued by ASIC (with the exception of the Mr. Jelks whose force-placed insurance was provided by SGIC, an Assurant, Inc. subsidiary.

150.    Defendant Standard Guaranty Insurance Company , a Delaware corporation is a wholly-owned subsidiary of Defendant American Security Insurance Company, who, in turn, is wholly-owned by Interfinancial, Inc., a Georgia corporation, who, in turn is owned by Defendant Assurant, Inc., a Delaware corporation and the ultimate parent of SGIC. *See* 2012 Assurant, 10-K.  SGIC provided force-placed insurance to Plaintiff Leonard Jelks from October 29, 20005 to October 29, 2012.

151.    Upon information and belief, Chase and Assurant Inc. have a significant financial stake in ASIC, a company that issues force-placed flood insurance policies.  Specifically, ASIC is a wholly-owned subsidiary of Assurant, Inc.  *See* Assurant, Inc., Annual Report (Form 10-K), Exhibit 21 (February 23, 2011).  As of January 19, 2010, JPMorgan Chase & Co. (the parent company of each of the Defendants) held 3,829,722 shares in Assurant, Inc. through JPMorgan and other affiliates.   *See* JPMorgan Chase & Co., Statement of Acquisition of Beneficial Ownership (Schedule 13G/A) (January 19, 2010).

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

152.    The Doe Defendants 1-10 represent those yet unidentified entities and individuals who were active participants in the improper scheme and practices alleged herein.

153.    The insurance policies that were forced placed by JPMorgan Chase through Assurant, Inc., ASIC and SGIC named the lender or servicer as the named insured under the force-placed policies and did not include the borrower as a named insured.

## FACTUAL ALLEGATIONS

### Defendants' Improper Force-Placed Insurance Scheme

#### Defendants' Force-Placed Insurance Operations

154.    JPMorgan Chase describes itself as a leading global financial services firm and one of the largest banking institutions in the United States of America. *See* JP Morgan Chase & Co. form 10-k for the year ending December 31, 2011 available at http://www.sec.gov/Archives/edgar/data/19617/000001961712000163/corp10k2011.htm.    (last visited Apr. 12, 2013). JPMorgan Chase is one of the largest mortgage originators in the United States with approximately $150 billion of mortgage originations annually.    Each such loan (origination) is secured by a deed of trust on the underlying property.    JPMorgan Chase also services more than 8 million mortgages and home equity loans. *Id.*

155.    JPMorgan Chase operates 5,500 bank branches (third largest nationally) and more than 17,200 ATMs (second largest nationally), as well as online and mobile banking around the clock.    Some 33,500 branch salespeople are available to assist customers with checking and savings accounts, mortgages, home equity and business loans.

156.    Chase conducts business "across the 23-state footprint from New York and Florida to California." *Id.*

157.    Assurant, Inc., ASIC, and their subsidiaries and affiliates acted together as the force-placed insurance providers for JPMorgan Chase pursuant to the scheme described herein. *See* Exhibit 14, ASIC NYDFS Testimony at 2.

34

158.    Assurant, Inc. plays a crucial role in the Defendants' force-placement activities as it admits in its filings, and as evidenced by its role in the NYDFS investigation which ultimately resulted in the entry of a Consent Order to which it was a party.

159.    Assurant has been JPMorgan Chase's exclusive provider of force-placed insurance since 2005. *See* Exhibit 13, Chase NYDFS Testimony at 4, n.4.

160.    Assurant and Chase have entered into contracts relating to all aspects of the force-placement of hazard insurance for borrowers whose loans are serviced by Chase. Chase NYDFS Testimony at 4-7.

**Defendants Abused Force-Placed Insurance Mortgage Clauses to Generate Hidden and Unearned Profits**

161.    Each loan serviced by JPMorgan Chase is secured by a mortgage or deed of trust on the underlying property.

162.    In order to ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer discretion to "force-place insurance" when the homeowner fails to maintain the insurance. Plaintiffs' and Class members' mortgage loan contracts contain such provisions affording JPMorgan Chase the authority to force-place insurance in the event of a lapse. The failure of a borrower to maintain hazard insurance was clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

163.    The discretion afforded Defendants, however, to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage itself. Chase routinely exceeds the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property in an effort to reap profits from the borrower which are not required nor contemplated by the mortgage contract and through other conduct described herein with respect to the force placement of insurance.    The typical mortgage contract does not disclose that the lender or other servicer will receive a financial benefit in connection with the

35

1  force-placed insurance policy. Instead, the contract misrepresents to borrowers that the cost

2  passed on to them is for the purpose of protecting the lender's interest in the secured property.

3  *See, e.g.*, Exhibits 2-11.

4      164.   These lender-placed or "force-placed" insurance policies are almost always more

5  expensive than standard insurance coverage, as evidenced by Plaintiffs' policies.  Such policies

6  can cost as much as ten times more than standard policies.  NYDFS March 21, 2013 Press

7  Release; NYDFS Consent Order.

8      165.   While the force-placed insurance policy is for the benefit of the lender, the cost is

9  passed on to the borrower.  *Id.*

10     166.   Once a lender and/or servicer receives evidence that a borrower has obtained

11  his/her own insurance policy, the forced placed coverage should be fully or partially canceled.

12  **Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged**
    **Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

13

14     167.   The force-placement of insurance policies is a very lucrative business for

15  servicers and insurance carriers as a result of the scheme described herein.  Here, JPMorgan

16  force-placed Plaintiffs' insurance with Assurant, Inc.'s subsidiaries, ASIC and SGIC, in

17  accordance with a pre-arranged agreement and in such a way as to receive and maximize its

18  financial benefit.  JPMorgan benefited because it placed the Plaintiffs' force-placed insurance

19  policies with Assurant, which had already agreed to share revenue with Chase in the form of a

20  direct commission payment, below cost tracking services and "reinsurance" premiums ceded to

21  BOIC (a "captive reinsurance arrangement").   Indeed, as Birny Birnbaum of the Center for

22  Economic Justice, another experienced and noted expert in the area of force-placed insurance

23  stated:

24              [s]ervicers have financial incentives to force-place the insurance
              because   the   premiums   include   commissions   and   other
25              considerations for the servicer.  With some servicers, the insurance
              is reinsured through captive reinsurer of the servicer, resulting in
26              additional revenue to the servicer from the force-placement
              coverage.

27                                      36

28                                                 Case No. CV-11-03058-JCS
                                          Consolidated Amended Class Action Complaint

1    *See* Birnbaum NYDFS Testimony at 15.

2      168.   JPMorgan and Assurant profited from the ability to exploit their authority to

3 force-place insurance in several ways, including through commission arrangements and

4 reinsurance deals as depicted in the following graphic from *American Banker*:

# Sharing in the Profits

How servicers make money arranging force-placed coverage

| Commissions | Reinsurance |
|---|---|
| **To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer** | **To replace lapsed coverage, servicer buys policy on home from insurer** |
| **Servicer advances premiums to insurer** | **Servicer advances premiums to insurer** |
| **Insurer pays portion of premium back to subsidiary as a commission** | **Subsidiary of servicer reinsures part of the policy, gets a cut of premiums** |
| **Servicer bills borrower for the policy** | **If necessary, subsidiary buys letter of credit from another party** |
| **If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale** | **Servicer bills borrower for the policy** |
| | **If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale** |





**Defendants' Improper Reinsurance Arrangements**

22      169.   As Assurant, Inc. readily admits in its 2012 Form 10-k, it has entered into a quota

23 share reinsurance arrangement as a mechanism to "share profits." Assurant 2012 10-K at 53.

24      170.   In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a

25 fixed percentage of all the insurer's insured losses. Thus, if the insurer experiences losses, the

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

1  reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance

2  contract – each party will pay a specified percentage of every claim.

3  171.  Pursuant to the terms of the Defendants' captive reinsurance agreement, Assurant

4  agrees to cede 75% of the premiums it collects from JPMorgan Chase borrowers to BOIC,

5  JPMorgan's captive reinsurer.   Thus the assets held by BOIC consist almost entirely of

6  premiums paid by JPMorgan Chase borrowers.

7  172.  In order for any reinsurance arrangement to be deemed legitimate, it must transfer

8  risk.

9  173.  Defendants claim that their reinsurance scheme is legitimate because it is a quota

10  share arrangement (purportedly splitting the liability 75/25 for every claim made) and therefore

11  must inevitably transfer risk.

12  174.  Defendants' purported quota share reinsurance arrangement is not legitimate

13  because, while it facially appears to share the risk associated with the insurance force-placed on

14  JPMorgan's borrowers, it does not because the Defendants have built in arrangements that vitiate

15  any possibility of risk transfer and therefore must be analyzed pursuant to accepted, accounting

16  and actuarial risk transfer analysis as set forth below.

17  175.  The arrangement shields JPMorgan Chase because Defendants have put in place

18  several additional layers of reinsurance coverage which makes it mathematically impossible for

19  JPMorgan Chase to be exposed to any risk or for any of its assets to be subject to payment of

20  claims.

21  176.  Here in addition to the "reinsurance" provided by BOIC, Assurant purchased two

22  additional insurance policies – a catastrophic reinsurance policy and an additional third-party

23  policy.

24  177.  Assurant's loss ratios for the years 2006-2011 never exceeded 24.7 percent and in

25  2008 the loss ratio was only 17.3 percent.   In contrast, the loss ratio for voluntary homeowners

26  insurance has traditionally been around 63%.  Hunter NYDFS Testimony.

27

28

1    178.    As a result of the interplay amongst all these policies, coupled with the low loss

2    ratios experienced by Assurant, JPMorgan Chase is exposed to *no* real reinsurance risk.  *See*

3    Hunter NYDFS Testimony; NYDFS Consent Order at 6-7.  That is, JPMorgan Chase will never

4    have to contribute to the payment of any claims and is not risking any of its own assets.

5    179.    Because Defendants must be subjected to the risk transfer tests set forth below,

6    Defendants cannot shield themselves from liability simply because the reinsurance arrangement

7    is a quota share arrangement.

8    180.    These arrangements do not pass muster under the accepted risk transfer tests.

9    181.    Because there is no possibility that JPMorgan Chase will ever pay any claims, the

10   transfer of 75% of borrower premiums to BOIC is nothing more than a kickback or rebate.

11   182.    A quota share reinsurance that does not expose the reinsurer to any real possibility

12   that it may be required to contribute its own money when called upon to pay for its share of

13   claims, is a sham.[6] This is exactly the situation in this case.  BOIC is a vehicle established for the

14   sole purpose of receiving reinsurance premiums ceded to it by Assurant, Inc. and its subsidiaries.

15   It did not engage in any reinsurance activities and due to the double layer of insurance, BOIC did

16   not take on any risk with respect to the so-called reinsurance arrangement because it will never

17   be called on to pay any claims.  The ceded premiums are simply kickbacks and rebates paid by

18   the Assurant entities to JPMorgan Chase.

19

20   [6] As noted by the American Academy of Actuaries:

21          straight quota share contracts are typically exempted from risk
22          transfer requirements under the paragraph 11 exception of FAS
             113.  However, *the introduction of risk limiting features* to a
23          quota share contract, such as a loss ratio cap . . . a loss retention
             corridor, or a sliding scale commission, often prevents the contract
24          from qualifying for the exception.

25   Available at http://www.actuary.org/files/publications/pc_risk_jan2007.pdf (last visited on Apr.
     12, 2012).
26

27                                                39

28

1    183.    Under accepted accounting and actuarial principles, for a contract to be treated as
2    "real," risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it
3    must be "reasonably possible that the reinsurer may realize a significant loss." *See generally*
4    Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for
5    Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 7, available
6    http://www.fasb.org/cs/BlobServer?blobkey=id&blobwhere=1175820919754&blobheader=appli
7    cation%2Fpdf&blobcol=urldata&blobtable=MungoBlob (last visited Apr. 12, 2013).

8    184.    Insurers and reinsurers are subject to two sets of accounting standards in the
9    United States: "(1) statutory accounting principles (SAP) and (2) generally accepted accounting
10   principles (GAAP)." *See* Robert W. Klein & Shaun Wang, *Catastrophe Risk Financing in the*
11   *US and the EU: A Comparative Analysis of Alternative Regulatory Approaches,* The Journal of
12   Risk    and    Insurance,    2009,    Vol.    76,    No.    3,    609,    available    at
13   http://www.google.com/url?sa=t&rct=j&q=&esrc=s&frm=1&source=web&cd=2&ved=0CDwQ
14   FjAB&url=http%3A%2F%2Fwww.researchgate.net%2Fpublication%2F228640123_Catastroph
15   e_risk_financing_in_the_us_and_the_eu_A_comparative_analysis_of_alternative_regulatory_ap
16   proaches%2Ffile%2Fd912f508fe3fa5eccf.pdf&ei=Vy9oUZihDrHI4APT04D4BA&usg=AFQjC
17   NHTVaSitA4QE0LF-m2gA5ZXICBx4A&sig2=wLQ-
18   YVSWNdcrSHBOOAk9yw&bvm=bv.45175338,d.dmg: (last visited April 12, 2013).

19   185.    SAP rules are determined by state insurance regulators through the NAIC, and
20   insurers are required to file detailed financial statements and other reports in accordance with
21   SAP. *Id.* GAAP rules are "determined by the Financial Accounting Standards Board (FASB),
22   and insurers are required to follow GAAP in their non-regulatory financial statements and
23   Securities and Exchange Commission (SEC) reports." *Id.*

24   186.    FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other
25   things, abuses in GAAP accounting for contracts that have the formal appearance of reinsurance
26   but do not transfer significant insurance risk and thus should not be eligible for reinsurance

27                                              40
28                                                              Case No. CV-11-03058-JCS
                                                    Consolidated Amended Class Action Complaint

accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates the same language as FAS 113, was implemented shortly thereafter to address the same issues with respect to statutory accounting." *CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts:  Analysis and Recommendations, Casualty Actuarial Society Forum,     Winter     2006     at     282,     available     at* http://www.casact.org/pubs/forum/06wforum/06w281.pdf (last visited on April 12, 2013).

187.   That is, FAS 133 was implemented to prevent reinsurance accounting for contracts, such as those at issue in this litigation, which do not transfer risk.

188.   Under FAS 113, "in order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

> 1.   It must be evident that 'the reinsurer has assumed substantially all of the insurance risk relating to the reinsured portion of the underlying insurance contracts' (paragraph 11), or
>
> 2.   The reinsurer must 'assume significant insurance risk under the reinsured portions of the underlying insurance contracts' (paragraph 9a) and it must be 'reasonably possible that the reinsurer may realize a significant loss from the transaction' (paragraph 9b)."

*Id.* at 283; *See generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 7,     available     at http://www.fasb.org/cs/BlobServer?blobkey=id&blobwhere=1175820919754&blobheader=appli cation%2Fpdf&blobcol=urldata&blobtable=MungoBlob (last visited Apr. 12, 2013).  Given Defendants' reinsurance arrangements, only the second test identified by FAS 113 is relevant here.  Indeed, the first test is viewed as an exception to the second.  *CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts:  Analysis and*

41

*Recommendations, Casualty Actuarial Society Forum, Winter 2006* at 283, available at http://www.casact.org/pubs/forum/06wforum/06w281.pdf (last visited on April 12, 2013). The "primary" test can be more fully and formally stated as mandating that real transfer of insurance risk is passed to a reinsurer only if:

>    a.   The reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying reinsurance contracts, and
>
>    b.   It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 7, available at http://www.fasb.org/cs/BlobServer?blobkey=id&blobwhere=1175820919754&blobheader=appli cation%2Fpdf&blobcol=urldata&blobtable=MungoBlob (last visited Apr. 12, 2013).

189.     Further, FAS 113 provides the blueprint for how to structure a "real risk transfer" analysis:

>    The ceding enterprises' evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming enterprises under reasonably possible outcomes, without regard to how the individual cash flows are characterized. The same interest rate shall be used to compute the present value of cash flows for each reasonably possible outcome tested.
>
>    Significance of loss shall be evaluated by comparing the present value of all cash flows . . . with the present value of the amounts paid . . . to the reinsurer.

*Id.* at 7.

190.     SSAP 62R's test for whether real risk transfer is found in a reinsurance contract is substantively identical:[7]

    1.    The reinsurer assumes significant insurance risk under the reinsured portions of the underlying insurance agreements; and

    2.    It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* NAIC Accounting Practices & Procedures Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and Casualty Reinsurance, Exhibit A "Implementation Questions and Answers").[8]

Reinsurance "[c]ontracts that do not result in the reasonable possibility that the reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits." *See* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts," (December 1992) at 4, available at http://www.fasb.org/cs/BlobServer?blobkey=id&blobwhere=1175820919754&blobheader=application%2Fpdf&blobcol=urldata&blobtable=MungoBlob (last visited Apr. 12, 2013); *see generally* Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer

---

[7]     "The above provisions of SSAP 62 are essentially the same as those in FAS 113." *See* American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005 at 6, http://www.actuary.org/pdf/casualty/risk_transfer.pdf.

[8]     *See also id.* at paragraph 15, 62R-6 ("The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes . . . . An outcome is reasonably possible if its probability is more than remote.").

43

1  Insurance Risk, October 19, 1998).

2      191.   The absence of any likelihood that the BOIC (or its parent JPMorgan Chase) will
3  ever experience any real losses, in turn, reveals the reinsurance agreement between BOIC and
4  Assurant to be a sham.   Such an arrangement does not constitute real, risk-transferring or
5  commensurately priced reinsurance

6      192.   Moreover, this kind of reinsurance arrangement creates an incentive for servicers
7  like JPMorgan Chase to force-place insurance at the greatest possible premium because it will
8  ultimately receive a large portion of the premium in the form of ceded reinsurance premium.
9  NYDFS Testimony at 20; NYDFS Consent Order at 6-7.

10     193.   JPMorgan Chase has made approximately 600 million dollars nationally since
11  2006 through reinsurance of insurance it force-placed on homes securing Chase's mortgage loan
12  portfolio.  *Id.*  The NYDFS recognized that this practice resulted in inflated premiums.   The
13  NYDFS Consent Order bans this practice in the future with respect to force-placed policies
14  provided for Chase borrowers in New York. NYDFS Consent Order at 3.

15     194.   Assurant reports huge profits from this line of business and it is its most profitable
16  business segment. Assurant 2012 10-K.

17     195.   There is no justification for Assurant to cede such a significant portion of its
18  premiums to BOIC, an entity with no real reinsurance experience or any certificates or
19  authorization to engage in reinsurance activities in any other fora.

20     196.   Amounts paid to lenders as unlawful kickbacks have become a part of the cost of
21  doing business that is borne by borrowers whose insurance is force-placed and results in higher
22  premiums for consumers.

23  **Defendants' Profit Making Commission Arrangements**

24     197.   Under the commission arrangement, the provider of the force-placed insurance
25  policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance
26  "agent."  Typically, under such an arrangement, commissions are paid to a "licensed insurance

27                                            44

28

agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

198.    CIA purportedly "manages" the relationship between Chase and Assurant.  *Id.* CIA does not act as an insurance agent or broker for Chase with regard to its force-placed insurance program.  As such, its true purpose is to provide a conduit for the receipt of kickbacks, commissions, rebates, earnouts and other consideration to Chase derived from the premiums paid by Plaintiffs and other borrowers whose insurance was force-placed.  Upon information and belief, CIA received commissions or other consideration in connection with the force-placement of borrowers' hazard insurance despite having done little to nothing to earn the consideration paid.  Thus, CIA knowingly plays an active and integral role in the force-placed insurance scheme.

199.    ASIC has acknowledged that it pays commissions in connection with force-placed insurance:

> **Commissions to Agencies and Expense Reimbursements to Servicers:**  This category consists of commissions paid to licensed insurance agencies and payments to servicers or their affiliates for reimbursement of placement-related expenses, typically up to a capped amount.  Commissions paid to servicer-affiliated agencies have historically been comparable to those in the standard homeowners market

ASIC NYDFS Testimony at 10.

200.    CIA, however, did not perform "the customary tasks that would justify a commission.  *See* Birnbaum NYDFS Testimony; NYDFS Consent Order.

201.    J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYDFS in connection with the Department's inquiry into force-placed insurance practices:

> [i]n some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-

45

1

affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

2

*See* Hunter NYDFS Testimony at 1.

3

202.   Assurant agreed to cease paying these commissions in the NYDFS Consent

4

Order.  *See* NYDFS Consent Order at 9.

5

**Chase Improperly Passed on Servicing Costs to Borrowers Who Were Required to Pay for**

6

**Force-Placed Insurance**

7

203.   Moreover, JPMorgan Chase used its own affiliate, CIA, in coordination with

8

Assurant, to perform its servicing functions.  In so doing, Chase transferred the cost of servicing

9

to CIA and Assurant.  As a result, these servicing costs were included in the force-placed

10

insurance premiums paid by Plaintiffs and Class members. Because Assurant was returning a

11

large percentage of the borrowers' premiums to Chase, this arrangement functioned as an

12

undisclosed kickback to Chase.

13

204.   Industry insiders acknowledge that force-placed insurance premiums are "a lot

14

more expensive than other alternatives" because the administrative costs "are bundled into the

15

costs of the premium."  *See* Testimony of Joseph Marcowicz (PRP Claims), Public Hearing on

16

Private Lender-Placed Insurance, Property and Casualty Insurance (C) Committee Market

17

Regulation and Consumer Affairs (D) Committee, National Association of Insurance

18

Commissioners, August 9, 2012, ("Markowicz Testimony") attached as Exhibit 63.   Mr.

19

Markowicz also confirmed that administrative costs "tend to keep premium costs high" because

20

expenses "which include the administrative work of the letter campaigns and tracking services

21

provided to the loan servicer" are bundled into the premium." *Id.*  In effect, Assurant is providing

22

below cost administrative services to servicers like JPMorgan Chase, and recouping those costs

23

from borrowers whose insurance is force-placed.  Moreover, Chase makes an additional profit

24

when a significant portion of the inflated premium is returned to it in the form of a ceded

25

reinsurance premium.  Through this arrangement, Chase receives a kickback each time it places

26

force-placed insurance with its exclusive, high-priced provider, Assurant.

27

46

28

205.   The NYDFS recognized that this practice has resulted in inflated premiums.   The NYDFS Consent Order bans this practice in the future with respect to force-placed policies provided for Chase borrowers in New York.   *See* NYDFS Consent Order at 3.

**Defendants Cannot Justify the High Cost of Force-Placed Insurance**

206.   Servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence."   *See* Birnbaum NYDFS Testimony at 1.

207.   Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.   *Id.*

208.   Force-placed insurance policies are not underwritten on an individual policy basis.   Rather, servicers' contracts with force-placed insurance providers require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

209.   As J. Robert Hunter in his recent testimony before the NYDFS argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."   *See* Hunter NYDFS Testimony at 5.   Yet it does not.   Instead, as a result of the arrangements between those participating in monitoring, placing and administering force-placed insurance, consumers are gouged.

210.   Force-placed insurer subsidiaries are highly profitable businesses.   "Among a published ranking of companies with the strongest operating insurance subsidiaries, several bank holding companies stand out . . . . Companies with insurance subsidiaries providing force-placed property insurance were at the top of the list.   These included Assurant Inc. and Bank of America."   *See* http://www.mainstreet.com/print/18604.

47

1    211. Servicers commonly attempt to justify the high price of force-placed insurance

2 policies by pointing to the higher risk associated with the lack of individual policy underwriting.

3 However, as *American Banker* noted:

> [t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

7 *See* Ties to Insurers.

8    212. Birny Birnbaum, in his testimony before the New York Department of Financial

9 Services, also presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI

10 hazard insurance during the 2004-2011 period as being, on average, more than 35 percentage

11 points lower than the ratios for commercially available homeowners policies. *See* Birnbaum

12 NYDFS Testimony at 9. When confined to the period from 2007-2011, the disparity between

13 LPI hazard insurance loss ratios and those of commercially available homeowners policies was

14 nearly 42 percentage points. *Id.*

15    213. Moreover, because the policies are not individually underwritten, the force-placed

16 insurer is spared the costs associated with individual underwriting.    *See* Birnbaum NYDFS

17 Testimony at 26.

18 **As Servicer, Chase's Interest In The Force-Placed Insurance Is The Kickbacks,**
**Commissions And Fees It Receives**

19

20    214. Although it may appear that servicers such as JPMorgan Chase force-place hazard

21 insurance on mortgaged properties to protect against their risk of losing any amounts in the event

22 of damage to the collateral, such "risk" is illusory.

23    215. While lenders originate mortgages, these mortgages are frequently packaged into

24 securities and sold to investors. Thereafter, a servicing affiliate of the originating lender often

25 continues to service those mortgages for a fee on behalf of the purchaser of the mortgages, often

26 Fannie Mae or Freddie Mac, but neither the originating lender nor its servicing affiliate bears the

27                                          48

28

1  risk that the mortgagees will default on the loan or that the collateral on the loan will become
2  impaired. Rather, that risk is borne by the borrower and/or the current lender/owner of the loan.

3      216.    Such servicers, including Chase, thus receive kickbacks and commissions for
4  force-placed insurance policies at the expense of their customers, but with no risk to their own
5  "investment."

6  **Defendants Routinely Require Redundant or Otherwise Unnecessary Insurance**

7      217.    Chase has routinely required borrowers to pay for unnecessary insurance coverage
8  through Assurant. Such examples include, without limitation: (a) requiring borrowers to pay for
9  insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the
10 secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay
11 for retroactive coverage despite the fact that the time has lapsed and no risk of loss exists for
12 such period; and (c) requiring borrowers to pay for force-placed insurance policies despite the
13 existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in
14 the property.

15     218.    Force-placed hazard insurance policies should not be backdated. The National
16 Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective
17 in nature." Requiring borrowers to pay for backdated insurance coverage to cover time periods
18 during which there is already no risk of loss is improper. *See, e.g.*, Ties to Insurers ("'[Insurance
19 policies] should not be back-dated to collect premiums for a time period that has already
20 passed'" (quoting the NAIC)).

21     219.    Moreover, many hazard insurance policies contain a Lender's Loss Payable
22 Endorsement. This endorsement typically protects the lender for a period of at least ten days
23 after the termination of the insurance policy. Accordingly, force-placing insurance policies
24 effective immediately following the termination of the borrower's policy and charging borrowers

27                                              49

28                                                            Case No. CV-11-03058-JCS
                                                  Consolidated Amended Class Action Complaint

1  expensive premiums for such insurance is unlawful and unfair because borrowers are charged for

2  needless and duplicative insurance coverage.[9]

## Defendants' Practices Improperly Inflate Premiums for Force-Placed Insurance Charges
3  ## to Borrowers

4      220.    As American Banker observed, "[w]hile servicers that partner with force-placed

5  insurers customarily perform little of the work in monitoring their portfolios for lapses and

6  writing policies, payments to them are simply a cost of doing force-placed business." *See*

7  Exhibit 53, *supra*.  These costs are ultimately paid by the borrowers and serve to unjustly enrich

8  all Defendants, including those with whom the borrower has no contractual relationship, such as

9  Defendants Assurant, Inc., ASIC, SGIC, CIA and BOIC.

10     221.    By retaining a commission or participating in a captive reinsurance arrangement,

11  the servicer forces the borrower to pay for both the actual cost of the insurance policy and the

12  cost of the kickback.  As American Banker observed, "[w]hile servicers that partner with force-

13  placed insurers customarily perform little of the work in monitoring their portfolios for lapses

14  and writing policies, payments to them are simply a cost of doing force-placed business." *See*

15  Ties to Insurers; *See also* NYDFS March 21, 2013 Press Release at 2.

16     222.    Thus, Defendants' kickback arrangements with force-placed insurance providers

17  tend to keep premiums for force-placed insurance artificially inflated over time because a

18  percentage of borrowers' premiums are not actually being paid to cover actual risk, but are

19  simply funding illegal kickbacks to lenders.  Amounts paid to servicers as sham reinsurance

20  premiums and commissions have become a part of the cost of doing business for force-placed

21  insurance providers.  As a result, force-placed insurance premiums incorporate the payment of

22  such kickbacks—to the detriment of consumers.

23

24
_____

25  [9]     For example, the MacKinnons' hazard insurance policy included a Lender's Loss Payable

26  Endorsement.

27                                              50

223.    While forced-placed insurers and servicers often attempt to justify the amounts charged to borrowers for force-placed insurance by arguing that force-placed insurance rates in certain states are filed with the respective state's insurance regulator, and are thus not subject to challenge, this defense is wholly inapplicable to Plaintiffs' claims.

224.    In those states where force-placed insurance rates are filed with state insurance regulators, the filed rate only encompasses rates charged between insurer and lender/servicers – not the reasonableness of rates charged by the lender/servicers to borrowers. The state insurance departments do not decide the premiums which would be reasonable as between a lender and its borrowers.

225.    The rates provided to the state insurance departments by insurers like the Assurant entities are inflated and are not truly related to the cost of services. Borrowers pay a premium bloated with commissions, ceded reinsurance premiums, and charges unrelated to the cost of force-placing their insurance while the premium paid JPMorgan Chase is discounted by the improper commissions, ceded reinsurance premiums, subsidized services and other improper kickbacks.

**Government Response**

226.    As discussed above, force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies.

227.    Thus, state attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers, including JPMorgan Chase ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (official website established by the government relating

51

1   to the settlement); *see also* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-*

2   *Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25 PM),

3   http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-034213-1.html (last

4   visited Apr. 12, 2013).

5       228.  Among other terms, the settlement essentially prohibits servicers from profiting

6   from force-placed insurance. Specifically, under the settlement, mortgage servicers: (a) shall not

7   obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not

8   paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement

9   cost of the improvements on the secured property; (c) must work with the borrower to continue

10   or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a

11   lapse in payment and the payments are escrowed regardless of homeowner payment; and (e)

12   must purchase the force-placed insurance at a commercially reasonable price. *See* Consent

13   Judgment, *United States of America v. Bank of America Corp.*, No. 1:12-cv-00361-RMC (D.D.C.

14   Apr. 14, 2012) (ECF No. 14 Section VII).

15       229.  The Consumer Financial Protection Bureau issued two notices on proposed rules

16   "to protect homeowners from surprises and costly mistakes by their mortgage servicers," which

17   included specific provisions for "avoiding costly force-placed insurance." *See* Consumer

18   Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers" available at

19   http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-

20   rules-to-protect-mortgage-borrowers/ (last visited Apr. 12, 2013).

21       230.  These rules became final on January 17, 2013. The new regulations prohibit

22   servicers of federally regulated mortgage loans from force-placing insurance unless a servicer

23   has a reasonable basis to believe that the borrowers insurance has lapsed. Servicers must provide

24   notice of force-placement three times at 45, 30 and 15 days in advance of issuing a policy.

25   Moreover the charge for any service that was actually performed must "bear a reasonable

26   relationship to the servicers cost of providing the service. A servicer cannot force-place

27

28

insurance if the borrower has an existing escrow account if the servicer can continue the existing insurance, even if the servicer must advance the funds for the insurance." *See* Summary of Final Mortgage Servicing Rules dated January 17, 2013 available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers (last visited Apr. 12, 2013). *See also*, 12 CFR 1024.

231.     On March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender-placed insurance. In its RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners." In particular, Fannie Mae made the following observations:

☐ "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

☐ "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms . . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

☐ "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*See*, Fannie Mae Request For Proposal dated March 6, 2012 attached as Exhibit 64.

232.     Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id.* at *3*.

233.    On March 26, 2013, the Federal Housing Finance Agency ("FHFA") issued a Notice regarding Lender Placed Insurance.  This Notice "sets forth an approach to address certain practices relating to lender placed insurance that the [FHFA] considers contrary to prudent business practices [and] to appropriate administration of Fannie Mae and Freddie Mac (the Enterprises) guaranteed loans," and which result in "litigation and reputational risks."  *See* Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions attached as Exhibit 65.

234.    FHFA prohibits:

> Certain Sales Commissions.  The Enterprises shall prohibit sellers and servicers from receiving, directly or indirectly, remuneration associated with placing coverage with or maintaining placement with particular insurance providers.

235.    The FHFA acknowledged:

☐    "Reportedly, premiums for lender placed insurance are generally double those for voluntary insurance and, in certain instances, significantly higher." *Id.* at 2.

☐    "[T]he multiples involved may not reflect claims experience..." *Id.*

☐    "Loss ratios for lender placed insurance are significantly below those for voluntary hazard insurance and some states have required or have considered rate reductions of 30 percent or more." *Id.*

☐    "Concerns about lender placed insurance costs, compensation and practices have been raised by the National Association of Insurance Commissioners, state regulators, the Consumer Financial Protection Bureau, state attorneys general and consumer organizations.  Generally, the focus has centered on excessive rates and costs passed on to borrowers, as well as commissions and other compensation paid to servicers by carriers.  In order to keep lender placed insurance costs to the Enterprises as low as possible, practices that provide incentives for and do not deter higher costs should be avoided." *Id.* at 3.

## RICO ALLEGATIONS

### The Chase Force-Placed Insurance Enterprise

236.    Plaintiffs, Class members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

54

237.   Based on Plaintiffs' current knowledge, the following persons constitute a group of associated persons who constitute a RICO enterprise that is referred to herein as the "Chase Force-Placed Insurance Enterprise." JPMorgan Chase Bank, N.A. Chase Bank USA, N.A., non-Defendant Chase Home Finance, LLC, Chase Insurance Agency, Inc., Banc One Insurance Co., Assurant, Inc., American Security Insurance Company, Standard Guaranty Insurance Company and/or other force-placed insurance provider subsidiaries of Defendant Assurant, Inc. and other entities involved in force-placing insurance on behalf of Chase not named as defendants herein who assist the named Defendants in effectuating their scheme to defraud Plaintiffs and other borrowers who were required by Chase to pay for force-placed hazard insurance.

238.   The Chase Force-Placed Insurance Enterprise is an ongoing organization that engages in, and whose activities effect, interstate commerce.

239.   While each of the Defendants participated in and are members of the Chase Force-Placed Insurance Enterprise, they also have an existence separate and distinct from the Enterprise.  The structure of the Enterprise is reflected in the allegations herein.  In particular, Chase implemented a plan to exploit JPMorgan Chase's ability, as a loan servicer acting on behalf of the mortgagees who owned Plaintiffs' and Class members' mortgages, to force-place hazard insurance to protect its interest in Plaintiffs' and Class members' mortgaged properties, to purchase high-priced insurance from its exclusive providers, Assurant, Inc., ASIC, SGIC and/or their subsidiaries and affiliates, enriching the Enterprise as a whole by funneling improper kickbacks in the form of fees, commissions, "rebates" and other consideration to BOIC and CIA, thereby generating improper profits for Chase and the other Enterprise participants at Plaintiffs' and other borrowers' expense.  These actions by all Enterprise participants caused injury to Plaintiffs' and borrowers' business or property.

**Conduct of the RICO Enterprise**

240.   As members of the Chase Force-Placed Insurance Enterprise, Defendants engaged in the following conduct in furtherance of aims and objectives of the enterprise:

1    (a)  JPMorgan Chase exercised (and abused) the authority granted it under the

2 terms of the mortgage contracts for lenders for whom they serviced mortgage loans to force-

3 place Plaintiffs and other borrowers with hazard insurance.  Rather than renewing Plaintiffs' and

4 other borrowers existing policies or obtaining the insurance at a commercially reasonable price,

5 Chase force-placed the insurance with its exclusive providers, thus choosing a more expensive

6 policy to enrich itself at Plaintiffs' and Class members' expense.

7    (b)  Assurant, its affiliates and subsidiaries, including ASIC and SGIC, in

8 coordination with Chase, provided and administered excessively priced policies charging

9 Plaintiffs and other borrowers not only for the cost of their force-placed insurance, but also

10 charging them for the costs of kickbacks, fees, commissions and other consideration in the form

11 of force-placed insurance premiums which were either charged directly to Plaintiffs and other

12 borrowers, added to Plaintiffs' existing mortgage loan balances or charged to their escrow

13 accounts.

14    (c)  JPMorgan Chase entered into exclusive deals with Assurant Inc., ASIC,

15 SGIC and/or subsidiaries and affiliates to force-place hazard insurance on terms incorporating or

16 requiring ancillary services and arrangements designed to generate additional profits which were

17 steered to fellow scheme members.

18    (d)  JPMorgan Chase paid fees, commissions, rebates, "earnouts" and other

19 consideration to its own affiliates, including BOIC and CIA as well as Assurant , purportedly for

20 their role as "insurance producers" or providers of "insurance agency services" in connection

21 with the provision of force-placed insurance when they did not, in fact, produce any insurance

22 business for JPMorgan Chase or provide legitimate insurance agency services as at all times

23 relevant to this complaint, JPMorgan Chase had entered into exclusive agreements with

24 Assurant.  In effect, Chase used these arrangements to establish conduits to funnel a portion of

25 Plaintiffs' and Class members' premiums back to it.  Assurant served as JPMorgan Chase's

26

27            56

28

1  exclusive provider of force-placed hazard insurance and CIA and BOIC served as conduits

2  through which as any premiums earned redounded to the benefit of its corporate parent.

3  (e)  Defendants colluded to include in the premiums - paid by the small

4  number of borrowers whose insurance was force-placed - the costs of servicing Chase's entire

5  portfolio of loans (*i.e.*, for portfolio monitoring, tracking and related administrative functions) in

6  addition to the costs directly attributable to force-placing the insurance. This practice operated

7  as a subsidy to JPMorgan Chase, the loan servicer. The structure created between Chase,

8  Assurant and their affiliates operated to funnel the profits thus derived directly to Chase. *See*

9  *e.g.*, Birnbaum NYDFS Testimony at 16-18, Exhibit 15.

10  (f)  Defendants colluded to establish an arrangement whereby in exchange for

11  JPMorgan Chase using Assurant as it sole provider of force-placed insurance, Assurant agreed to

12  cede a substantial portion of the premiums for such insurance to Chase's captive reinsurer BOIC;

13  (g)  Assurant performed JPMorgan Chase's tracking and outsourcing, for little

14  or no charge.

15  **Defendants' Misrepresentations and Omissions**

16  241.  As set forth herein, Defendants made numerous misrepresentations, omissions

17  and half-truths truths to borrowers and others in furtherance of their fraudulent scheme. These

18  misrepresentations, omissions and half-truths created a false impression that Defendants were

19  operating within the bounds of their contractual authority. The intricate and secretive operations

20  of the force-placed insurance scheme are of the type that ordinary consumers and borrowers

21  would not be aware of. Therefore, Defendants would have the obligation to fully disclose *all* the

22  relevant facts surrounding their force-placed insurance practices and related transactions to avoid

23  misrepresentations, omissions and half-truths. Instead, Defendants kept the true nature of their

24  activities concealed and borrowers were harmed as a result.

25  242.  In order for Defendants' fraudulent force-placed insurance scheme to be

26  successful, Defendants intentionally maintained the appearance of traditional provision of

27  

28  

57

insurance disguising the improper provision of high cost, duplicative and unnecessary force-placed insurance as an unremarkable and legitimate transaction when it was not. In order to maintain the illusion of propriety, Defendants deceived Plaintiffs and Class members by failing to disclose the true nature of their self-dealing, profit-making venture.

243. The cycle letters sent to Plaintiffs and Class members affirmatively misrepresented the true nature of Defendants' force-placed insurance arrangements. The letters misrepresent the real reason for the increased cost of force-placed insurance. While acknowledging that force-placed insurance is more expensive than a voluntary policy, the notifications state that "the higher cost is because the insurance we purchase is issued automatically without evaluating the risk of insuring your property." *See e.g.* Exhibits 25; 41; 56; and 59; Notice of Placement of Hazard Insurance sent to Colin and Terrie Mackinnon dated November 5, 2010 attached as Exhibit 66; Notice of Placement of Hazard Insurance sent to Andrea North dated May 2, 2010 attached as Exhibit 67; Notice of Placement of Hazard Insurance sent to Leamon and Patricia Leger dated January 19, 2012 attached as Exhibit 68; Notice of Placement of Hazard Insurance sent to Chad Knox dated February 29, 2012 attached as Exhibit 69; Second Notice of Placement of Insurance Binder sent to Achikam Yogev dated June 21, 2010 attached as Exhibit 70. In reality, the higher cost of the force-placed insurance policy is the result of Defendants' improper practices which inflate the premium to account for kickbacks, improper fees and other hidden arrangements between the Defendants designed to heap additional burden on borrowers.

**Predicate Acts of Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343.**

244. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.SC. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged in conduct violating both of these laws to effectuate their scheme.

245.   For the purpose of executing or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1341, on two more or occasions throughout the Class period and up to and including the present, either caused papers to be delivered by the Postal Service or by private commercial interstate carriers or knew and agreed that papers would be delivered by the Postal Service or by private or commercial interstate carriers, including, as described in greater detail below, loan documents, correspondence relating to the provision of force-placed hazard insurance, such as applications, agreements, checks or money orders, notices, correspondence to Plaintiffs and Class members and correspondence and memoranda to and among each other.

246.   For the purpose of executing and/or attempting to execute the above described scheme to obtain money by means of false or fraudulent pretenses, representations or promises, each of the Defendants, in violation of 18 U.S.C. § 1343, on two more or occasions throughout the Class period and up to and including the present, transmitted and received by wire, matter and things, including transfers of money, correspondence, reports, memoranda, manuals, applications and agreements over the telephone, FAX, electronic mail and internet.

247.   Each of the Defendants sent matter and things via the postal service, private or commercial carrier, wire or other interstate media, *inter alia,* as described in the foregoing incorporated paragraphs and set forh with specificity below, in furtherance of their scheme to force-place high-cost, unnecessary and duplicative force-placed insurance.

248.   These notices, telephone calls, correspondence and other communications allowed Defendants to execute their plan and were used to perpetuate the misrepresentations and omissions that lay at the core of Defendants' scheme. While providing an outward appearance of legitimacy, they omitted material details of their scheme and misrepresented the nature and extent of Chase's authority to force-place insurance and misrepresented that Defendants were force-placing insurance to protect the lender's interest in the secured property and failed to

1  inform Plaintiffs and Class Members that Defendants were engaging in a self-dealing, profit
2  making enterprise at their expense, and included:

3        (a)    notices sent by Chase, and Assurant and ASIC or their subsidiaries, as
4  exclusive  force-placed insurance providers for Chase, with Chase's knowledge and consent, to
5  Plaintiffs and Class members informing them of their authority to force-place hazard insurance.
6  A series of these notices, often referred to as cycle letters, were sent to Plaintiffs and each Class
7  members amounting to hundreds of thousands mailings in furtherance of the Defendants'
8  scheme. Chase NYDFS Testimony at 4-5; ASIC NYDFS Testimony at 3-5.  Plaintiffs each
9  received such notices. *See* Exhibits 25, 41, 56, 59, 66-70.

10        (b)    Chase, Assurant, Inc., ASIC and SGIC either in their own capacities, or
11  through their subsidiaries and/or affiliates communicated with borrowers who its systems
12  identified as having lapsed insurance, on multiple occasions by written and verbal (telephone)
13  communications. *See* Exhibit 14, ASIC NYDFS Testimony at 3-5.  *See also*, cycle letters sent
14  to Plaintiffs. *See* Exhibits 20, 25, 39, 41, 46, 47.  These mailings contained false information,
15  half-truths and/or omitted information necessary for borrowers to understand the nature of the
16  force-placed insurance scheme they were being subjected to by Defendants.

17        (c)    Assurant and CIA used the wires to monitor and track Chase's loan
18  servicing portfolio and to identify borrowers whose insurance had lapsed.  This monitoring and
19  tracking function was done pursuant to the scheme and was used for the specific purpose of
20  finding additional scheme victims.

21        (d)    Chase, Assurant, Inc., ASIC and SGIC mailed policies and declarations to
22  Plaintiffs and Class members.  These policies and declarations were known to contain half truths,
23  misinformation and omitted critical information needed by borrowers to protect themselves from
24  the scheme.

25

26

27                                                60

28                                                      Case No. CV-11-03058-JCS
                                                Consolidated Amended Class Action Complaint

1       (e)     Chase communicated to Plaintiffs and Class members through the mail,

2 email, and on the internet.  These communications were in furtherance of the force-placed

3 insurance scheme.

4       (f)     Chase maintains a website through which Plaintiffs and Class members

5 could pay for the fraudulently placed force-placed insurance premiums and obtain information

6 regarding their escrow accounts. *See* https://www.chase.com/online/services/bill-pay.htm.

7       (g)     Chase's website did not contain information necessary for borrowers to

8 understand the true nature and purpose of the force-placed insurance scheme.

9       (h)     Chase, Assurant, Inc., ASIC and SGIC used the wires to establish and

10 manage Plaintiffs' and Class members' escrow accounts, including funding and transferring

11 money which should not have been funded or transferred from the escrow accounts to

12 themselves.

13       (i)     Defendants accepted the improperly-gained payment of money from

14 Plaintiffs and Class members through the mail and by computer transfer/payment of funds.

15 **Pattern of Racketeering Activity**

16     249.    The Defendants have engaged in a "pattern of racketeering activity," as defined

17 by 18 U.S.C. § 1961(5) by committing at least two acts of racketeering, *i.e,.* indictable violations

18 of 18 U.S.C. §§ 1341 and 1343 as described herein, during the class period.  Indeed, Defendants

19 have committed thousands of such acts in connection with the hundreds of thousands of loans for

20 which they force-placed insurance.

21     250.    The multiple acts of racketeering activity that Defendants committed and/or

22 conspired to commit were related to each other, and amount to and pose a threat of continued

23 racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18

24 U.S.C. § 1961(5).

25     251.    Defendants' predicate acts were related, because they reflected the same purpose

26 or goal (to obtain money from Plaintiffs and Class members for the economic benefit of

27                            61

28

Defendants and members of the enterprise); results (obtaining such money); victims (Plaintiffs' and the Class); and methods of commission (the Scheme and other acts described in the Complaint).   The acts were interrelated and not isolated events since they were carried out continuously for the same purposes over a substantial period of time

**Defendants' Conduct Caused Direct Injury**

252.   Plaintiffs and Class members suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment and were caused to suffer injury to their property and/or business in the following ways:

(a)   Defendants force-placed Plaintiffs and Class members into overpriced policies which resulted in unearned profit to Defendants rather than renewing Plaintiffs' and Class members' existing policies or purchasing policies at a commercially reasonable price;

(b)   Defendants charged the premiums for high cost, unnecessary and duplicative force-placed insurance to Plaintiffs' and Class members' escrow accounts;

(c)   Defendants added amounts equaling unpaid force-placed insurance premiums to the balance of Plaintiffs' and Class Members' loans adding to their debt and reducing their equity in their homes;

(d)   Defendants imposed additional costs and debt obligations;[10] and

(e)   Defendants charged for unnecessary and duplicative force-placed insurance.

**Conspiracy Allegations**

253.   In violation of 18 U.S.C. 1962 (d), Defendants have, as set forth above, conspired to violate 18 U.S.C. 1962(c).   The object of the conspiracy was to generate secret profits for Defendants through the Defendants' improper and unlawful abuse of JPMorgan Chase's

---

[10]   *See* Fannie Mae Servicing Guide Announcement SVC-2012-04, available at https://www.efanniemae.com/sf/guides/ssg/2012annlenltr.jsp (last visited Apr. 12, 2013).

62

1  authority to force-place hazard insurance for borrowers whose hazard insurance had lapsed.
2  Instead of providing reasonably priced insurance, Defendants provided unnecessarily high priced
3  policies for unnecessary, duplicative and back dated force-placed insurance. Defendants acted
4  together and misrepresented the reasons for the high cost of the insurance and omitted to inform
5  Plaintiffs and the Class that they were making a substantial profit from the provision of force-
6  placed insurance in a manner inconsistent with their duties and authority granted them under
7  Plaintiffs' and Class members' mortgage contracts.

8      254.    As set forth above, each of the Defendants knowingly, willfully and unlawfully
9  agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs
10 and activities of the Chase Force-Placed Insurance Enterprise through a pattern of racketeering
11 activity, including indictable acts under 18 U.S.C. §§ 1341 and 1343 in violation of 18 U.S.C.
12 1962(c).

13     255.    Each of the Defendants received illicit compensation flowing from the scheme to
14 defraud including, *inter alia*:

15          (a)    JPMorgan Chase received free or discounted tracking services in return for
16 its agreement to exclusively use Assurant Inc.'s force-placed insurance products;

17          (b)    CIA received unearned commission payments from Assurant for each
18 force-placed policy;

19          (c)    BOIC received overpriced reinsurance premiums in light of the fact that
20 BOIC had little to no risk of paying out any money in the form of claims;

21          (d)    ASIC received illicit profits from its overpriced insurance products and the
22 exclusive arrangement between Assurant and Chase;

23          (e)    SGIC received illicit profits from its overpriced insurance products and the
24 exclusive arrangement between Assurant and Chase; and

25          (f)    Assurant, Inc. received monies flowing from the profits received from its
26 wholly owned insurance subsidiaries including ASIC.

27                                          63

28                                                          Case No. CV-11-03058-JCS
                                                    Consolidated Amended Class Action Complaint

1    256.    The agreement between and among the Defendants to act in concert to defraud
2  Plaintiffs and the Class is evident from the conduct in which each engaged that supported and
3  was used by each to implement the improper, deceptive and misleading fraudulent scheme.

4    257.    Each of the Defendants engaged in multiple overt acts in furtherance of the
5  conspiracy to defraud borrowers who were required by Chase to pay for force-placed insurance,
6  including misrepresenting the true reasons for the high cost of force-placed insurance and
7  omitting to inform borrowers that they were profiting from the transaction at their expense.

8          (a)    Chase through its exclusive providers of force placed insurance and their
9  affiliates and subsidiaries developed and forwarded misleading notices to Plaintiffs and the Class
10  which failed to disclose that Chase was earning money from the transaction.

11          (b)    By entering into exclusive deals whereby the force-placed insurance
12  providers, Assurant, Inc., ASIC, SGIC and their affiliates and subsidiaries not only charged for
13  the cost of providing force-placed insurance but also improperly recouped general servicing costs
14  by charging the small subset of borrowers' whose insurance was force-placed for the costs of
15  servicing Chase's loan  portfolio, including such portfolio-wide administrative activities  as
16  tracking and monitoring, the costs of which were not properly included in Plaintiffs' and other
17  borrowers' force-place insurance premiums. *See* Birnbaum NYDFS Testimony at 17.

18          (c)    Paying fees, commissions or other consideration to subsidiaries and
19  affiliates (BOIC and CIA) for ***producing*** insurance business or functioning as an insurance
20  agency for Chase when they do not perform the traditional role of an insurance broker and do not
21  and did not, in fact, ***produce*** any insurance or provide insurance agency services in the
22  traditional sense as Chase entered into exclusive deals with Assurant under which they provided
23  all force-placed insurance for Chase.  Indeed, CIA, Assurant, Inc., ASIC  or SGIC did not
24  perform any of the traditional duties of insurance producer, such as evaluating the individual
25  needs of the policy holder or seeking the most competitive price for the borrower. *See* Birnbaum
26  NYDFS Testimony at 18.

27

28

1

## CLASS ACTION ALLEGATIONS

2    258.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and

3    23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes: [11]

4          a nationwide class consisting of all persons who have or had a
           residential mortgage loan or line of credit with JPMorgan, Chase
5          Bank or Chase Home Finance and had hazard insurance force-
           placed upon the secured property by JPMorgan, Chase Bank or
6          Chase Home Finance, between June 20, 2007, and the date of final
           disposition of this action;
7

8          a California subclass consisting of all persons who have or had a
           residential mortgage loan or line of credit with JPMorgan, Chase
9          Bank or Chase Home Finance secured by property located in the
           State of California and had hazard insurance force-placed upon the
10         secured property by JPMorgan, Chase Bank or Chase Home
           Finance between June 20, 2007, and the date of final disposition of
11         this action. (the "California Subclass");

12         a New Jersey subclass consisting of all persons who have or had a
           residential mortgage loan or line of credit with JPMorgan, Chase
13         Bank or Chase Home Finance secured by property located in the
           State of New Jersey and had hazard insurance force-placed upon
14         the secured property by JPMorgan, Chase Bank or Chase Home
           Finance between October 17, 2005 and the date of final disposition
15         of this action. (the "New Jersey Subclass"); and

16         a Florida subclass consisting of all persons who have or had a
           residential mortgage loan or line of credit originated and/or
17         serviced by JPMorgan, Chase Bank or Chase Home Finance, that
           was secured by real property located in the State of Florida, and
18         between October 17, 2005 and the date of final disposition of this
           action, were required to pay for a "forced-placed" hazard insurance
19         policy, and who were contacted by or on behalf of Defendants
           knowing that such persons were represented by attorneys at the
20         time with respect to debts in contravention of s. 559.72(18), Fla.
           Stat., between June 20, 2007 and the date of the final disposition of
21         this action (the "Florida Subclass").

22

23

24

25         [11]    Plaintiffs reserve the right to seek modification of the Class Period definitions for the
           class and subclasses in the likely event that further investigation/discovery reveals a more
26         appropriate and broader time period.

27                                                65

28

an Illinois subclass consisting of all persons who have or had a residential mortgage loan or line of credit owned, originated or serviced by JPMorgan Chase Bank, N.A. or Chase Home Finance, LLC secured by property located in the State of Illinois and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property (the "Illinois Class") (collectively, the "Classes").

259.    The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns. The Classes also exclude government entities and judicial officers that have any role in adjudicating this matter.

260.    The Classes are so numerous that joinder of all members is impracticable.

261.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

262.    Plaintiffs' claims are typical of the claims of the Classes.

263.    There are questions of law and fact common to the Classes, including but not limited to:

(a)    The nature, scope and implementation of Defendants' unlawful, improper and fraudulent acts;

(b)    Whether Defendants conspired in furtherance of the unlawful acts alleged herein;

(c)    Whether Defendants have engaged in mail and wire fraud;

(d)    Whether Defendants have engaged in a pattern of racketeering activity;

(e)    Whether the Chase Force-Placed Insurance Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(f)    Whether Defendants conducted or participated in the affairs of the Chase Force-Placed Insurance Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

(g)     Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to Plaintiffs' and Class members' business or property;

(h)     Whether Defendants misrepresented the reason for the high cost of force-placed insurance;

(i)     Whether Defendants misrepresented that the Plaintiffs' and Class members mortgage contracts authorized them to force-place insurance in the manner they did;

(j)     Whether Defendants fraudulently concealed their scheme;

(k)     Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(l)     Whether Chase maintained a policy of referring force-placed insurance business to Assurant;

(m)     Whether JPMorgan Chase breached the terms of Plaintiffs' and Class members' mortgages or loan contracts;

(n)     Whether Defendants had captive reinsurance arrangements with force-placed insurance providers;

(o)     Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

(p)     Whether Defendants received commission payments from force-placed insurance providers;

(q)     Whether subsidiaries or affiliates of Defendants received reinsurance premium payments from force-placed insurance providers;

(r)     Whether Defendants' force-placed insurance policies were provided by an affiliated entity;

(s)     Whether Defendants or their affiliates participated in arrangements that involved kickbacks;

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

1        (t)      Whether Defendants received financial benefits from the force-placed

2 insurance provider in the form of insurance monitoring, tracking and processing services;

3        (u)      Whether Defendants received unauthorized and illicit payments in

4 connection with force-placed insurance that were unrelated to a *bona fide* service in connection

5 with the force-placed insurance and its purpose;

6        (v)      Whether Defendants received payments in connection with force-placed

7 insurance that exceeded the value of any services actually performed or that were otherwise

8 commercially unreasonable;

9        (w)     Whether Defendants wrongfully backdated force-placed insurance

10 policies;

11        (x)      Whether Defendants required unnecessary or duplicative force-placed

12 insurance;

13        (y)      Whether Defendants violated their implied covenant of good faith and fair

14 dealing;

15        (z)      Whether Defendants breached the implied covenant of good faith and fair

16 dealing in Plaintiffs' and Class Members' mortgages or loan contracts;

17        (aa)    Whether Defendants breached the terms of Plaintiffs' and Class members'

18 mortgages or loan contracts;

19        (bb)    Whether JPMorgan Chase breached its fiduciary duty to Plaintiffs and

20 members of the Class;

21        (cc)    Whether Assurant, Inc., ASIC and SGIC induced and/or participated in

22 JPMorgan Chase's breach of fiduciary duties;

23        (dd)    Whether Defendants have been unjustly enriched; and

24        (ee)    Whether Defendants are liable to Plaintiffs and the Class (and Subclass)

25 for damages and, if so, the measure of such damages.

26

27

28

264.   These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Classes members.

265.   The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by Defendants.

266.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes.  Plaintiffs have no claims antagonistic to those of the Classes.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Classes.

267.   Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

268.   Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudication with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

269.   Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

270.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**BREACH OF CONTRACT**
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING ON BEHALF OF THE NATIONWIDE CLASS AGAINST**
**DEFENDANTS JPMORGAN CHASE BANK, N.A. CHASE BANK USA, N.A.)**

271.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

272.    Every contract contains an implied covenant of good faith and fair dealing.

273.    The mortgage contracts of Plaintiffs and the other Class members contained an implied covenant of good faith and fair dealing, pursuant to which Defendants were bound to perform their obligations in good faith and to deal fairly with Plaintiffs and the other Class members.

274.    To the extent that the mortgage contracts of Plaintiffs and the Class members permitted Defendants to unilaterally "force-place" insurance, Defendants were obligated not to exercise their discretion to do so capriciously and in bad faith (for their own financial gain for the purposes of maximizing profits at borrowers' expense).

275.    Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

(a)    Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing borrowers to pay for insurance policies from providers chosen by Defendants.  These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b)    Using their discretion to choose a force-placed insurance provider and a policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the

70

property and (ii) the cost of the commissions/reinsurance premiums Defendants accepted from the force-placed insurance provider;

   (c) Failing to seek competitive bids on the open market or otherwise making good faith efforts to reasonably exercise their discretion and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for Defendants;

   (d) Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and the Class while misrepresenting the reason for the cost of the policies;

   (e) Collecting a percentage of the force-placed premiums charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

   (f) Accepting purported reinsurance premiums and/or commissions in return for placing borrowers with force-placed insurance providers, despite the fact that Defendants actually incur little, if any, expense because: (i) the force-placed insurance policies are automatically issued pursuant to pre-arranged agreements with providers; and/or (b) Defendants' captive reinsurance agreements provide for little or no actual transfer of risk;

   (g) Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

   (h) Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss Payable Endorsement;

   (i) Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

(j)     Failing to provide borrowers with any opportunity to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a commission and/or captive reinsurance arrangement.

276.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the other Class members have suffered damages.

277.    Plaintiffs and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## COUNT TWO

## BREACH OF CONTRACT

## (ON BEHALF OF THE NATIONWIDE CLASS AGAINST DEFENDANTS JPMORGAN CHASE BANK, N.A. , CHASE BANK USA, N.A.)

278.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

279.    Defendants have serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

280.    To the extent that the mortgage contracts of Plaintiffs and the Class permitted Defendants to unilaterally "force-place" insurance, Defendants were contractually obligated to exercise their discretion to do so in a reasonable manner.

281.    Nonetheless, Defendants have imposed or collected amounts that exceeded the amounts necessary to protect the mortgagee's interest in the policy.   Such practices have included, without limitation: (a) requiring borrowers to pay amounts for insurance coverage that exceed the amounts necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

72

282.    Defendants have thus breached the mortgage contracts of Plaintiffs and the other Class members.

283.    Plaintiffs and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

**COUNT THREE**

**VIOLATION OF THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT, 18 § U.S.C. 1962(C) – RICO**

**(ON BEHALF OF THE NATIONWIDE CLASS AGAINST ALL DEFENDANTS)**
0

284.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

285.    This claim for relief arises under 18 U.S.C. § 1962(c).

286.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

287.    As set forth above and in the succeeding paragraphs (and particularly ¶¶ 151-169), Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Chase Force-Placed Insurance Enterprise, through a pattern of racketeering acts indictable under 18 U.S.C. §§ 1341 and 1343 which resulted in injury to Plaintiffs and the Class.

288.    As a direct and proximate result, Plaintiffs and Class members have been injured in their business or property by predicate acts which make up the Defendants' pattern of racketeering activity as described herein.

**COUNT FOUR**

**VIOLATION OF THE RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d) – RICO**

**(ON BEHALF OF THE NATIONWIDE CLASS AGAINST ALL DEFENDANTS)**

289. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

290. This claim for relief arises under 18 U.S.C. § 1962(c).

291. In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above (and particularly ¶¶ 151-169), conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Chase Force-Placed Insurance Enterprise.

292. As a direct and proximate result, Plaintiffs and Class members have been injured in their business or property by predicate acts which make up the Defendants' pattern of racketeering activity as described herein.

**COUNT FIVE**

**BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION OF FUNDS HELD IN TRUST**

**(ON BEHALF OF THE NATIONWIDE CLASS AGAINST DEFENDANTS JPMORGAN CHASE BANK, N.A., CHASE BANK USA, N.A.)**

293. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

294. JPMorgan Chase holds and/or controls funds in escrow; controls the establishment, funding requirements and maintenance of escrow accounts for the purposes of paying taxes, assessments, insurance premiums and other items set forth in borrowers'

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

mortgages, *see* Exhibits 2-9 at ¶ 3, and is obligated under the mortgages to return any excess funds in accordance with the terms of the mortgages.

295.    Since the time that JPMorgan Chase began servicing the Plaintiffs' mortgages, JPMorgan Chase has required payment of and accepted monies from the Plaintiffs for escrow items identified in their mortgage on a monthly basis, held them in escrow and charged the cost of the premiums to Plaintiffs' escrow, pursuant to the terms of Plaintiffs' mortgages.

296.    JPMorgan Chase was obliged to hold, manage and control these escrow funds in trust, and owed Plaintiffs and members of the Class the highest fiduciary duty with respect to the handling of such funds.

297.    JPMorgan Chase breached its fiduciary duty to Plaintiffs and the members of the Class by, *inter alia*: (a) unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that were inflated solely in order to generate additional profits for Defendants; (b) profiting from unnecessary and excessive force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiffs and the Class members; (c) unilaterally utilizing the escrow funds to pay for unnecessary and duplicative insurance for purposes of increasing Defendants' profits; and (d) improperly depleting the escrow funds for unnecessary, unauthorized and duplicative hazard insurance resulting in additional costs and injury to Plaintiffs and members of the Class.

298.    These actions were undertaken by JPMorgan Chase in bad faith solely for the benefit of Defendants and were not intended to benefit Plaintiffs or other borrowers.

299.    As a direct result of JPMorgan Chase's actions and subversion of Plaintiffs' interest to Defendants' own interests in reaping additional, extravagant and unauthorized fees and profits, Plaintiffs and the Class have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss

1  of equity in the property due to increases in the amounts due under the mortgage to cover escrow
2  shortfalls.

3      300.    Plaintiffs and the Class are entitled to all damages resulting from JPMorgan
4  Chase's breach of its fiduciary obligations and misappropriation of escrow funds. In addition,
5  Plaintiffs and the Class are entitled to punitive damages because JPMorgan Chase acted in bad
6  faith in deliberate and/or reckless disregard of their rights and JPMorgan Chase's obligation to
7  hold their escrow funds in trust.

8                                    **COUNT SIX**

9                    **AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY**

10                **(ON BEHALF OF THE NATIONWIDE CLASS AGAINST DEFENDANTS
              ASSURANT, INC., AMERICAN SECURITY INSURANCE
11           COMPANY, STANDARD GUARANTY INSURANCE COMPANY, CHASE
              INSURANCE AGENCY, INC. AND BANC ONE INSURANCE COMPANY)**
12

13     301.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they
14  were fully set forth herein.

15     302.    JPMorgan Chase breached its fiduciary duties to Plaintiffs and the Class as set
16  forth herein above, including specifically as set forth in Count Three.

17     303.    Assurant, Inc., ASIC, SGIC CIA and BOIC actively induced and/or participated
18  in JPMorgan Chase's breach of fiduciary duties through the conduct described herein, including,
19  but not limited to, offering JPMorgan Chase the opportunity to reap additional profits through a
20  scheme to force-place borrowers serviced by JPMorgan Chase in unnecessary, duplicative and
21  exorbitantly priced force-placed insurance and tracking services sold by ASIC, SGIC and other
22  Assurant, Inc. subsidiaries, in exchange for kickbacks, sham commissions, fees for sham services
23  and "rebates" paid to Chase.

24     304.    Assurant, Inc. ASIC and SGIC actively induced and/or participated in JPMorgan
25  Chase's breach of fiduciary duties through the provision of tracking services that identified and
26  implemented the force-placement of Plaintiffs and Class members in unnecessary, duplicative

27                                        76

28                                                     Case No. CV-11-03058-JCS
                                          Consolidated Amended Class Action Complaint

and exorbitantly priced hazard insurance and facilitated the billing and payment for such insurance.

305.    BOIC induced and/or participated in JPMorgan Chase's breach of fiduciary duties through the acceptance of ceded reinsurance premiums that were nothing more than kickbacks to JPMorgan Chase and which were improperly included in the force-placed hazard insurance premiums paid by Plaintiffs and Class members.

306.    CIA induced and/or participated in JPMorgan Chase's breach of fiduciary duties through the facilitation of Chase's scheme by participating in the selection of Chase's exclusive force-placed insurance provider.

307.    As a result of the breach of fiduciary duties to Plaintiffs and members of the Class by JPMorgan Chase that Assurant Inc., ASIC, SGIC, CIA and BOIC induced and/or participated in with full knowledge as herein described, Plaintiffs and members of the Class suffered damages in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

308.    Plaintiffs and the Class are entitled to all damages resulting from JPMorgan Chase's breach of their fiduciary obligations and misappropriation of escrow funds. BOIC, CIA and the Assurant defendants are liable for these damages by virtue of Assurant's aiding and abetting JPMorgan Chase's conduct.

**COUNT SEVEN**

**VIOLATION OF CALIFORNIA BUSINESS AND
PROFESSIONAL CODE §§ 17200 ET SEQ.**

**(ON BEHALF OF THE CALIFORNIA SUBCLASS AGAINST ALL DEFENDANTS)**

309.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

310.   Throughout the Class Period, Defendants have regularly conducted business throughout the State of California.

311.   California Business & Professions Code §§ 17200 *et seq.* prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

312.   Defendants engaged in unfair and unlawful business acts and practices in violation of California Business & Professions Code §§ 17200, *et seq.*, in that: (a) Defendants' conduct is an unlawful violation of RICO; (b) Defendants' practices and conduct are immoral, unethical, oppressive and substantially harmful to Plaintiffs and the members of the Class; (c) the justification for Defendants' practices and conduct is outweighed by the gravity of the injury to Plaintiffs and the Class; (d) Defendants' practices constitute unfair, untrue or misleading actions in that such conduct is likely to deceive and, in fact, did deceive members of the public.

313.   Defendants' unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

(a)   Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing borrowers to pay for insurance policies from providers of Defendants' choice. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b)   Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the property and (ii) the cost of the commissions/reinsurance premiums Defendants accepted from the force-placed insurance provider;

(c)   Failing to seek competitive bids on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

1         (d)     Assessing excessive, unreasonable, and unnecessary insurance policy

2 premiums against Plaintiffs and the Class and misrepresenting the reason for the cost of the

3 policies;

4         (e)     Collecting a percentage of the force-placed premiums charged to Plaintiffs

5 and the Class and not passing that percentage on to the borrower, thereby creating the incentive

6 to seek the highest-priced premiums possible;

7         (f)     Accepting purported reinsurance premiums and/or commissions in return

8 for placing borrowers with force-placed insurance providers, despite the fact that Defendants

9 actually incur little, if any, expense because: (i) the force-placed insurance policies are

10 automatically issued pursuant to pre-arranged agreements with providers; and/or (b) Defendants'

11 captive reinsurance agreements provide for little or no actual transfer of risk;

12         (g)     Backdating force-placed insurance policies to cover time periods which

13 have already passed and for which there is absolutely no risk of loss;

14         (h)     Procuring force-placed insurance policies to cover time periods during the

15 mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement;

16         (i)     Misrepresenting in their force-placed insurance notices that borrowers

17 were obligated to pay for backdated insurance coverage for periods during which the lender had

18 no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss

19 Payable Endorsement;

20         (j)     Purchasing force-placed insurance coverage through and/or from related

21 entities at inflated premiums instead of through disinterested brokers and/or insurance carriers,

22 thereby depriving borrowers of the benefit of price competition;

23         (k)     Failing to provide borrowers with any opportunity to opt out of having

24 their force-placed insurance policies provided by an insurer with whom Defendants had a

25 commission and/or captive reinsurance arrangement; and

26

27                                      79

28                                                   Case No. CV-11-03058-JCS

1    (l)   Engaging in other unfair and/or unlawful conduct as described in this

2  complaint.

3    314.   The foregoing acts and practices have detrimentally impacted competition and

4  caused substantial harm to Plaintiffs and to members of the Class.  Plaintiffs have suffered

5  injuries in fact and have lost money or property as a result of Defendants' conduct.

6    315.   By reason of the foregoing, Defendants should be required to pay damages in an

7  amount to be proven at trial; disgorge their illicit profits and/or make restitution to Plaintiffs, the

8  general public, and the other members of the Class; and/or be enjoined from continuing in such

9  practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

10  ## COUNT EIGHT

11  ## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

12  ## (ON BEHALF OF THE NEW JERSEY SUBCLASS AGAINST ALL DEFENDANTS)

13    316.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they

14  were fully set forth herein.

15    317.   The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2 (2006), provides

16  that:

17          [t]he act, use or employment by any person of any unconscionable
18          commercial practice, deception, fraud, false pretense, false
            promise, misrepresentation, or the knowing, [sic] concealment,
19          suppression, or omission of any material fact with intent that others
            rely upon such concealment, suppression or omission, in
20          connection with the sale or advertisement of any merchandise or
            real estate, or with the subsequent performance of such person as
21          aforesaid, whether or not any person has in fact been misled,
            deceived or damaged thereby, is declared to be an unlawful
22          practice; …

23    318.   Defendants' violated this section in that: (a) Defendants' conduct in violation of

24  RICO constitutes a *per se* violation of the NJCFA; (b) Defendants' practices are unconscionable

25  in that they are unethical, immoral, oppressive and harmful and depart from the standard of good

26  faith, honesty in fact and fair dealing established under the NJCFA; and (c) Defendants conduct

27                                          80

28

was deceptive and fraudulent, concealing numerous material facts and misrepresenting others all with the result of causing Plaintiffs and Class members to suffer ascertainable losses of money or property

319.   These unconscionable acts and practices include, but are not limited to, the following:

(a)   Failing to make any effort to maintain home owners' existing insurance policies and, instead, forcing home owners to pay for exorbitantly priced insurance policies from providers of Defendants' choice and from whom Defendants received unlawful kickbacks;

(b)   Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both insurance and kickbacks/commissions to Defendants;

(c)   Failing to seek competitive bids on the open market or otherwise force-place insurance at commercially reasonable rates;

(d)   Force-placing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and the other Class members while misrepresenting the reason for the excessive cost of the policies;

(e)   Collecting a percentage of the force-placed insurance policy premiums as a commission and not passing that percentage on to the borrower, thereby creating an incentive to seek the highest-priced premiums possible;

(f)   Accepting commissions or kickbacks in return for force-placing home owner's insurance on Plaintiff Mayko's and the other New Jersey Subclass members' properties, despite the fact that Defendants actually incur virtually no costs in placing the insurance because force-placed insurance carriers like Assurant, Inc., ASIC and SGIC monitor Defendants' loan portfolio's and agree to place insurance when existing policies lapse; all at no cost to Defendants.

81

1        (g)     Backdating force-placed insurance policies to cover periods of time during

2 which there were no claims or loss on the properties, thus charging for insurance with zero risk

3 of loss;

4        (h)     Misrepresenting in their force-placed insurance notices that borrowers

5 were obligated to pay for backdated insurance coverage for periods during which the lender had

6 no risk of loss due to the passing of time or the lender's coverage under a Lender's Loss Payable

7 Endorsement;

8        (i)     Purchasing force-placed insurance coverage through related entities at

9 inflated premiums instead of on the open market at commercially reasonable prices;

10       (j)     Failing to provide home owners with any opportunity to choose any

11 insurance provider other than one with whom Defendants had a commission or kickback

12 reinsurance arrangement.

13       (k)     Engaging in other unfair, deceptive, unreasonable or unconscionable

14 conduct described herein.

15    320.    These are unconscionable commercial practices, including acts of deception,

16 fraud, false promises and misrepresentations, which constitute multiple, separate violations of

17 N.J. Stat. Ann. § 56:8-2 (2006).

18    321.    Defendants' unlawful conduct set forth in this Complaint has the capacity to

19 mislead or deceive consumers, including Plaintiff Mayko and the other members of the New

20 Jersey Subclass.

21    322.    Defendants' business practices, including their misrepresentations and omissions,

22 set forth in this Complaint are material in that they relate to matters which reasonable persons,

23 including Plaintiff Mayko and the other members of the New Jersey Subclass, would attach

24 importance to in their conduct regarding Defendants' products.

25

26

27                          82

28

323.     Plaintiff Mayko and the other members of the New Jersey Subclass have suffered ascertainable losses of money and/or property as a result of Defendants' employment of the unlawful acts and practices set forth in this Complaint.

324.     Plaintiff Mayko and the other members of the New Jersey Subclass seek damages, treble damages, injunctive relief and other appropriate legal or equitable relief, including restitution, filing fees, costs and attorneys' fees, pursuant to N. J. Stat. Ann. § 56:8-19 (2006), and a refund of all monies acquired by Defendants by means of Defendants' unlawful conduct as set forth in this Complaint, pursuant to N.J. Stat. Ann. §§ 56:8-2.11 and 56:8-2.12 (2006).

## COUNT NINE

## VIOLATION OF THE FLORIDA CONSUMER COLLECTIONS PRACTICES ACT (VIOLATION OF § 559.72, FLA. STAT.)

## (ON BEHALF OF THE FLORIDA SUBCLASS AGAINST ALL DEFENDANTS)

325.     Plaintiffs herby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

326.     The Florida Consumer Collections Practices Act ("FCCPA"), as per § 559.72, Fla. Stat., provides:

327.     In collecting consumer debts, no person shall:

> (9) Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist.

> \* \* \*

> (18) Communicate with a debtor if the person knows that the debtor is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the debtor's attorney fails to respond within 30 days to a communication from the person, unless the debtor's attorney consents to a direct communication with the debtor, or unless the debtor initiates the communication.

328.     Pursuant to § 559.55(1), Fla. Stat.:

83

'debt' or 'consumer debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

329.    Pursuant to § 559.55(2), Fla. Stat., "'Debtor' or 'consumer' means any natural person obligated or allegedly obligated to pay any debt."

330.    The alleged debt represented by Plaintiffs Leger and Varnes' notes and mortgages arose out of a transaction in which the money, property, and insurance that are the subject of the mortgage were primarily for personal, family, or household purposes, to wit: shelter and shelter-related expenses for Plaintiffs Leger and Varnes' respective families.

331.    Defendants' charging and collection in connection with the mortgage note, including for force-placed insurance, is the collection of consumer debts and regulated by the FCCPA.

332.    In charging for force-placed insurance and pursuing collection thereof, including threatened foreclosure, Defendants claimed, attempted, and threatened to enforce a debt when they had full knowledge that the debt was not legitimate, and asserted the existence of the legal right to charge and collect excessive amounts for force-placed insurance when they had knowledge that the rights did not exist, and thereby violated the FCCPA.

333.    By communicating with debtors with full knowledge that the debtors are represented by attorneys with respect to such debts in contravention of the FCCPA, Defendants violated the FCCPA.

334.    Pursuant to the FCCPA, § 559.77, Fla. Stat., Defendants are liable for actual damages and for additional statutory damages of up to $1,000 for Plaintiffs Leger and Varnes, and an aggregate award of additional statutory damages up to the lesser of $500,000 or 1 percent of Defendants' net worth for all remaining class member, so long as the aggregate award does not provide an individual class member with additional statutory damages in excess of $1,000.

84

335.    In accordance with the FCCPA, § 559.77, Fla. Stat., Plaintiffs Leger and Varnes also seek court costs and reasonable attorneys' fees, as well as punitive damages and such other equitable relief as this court deems necessary or proper, including enjoining Defendants from further violations of the FCCPA.

## COUNT TEN

### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, *ET SEQ.*

### (ON BEHALF OF THE ILLINOIS SUBCLASS AGAINST ALL DEFENDANTS)

336.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

337.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* provides, in pertinent part: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damage thereby...." *See* 815 ILCS 505/2.

338.    Defendants' business practices alleged herein are deceptive acts or practices and, thus, constitute multiple, separate and independent violations of 815 ILCS 505/1, *et seq.*  These deceptive acts and practices include, without limitation:

(a)    Failing to make any effort to maintain borrowers' existing insurance policies and, instead, for the sole purpose of maximizing their own financial gain, purchasing and charging borrowers for force-placed insurance policies from providers of Defendants' choice, such as ASIC and SGIC.  These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

85

1          (b)    Choosing a force-placed insurance provider and policy in bad faith and in

2  contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay

3  for more than the cost of protecting the lender's interest in the secured property;

4          (c)    Selecting force-placed insurance providers according to pre-arranged

5  secret deals whereby the insurance policies are continually purchased through the same

6  companies;

7          (d)    Assessing excessive, unreasonable and unnecessary insurance policy

8  premiums against Plaintiffs and the Illinois Class and misrepresenting the reason for the cost of

9  the policies;

10         (e)    Backdating force-placed insurance policies to cover time periods which

11  have already passed and for which there was already absolutely no risk of loss;

12         (f)    Misrepresenting in force-placed insurance notices that borrowers were

13  obligated to pay for backdated insurance coverage for periods during which the lender had no

14  risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss

15  Payable Endorsement or standard mortgage clause;

16         (g)    Procuring force-placed insurance policies to cover time periods during

17  which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement or

18  standard mortgage clause;

19         (h)    Failing to provide borrowers with any opportunity to opt out of having

20  their force-placed insurance policies provided by an insurer with whom Defendant had a

21  kickback arrangement;

22         (i)    Misrepresenting that the charges imposed for force-placed insurance were

23  to protect the borrowers' and Defendants' "mutual interests in the property" and that any

24  portions of the premiums returned to Defendants were for expense incurred in connection with

25  forced-placing insurance; and

26

27                              86

28

1          (j)     Engaging in other unfair or unlawful conduct as described in this

2    Complaint.

3          339.    Defendants engaged in these deceptive acts or practices in the conduct of

4    business, trade or commerce in the State of Illinois.

5          340.    Defendants' communications with Plaintiffs and the Illinois Class members in

6    which they notify mortgagees that force-placed insurance has been or will be purchased on the

7    mortgaged property and communications or documents which purport to describe or proscribe

8    Defendants' practices of force-placed insurance are directed to consumers as that term is defined

9    under Illinois Law.

10         341.    Defendants' deceptive acts or practices alleged herein are likely to mislead

11   reasonable consumers acting reasonably under the circumstances, including Plaintiffs and

12   members of the Illinois Class.

13         342.    Defendants' deceptive acts or practices alleged herein constitute consumer-

14   oriented conduct in that Defendants' deceptive acts or practices were directed to, and affected,

15   consumers of mortgage and home insurance products, including Plaintiffs and the Illinois Class

16   members.

17         343.    Defendants' deceptive acts or practices alleged herein have a broad, adverse

18   impact on consumers, including Plaintiffs and the Illinois Class members.

19         344.    Defendants' deceptive acts or practices alleged herein are part of a pattern of

20   conduct by Defendants to defraud consumers, are ongoing and are likely to continue to harm the

21   public and frustrate the public interest in commercially reasonable and non-deceptive insurance

22   and mortgage servicing practices between Defendant and the residents of Illinois whose

23   mortgages they service.

24         345.    Defendants' deceptive acts or practices alleged herein have been furthered, in

25   part, through a pattern of standard written communications disseminated broadly by or on behalf

26   of Defendants to thousands of Illinois residents whose mortgages they service.

27                                              87

28                                                              Case No. CV-11-03058-JCS
                                                   Consolidated Amended Class Action Complaint

346.    Defendants' deceptive acts or practices alleged herein are material in that they relate to matters that would reasonably be expected to be important to a reasonable consumer in making his or their decision whether to do business with Defendant.

347.    Plaintiffs and the Illinois Class members suffered injuries as a direct or proximate result of Defendants' deceptive acts or practices set forth in this Complaint.   Defendants' deceptive acts or practices caused injury and damages to Plaintiffs and the Illinois Class members in an amount to be proven at trial, including paying excessive and commercially unreasonable premiums for homeowners insurance.

348.    Plaintiffs and the Illinois Class members seek to recover their actual damages, injunctive relief, costs and reasonable attorneys' fees, pursuant to 815 ILCS 505/1, *et seq*.

## COUNT ELEVEN

### UNJUST ENRICHMENT/DISGORGEMENT
### (ON BEHALF OF THE NATIONWIDE CLASS AGAINST ASSURANT, INC, ASIC, SGIC, CIA AND/OR BOIC)

349.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

350.    Neither Plaintiffs nor other Class Members entered into a contract with Defendants Assurant, Inc., ASIC, SGIC, CIA and/or BOIC as a result of the imposition of force-placed insurance.   As a result of the explicit absence of a contractual relationship between Plaintiffs/Class Members and Defendants Assurant, Inc., ASIC, SGIC, CIA and/or BOIC there is no adequate remedy at law to compensate Plaintiffs and Class Members for the money improperly taken from them and retained by Assurant through the scheme described herein.

351.    Plaintiffs and the members of the Class have conferred a substantial benefit upon Defendants which has been appreciated by Defendants.   During the Class Period, Defendants have wrongfully collected millions of dollars in unearned commission payments and purported reinsurance premiums and derived from the force-placed insurance premiums paid by Plaintiffs and the putative Class members.

88

352.   The reason Plaintiffs and Class Members were required to pay the unreasonable amounts charged for unnecessary, backdated and/or duplicative force-placed insurance is because of the scheme designed and perpetrated between Defendants described herein. These improper payments were accepted and retained by Defendants Assurant, Inc., ASIC, SGIC, CIA and/or BOIC under circumstances such that it would be inequitable for those Defendants to retain the benefit without payment to Plaintiffs and the Classes.

353.   These payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiffs and the members of the Class.

354.   Additionally, Chase improperly received late fees, interest and other income based upon Plaintiffs' and members of the Class' failure to pay for the insurance premiums that Defendants illegally charged.

355.   As a result of Defendants' unjust enrichment, Plaintiffs and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

356.   Plaintiffs and the Class also seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

357.   Defendants received from Plaintiffs and Class Members a benefit in the form of overcharges for force-placed insurance policies which are excessive and unreasonable, and are the result of overreaching and self-dealing.

358.   Defendants entered into an agreement where Assurant, Inc. and/or ASIC and/or SGIC would provide force-placed insurance policies to Plaintiffs and the Class, which policies were paid for at prices that were far higher than the market rates for similar policies. Defendants knew that the charges for these policies were excessive and not the result of good faith practices.

359.    Assurant, Inc. and/or ASIC and SGIC paid significant monies in illegal kickbacks, commissions, and referral fees directly to Defendants in order to be able to exclusively provide force-placed insurance policies at unreasonable rates.

360.    BOIC received sham reinsurance premiums.

361.    CIA received improper fees, consideration and commissions.

362.    Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes and award the following relief:

A.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    Plaintiffs and the Classes be awarded treble the amount of damages suffered by Plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses pursuant to RICO, 18 U.S.C. §§ 1962 (c) and (d); § 8(d)(2);

D.    Compensatory, consequential, and general damages in an amount to be determined at trial;

E.    Costs and disbursements of the action;

F.    Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

G.    Pre- and post-judgment interest;

H.    Reasonable attorneys' fees; and

I.    That Defendants be enjoined from the conduct challenged herein; and

Case No. CV-11-03058-JCS
Consolidated Amended Class Action Complaint

1       J.      Such monetary, injunctive other relief to each of the subclasses that is provided

2 for by the state statutes pursuant to Counts Eight –Ten; and

3       K.      Such other and further relief as this Court may deem just and proper.

4                                 **DEMAND FOR JURY TRIAL**

5       Plaintiffs hereby demand a trial by jury as to all claims in this action.

6 Dated April 26, 2013                       Respectfully submitted,

7

8                                 */s/ Edward W. Ciolko*
                                **KESSLER TOPAZ**

9                                     **MELTZER & CHECK, LLP**
                                Ramzi Abadou (SBN 222567)

10                               One Sansome Street, Suite 1850
                              San Francisco, CA 94104

11                               Telephone: (415) 400-3000
                              Facsimile: (415) 400-3001

12                                 **KESSLER TOPAZ**

13                                   **MELTZER & CHECK, LLP**
                              Edward W. Ciolko

14                               Peter A. Muhic
                              Donna Siegel Moffa

15                               Amanda R. Trask
                              Jesse C. Klaproth

16                               280 King of Prussia Road
                              Radnor, PA 19087

17                               Telephone: (610) 667-7706
                              Facsimile: (610) 667-7056

18                               eciolko@ktmc.com

19                               pmuhic@ktmc.com
                              dmoffa@ktmc.com

20                               atrask@ktmc.com

21                               jklaproth@ktmc.com

22                               **NIX PATTERSON & ROACH, LLP**
                              Brad Seidel

23                               Christopher Johnson
                              3600 North Capital of Texas Highway

24                               Building B Suite 350

25                               Austin, TX 78746
                              Telephone: (512) 328-5333

26                               Facsimile: (512) 328-5335

27                         91

28                               Case No. CV-11-03058-JCS
                          Consolidated Amended Class Action Complaint

**SALPETER GITKIN, LLP**
James P. Gitkin
Eric T. Salpeter
Museum Plaza – Suite 503
200 South Andrews Avenue
Fort Lauderdale, FL 33301
Telephone: (954) 467-8622
Facsimile: (954) 467-8623
Email: jim@salpetergitkin.com
Email: eric@salpetergitkin.com

**GOLDMAN SCARLATO KARON &
PENNY, P.C.**
Brian D. Penny
101 E. Lancaster Avenue, Suite 204
Wayne, PA 19087
Phone: 484 342-0700
Email: penny@gskplaw.com

**BERGER & MONTAGUE, P.C.**
Michael Dell'Angelo
Sarah R. Schalman-Bergen
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215 875-3080
Facsimile:  (215)875-4604
Email: mdellangelo@bm.net
Email: sschalman-bergen@bm.net

**TAUS, CEBULASH & LANDAU, LLP**
Archana Tamoshunas
80 Maiden Lane, Suite 1204
New York, New York 10038
Telephone: 212-931-0704
Fax: 212-931-0703
Email: atamoshunas@tcllaw.com

**GILMAN LAW LLP**
Kenneth G. Gilman, FBN #0340758
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 307
Bonita Springs, FL  34134
Telephone (239) 221-8301
Facsimile (239) 676-8224
Email: kgilman@gilmanpastor.com

92

**HOLLAND, GROVES, SCHNELLER & STOLZE, LLC**
Eric D. Holland
Gerard B. Schneller
300 N Tucker, Suite 801
St. Louis, Missouri 63101
Telephone: 314.241.8111
Facsimile: 314.241.5554
Email: eholland@allfela.com
Email: gschneller@allfela.com

**CATES MAHONEY, LLC**
David Cates
216 West Pointe Drive, Suite A
Swansea, IL  62226
Telephone: 618-277-3644
Facsimile: 618-277-7882
Email: dcates@cateslaw.com

**GROSSMAN ROTH, P.A.**
Seth E. Miles
2525 Ponce de Leon Blvd.
Suite 1150
Coral Gables, FL  33134
Telephone: 305.442.8666
Facsimile: 305.285.1668
Email  sem@grossmanroth.com

**EDELSON & ASSOCIATES, LLC**
Marc H. Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: 215.230.8043
Facsimile: 215.230.8735
Email: medelson@edelson-law.com

**LAW OFFICE OF
ANDREW BENNETT SPARK**
Andrew Bennett Spark
13911 W. Hillsborough Ave., Suite 161
Tampa, FL  33635
Telephone: 941.321.5927
Facsimile: 813.441.1117
Email: abspark@msn.com

*Attorneys for Plaintiffs*

93