# EXHIBIT 14

**Public Hearing before the Florida Office of Insurance Regulation
Regarding a Rate Filing for Force-Placed Insurance by
Praetorian Insurance Company**

**July 3, 2012**

**Testimony of Birny Birnbaum
On Behalf of the Center for Economic Justice**

The Center for Economic Justice (CEJ) is a 501(c)3 non-profit consumer advocacy organization that advocates on behalf of low-income and minority consumers on credit, insurance and utility.  CEJ has been active in credit-related insurance regulatory issues for over 15 years.

I am a consulting economist and former insurance regulator specializing in insurance rates, regulation and policy, with expertise in credit-related, auto and property insurance.  I have particular expertise in evaluation of rates for credit-related insurance, including force-placed insurance.  Appendix A describes my qualifications.

1.  **Summary of Testimony**

   A.  The Lender-Placed Home Insurance (LPI) market is characterized by reverse competition, in which the cost of insurance placed on the borrower's loan is pushed up by LPI insurers in competition for servicers' business.

   B.  The LPI market is not beneficially competitive to consumers, as evidenced by numerous measures, including market concentration, high prices, low loss ratios and kickbacks to servicers.

   C.  Because of reverse competition, LPI insurer expenses cannot be deemed reasonable simply because the insurer incurred those expenses.  With reverse competition, insurers will provide considerations to lenders and such expenses are not reasonably included in rates or passed on to borrowers.

   D.  Expenses permitted in LPI rates should include only those for activities directly and uniquely associated with the provision of LPI insurance.  Expenses associated with servicing other the provision of LPI insurance must be excluded from rates. Such excluded expenses include commissions to servicer-affiliated producers, tracking expenses and captive reinsurance administrative fees.

   E.  Recent actions by state attorneys general and Fannie Mae challenge state insurance regulators to interpret and implement requirements for LPI rates to be "commercially reasonable."

F.  Current and proposed LPI rates are clearly excessive and in violation of statutory rate standards. The very low loss ratios alone indicate excessive rates. Further, as soon as servicer-affiliated producers stopped accepting commissions, the LPI rates became excessive because an expense included in the filed rate was eliminated. The Department should act immediately to disapprove current LPI rates and force LPI insurers to file new rates that meet the statutory rate standards and exclude unreasonable expenses. In forcing LPI insurers to file new rates, the Department should define "commercially reasonable" LPI prices as rates that produce an expected loss ratio, including catastrophe reinsurance costs of 85% or greater.

G.  The proposed rates in the Praetorian are clearly excessive. Praetorian selects a rate change of zero, despite an indicated rate of -14.6%  However, the Praetorian indicated rate change is massively excessive;  the reasonable indicated rate decrease is several times greater than -14.6%

H.  The Praetorian indication is unreasonable and excessive because it includes excessive expense loads for commission and general and administrative expenses. The Praetorian rate indication is also unreasonable because of unreasonable premium and loss trends. The rate analysis is deficient because more current data and data broken out by Balboa IC and QBE Specialty should be used.

I.  The Praetorian rate analysis is further suspect because of questionable incurred losses versus paid losses, failure to consider prior scheduled rating in establishing premium at current rate level, lack of support for the assessment of QBE rates relative to Balboa rates and the failure to analyze REO and non-REO property experience separately. The proposed scheduled rating program is arbitrary and unreasonable and the age of home rating factor, which increase rates by over 50% when a property turns 15 years old, is too blunt.

## 2.      Mortgage Servicer Responsibilities and Lender-Placed Insurance

Mortgage servicers are entities which manage mortgage loans on behalf of the owners of the loan. The largest mortgage servicers include Bank of America, JP Morgan Chase, Wells Fargo, American Home Mortgage Servicing and GMAC who service millions of mortgages each. The largest owners of mortgages are the government-sponsored enterprises Fannie Mae and Freddie Mac. Fannie, Freddie and other mortgage owners/investors contract with mortgage servicers to perform a variety of activities to service the mortgage loans, including, among many other things, collecting mortgage payments by borrowers and distributing those funds to the proper parties.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 3

Mortgage loan agreements include a requirement that the borrower maintain insurance to protect the property serving as collateral for the loan and, if the borrower fails to maintain the required insurance or fails to provide required evidence of insurance, the lender, through the servicer, may place insurance on the property serving as collateral for the loan and charge the borrower for this insurance.

Among other responsibilities, the mortgage servicer is required, through its servicing agreement with the owners of mortgage loan, to maintain continuous insurance coverage on the properties serving as collateral for the loan. This requirement involves two distinct activities – tracking insurance on loans being serviced and placing insurance when the borrower fails to maintain the required insurance coverage. The insurance placed by the servicer under these circumstances is called lender-placed insurance (LPI) or force-placed insurance. LPI protects the lender's collateral in the event the borrower fails to maintain insurance protecting the collateral.

It is critical to distinguish activities related to monitoring and maintaining continuous insurance on mortgage loans that are the servicer's responsibility from those activities that are the LPI insurer's responsibilities. Insurance tracking – monitoring the portfolio of loans for evidence of required insurance maintained by the borrower – is a servicer responsibility for which the servicer is paid by the mortgage owner/investor.

## 3.    The LPI Policy and LPI Issuance Process

### 3.1    *LPI is a Group Master Policy*

The LPI insurance policy sold to the servicer is a group insurance master policy. Group insurance means that the policy covers a group of properties and not just a single property like the homeowners insurance policy purchased by a borrower. A master policy means that the policy covers all eligible properties and, as a property becomes eligible for coverage, a certificate of coverage for the individual property is issued under the master policy.

The LPI insurance policy provides that coverage begins on any property in the servicer's covered mortgage loan portfolio at the instant that the borrower's voluntary policy ceases to provide the required coverage. This provision is called automatic coverage. The LPI policy provides coverage, for example, if the borrower's homeowners insurance policy is canceled by the borrower or the borrower's insurance company or if the voluntary policy lapses because of non-payment of premium. To ensure that the property serving as collateral for its loans is always protected by insurance, the LPI policy provides coverage whenever the borrower's required insurance fails to remain in-force – even if the servicer or its vendor do not discover this failure of insurance coverage for days or weeks after the borrower's policy coverage has ended. The LPI group policy covers all properties in the servicer's loan portfolio and provides coverage as needed.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 4

When the insurance tracking vendor notifies the LPI insurance company that there is a lapse in coverage on a property in the mortgage loan portfolio, the LPI insurer issues a temporary binder of insurance coverage retroactive to the date and time the borrower's coverage ceased to be in-force along with correspondence to the borrower on behalf of the servicer that such binder has been issued and the premium for the LPI has been added to the borrower's loan amount. The correspondence informs the borrower that the LPI coverage will be canceled if the borrower provides the required evidence of insurance coverage. This process is largely automated and conducted by a single vendor providing insurance tracking services and LPI insurance.

The LPI insurance company bills the servicer on a monthly basis for all the insurance provided. The servicer then passes along the LPI premium charges to individual borrowers, removes funds from the borrower's escrow to pay for the LPI premium, debits the borrower's escrow if there are insufficient funds to pay the premium or establishes an escrow account if one does not exist and debits the new escrow account for the amount of the LPI premium. Again, while this is a servicer responsibility, some or all of these activities are performed by the LPI insurance company or vendor on behalf of the loan servicer.

If the borrower provides evidence that there was no lapse in required insurance coverage, the LPI insurance company will refund the premium paid by the servicer and the servicer will refund the LPI amounts charged to the borrower's loan. The LPI insurance company or vendor typically performs the individual borrower refund activities on behalf of the servicer. Testimony at a recent hearing before the New York Department of Financial Services indicates that 10% to 15% of LPI insurance is flat-cancelled, which means the LPI policy was erroneously placed.

If, after the temporary binder has been issued and after a certain period of time, the borrower fails to provide evidence of required insurance, the LPI insurance company issues a certificate of insurance from the master LPI policy, typically providing a year of coverage from the original effective date of LPI coverage. The certificate of insurance names both the servicer and the borrower as insureds covered by the policy.

**3.2    *Servicer Recovers LPI Premiums Even In Event of Foreclosure***

The servicer recovers the LPI premium it has paid to the LPI insurer, even in the event that a borrower defaults and there is a foreclosure or short sale because the LPI premiums are paid by the owner of the loan (the investor) to the servicer out of the proceeds from the foreclosure or short sale.

**3.3    *LPI Coverage is Limited***

LPI coverage is that of a dwelling fire policy, typically providing only hazard protection. Coverages typically included in a homeowners policy and generally not included in the LPI policy are liability, personal property and additional living expense (ALE) in the event of a claim. The absence of coverage for personal property and ALE can result in a significant difference in claim costs from a catastrophe event between LPI and homeowners policies.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 5

### 3.4   *There is No Underwriting of Individual Properties Insured under an LPI Policy*

LPI policies cover all properties in the servicer's loan portfolio and provide coverage to any property as needed.

### 4.   Servicer vs. Insurer Responsibilities for Maintaining Continuous Insurance Coverage

There are a variety of activities associated with the requirement of servicers to ensure continuous insurance coverage. Most of these activities are the responsibility of the servicer and not the insurance company providing the LPI. Table 1 lists activities associated with the continuous insurance requirement of servicers and whether the activity is the responsibility of the servicer or LPI insurance company.

It is important to distinguish between the entity responsible for the activity in Table 1 and the entity actually carrying out the activity. Servicers typically contract with an outside vendor for most or all of the servicer responsibilities in Table 1 and that vendor is typically the insurance company providing the LPI insurance.

The servicers are responsible for insurance tracking to monitor loans to ensure borrowers are maintaining the required insurance, including requirements that the insurance policy or policies have:

- sufficient coverage amount to repair or replace the property if destroyed;
- cover the relevant perils, including fire, wind and flood, for example; and
- been issued by an insurance company with acceptable financial strength, as measured by a minimum financial strength rating by a credit rating agency.

A mortgage servicer is likely to have LPI policies for normal hazards (such as fire) and for other perils not covered by a standard homeowners policy, such as flood, excess flood, wind and excess wind. All residential property insurance policies (homeowners and dwelling fire) exclude flood as a covered peril (or cause of loss) and borrowers in designated flood areas are required by lenders to purchase a flood insurance policy from the federal government's National Flood Insurance Program. In many coastal states, insurers have excluded wind (hurricane) coverage from the standard residential property insurance policy in certain parts of the state and, consequently, borrowers must purchase a wind-only policy from a state-operated insurance program, like the Texas Windstorm Insurance Association.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 6

**Table 1**
**Ensuring Continuous Insurance Coverage:**
**Mortgage Servicer vs. Insurer Responsibilities**

| Activity | Servicer vs. Insurer |
|---|---|
| *Tracking Insurance* | |
| Loading Insurance Information into Database | Servicer |
| Maintaining/Monitoring Insurance Tracking Database | Servicer |
| Contacting Borrowers, Problems with Insurance | Servicer |
| Customer Service Borrowers Insurance Evidence | Servicer |
| Contacting Insurers/Agents Insurance Evidence | Servicer |
| | |
| *Placing Insurance* | |
| Notifying Insurer to Issue Binder or Policy | Servicer |
| **Issuing Temporary Binder** | **Insurer** |
| Determining Coverage Amount | Servicer |
| **Servicer Payment to Insurer** | Servicer/**Insurer** |
| Billing Borrower for LPI Premium | Servicer |
| Setting up Escrow when necessary for LPI | Servicer |
| **Refunds to Servicer** | **Insurer** |
| Refunds to Borrower | Servicer |
| **Issuing Permanent Policy** | **Insurer** |
| Customer Service about Insurance Placement | Servicer |
| Customer Service about Borrower Refunds | Servicer |
| **Customer Service about LPI Claims** | **Insurer** |

### 4.1    *Fannie Mae's Description of Unreasonable Expenses in LPI Premiums*

Fannie Mae is a government-sponsored enterprise that purchases mortgages originated by others. Fannie Mae is the largest single owner of mortgages in the United States and contracts with mortgage servicers to service the tens of millions of mortgage loans Fannie owns. Fannie pays a fee to mortgage servicers for each mortgage loan serviced. In addition, when a mortgage owned by Fannie goes into default and the mortgaged property is foreclosed, Fannie pays any outstanding LPI premium due on the defaulted loan to the servicer. In a recent request for proposal[1] for insurance tracking and LPI, Fannie Mae also describes the problem with unreasonable expenses included in LPI premium charges.

---

[1]   See Appendix B for the Fannie Mae RFP

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 7

After extensive internal review, Fannie Mae believes that current Lender Placed
Insurance costs are not market competitive and can be improved through unit price
reductions and fee transparency to the benefit of both the taxpayers and homeowners.

Current Situation
Fannie Mae's current Lender Placed Insurance situation is as follows:

1. Homeowners are required to maintain voluntary hazard insurance on Fannie Mae
   insured properties.

2. Lender Placed Insurance must be acquired by mortgage Servicers when a property is
   no longer eligible for Voluntary Insurance, or when the Servicer cannot obtain proof
   of adequate Voluntary Insurance from the homeowner, irrespective of whether or not
   that homeowner is current or delinquent on the loan.

3. The cost of Lender Placed Insurance is higher than the cost of voluntary hazard
   insurance. Homeowners are billed for the Lender Placed Insurance premiums.
   However, if the homeowner does not pay the premium (for example, if the property
   has already been vacated), then Servicers pass on the premium costs to Fannie Mae.

4. Servicers are responsible for providing tracking services, per Fannie Mae Guidelines.
   Many large Servicers have chosen to outsource the Insurance Tracking and associated
   administrative process to third parties, the largest of which are affiliated with Lender
   Placed Insurers.

5. Lender Placed Insurers often pay commissions/fees to Servicers for placing business
   with them. The cost of such commissions/fees is recovered in part or in whole by the
   Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie
   Mae.

6. The existing system may encourage Servicers to purchase Lender Placed Insurance
   from Providers that pay high commissions/fees to the Servicers and provide tracking,
   rather than those that offer the best pricing and terms to Fannie Mae. Thus, the
   Lender Placed Insurers and Servicers have little incentive to hold premium costs
   down. In addition, Fannie Mae is often paying twice for Insurance Tracking services;
   once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender
   Placed Insurance premiums, since those premiums may include or subsidize the costs
   of tracking services (to the extent that insurers are providing such services).

In appropriate Circumstances, Lender Placed Insurance is necessary and important to the
preservation of Fannie Mae assets. However, much of the current Lender Placed
Insurance cost borne by Fannie Mae results from an incentive arrangement between
Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 8

The situation Fannie describes is reverse competition in LPI markets – where the price of LPI is inflated because of considerations to the mortgage servicer built into the LPI rates which are paid for by the 1-2% of borrowers who are charged LPI premiums. For example, in the recent LPI hearing in New York held by the Department of Financial Services, one mortgage servicer testified that it contracted with Balboa for insurance tracking, but paid no fee for that service. Balboa provided the insurance tracking without charge in exchange for providing the LPI on the servicer's portfolio. Another mortgage servicer testified that ZC Sterling – which became QBE First after acquisition by QBE – paid the servicer $9 million in addition to commissions for marketing. Consequently, LPI rates include inappropriate expenses – expenses not associated with the provision of insurance or the transfer of risk.

## 5.    LPI Market Participants and Results

There has been dramatic growth in the amount of LPI insurance countrywide and in Florida over the past eight years, as shown in Table 2. Countrywide net written premium grew $800 million to $3.5 billion. Florida LPI net written premium grew by a factor of 15 from $84 million to $1.2 billion.[2] Gross written premium means the total premium on policies issued during the year before any refunds. Net written premium is gross written premium less premium refunded. Assurant has been the major writer of LPI with over 50% of the market. Florida's share of the countrywide total has grown to over one-third from 2009 to 2011.

### Table 2
### Florida and Countrywide LPI Premium, 2004-2011s
### ($ Millions)

|         | Florida     | Countrywide  | FL Share |
|---------|-------------|--------------|----------|
| 2004    | $84.19      | $796.22      | 10.6%    |
| 2005    | $99.28      | $918.74      | 10.8%    |
| 2006    | $142.81     | $1,074.36    | 13.3%    |
| 2007    | $294.66     | $1,647.10    | 17.9%    |
| 2008    | $506.91     | $2,209.33    | 22.9%    |
| 2009    | $1,046.56   | $3,048.94    | 34.3%    |
| 2010    | $1,184.11   | $3,223.27    | 36.7%    |
| 2011    | $1,211.26   | $3,449.80    | 35.1%    |
| 2004-11 | $4,569.80   | $16,367.76   | 27.9%    |

---

[2] The source of the data in this table is Credit Insurance Experience Exhibit data from the creditor-placed home columns of part 4 plus the experience of QBE Insurance Corp and QBE Specialty reported in part 5 Other..

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 9

Table 3 shows that in 2009 and 2010, LPI represented a significant portion – about 15% of the total of LPI and homeowners premiums in Florida.  The amount of Florida LPI is massive in both absolute dollar volume and as a share of total residential property premium.  I estimate that 1-2% of mortgage borrowers have LPI placed on their loans – in sharp contrast to the 14% share of LPI premiums.

**Table 3**
**Florida LPI and Homeowners Premium**
*($ Millions)*

| Year | LPI | Homeowners | LPI Share of Total |
|------|-----|-----------|--------------------|
| 2009 | $1,184.11 | $6,932.27 | 14.6% |
| 2010 | $1,211.26 | $7,568.47 | 13.8% |

Average LPI premiums are much higher than average homeowners premiums.  Table 4 shows the average LPI premium for Balboa Insurance Company and QBE Specialty based on combined data presented in the rate filing.  The companies' own data show average LPI premiums reaching $6,535 in the 2008-09 period.

**Table 4**
**Balboa/QBE Average LPI Premium, 2006 - 2011**

| Year | Exposures | Written Premium | Average Premium |
|------|-----------|-----------------|-----------------|
| 7/06-6/07 | 15,956 | $37,427,737 | $2,346 |
| 7/07-6/08 | 25,520 | $125,281,407 | $4,909 |
| 7/08-6/09 | 45,451 | $297,001,037 | $6,535 |
| 7/09-6/10 | 97,567 | $596,331,000 | $6,112 |
| 7/10-6/11 | 119,611 | $589,176,927 | $4,926 |

Table 5 shows Florida LPI net written premium, paid to written loss ratios and incurred to earned loss ratios for Balboa IC and QBE Specialty, as reported in the Credit Insurance Experience Exhibit to the statutory annual statement.  Table 5 shows massive growth by Balboa from 2008 to 2009 and very low loss ratios from 2007 through 2011.  QBE grew quickly from its start in 2009 and also shows very low loss ratios.  Table 5 also shows significant and persistent differences between paid loss ratios and incurred loss ratios.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 10

**Table 5**
**Florida LPI Net Written Premium and Loss Ratios for Balboa IC and QBE Specialty**

| Year | Balboa IC | Paid LR | Incurred LR |
|------|-----------|---------|-------------|
| 2004 | $22,539,043 | 63.8% | 74.0% |
| 2005 | $25,449,604 | 46.8% | 82.0% |
| 2006 | $26,939,907 | 64.3% | 28.1% |
| 2007 | $51,516,777 | 8.7% | 10.7% |
| 2008 | $97,452,240 | 7.4% | 9.2% |
| 2009 | $464,463,676 | 3.8% | 13.7% |
| 2010 | $431,916,007 | 3.7% | 2.4% |
| 2011 | $430,911,925 | 5.7% | 9.2% |
| 2004-2011 | $1,551,189,179 | 7.3% | 10.6% |

| Year | QBE Specialty | Paid LR | Incurred LR |
|------|---------------|---------|-------------|
| 2004 | | | |
| 2005 | | | |
| 2006 | | | |
| 2007 | | | |
| 2008 | | | |
| 2009 | $101,500,912 | 0.3% | 12.5% |
| 2010 | $212,608,944 | 0.1% | 2.5% |
| 2011 | $194,446,072 | 4.7% | 4.4% |
| 2004-2011 | $508,555,928 | 1.9% | 4.7% |

| Years | Combined | Paid LR | Incurred LR |
|-------|----------|---------|-------------|
| 2004-2011 | $2,059,745,107 | 6.0% | 9.1% |
| 2005-2011 | $2,037,206,064 | 5.4% | 8.3% |
| 2006-2011 | $2,011,756,460 | 4.8% | 7.4% |
| 2007-2011 | $1,984,816,553 | 4.0% | 7.0% |
| 2008-2011 | $1,933,299,776 | 3.9% | 7.0% |
| 2009-2011 | $1,835,847,536 | 3.7% | 6.8% |

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 11

Table 6 shows Balboa IC and QBE Specialty Florida LPI incurred loss ratios have been significantly below the Florida aggregate homeowners loss ratio in each year from 2004 through 2011. The chart below Table 6 graphs the data in the table.

### Table 6
### Incurred Loss Ratios: Balboa and QBE LPI vs. Florida Homeowners

| Year | Balboa IC | QBE Specialty | FL Homeowners |
|------|-----------|---------------|---------------|
| 2004 | 74.0% | | 303.0% |
| 2005 | 82.0% | | 153.6% |
| 2006 | 28.1% | | 32.6% |
| 2007 | 10.7% | | 25.6% |
| 2008 | 9.2% | | 33.9% |
| 2009 | 13.7% | 12.5% | 38.4% |
| 2010 | 2.4% | 2.5% | 38.1% |
| 2011 | 9.2% | 4.4% | 30.0% |



CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 12

### 5.1    *QBE Specialty Selling LPI through Surplus Lines*

Florida prohibits a policy from being issued through surplus lines insurers unless the coverage under the policy is "eligible for export."[3]  A coverage is eligible for export – eligible for sale through surplus lines – if the coverage meets a number of criteria.[4]  One requirement is:

> (a)    The full amount of insurance required must not be procurable, after a diligent effort has been made by the producing agent to do so, from among the insurers authorized to transact and actually writing that kind and class of insurance in this state, and the amount of insurance exported shall be only the excess over the amount so procurable from authorized insurers.[5]

QBE Specialty is a surplus lines insurer and the LPI sold by QBE Specialty is surplus lines insurance.  It is unclear how QBE Specialty has met or can meet the Florida surplus lines requirements for LPI to be eligible for export when the coverage has been available and continues to be available from admitted carriers, including Balboa IC and American Security IC.

### 6.    Detailed Analysis of Commissions, Other Acquisition and General Expenses

As a preliminary matter, the only potentially substantive justification for the proposed expense provisions is Exhibit 21 of the filing – "Letter of Intent on Commissions."  Praetorian has claimed this information as a trade secret and the exhibit is not available to the public for review.  Given that a prior Balboa IC LPI filing has contained materially false statements[6], it is reasonable and necessary for Exhibit 21 to be available for public inspection and review.

The filing contains unreasonable expense provisions – 15% for commissions, 2.4% for other acquisition expenses and 11.5% for general expenses for a total of 28.9%.  The selection of expense provisions is completely arbitrary, without empirical or logical support and unreasonable on its face.  Table 7 shows the three-year averages for commissions, other acquisition and general expenses for fire and homeowners lines in Florida from 2008 to 2010.[7]

---

[3]  Florida Insurance Statutes 626.915(1)

[4]  Florida Insurance Statutes 626.916(1)

[5]  Florida Insurance Statutes 626.916(1)(a)

[6]  For example, in OIR Filing No. 10-20376, Balboa wrote to OIR Actuary Robert Lee and stated:
Confirm no expense in this filing relates to activities that solely relate to bank or mortgage entity not related to insurance transaction. *RESPONSE: The insurance expenses used to support this filing are pulled from the Insurance Expense Exhibit which makes a part of our NAIC financial statements. The expenses identified in the IEE do not include any activity solely related to banking, mortgage lending, or mortgage servicing or any entity not related to the insurance transaction.* Earlier, in the letter, Balboa described expenses for activities specifically related to the insurance tracking activities of mortgage servicers, contradicting the response regarding non-insurance expenses.

[7]  The Florida fire and homeowners figures are a weighted average of data reported in the OIR Annual Reports of 2009, 2010 and 2011, Florida Property and Casualty Insurance Calendar Year Experience pursuant to Section 627.915 (2), FS.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 13

## Table 7
### Florida Homeowners and Fire Expenses vs. Praetorian Expenses

|                   | Homeowners | Fire   | Praetorian LPI |
|-------------------|------------|--------|----------------|
| Other Acquisition | 6.60%      | 3.61%  | 2.40%          |
| General Expense   | 3.76%      | 4.41%  | 11.50%         |
| Commission        | 12.91%     | 10.43% | 15.00%         |
| Total             | 23.26%     | 18.44% | 28.90%         |

We would expect much lower historical expense provisions as a percentage of premium for LPI than for homeowners or fire for at least two reasons. First there are far fewer activities and related expenses for the sale and administration of a group master policy with no underwriting of individual properties than for individually-underwritten and individually-sold residential property insurance policies. Stated differently, expense dollars per property insured should be much less for LPI than for homeowners or fire.

For LPI, the LPI insurer issues a group master policy and, upon notification by the servicer, issues coverage for specific properties. The LPI insurer administers the group master policy, typically billing monthly for coverage issued during the period. The LPI insurer settles claims under the LPI policy and answers questions from the servicer and borrowers about claim settlement. The insurer must develop rates for the LPI insurance.

Contrast these few activities with those of an agent and insurer for homeowners insurance. The insurer and agent constantly seek to solicit new business via marketing and advertising and to maintain existing customers with customer service and communication. The sale of a homeowners policy involves the collection of large amounts of information about the consumer and the property, including credit history, loss history reports and other information for underwriting. The agent and insurer must work with the consumer to establish the coverages needed and the appropriate amount of coverage. The agent commission covers the expenses associated with agent's activities for marketing, new business solicitation, sales, underwriting, rating, customer service and assistance with claims. The insurer expenses cover the costs of advertising and marketing for sales and customer retention, developing sophisticated underwriting and rating systems, obtaining detailed underwriting and rating data for the sophisticated rating, issuing complete homeowners policies to new policyholders, customer service and claims settlement.

Second, because the average premium for LPI is much greater than the average premium for homeowners or fire, the same expense dollars per property insured should produce a much lower expense percentage of premium. With fewer expenses and higher average premium per property insured for LPI than homeowners, the expense percentages for LPI should be significantly less than those for homewoners. The Praetorian filing proposes higher expense percentages applied to higher average premium, which would produce expense dollars per

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 14

property insured for LPI multiples greater than the expense dollars per property insured for homeowners. The proposed expense provisions are clearly unreasonable and excessive.

The filing's public justification for these expense provisions consists of the following statements:

> Exhibit 13A displays both historical and prospective expenses. The selected expenses are based on future anticipated expenses and industry data. American Security Insurance Company figures are shown 13A for comparison. Our selections are in line with industry standards, and American Security Insurance Company represents the only direct competitor which writes this business on an admitted basis.

> The most recent Balboa filing made for the Risk Based Protection product noted that commission expense was projected based on expected market demands and the commission expense reflected in competitor programs. The combination of the Balboa business with the QBE Specialty business contemplates the payment of reasonable commissions to unaffiliated business partners. The commission expense used in this filing reflects the existing combination commission obligation of Praetorian and the expected commissions necessary to acquire new business commensurate with industry standards. Exhibit 21 details the commission expense reasonably expected and summarizes the services we expect to receive in return for payment of those commissions.

This explanation is gibberish. Exhibit 13A of the filing shows five-year historical average expenses of 4.7% for commissions, 2.3% for other acquisition and 9.4% for general expenses. Praetorian ignores these actual historical values and selects higher amounts, presumably because American Security's approved filing includes higher expense provisions. All three sets of expense provisions – Balboa IC historical average, Praetorian proposed and American Security – are unreasonable and excessive because the expenses are inflated by expenses associated with considerations for the mortgage service, including expenses for mortgage servicing activities.

## 6.1    *Reverse Competition in LPI Markets Leads to Unreasonable Expenses*

Reverse competition describes a market structure in which consumers/borrowers exert little or no market power over prices. Instead of competing for individual consumers, insurers compete for the entities with the market power to steer the ultimate consumer to the insurer. Insurers compete for the servicer's business by providing considerations to the servicer, with the cost of such considerations passed on to the borrower. Greater competition for the lender's business leads to higher prices of credit-related insurance, including LPI, to the borrower. This form of competition, which results in *higher* prices to consumers, is called reverse competition. The Fannie Mae RFP, cited above, describes this dynamic in LPI markets.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 15

*Because of reverse competition, LPI insurer expenses cannot be deemed reasonable simply because the insurer incurred those expenses. With reverse competition, insurers will provide considerations to lenders and such expenses are not reasonably included in rates or passed on to borrowers.*

**6.2     Consumers Are Especially Vulnerable to Excessive LPI Rates**

The incentives and potential for excessive LPI rates are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Servicers have financial incentive to force-place the insurance because the premium includes commission and other consideration for the servicer. With some servicers, the insurance is reinsured through a captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement of the coverage.[8]

Borrowers are vulnerable to excessive rates for LPI insurance because the borrowers / consumers exert no market power in the setting of these rates. The insurance is force-placed on the borrower and the borrower has no say or decision in the amount or type of coverage placed. In addition, there is no downward market pressure on rates; the vendors/insurers offering LPI do not compete on the basis of price, but on the basis of services provided to the lender and compensation and other considerations provided to the lender or its affiliates.

**6.3     Unreasonable Expenses**

Because of reverse competition, borrowers are charged unreasonable LPI premiums because of unreasonable expenses included in the LPI premium. To compete for servicer business, LPI insurers must provide considerations to the lender. This cost of these considerations – payments by the LPI insurer to the servicer or expenditures by the LPI insurer to subsidize the servicer's cost for non-LPI activities – inflate the LPI premium beyond the reasonable costs of providing the insurance. Unreasonable expenses included in LPI rates include:

- Tracking/Servicing Activities Unrelated to the Provision of LPI
- LPI Commissions
- Captive Reinsurance Administrative Costs
- Affiliate Transactions at Above-Market Prices
- Flat Cancellations

*6.3.1   Tracking and other Servicer Activities*

Table 1 provides a list of LPI-related activities and identifies the activities as associated with servicing a portfolio of loans versus the issuance and administration of the LPI master policies and individual property coverages.

---

[8]  See, for example, "Ties to Insurers Could Land Mortgage Services in More Trouble," Jeff Horwitz, *American Bankers*, November 10, 2010.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 16

Although most of the activities in Table 1 are servicing activities, most or all of these activities are typically performed by the LPI vendor for the servicer. Some of these services may be billed separately from the LPI premium, but some portion of the LPI insurer's expenses are for performing servicer activities not a part of the provision of LPI. Such expenses are unreasonable to include in LPI premium charges to borrowers.

As in Table 1, the Fannie Mae RFP draws a clear distinction between insurance tracking and the provision of LPI insurance. The LPI requirements in the RFP are limited to issuance of insurance, settlement of claims under policy, customer service regarding claims. The LPI critical performance indicators are for speed of unearned premiums refunds, insurance placement and claim settlement. The key performance indicators are for claims call answer speed, damage inspection speed, estimated repair cost verification speed and call center abandonment rate.

Expenses for other loan servicing activities, including, for example, insurance tracking, customer service related to insurance tracking and billing borrowers for LPI, are expenses associated with the servicing the entire loan portfolio and are not reasonable to include in LPI premiums charged to 1%-2% of borrowers.

### 6.3.2   Commissions to Servicer-Affiliated Producers

At a recent hearing before the New York State Department of Financial Services, mortgage servicers testified about commissions paid to servicer-affiliated insurance agents (also known as producers). I monitored the hearing and provided testimony following the servicers and LPI insurers. Testimony at this hearing, in my opinion, revealed that commissions paid to servicer-affiliated producers are not justified by any service provided by these producers and represent a kickback to the servicer for placing the LPI. When asked what activities the servicer-affiliated producers perform to justify the commissions, the responses included:

- Soliciting LPI providers
- Reviewing LPI form letters and other documents
- Third-party broker commissions are commonplace
- Broker commissions are an accepted and approved practice
- LPI broker commissions are similar to those in other lines of insurance
- Manage the LPI rating program
- Manage the LPI vendor relationship
- Quality review of the LPI vendor
- Commissions are a cost of doing business

The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in LPI because historically there were only three national providers of the necessary package of insurance and related services and there is no price competition among the insurers. With QBE's acquisition of the Balboa LPI business from Bank of America, soliciting new

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 17

business consists of asking typically two vendors for proposals – and such activity is a rare event for most servicers.

Reviewing LPI form letters and other communication templates is the servicer's responsibility. A servicer-affiliated producer performing such review is performing servicer activity which should not be compensated for through LPI insurance premiums.

The fact that third-party broker commissions are commonplace or a standard industry practice in LPI or other lines of insurance is no justification for such commissions in the LPI market. There have been a variety of standard industry practices by servicers and insurers that were unfair and abusive to consumers – and which were not justified by virtue of many servicers or insurers engaging in the same practice. In the servicing realm, recent settlements between states and servicers have identified a number of unfair industry practices, such as robosigning foreclosure documents. In the insurance realm, steering of business based on contingent commissions, unfair use of retained asset account and abusive sales of financed single premium credit insurance, were industry standard practices, to name a few.

Other justifications cited by industry witnesses –managing the LPI vendor relationship and quality review of the LPI vendor – are responsibilities of the servicer and, to the extent the servicer-affiliated producer is performing these activities, the commissions to these producers represent a kickback of the LPI premiums to subsidize servicer activities.

In summary, just as in the Praetorian filing, industry witnesses in New York provided no justification for any LPI commissions to servicer-affiliated producers. Fannie Mae's new policy – to not reimburse servicers for any portion of LPI premiums paid as commission to servicer-affiliated producers and described in the next section – provides further evidence that no commissions to servicer-affiliated producers are warranted.

### 6.3.3    Fannie Mae Servicing Guidelines for LPI

On March 14, 2012, Fannie Mae issued new guidelines to mortgage servicers regarding LPI.[9]  The new guidelines mandate that LPI premiums exclude certain unreasonable expenses, including commissions to servicer-affiliated producers and expenses associated with insurance tracking. The Fannie Mae servicer guidelines are consistent with the evaluation by Fannie Mae in its LPI RFP that LPI premium charges are unreasonably inflated by expenses unrelated to the provision of LPI insurance.

---

[9]  Fannie Mae, *Servicing Guideline  SVC-2012-04, Updates to Lender Placed Property Insurance and Hazard Insurance Claims Processing,* March 14, 2012, available at
https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2012/svc1204.pdf

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 18

### Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must **exclude**:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity,

- costs associated with insurance tracking or administration, or

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

The Praetorian filing cites one aspect of the Fannie Mae servicing guideline to justify higher rates – increased deductibles in support of its premium trend selection – but fails to mention other parts of the servicing guideline that justify lower rates because of lower expenses. The Fannie Mae guideline will result in fewer commissions paid on LPI. In fact, two major servicers – AHMSI and Chase – announced at the New York Department of Financial Services hearing in May, 2012, that they will no longer accept commissions on LPI placed on loans in their portfolios. It is likely that other servicer-affiliated producers will also cease accepting LPI commissions.

### 6.3.4   QBE Acquisition of Balboa / 10-Year Agreement for Bank of America Business

In June 2011, QBE acquired, among other things, the Balboa LPI business from Bank of America (BOA).[10]  The acquisition included a ten-year agreement for Bank of America to use QBE for LPI. Since BOA was and remains one of the largest mortgage servicers, the BOA LPI business represents a significant portion of the QBE/Praetorian LPI business. There is no reason for Praetorian to pay a commission for the BOA LPI business as no producer services or other acquisition expenses are needed to maintain the BOA LPI business.

### 6.3.5   Quota Share Reinsurance

Quota Share reinsurance arrangements – in which the LPI insurer reinsures a portion of LPI business with a reinsurance company typically owned or affiliated with the servicer – are simply profit-sharing mechanisms designed to provide additional considerations to the servicer. These arrangements serve no substantive risk management purpose and, consequently, serve no purpose for the consumers/borrowers of LPI.

Captive LPI reinsurance arrangements should be prohibited because they create a conflict of interest between the servicer and the borrower. By having a financial interest in the price and placement of LPI through a captive reinsurance program, the servicer has a glaring conflict with

---

[10]  Appendix C has news reports describing the transaction

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 19

the interest of the borrower for lower-cost LPI.  Testimony of industry witnesses in NY – "we can see that there might be a perception of a conflict, but it does not affect our practice" – does not address or eliminate the actual conflict of interest.   The person who has a conflict of interest does not eliminate the conflict simply by saving, "I'm not affected by these financial incentives."

Regardless of whether the captive reinsurance arrangements are prohibited, the expenses associated with administering the arrangements should be excluded from LPI rates because these expenses provide no benefit for the borrower charged the LPI premium.

### 6.3.5   *Affiliate Transactions*

LPI expenses for both Balboa and QBE include significant affiliate transactions.  QBE First has testified that the QBE insurers pay a significant commission to QBE First to administer the LPI program.  Expenses for affiliate transactions should be identified and reviewed for reasonableness to ensure that such affiliate transaction expenses are not insurer profit characterized as expense.

### 6.3.6   *Flat Cancellations*

When LPI coverage is issued and the servicer discovers that the borrower had, in fact, the required insurance on the property, the LPI premium is fully refunded.  Testimony at the New York DFS hearing in May, 2012 indicated 10% to 15% of LPI policies were flat-cancelled, meaning the policies were placed in error and premiums fully refunded.  The expenses associated with these flat cancellations to the insurer – issuing a temporary binder, removing the coverage, billing the servicer and refunding premium to the servicer – should be borne by the servicer and not the borrowers charged LPI premiums.  Flat cancellations occur because the servicer erroneously directed the LPI insurer to issue coverage.  These errors may have resulted from poor work by the servicer or its vendor performing insurance tracking.  Or the errors may have resulted from borrowers not providing information in a timely fashion.  Since there is no charge to consumers who are late providing insurance information – there is a flat cancellation – the cost of flat cancellations is an expense associated with servicing the portfolio.  The cost of flat cancellation should not be borne by the small percentage of borrowers who are actually charged LPI premiums.

### 6.4     Reasonable Expense Provisions

The reasonable expense provisions are those for which the activities are clearly related to the transfer of risk with LPI insurance and for which Praetorian can demonstrate it will incur that expense.  Praetorian should document the expenses associated with specific LPI activities and those expenses should be reviewed to ensure the expense is relevant for LPI and reasonable.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 20

| Commissions | 0% to 2% |
|---|---|
| Other Acquisition Expense | 2% to 3% |
| General Expense | 3% to 4% |
| Total | 5% to 9% |

No provision for commissions is warranted for insurer-affiliated and servicer-affiliated producers. Commissions for non-affiliated producers should be documented and, if legitimate, a commission provision based on a premium-weighted average actual non-affiliated producer commissions and zero for affiliated producers. Many servicer-affiliated producers have already stopped accepting commissions on LPI because of the new Fannie Mae policy and other servicer-affiliated producers will soon stop accepting commissions on LPI insurance. Further, servicer-affiliated producers do nothing to warrant a commission. Industry testimony about the activities of servicer-affiliated producers indicates the activities of these producers are really vendor management oversight by the servicers. The costs of these vendor management activities are servicer responsibilities and not a reasonable LPI insurance expense.

Absent any concrete evidence to the contrary, a range of 2% to 3% is a maximum provision for other acquisition expense. Unlike personal lines insurance, there is no advertising to consumers (borrowers). Many mortgage servicers – and certainly the larger mortgage servicers – operate in many or all states.   Given that there are only two national LPI insurers and servicers know who these insurers are, the LPI insurers do not require significant expense to solicit business; rather, the LPI insurers will typically respond to solicitations.

To put this in perspective, a 2% provision for other acquisition provides $10 million annually for $500 million in annual premium. This is a significant amount of money for other acquisition for LPI in Florida. As stated above, the following activities, present for homeowners insurance, are not found for LPI.

- Development of complex underwriting and rating models
- Development of complex premium calculation models and software
- Underwriting of individual properties and policyholders, including credit reports, credit scores, claims history reports and other property-or-consumer specific data
- Interaction with individual policyholders to determine appropriate coverage amount and coverages for the policy
- Sales and underwriting activity not resulting in a policy, including, for example, obtaining credit scores and loss history reports for applicants who do not purchase a policy.

Absent any concrete evidence to the contrary, a range of 3% to 4% is a maximum for general and administrative expense. As discussed above, the general and administrative expenses associated with a non-underwritten group blanket policy must be significantly less than general and administrative expenses associated with homeowners insurance. The following expenses for homeowners insurance are not found for LPI:

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 21

- Maintenance of detailed underwriting, rating and coverage information on individual policyholders
- Billing of individual policyholders

## 7.    Detailed Analysis of Non-Expense Provisions of Rate Filing

As a preliminary matter, several key rate development issues could not be analyzed because the supporting documentation was claimed a trade secret and not available to the public.

As with the expense provisions, the requested rate bears no relation to the rate indicated by the Praetorian data analysis and is based on unsupported claims about the LPI market.  The filing states:

> The overall indication emphasizes the more recent loss data that shows increasing loss frequency and recent regulatory trends expected to reduce future premium. The company anticipates these trends will continue. Significant market uncertainty remains with respect to lender placed insurance, in addition to the specific actions noted in the trend discussion below. The market is characterized by large volumes of seriously delinquent loans, changing loan servicing and loan modification requirements, and a persistent backlog of REO properties. The increasing market uncertainty and the recent premium and loss trends support the company's selected rate change for this filing.

The only regulatory change cited by Praetorian in its filing is a change in deductibles required by Fannie Mae.  The filing does not mention other changes in the Fannie Mae LPI guidelines – changing coverage amount to unpaid principal balance after a loan with LPI goes 120 days delinquent and Fannie's refusal to reimburse servicer-affiliated producer commissions and tracking expenses included in LPI premiums.

Praetorian cherry picks the regulatory changes to maximize the indicated and selected rate.  While using higher deductibles to justify a more negative premium trend than indicated by the data, Praetorian ignores the impact of higher deductibles in its loss trend analysis.

The requirement by Fannie to change coverage amounts to unpaid balance at 120 days delinquent does not necessarily mean a lower amount of coverage.  A significant number of mortgages are underwater – meaning that more is owed on the home than the home is worth. The fourth quarter 2011 negative equity report from CoreLogic[11] shows that around 43% of Florida mortgages have negative equity.

---

[11]  http://www.corelogic.com/about-us/researchtrends/asset_upload_file866_14435.pdf

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 22

Praetorian's argument that higher-than-indicated rates are needed because of "market uncertainty" and because of "large volumes of seriously delinquent loans, changing loan servicing and loan modification requirements, and a persistent backlog of REO properties" is without empirical support. The LPI market has been characterized by uncertainty, large volumes of seriously delinquent loans, changing loan servicing requirements and a backlog of REO properties for several years. Serious mortgage delinquencies peaked in 2010 and have declined significantly since then, though the numbers are still far above historical norms. There is simply no actuarial or economic basis for the Praetorian selected LPI rate and rate justification.

Some of the most glaring problems with the actuarial analysis in the filing are now discussed.

### 7.1    *Ignored Indication*

The filing shows an indicated rate change of -14.6%. Yet, the filer selects a zero rate change. The indicated rate change from a reasonable analysis is at least three times greater than the filer's indication.

### 7.2    *Data Time Frames*

The filing presents premium and loss data from third quarter 2006 through second quarter 2011, evaluated as of September 2011. The filing was filed with the Office on May 4, 2012. It is unclear why calendar accident year data through fourth quarter 2011 was not presented, since such data was available at the time of filing.

The use of other-than-most-currently-available data poses problems. First, the impact of the negative premium and massive positive loss trends are increased. Second, it is not possible to reconcile the data presented to any calendar year report, such as the statutory annual statement or Credit Insurance Experience Exhibit. Third, the premium and loss data are mismatched with expense and LAE data because the former are based on a July through June 12-month period, while the latter are based on a January through December 12-month period.

### 7.3    *Balboa IC and QBE Specialty Combined vs. Separate Experience*

The premium and loss data, including premium and loss trend data, are presented on a combined basis for Balboa IC and QBE Specialty. The combination of the data may skew results, particularly for trend analysis and loss development. The data should be presented separately for Balboa IC and QBE Specialty to allow review of individual company data for anomalies for individual company experience or combined experience.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 23

### 7.4    *Paid vs. Incurred Losses*

Table 5, above, shows significant and persistent differences between paid and incurred loss ratios. While it is reasonable to expect paid loss ratios to lag incurred loss ratios for a short time when premium is growing, the disparity between paid and incurred loss ratios for both Balboa and QBE persists when premium growth stabilized. The high incurred loss ratios relative to paid loss ratios suggest that one or both insurers are over-reserving and, consequently, overstating incurred losses during the period of experience review.

### 7.5    *QBE Rate vs. Balboa*

The filing claims that the current average QBE Specialty rates are 10.5% higher than the Balboa rate level. The filing asserts the rate differential was calculated by rerating QBE Specialty policies using current Balboa IC rates (Exhibit 5C). No support or evidence is provided for this assertion, which has impact on the premium at current rate level analysis. Data in the filing do not support this assertion of rate differential. Exhibit 24 – Overall Premium Impact Calculation – shows the current number of property risks and total premium for Balboa IC and QBE. The average premium for Balboa IC is $352,100, 194 / 87,678 equals $4,015.83. The average premium for QBE Specialty is $108,558,904 / 26,432 equals $4,107.10. The average QBE premium is only 2.3% greater than the average Balboa premium.

### 7.6    *Scheduled Rating Impact*

Balboa's prior filings include scheduled rating, which is a deviation from the filed and approved base rates at the discretion of the insurer up to + / - 25% of the base rates. The presence of significant schedule rating credits would mean that the actual net written premium was at rates significantly below the filed and approved rates. There is no indication of any consideration of scheduled rating in the rate development analysis. Yet, Exhibit 24 indicates that significant scheduled rating credits were awarded. The scheduled rating factor for Balboa in the Exhibit 24 for current experience is 0.751, indicating an average scheduled rating credit of 24.9% If this is accurate, then actual premiums at current rate levels for Balboa are about one-third higher than presented.

Presumably, QBE Specialty also employed scheduled rating, but no data are provided for current or historic QBE scheduled rating.

### 7.7    *Premium Trend*

The filing proposes a premium trend of -3.0% based, in part, on an analysis of changing average amounts of insurance (Exhibit 9) and, in part, on the following:

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 24

> *The largest purchaser of residential mortgages, Fannie Mae, announced that effective June 1, 2012, changes in deductible requirements and coverage requirements for lender placed insurance. These changes will reduce premium, and the premium trend shown likely underestimates the impact of the Fannie deductible and coverage policy revisions.*

The premium trend analysis and selection are massively flawed and must be rejected:

- Fannie has delayed the effective date of the new LPI requirements and has not announced a new effective date, so this rationale is currently not valid.

- The proposed rates provide a rate reduction of 1.1% for non-hurricane and 1.8% for hurricane for moving from a $500 to $1,000 deductible. The impact of Fannie's new requirement is likely to have a fraction of these rate impacts because some servicers are likely already using the higher deductible.

- The data used for the premium trend analysis is not actual premium, but amount of insurance. Based on the proposed amount of insurance factor in the filing, a 1% change in amount of insurance results in less than a 1% change in the premium. Increasing the amount of if insurance from $200,000 of coverage by 1% to $202,000 of coverage increases the premium by 0.5%.

- The premium trend data are likely skewed by the combination of Balboa and QBE experience. Exhibit 5C shows that QBE premium started in second quarter 2009 and increased significantly in the third and fourth quarters of 2009. Exhibit 9 shows that the average amount of insurance jumped from second quarter 2009 to third quarter 2009 when the QBE experience was supplementing the Balboa experience. The result was a high point for average amount of insurance.

- The premium trend selection of -3.0% bears no relation to the amount of insurance data presented in Exhibit 9. The table below shows the average amount of insurance (AOI) by quarter from Exhibit 9 and the 12-month average by quarter. The filer is only able to produce a negative premium trend by relying on the most recent years – four and eight points. If the analysis was based on ten or more points, the premium trend is positive.

- The premium trend selection produces the absurd result of applying a -3% premium trend – for over six years -- to the four-quarter period ending second quarter 2007 even though the average amount of insurance for that period of $148,252 was over 25% less than the most recent four-quarter period ending second quarter 2011. Similarly, over five years of -3% premium trend is applied annual experience ending second quarter 2008 even though the average amount of insurance for that period almost 20% less than the most recent four-quarter period ending second quarter 2011.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 25

- LPI insurers have no say in which properties are insured. Past amounts of insurance are not a guide to future amounts of insurance for new properties insured. The amount of insurance is predominantly determined by the type of property for which the borrower fails to provide evidence of insurance, which is a function of the state of the real estate market and the economy.

## Table 8
## Praetorian Premium Trend Data

| Quarter | Average AOI | 12-Month Average AOI | Trend Analysis Points | Exponential Trend |
|---------|-------------|----------------------|------------------------|-------------------|
| 2006Q3 | 133,759 | | | |
| 2006Q4 | 141,440 | | | |
| 2007Q1 | 153,093 | | | |
| 2007Q2 | 160,340 | **148,252** | 17 | 7.4% |
| 2007Q3 | 173,234 | 158,438 | 16 | 6.1% |
| 2007Q4 | 181,488 | 168,502 | 15 | 5.0% |
| 2008Q1 | 184,520 | 175,962 | 14 | 4.0% |
| 2008Q2 | 194,007 | **184,558** | 13 | 2.9% |
| 2008Q3 | 195,749 | 190,009 | 12 | 2.1% |
| 2008Q4 | 199,315 | 194,298 | 11 | 1.2% |
| 2009Q1 | 205,325 | 199,152 | 10 | 0.2% |
| 2009Q2 | 207,447 | **202,794** | 9 | -0.7% |
| 2009Q3 | 213,305 | 207,594 | 8 | -1.7% |
| 2009Q4 | 211,522 | 210,104 | 7 | -2.4% |
| 2010Q1 | 208,588 | 210,301 | 6 | -2.4% |
| 2010Q2 | 200,512 | **207,775** | 5 | -1.8% |
| 2010Q3 | 204,072 | 205,753 | 4 | -1.2% |
| 2010Q4 | 205,593 | 204,555 | | |
| 2011Q1 | 204,603 | 203,696 | | |
| 2011Q2 | 201,947 | **204,035** | | |

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 26

### 7.8    Loss Trend

Praetorian selects an annual loss trend of 23.9%, which, combined with the premium trend of – 3.0% produces an annual net trend 27.7%  The filing justifies the selection by stating the "selected loss trend reflects the significant increase in frequency experienced in recent periods."

The loss trend is clearly unreasonable and excessive.  If the loss trend was actually 23.9% and the annual trend was actually 27.7%, we would expect to see massively deteriorating loss ratios.  The actual loss ratios show no such deterioration.  Even following a 15% rate reduction effective October 1, 2010, the Balboa loss ratio for 2011 remained below 10%.

**Table 9**
**Recent Actual Florida LPI Loss Ratios for Balboa IC and QBE Specialty**

| Year | Balboa IC |
|------|-----------|
| 2007 | 10.7% |
| 2008 | 9.2% |
| 2009 | 13.7% |
| 2010 | 2.4% |
| 2011 | 9.2% |

| Year | QBE Specialty |
|------|---------------|
| 2009 | 12.5% |
| 2010 | 2.5% |
| 2011 | 4.4% |

The loss trend selection is unreasonable because it fails to consider the impact of higher deductibles utilized by Praetorian in the premium trend selection.  If higher deductibles are a valid consideration for premium trends, then the higher deductibles must be considered in the loss trend.  No consideration of higher deductibles was given by Praetorian for the loss trend.

The loss trend selection is unreasonable because it selects the trend based on only five data points and, despite the claim that the rate selection is based on recent claim frequency increases, does not include the most recent data point of 12-months ending second quarter 2011.  Table 10 shows annual loss severity, frequency and pure premium trends using Praetorian loss trend data for various analysis periods including the last data point and excluding the last data point.  The Praetorian selection – five points excluding the last data point – is highlighted in bold.  Had Praetorian selected the pure premium trend based on six points (excluding the most

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 27

recent point), the loss trend would have been 7.5% instead of 23.9%. Had Praetorian selected
seven or more points, the loss trend would have been negative. The selection of a loss trend
based on few data points to emphasize recent experience, while eliminating the most recent data
point is arbitrary and unreasonable.

The loss trend analysis is suspect because the losses in loss trend Exhibit 10 do not match
the losses reported in Exhibit 3 Summary of Premiums, Losses and ALAE. The losses in Exhibit
10 are closest to the actual incurred losses and LAE in the rate level indication exhibit.
Consequently, it appears that the trend data is based on incurred losses and claims as opposed to
paid losses and claims. Trend analysis based on incurred losses can be easily skewed by loss
development factors.

The loss trend analysis highlights the weakness of the loss trend data utilized by
Praetorian – data only through second quarter 2011 when more current data are available and
combined data for Balboa IC and QBE Specialty instead of separate data and trend analyses.

**Table 10**
**Exponential Trend Analysis Results, Praetorian Data from Filing Exhibit 10**

| Points | Severity | Freq | Pure Prem | | Exclude Severity | Last Freq | Point Pure Prem |
|--------|----------|------|-----------|---|---------|------|-----------|
| 17 | -17.1% | 22.7% | 1.7% | | | | |
| 16 | -17.2% | 25.3% | 3.7% | | -18.3% | 21.4% | -0.8% |
| 15 | -17.3% | 27.9% | 5.8% | | -18.6% | 24.2% | 1.1% |
| 14 | -17.0% | 28.3% | 6.5% | | -18.9% | 27.0% | 3.0% |
| 13 | -16.2% | 27.4% | 6.7% | | -18.8% | 27.3% | 3.3% |
| 12 | -16.2% | 25.8% | 5.5% | | -18.3% | 26.1% | 3.1% |
| 11 | -18.4% | 24.4% | 1.5% | | -18.6% | 24.0% | 0.9% |
| 10 | -19.9% | 25.8% | 0.8% | | -21.7% | 21.8% | -4.6% |
| 9 | -18.3% | 26.6% | 3.4% | | -24.3% | 22.9% | -7.0% |
| 8 | -15.6% | 28.7% | 8.6% | | -23.6% | 23.1% | -6.0% |
| 7 | -11.3% | 35.8% | 20.4% | | -22.0% | 24.6% | -2.8% |
| 6 | -1.8% | 40.1% | 37.5% | | -19.0% | 32.7% | 7.5% |
| 5 | 5.3% | 46.3% | 54.0% | | **-9.9%** | **37.5%** | **23.9%** |
| 4 | 12.9% | 51.6% | 71.2% | | -4.2% | 45.9% | 39.7% |

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 28

### 7.9 *REO vs. non-REO*

Real-Estate Owned (REO) is property that has been foreclosed and is now owned by the lender/investor. LPI premiums for REO properties cannot be passed on to the borrower because there is no longer a mortgage or a borrower involved. LPI premiums are paid by the servicer and passed through to the lender/investor.

It is logical that there is different loss experience for REO and non-REO properties. REO properties are more likely to be vacant and more likely to be in neighborhoods with other foreclosed properties. Earlier Balboa filings partially recognized this issue by having a rating factor for type of occupancy with significantly higher rates for vacant properties. Prior to 2010, the rate for vacant properties was 3.05 times the rate of owner-occupied properties. In 2001, the vacant occupancy rate became 1.54 times the rate of owner-occupied properties. The Praetorian filing eliminates this rating factor.

The analysis of loss experience should be performed separately for REO and non-REO properties because the loss experience of REO properties is likely to be worse than that of non-REO properties. There should be different LPI rates for REO and non-REO properties, so borrowers in non-REO properties are not charged excessive rates to subsidize the rates of REO properties.

### 7.10 *Scheduled Rating*

Scheduled Rating is a mechanism for the insurer to modify the base rates – and, consequently, premiums charged – by up to + / - 25% based on characteristics of the loan portfolio covered by the LPI. The proposed schedule rating plan includes:

- 30+ days contractual delinquency measured as a % of total active mortgage loans (+ / - 15%)
- Foreclosure loans measured as a % of total active mortgage loans (+ / - 10%)
- Named Insured choice to purchase coverage for the lesser of value of improvements for unpaid principal balance ((+ / - 10%)
- Operating Expenses Associated with Lender Placed Program (+ / - 15%)
- Loss History for Hazard Insurance Protection (+ / - 15%)
- Concentration of exposures in high risk (catastrophe prone) areas (+ / - 15%)
- Average Property Values (+ / - 15%)

Scheduled Rating should not be permitted or approved because it allows the insurer to arbitrarily change the rate. For "risk characteristics" that are objectively measured – delinquent loans, foreclosure loans, basis for coverage – a rating factor should be introduced if there is an objective relationship to risk of loss. In earlier filings, Balboa had a rating factor for loans in foreclosure.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 29

Scheduled rating based on average property values and concentration of risk in catastrophe prone areas is inappropriate because those characteristics are already captured in proposed rating factors. The filing proposes a complex rating factor for amount of coverage and includes rating territories with extremely high relativities for cat prone territories.

Scheduled rating based on operating expenses is inappropriate because it is arbitrary and because operating expenses for LPI – as opposed to insurance tracking – are minimal. Given that operating expenses for LPI should be in the range of 5%, it is unreasonable to include a provision to change rates up to + / - 15% based on a subjective evaluation of operating expenses associated with a particular servicer. In addition, this factor is particularly unreasonable because affiliates of Praetorian are likely the contractors selected by the mortgage servicers to perform the insurance tracking and related services. In essence, scheduled rating could be used to reward servicers who select QBE/Balboa for non-LPI mortgage servicing activities.

Finally, scheduled rating for loss history is inappropriate for LPI because there is no reasonable opportunity for mortgage servicers to engage in LPI loss mitigation. Unlike insureds in other lines of insurance subject to scheduled rating who can employ loss mitigation strategies to reduce losses, mortgage servicers cannot and do not employ loss mitigation strategies for LPI. Properties insured are only those without sufficient evidence of insurance; the mortgage servicer identifies the properties to be insured under the LPI policy, but does not select the properties to be insured.

### 7.11  *Age of Home Rating Factor*

The age of home rating factor has a massive impact on premium. The relativities are 0.683 for homes zero to 14 years old, 1.051 for homes 15 years and older and 1.000 for "not supplied." For properties older than 14 years, the LPI premium is 54% higher than homes 14 years or younger. The age of home factors are the same for non-hurricane and hurricane perils. It seems unlikely that the age of home factor is the same for non-hurricane and hurricane perils. Exhibit 29D shows relativities of 0.389 and 1.000 for homes 14 years and older and homes 15 years and older, respectively for hurricane pure premium. This is inconsistent with the filed age of home relativities.

Further, it is unclear if the age of home analysis was performed on countrywide for Florida-specific data. The preliminary one-way analysis in Exhibit 28E shows a much higher clam frequency for older homes, but a slightly lower claim severity.

CEJ Testimony Regarding Praetorian Lender-Placed Insurance Florida Rate Filing
July 3, 2012
Page 30

8.    **Rates Relative to Voluntary Market / Citizens or Assurant**

In a prior filing, Balboa rates were determined by comparison to Assurant and Citizens. There is no valid reason why LPI rates must be more than voluntary homeowners rates. Even if we assume that LPI claims are more frequent than homeowners claims, the lesser coverage and higher reasonable loss ratios for LPI than for homeowners could produce a lower LPI premium than homeowners premium for the same property. Table 11 starts with a homeowners premium of $1X. With an expected loss ratio of 65%, the expected claims on this coverage are 0.65X. If we assume that LPI claims are 1.6 times more frequent than homeowners claims and that the lesser LPI coverage is 80% of homeowners coverage, the expected LPI claims on this property are .65X * 1..6* 0.8 which equals 0.83X. With an expected loss ratio of 85%, the indicated premium for this property is 0.98X or slightly less than the homeowners premium for the property.

**Table 11**
**LPI versus Homeowners Premium for Same Property**

| 1 | Homeowners Premium | 1X |
|---|---|---|
| 2 | Expected HO Loss Ratio | 0.65 |
| 3 | Expected HO Claims (2 * 3) | 0.65X |
| 4 | LPI Coverage / HO Coverage | 80% |
| 5 | Higher LPI Pure Premium | 160% |
| 6 | LPI Expected Claims (3 * 4 * 5) | 0.83X |
| 7 | Expected LPI Loss Ratio | 85% |
| 8 | LPI Premium (6 / 7) | 0.98X |

# EXHIBIT 14.1

**Testimony of Birny Birnbaum on behalf of the Center for Economic Justice[1]**

**Public Hearing on Force-Placed Insurance before the**
**New York Department of Financial Services**

**May 21, 2012**

1.    **Summary of Testimony**

A.  The Lender-Placed Home Insurance (LPI) market is characterized by reverse
competition, in which the cost of insurance placed on the borrower's loan is pushed up by
LPI insurers in competition for servicers' business.

B.  The LPI market is not beneficially competitive to consumers, as evidenced by numerous
measures, including market concentration, high prices, low loss ratios, insurer
profitability and kickbacks to servicers.

C.  Because of reverse competition, stringent regulation of insurance rates is necessary.  The
Department of Financial Service's credit insurance regulations acknowledge the problem
of reverse competition and the need for vigorous oversight of credit insurance rates.

D.  Because of reverse competition, LPI insurer expenses cannot be deemed reasonable
simply because the insurer incurred those expenses.  With reverse competition, insurers
will provide considerations to lenders and such expenses are not reasonably included in
rates or passed on to borrowers.

E.  Expenses permitted in LPI rates should include only those for activities directly and
uniquely associated with the provision of LPI insurance.  Expenses associated with
servicing other the provision of LPI insurance must be excluded from rates.  Such
excluded expenses include commissions to servicers, tracking expenses and captive
reinsurance administrative fees.

F.  A reasonable permissible or minimum loss ratio for LPI in New York is at least 80%.
New York LPI consumers have been overcharged by $500 million since 2004 and
continue to be overcharged by over $275,000 per day.

G.  Insurer excuses for maintaining excessive rates are unsupported by any evidence,
actuarial principles or logic and are without merit.

H.  Recent actions by state attorneys general and Fannie Mae challenge state insurance
regulators to interpret and implement requirements for LPI rates to be "commercially
reasonable."

---

[1]  The Center for Economic Justice is a non-profit organization that advocates on behalf of low-income and minority
consumers on insurance, credit and utility issues.

1

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

I. Current LPI rates are clearly excessive and in violation of statutory rate standards. The very low loss ratios alone indicate excessive rates. Further, as soon as servicer-affiliated producers stopped accepting commissions, the LPI rates became excessive because an expense included in the filed rate was eliminated. The Department should act immediately to disapprove current LPI rates and force LPI insurers to file new rates that meet the statutory rate standards and exclude unreasonable expenses. In forcing LPI insurers to file new rates, the Department should define "commercially reasonable" LPI prices as rates that produce an expected loss ratio of 80% or greater.

J. The single most effective action by the Department to stop LPI abuses and to better align the interests of the servicer with the borrower is require LPI insurers to reduce rates to levels sufficient to cover the expected costs associated with the provision of insurance and to wring out unreasonable expenses associated with other servicing activities. By doing this, the Department will eliminate LPI as a profit center for servicers, eliminate the market incentives for servicers to unnecessarily place LPI and eliminate incentives for unnecessary activities whose purpose is to share LPI revenue and profits with servicers.

K. CEJ fully supports the recommendations of NEDAP regarding rates, disclosure, servicers continuing the borrowers' voluntary coverage, timeliness of refunds and limits on retroactive billing of borrowers. In addition, CEJ recommends that the Department and LPI vendors utilize focus-group testing and the insights of behavioral economics to dramatically improve LPI notices and disclosures to borrowers.

## 2.    Qualifications

I am a consulting economist and former insurance regulator specializing in insurance rates, regulation and policy, with particular expertise in credit-related insurance and insurance ratemaking and risk classification. I have worked on credit-related insurance issues for over 20 years and lender-placed insurance, specifically, for 18 years. I have been accepted as an expert on economic and actuarial issues related to credit-related insurance, including lender-placed insurance and title insurance, in many administrative and judicial proceedings.

## 3.    Description of Lender-Placed Insurance (LPI) Products and Markets

LPI, or force-placed insurance, is insurance placed by the loan servicer on the collateral underlying the loan. LPI protects the lender's collateral in the event the borrower fails to maintain insurance protecting the collateral. LPI is common for auto and real property loans. My testimony today discusses LPI placed and sold in connection with real-estate secured loans.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Mortgage loan agreements include a requirement that the borrower maintain insurance to protect the property serving as collateral for the loan. In addition, mortgage agreements typically include a requirement that the borrower's insurance policy include a lender loss payee endorsement.[2] This endorsement provides significant protection for the lender, including coverage for the lender even if coverage ceases for the borrower because of her non-compliance with policy provisions. The endorsement also allows the lender to continue coverage if the borrower fails to pay premium:

> In the event of failure of the insured to pay any premium or additional premium which shall be or become due under the terms of this policy or on account of any change in occupancy or increase in hazard not permitted by this policy, this Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from, and within one hundred and twenty (120) days after, due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefore. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said premium written notice by the Lender.

Mortgage loan servicers typically contract with an outside vendor to monitor whether borrowers are maintaining the required insurance, including requirements that the insurance policy or policies have:

- sufficient coverage amount to repair or replace the property if destroyed;

- cover the relevant perils, including fire, wind and flood, for example; and

- been issued by an insurance company with acceptable financial strength, as measured by a minimum financial strength rating by a credit rating agency.

The loan servicer provides the vendor with access to loan data, which generally includes insurance information obtained during the loan closing. The vendor utilizes automated computer systems to monitor the insurance coverage, including automated interaction with insurance companies to obtain insurance coverage information. These automated systems produce correspondence to the borrower if the borrower fails to provide evidence of the required insurance.

In connection with the monitoring of the servicer's portfolio of loans for evidence of required insurance, the insurance tracking vendor is typically the insurance company issuing the LPI policy or policies or an entity associated with an insurance company issuing the LPI policy or policies to the servicer. A mortgage servicer is likely to have LPI policies for normal hazards (such as fire) and for other perils not covered by a standard homeowners policy, such as flood, excess flood, wind and excess wind.

---

[2] Appendix A contains the standard lender loss payee endorsement.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

All residential property insurance policies (homeowners and dwelling fire) exclude flood as a covered peril (or cause of loss) and borrowers in designated flood areas are required by lenders to purchase a flood insurance policy from the federal government's National Flood Insurance Program. In many coastal states, insurers have excluded wind (hurricane) coverage from the standard residential property insurance policy in certain parts of the state and, consequently, borrowers must purchase a wind-only policy from a state-operated insurance program, like the Texas Windstorm Insurance Association.

### 3.1    LPI is a group master policy

The LPI insurance policy sold to the servicer is a group insurance master policy. Group insurance means that the policy covers a group of properties and not just a single property like the homeowners insurance policy purchased by a borrower. A master policy means that the policy covers all eligible properties and, as a property becomes eligible for coverage, a certificate of coverage for the individual property is issued under the master policy.

The LPI insurance policy provides that coverage begins on any property in the servicer's covered mortgage loan portfolio at the instant that the borrower's voluntary policy ceases to provide the required coverage. The LPI policy provides coverage, for example, if the borrower's homeowners insurance policy is canceled by the borrower or the insurance company or lapses because of non-payment of premium. To ensure that the property serving as collateral for its loans is always protected by insurance, the LPI policy provides coverage whenever the borrower's required insurance fails to remain in-force – even if the servicer or its vendor do not discover this failure of insurance coverage for days or weeks after the borrower's policy coverage has ended. The LPI group policy covers all properties in the servicer's loan portfolio and provides coverage as needed.

The vendor's automated systems issue a temporary binder of insurance coverage – retroactive to the date and time the borrower's coverage ceased to be in-force – along with correspondence to the borrower on behalf of the servicer that such binder has been issued and the premium for the LPI has been added to the borrower's loan amount. The correspondence informs the borrower that the LPI coverage will be canceled if the borrower provides the required evidence of insurance coverage.

The LPI insurance company or its associated vendor providing the loan tracking and other LPI-related services to the servicer bills the lender on a monthly basis for all the insurance provided. The LPI insurance company or vendor, on behalf of the loan servicer, removes the amount of the LPI premium form the borrower's escrow account, debits the escrow account if insufficient funds are available or adds the LPI premium to the borrower's loan amount.

If the borrower provides evidence that there was no lapse in required insurance coverage, the LPI insurance company will refund the premium paid by the servicer and the servicer will refund the LPI amounts charged to the borrower's loan. Testimony at this hearing indicates that 10% to 15% of LPI insurance is flat-cancelled, which means the LPI policy was erroneously placed.

4

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

If, after the temporary binder has been issued and after a certain period of time, the borrower fails to provide evidence of required insurance, the LPI insurance company issues a certificate of insurance from the master LPI policy. The certificate of insurance names both the servicer and the borrower as insureds covered by the policy.

### 3.2   Servicer Recovers LPI Premiums Even In Event of Foreclosure

The servicer recovers the LPI premium it has paid to the LPI insurer, even in the event that a borrower defaults and there is a foreclosure or short sale because the LPI premiums are paid by the owner of the loan (the investor) to the servicer out of the proceeds from the foreclosure or short sale.

### 3.3   LPI Coverage is Limited

LPI coverage is that of a dwelling fire policy, typically providing only hazard protection. Coverages typically included in a homeowners policy and generally not included in the LPI policy are liability, theft, personal property and additional living expense (ALE) in the event of a claim. The absence of coverage for personal property and ALE can result in a significant difference in claim costs from a catastrophe event between LPI and homeowners policies.

### 3.3   LPI Rates and Premium Charges

Rates for LPI are very simple because there is no individual underwriting of properties. Any property in the portfolio is eligible for coverage and the rate for every property is the same, with the exception that, in a few states, LPI insurers use rating territories. LPI insurers do not use rating territories in New York.

Rates for LPI insurance are an amount per $100 of coverage. The premium is determined simply by multiplying the rate times the amount of coverage in $100s. If the rate is $1.20 per $100, as is the case for LPI insurers in New York, the premium on a property with $300,000 of coverage is $3,600.

The coverage is amount is determined in one of three ways – the coverage amount on the last known voluntary policy, the replacement cost of the property or the unpaid principal balance.

### 4.   LPI Market Participants and Results

There has been dramatic growth in the amount of LPI insurance countrywide and in New York over the past five years. Table 1 shows statewide totals for New York LPI gross written premium, net written premium and earned premium. The data are compiled from the creditor-placed home columns of Credit Insurance Experience Exhibit (CIEE) to the statutory annual statement. The table understates the actual amount of New York LPI premium because QBE Insurance Corporation and QBE Specialty Insurance Company did not correctly report their LPI experience in the CIEE and, consequently, the experience of the two insurers is not included. The data for these two insurers would show up in years 2009 through 2011. Even in the absence of the QBE data, the table shows significant growth in LPI premium written in New York.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

## Table 1[3]
## New York LPI Premium, 2004-2011

| Year | Gross Written Premium | Net Written Premium | Earned Premium |
|------|----------------------|---------------------|----------------|
| 2004 | $55,566,227 | $28,795,446 | $28,833,666 |
| 2005 | $72,686,801 | $32,715,942 | $29,992,876 |
| 2006 | $100,753,850 | $48,242,893 | $41,769,062 |
| 2007 | $135,687,791 | $72,380,384 | $60,836,573 |
| 2008 | $173,405,889 | $94,217,189 | $83,632,490 |
| 2009 | $237,899,307 | $141,612,916 | $119,193,737 |
| 2010 | $262,582,431 | $144,579,586 | $143,830,768 |
| 2011 | $269,669,199 | $168,483,441 | $152,178,816 |
| 2004-11 | $1,308,251,495 | $731,027,797 | $660,267,989 |

   Table 2 shows the amount of paid and incurred claims and loss ratios for New York over the past eight years. Paid claims represent dollars spent during the year for claims. Incurred claims represent paid claims plus changes in reserves. The paid loss ratio is paid claims divided by written premium, while the incurred loss ratio is incurred claims divided by earned premiums. Paid loss ratios are generally lower than incurred loss ratios, indicating that LPI insurers have established reserves for expected claims that have not yet been reported. American Security's annual statement financial data shows that in each of the past five years, American Security has significantly reduced its estimates initial estimates of losses[4].

   Table 3 shows the gross written premium for Assurant and QBE / Balboa in New York from 2004-2011. As explained above, the QBE amounts are understated because of reporting errors by QBE Insurance Corporation and QBE Specialty Insurance Company. Together, Assurant and QBE account for the entire New York LPI market.

---

[3]  Appendix B includes detailed LPI data by individual insurer.
[4]  See Appendix C, which contains financial highlights of American Security from the 2011 annual statement.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### Table 2
### New York LPI Claims and Loss Ratios, All Insurers

| Year | Claims Paid | Claims Incurred | Paid LR | Incur LR |
|---|---|---|---|---|
| 2004 | $9,697,959 | $8,890,015 | 33.7% | 30.8% |
| 2005 | $7,160,826 | $6,994,609 | 21.9% | 23.3% |
| 2006 | $10,381,964 | $10,669,942 | 21.5% | 25.5% |
| 2007 | $10,124,351 | $11,481,755 | 14.0% | 18.9% |
| 2008 | $11,015,223 | $12,271,453 | 11.7% | 14.7% |
| 2009 | $21,616,586 | $24,171,220 | 15.3% | 20.3% |
| 2010 | $26,060,882 | $29,515,338 | 18.0% | 20.5% |
| 2011 | $38,515,613 | $41,843,150 | 22.9% | 27.5% |
| 2004-11 | $134,573,404 | $145,837,483 | 18.4% | 22.1% |

### Table 3
### Assurant and QBE / Balboa New York LPI Gross Written Premium, 2004-2011

| Year | Assurant | QBE / Balboa |
|---|---|---|
| 2004 | $46,815,426 | $8,750,801 |
| 2005 | $65,217,345 | $7,469,456 |
| 2006 | $92,265,215 | $8,488,635 |
| 2007 | $122,884,361 | $12,803,430 |
| 2008 | $159,042,795 | $14,363,094 |
| 2009 | $172,607,633 | $65,291,578 |
| 2010 | $200,651,456 | $61,930,975 |
| 2011 | $205,227,821 | $64,441,378 |
| 2004-11 | $1,064,712,052 | $243,539,347 |

7

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Table 4 shows the paid and incurred loss ratios of Assurant and QBE / Balboa LPI business in New York from 2004-2011.   In most years and in aggregate over the period, paid loss ratios are less than incurred loss ratios.

**Table 4**
**Assurant and QBE / Balboa New York LPI Loss Ratios, 2004-2011**

| Year | Assurant Paid LR | Assurant Incur LR | QBE/Balboa Paid LR | QBE/Balboa Incur LR |
|---|---|---|---|---|
| 2004 | 32.0% | 29.7% | 44.8% | 37.4% |
| 2005 | 19.4% | 21.3% | 44.2% | 39.6% |
| 2006 | 18.9% | 23.5% | 50.4% | 45.2% |
| 2007 | 13.0% | 18.0% | 22.2% | 26.2% |
| 2008 | 11.0% | 14.1% | 18.5% | 19.9% |
| 2009 | 16.8% | 18.8% | 12.1% | 24.7% |
| 2010 | 19.4% | 23.2% | 14.4% | 14.3% |
| 2011 | 24.8% | 27.8% | 18.3% | 26.7% |
| 2004-11 | 18.6% | 21.8% | 17.7% | 23.2% |

Table 5 shows incurred loss ratios for homeowners insurance and for LPI home countrywide and in New York from 2004 to 2011.  LPI loss ratios are consistently far less than homeowners loss ratios.  Table 5 and Figure 1 show that LPI loss ratios are not only lower than homeowners loss ratios, but do not track increases in homeowners loss ratios resulting from major catastrophe events.   Homeowners loss ratios spiked in 2008 and 2011 because of major catastrophe events, but LPI loss ratios remained low.

8

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**Table 5**
**Loss Ratios for Homeowners and LPI Home, 2004-2011[5]**

*Countrywide*

| Year | Homeowners | LPI Home |
|------|------------|----------|
| 2004 | 66.0% | 33.1% |
| 2005 | 75.2% | 53.5% |
| 2006 | 48.2% | 28.3% |
| 2007 | 50.4% | 20.5% |
| 2008 | 70.7% | 23.2% |
| 2009 | 59.3% | 20.3% |
| 2010 | 60.5% | 18.1% |
| 2011 | 76.0% | 26.5% |

*New York*

| Year | Homeowners | LPI Home |
|------|------------|----------|
| 2004 | 47.3% | 30.8% |
| 2005 | 43.3% | 23.3% |
| 2006 | 42.7% | 25.5% |
| 2007 | 41.1% | 18.9% |
| 2008 | 39.8% | 14.7% |
| 2009 | 40.7% | 20.3% |
| 2010 | 48.4% | 20.5% |
| 2011 | 56.6% | 27.5% |

---

[5] Data Sources: Homeowners 2004-2010, *NAIC Report on Profitability by State by Line in 2010*; Homeowners 2011, preliminary annual statement state page data compiled by Birnbaum; LPI Home, NAIC Credit Insurance Experience Exhibit data compiled by Birnbaum. Appendix E contains selected pages from *NAIC Profitability Report*.

9

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### Figure 1:  Catastrophe Losses for Homeowners Not Present for LPI Home



### Table 6
### New York LPI Overcharges, 2004-11
### Based on 80% Loss Ratio Standard

| Year | Earned Premium | Actual Loss Ratio | % Excessive | Amount Excessive | Daily Overcharge |
|------|----------------|-------------------|-------------|------------------|------------------|
| 2004 | $28,833,666 | 30.8% | 61.5% | $17,721,147 | |
| 2005 | $29,992,876 | 23.3% | 70.8% | $21,249,615 | |
| 2006 | $41,769,062 | 25.5% | 68.1% | $28,431,634 | |
| 2007 | $60,836,573 | 18.9% | 76.4% | $46,484,379 | |
| 2008 | $83,632,490 | 14.7% | 81.7% | $68,293,174 | |
| 2009 | $119,193,737 | 20.3% | 74.7% | $88,979,712 | |
| 2010 | $143,830,768 | 20.5% | 74.3% | $106,936,596 | $292,977 |
| 2011 | $152,178,816 | 27.5% | 65.6% | $99,874,879 | $273,630 |
| 2004-11 | $660,267,989 | 22.1% | 72.4% | $477,971,136 | |

10

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 4.1 New York LPI Rates Were and Are Extremely Excessive

The very low loss ratios shown in table 2 indicate that LPI rates were excessive. As explained in more detail below, a reasonable loss ratio for LPI is 80% or higher. Based on an 80% loss ratio standard, New York consumers were overcharged by about $500 million from 2004 through 2011, as shown in Table 6. Rates continue to be grossly excessive in violation of statutory requirements that rates be reasonable and not excessive. New York mortgage borrowers are being overcharged more than $275,000 each day current LPI rates remain in effect.

### 4.2 LPI Insurance is Extremely Profitable for Insurers and Servicers

Appendix C shows some of the financial highlights for American Security taken from the 2011 annual statement. The data show LPI is very profitable for American Security and its servicer-partners:

- Net pre-tax income for American Security was 33.5%, 42.0% and 31.8% of net written premium in 2009, 2010 and 2011, respectively

- Net after-tax income for American Security was 22.8%, 28.0% and 22.2% of net written premium in 2009, 2010 and 2011, respectively

- After-tax return on policyholder surplus for American Security was 41.7%, 50.5% and 44.8% of net written premium in 2009, 2010 and 2011, respectively

- From 2009 to 2011, American Security distributed $1.143 billion in dividends to policyholders – fully 29.5% of net premiums written over the period $200 million more than net after-tax income for the period.

- As shown in Table 8, below, captive reinsurance partners of American Security received hundreds of millions of reinsurance premiums in 2011. The amounts reported for paid claims and known claim reserves for the four captive reinsurers in Table 8 were only 4% to 5% of ceded premium.

- American Security reduced its initial estimates of expected claims by 3.3%, 4.0% and 3.0% in 2009, 2010 and 2011 respectively, indicating that initial reserves were too high.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

## 5.    Recent Important Activities Related to LPI

There have been significant actions within the past year by federal agencies, state attorneys general, state agencies and Fannie Mae related to performance of mortgage loan servicers. These actions include new performance standards for LPI, which impact the state insurance department's oversight of LPI.

### 5.1    *AG Settlement*

Earlier this year, most state attorneys general and the United States Department of Justice entered into settlement agreements with several mortgage servicers. The settlement agreements included requirements for LPI. Appendix C includes the relevant pages from the settlement with Bank of America. Of particular note is the following requirement:

> 8.  Any force-placed insurance policy must be purchased for a commercially reasonable price.

### 5.2    *Fannie Mae*

Fannie Mae is a government-sponsored enterprise that, among other things, purchases mortgage loans and contracts with servicers to service those loans. Fannie, which owns or guarantees a large portion of all outstanding mortgages, requires that insurance be in place on property serving as collateral for its mortgage loans. Stated differently, Fannie requires servicers to have LPI policies in place to ensure continuous insurance coverage for Fannie's mortgage properties.

In March, 2012, Fannie issued Fannie Mae Servicing Guide Announcement SVC-2012-04 announcing significant changes to its LPI requirements.[6]  Significant sections are cited below:

**Lender-Placed Insurance Coverage Amount and Deductible Requirements**

Fannie Mae is amending and clarifying its requirements related to the amount of lender-placed insurance coverage as shown below:

- For mortgage loans that are current to 119 days delinquent, the insurance coverage amount should be issued at the borrower's last known coverage amount.

- For mortgage loans that are currently 120 days or more delinquent or for those loans that become 120 days delinquent after the effective date of this Announcement, the insurance coverage amount must be changed to the lesser of:

---

[6]  Available at https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2012/svc1204.pdf

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

- the unpaid principal balance (UPB) or

- 100% of the insurable value of the improvements (as established by the property insurer).

The servicer may use the last known coverage amount for the borrower's property insurance in lieu of the insurable value of the improvements.

### *Notifying Borrower of Lender-Placed Insurance*

Fannie Mae is changing the requirement that the servicer must contact the borrower at least once by letter before placement of any lender-placed insurance coverage. With this Announcement, the servicer must contact the borrower at least twice by letter prior to obtaining lender-placed insurance coverage. In addition, the servicer must notify the borrower in writing when it is required to change the lender-placed insurance coverage amount due to the delinquent status of the mortgage loan.

### **Acceptable Lender-Placed Insurance Carriers**

Servicers must ensure that the lender-placed insurance carriers they use are filed and admitted in every state in which they service loans for Fannie Mae. For carriers and lender-placed programs that do not meet this requirement, Fannie Mae will allow the use of excess and surplus lines coverage during the filing period, up to a maximum of 180 days from the date of this Announcement.

Finally, the Fannie announcement requires rates be "commercially reasonable," but must exclude servicer commissions, tracking costs and other expenses not associated with "actual cost of the lender-placed insurance premium."

The lender-placed vendor selected by the servicer must have premium rates that are competitively priced and commercially reasonable. The servicer must have a documented process in place that demonstrates that the vendor meets this requirement. Fannie Mae reserves the right to require that a servicer change its lender-placed insurance provider if the provider has not demonstrated its ability to file rates within a timely manner.

### **Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees**

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must **exclude**:

13

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

- any lender-placed insurance commission earned on that policy by the servicer or any related entity,

- costs associated with insurance tracking or administration, or

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

## 5.3    DFS Agreement with Ocwen Financial on Mortgage Servicing Practices

The Department entered into an agreement with Ocwen Financial in December 2011 regarding mortgage servicing practices.  The agreement contains a number of service standards for LPI, including:

61. To the extent Servicer purchases a master hazard insurance policy for force-placed it shall only purchase a policy that is reasonably priced in relation to the claims that may be incurred.

This service standard is consistent with rate standards for credit-related insurance and better reflects insurance regulatory rate standards than the "commercially reasonable" standard found in the prior documents cited.

## 5.4    Insurance Regulators Responsibility for LPI Rates

The settlements with servicers and the Fannie servicing guidelines for LPI both require LPI rates to be "commercially reasonable."  This servicing standard requires action by state insurance regulators.  State insurance statutes require that rates be not excessive, not inadequate, not unfairly discriminatory and reasonable in relation to benefits provided.  "Commercially reasonable" is not a concept found in insurance rate regulation.

In addition, servicers will interpret "commercially reasonable" – as some servicer witnesses testified in this proceeding on May 18 – to mean rates available in the market.  In a market characterized by reverse competition and with only two providers who charge the same or similar rates, such an interpretation provides no consumer protection.

The Department of Financial Services and other state insurance regulators should quickly establish a substantive interpretation of "commercially reasonable" to be consistent with state insurance rate standards and to exclude unreasonable expenses, including those listed in the Fannie servicing announcement.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 6.    Reverse Competition, Market Failure and the Need for Strict Regulatory Oversight

Reverse competition describes a market structure in which consumers/borrowers exert little or no market power over prices.  Instead of competing for individual consumers, insurers compete for the entities with the market power to steer the ultimate consumer to the insurer.  Insurers compete for the servicer's business by providing considerations to the servicer, with the cost of such considerations passed on to the borrower.  Greater competition for the lender's business leads to higher prices of credit-related insurance, including LPI, to the borrower.  This form of competition, which results in *higher* prices to consumers, is called reverse competition.

New York, as have many other states, recognizes the problems with reverse competition in credit-related insurance markets.  New York insurance regulation 27A states:

> Section 185.0
>  (b) In the marketing of credit insurance, the inferior bargaining position of the debtor creates a captive market in which, without appropriate regulation of such insurance, the creditor can dictate the choice of coverages, premium rates, insurer, agent and broker, with such undesirable consequences as: excessive coverage (both as to amount and duration); excessive charges (including payment for nonessential items concealed as unidentifiable extra charges under the heading of insurance); failure to inform debtors of the existence and character of their credit insurance and the charges therefore, and consequent avoidance of the protection provided the debtor by such coverage.
>
> (c) In the absence of regulation, premium rates and compensation for credit insurance tend to be set at levels determined by the rate of return desired by the creditor in the form of dividends or retrospective rate refunds, commissions, fees, or other allowances, instead of on the basis of reasonable cost. Such reverse competition, unless properly controlled, results in insurance charges to debtors that are unreasonably high in relation to the benefits provided to them.

### 6.1    *Consumers Are Especially Vulnerable to Excessive LPI Rates*

The incentives and potential for excessive LPI rates are great.  Consumers do not request the insurance, but are forced to pay for it.  The cost of LPI is much higher than a policy the borrower would purchase on his or her own.  Servicers have financial incentive to force-place the insurance because the premium includes commission and other consideration for the servicer. With some servicers, the insurance is reinsured through a captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement of the coverage.[7]

---

[7] See, for example, "Ties to Insurers Could Land Mortgage Services in More Trouble," Jeff Horwitz, *American Bankers*, November 10, 2010.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Borrowers are vulnerable to excessive rates for LPI insurance because the borrowers / consumers exert no market power in the setting of these rates. The insurance is force-placed on the borrower and the borrower has no say or decision in the amount or type of coverage placed. In addition, there is no downward market pressure on rates; the vendors/insurers offering LPI do not compete on the basis of price, but on the basis of services provided to the lender and compensation and other considerations provided to the lender or its affiliates.

### 7.      Unreasonable Expenses

Because of reverse competition, LPI rates are excessive, in part, because of unreasonable expenses. To compete for servicer business, LPI insurers must provide considerations to the lender. This cost of these considerations – payments by the LPI insurer to the servicer or expenditures by the LPI insurer to subsidize the servicer's cost for non-LPI activities – inflate the rates for LPI. Unreasonable expenses included in LPI rates include:

- Tracking/Servicing Activities Unrelated to the Provision of LPI
- LPI Commissions
- Captive Reinsurance Administrative Costs
- Affiliate Transactions at Above-Market Prices

### 7.1    *Tracking and other Servicer Activities*

Table 7 provides a list of LPI-related activities and identifies the activities as associated with servicing a portfolio of loans versus the issuance and administration of the LPI master policies and individual property coverages.

Although most of the activities in Table 7 are servicing activities, most or all of these activities are typically performed by the LPI vendor for the servicer. Some of these services may be billed separately from the LPI premium, but some portion of the LPI insurer's expenses are for performing servicer activities not a part of the provision of LPI. Such expenses are unreasonable to include in LPI premium charges to borrowers.

16

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

## Table 7
### LPI-Related Servicing and Insurance Activities

| Activity | Servicing vs. Insurance |
|---|---|
| *Tracking Insurance* | |
| Loading Insurance Information into Database | Servicing |
| Contacting Borrowers, Problems with Insurance | Servicing |
| Customer Service Borrowers Insurance Evidence | Servicing |
| Contacting Insurers/Agents Insurance Evidence | Servicing |
| | |
| *Placing Insurance* | |
| Notifying Insurer to Issue Binder or Policy | Servicing |
| Issuing Temporary Binder | Insurance |
| Determining Coverage Amount | Servicing |
| Servicer Payment to Insurer | Insurance |
| Billing Borrower for LPI Premium | Servicing |
| Setting up Escrow when necessary for LPI | Servicing |
| Refunds to Servicer | Insurance |
| Refunds to Borrower | Servicing |
| Issuing Permanent Policy | Insurance |
| Customer Service about Insurance Placement | Servicing |
| Customer Service about Borrower Refunds | Servicing |
| Customer Service about LPI Coverage | Servicing |
| Customer Service about LPI Claims | Insurance |

### 7.2    *Commissions to Servicer-Affiliated Producers*

Testimony at this hearing has revealed that commissions paid to servicer-affiliated producers are not justified by any service provided by these producers and represent a kickback to the servicer for placing the LPI. When asked what activities the servicer-affiliated producers perform to justify the commissions, the responses included:

- Soliciting LPI providers
- Reviewing LPI form letters and other documents
- Third-party broker commissions are commonplace
- Broker commissions are an accepted and approved practice
- LPI broker commissions are similar to those in other lines of insurance
- Manage the LPI rating program
- Manage the LPI vendor relationship
- Quality review of the LPI vendor
- Commissions are a cost of doing business

17

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in LPI because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two vendors for proposals – and such activity is a rare event for most servicers.

Reviewing LPI form letters and other communication templates is the servicer's responsibility. A servicer-affiliated producer performing such review is performing servicer activity which should not be compensated for through LPI insurance premiums.

The fact that third-party broker commissions are commonplace or a standard industry practice in LPI or other lines of insurance is no justification for such commissions in the LPI market. There have been a variety of standard industry practices by servicers and insurers that were unfair and abusive to consumers – and which were not justified by virtue of many servicers or insurers engaging in the same practice. In the servicing realm, recent settlements between states and servicers have identified a number of unfair industry practices, such as robosigning foreclosure documents. In the insurance realm, steering of business based on contingent commissions, unfair use of retained asset account and abusive sales of financed single premium credit insurance, were industry standard practices, to name a few.

Other justifications cited by industry witnesses – managing the LPI vendor relationship and quality review of the LPI vendor – are responsibilities of the servicer and, to the extent the servicer-affiliated producer is performing these activities, the commissions to these producers represent a kickback of the LPI premiums to subsidize servicer activities.

In summary, industry witnesses have provided no justification for any LPI commissions to servicer-affiliated producers. Fannie Mae's new policy – to not reimburse servicers for any portion of LPI premiums paid as commission to servicer-affiliated producers – provides further evidence that no commissions to servicer-affiliated producers are warranted.

### 7.3    *Captive Reinsurance*

Captive reinsurance arrangements – in which the LPI insurer reinsures a portion of LPI business with a reinsurance company owned or affiliated with the servicer – are simply profit-sharing mechanisms designed to provide additional considerations to the servicer. These arrangements serve no substantive risk management purpose and, consequently, serve no purpose for the consumers/borrowers of LPI.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Table 8 shows information about four captive reinsurance arrangements managed by American Security Insurance Company. The amount of reinsurance premium ceded ranges from about $29 million to over $360 million. Paid losses plus known case (loss) reserves are only 4% to 5% of premium ceded. Even adding the reported amounts for IBNR (incurred but not reported) reserves – reserves for claims the reinsurer does not know about but expects will occur and which, in all four cases, are significantly greater than paid claims plus known reserves – claims plus all reserves are only 10-13% of premium ceded. The captive reinsurance arrangements are very profitable for the servicer's captive reinsurer.

**Table 8**
**American Security IC Captive Reinsurance, Selected Reinsurers**
**Schedule F, Part 3, Ceded Reinsurance, 2011 Annual Statement**
**($ 000)**

|  | Pelatis | Banc One | HSBC | Alpine Indemnity (PNC) |
|---|---|---|---|---|
| Reinsurance Premium Ceded | $30,535 | $363,012 | $28,686 | $34,052 |
| Paid Losses | $692 | $7,708 | $682 | $701 |
| Known Case Reserves | $883 | $6,596 | $757 | $696 |
| Known LAE Reserves | $56 | $422 | $48 | $45 |
| IBNR Loss Reserves | $2,327 | $27,476 | $2,201 | $1,934 |
| IBNR LAE Reserves | $179 | $1,853 | $132 | $151 |
|  |  |  |  |  |
| Paid Losses + Known Reserves | $1,631 | $14,726 | $1,487 | $1,442 |
| Percentage of Premium Ceded | 5.3% | 4.1% | 5.2% | 4.2% |
|  |  |  |  |  |
| Paid Losses + All Reserves | $4,137 | $44,055 | $3,820 | $3,527 |
| Percentage of Premium Ceded | 13.5% | 12.1% | 13.3% | 10.4% |

19

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

The arrangements should be prohibited because they create a conflict of interest between the servicer and the borrower.  By having a financial interest in the price and placement of LPI through a captive reinsurance program, the servicer has a glaring conflict with the interest of the borrower for lower-cost LPI.  Testimony of industry witnesses – "we can see that there might be a perception of a conflict, but it does not affect our practice" – does not address or eliminate the actual conflict of interest.   The person who has a conflict of interest does not eliminate the conflict simply by saying, "I'm not affected by these financial incentives."

Regardless of whether the captive reinsurance arrangements are prohibited, the expenses associated with administering the arrangements should be excluded from LPI rates because these expenses provide no benefit for the borrower.  The administrative expenses for captive reinsurance arrangements are likely substantial; the 2011 American Security Insurance Company statutory annual statement shows dozens of such arrangements.

## 7.4    *Affiliate Transactions*

LPI expenses for both Assurant and QBE include significant affiliate transactions.  QBE First has testified that the QBE insurers pay a significant commission to QBE First to administer the LPI program.  Schedule Y, Part 2 of the 2011 American Security Insurance Company annual statement shows American Security paid $$161,444,866 to Assurant, Inc for "management agreements and service contracts."  Amounts paid for affiliated transactions above reasonable market prices should be excluded from LPI rates.

## 8.    **Rate Standards and Ratemaking Methodology**

New York Insurance Statutes § 2303 sets out the rate standards applicable to property casualty insurance:

§ 2303. Standards for rates. Rates shall not be excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers.

Current LPI rates are not only excessive, but destructive of competition.  Because of reverse competition, excessive rates include amounts used by insurers to provide consideration to servicers in exchange for the LPI business.

Testimony at the hearing described the nature of QBE's acquisition of the Balboa insurance books of business and included an initial payment (of around $700) plus profit sharing on LPI and other lines of business in exchange for an agreement by Bank of America to utilize QBE for LPI for at least ten years.  It is unclear why insurance regulators approved this deal; it is effectively a referral fee for a guaranty of LPI business for ten years and eliminates any competition for 20% of the LPI market for ten years.

20

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

## 8.1    *Component Rating and Loss Ratio Rate Regulation*

There are two methodologies used by state insurance regulators for credit-related insurance – component rating and loss ratio.  The NAIC Creditor-Placed Insurance Model Act includes the two methodologies, which are also found in other NAIC credit-related insurance models.  Section 8E of the model states[8]:

Alternative 1:
The schedule of premium rates shall not be excessive, inadequate or unfairly discriminatory.  In determining whether a schedule of premium rates are excessive, inadequate or unfairly discriminatory, the commission shall take into account past and prospective loss experience, general and administrative expenses, loss settlement and adjustment expenses, reasonable creditor compensation and other acquisition costs including insurance tracking costs, reserves, taxes, licenses, fees and assessments, reasonable insurer profit and other relevant data.

Alternative 2:
A schedule of premium rates shall provide for premiums that are not unreasonable in relation to the benefits provided by the form to which the schedule applies.  A premium rate or schedule of premium rates shall be presumed to be reasonable for purposes of this section if the rate or schedule or [sic] rates produces or may reasonably be expected to produce a loss ratio of sixty percent (60%) or greater.  Nothing in this subsection shall prohibit the commissioner from approving other loss ratios which may be found reasonable.

---

[8]   The NAIC Creditor-Placed Insurance Model Act was strongly criticized by consumer advocates and some insurance regulators when adopted by the NAIC, arguing that the model act legitimizes many of the practices identified as unfair and abusive to consumers.  For example, the Act permits, in Section 8 E Alternative 1, the inclusion of tracking costs in the insurance premium, despite the fact that such an expense is clearly the responsibility of the lender as part of its loan servicing responsibility and, consequently, including tracking expenses in the insurance premium would appear to violate federal law – the Real Estate Settlement Procedures Act (RESPA) Section 2607 (a) prohibition against any fee, kickback or thing of value for business referrals.  Section 8D permits servicer-affiliated producer commissions and other payments to the servicer/lender for servicing – and not insurance – activities.  See National Consumer Law Center, *The Cost of Credit, 4th Edition,* page 383, citing Mark A. Chavez, *If You Can't Beat Them, Change the Rules:  The Industry Response to Forced-Place Insurance Litigation,* The Consumer Advocate, Vol. 3, Issue 5 (Nov/Dec 1997).  See also letters of April 30, 1996 and September 5, 1996 from NCLC, Consumers Union and the Consumer Federation of America to the NAIC regarding the proposed NAIC Creditor-Place Model Law, stating, "The model actually makes matters worse for the public.  No model act is preferable to this model act."

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 8.2    *In Reverse-Competitive Market, Actual Expenses Can Not Be Considered Reasonable*

Alternative 1 describes component rating – the traditional actuarial approach to ratemaking. With component rating a rate is developed on the basis of reasonable component costs – expected claims, selling expenses, administrative expenses, profit and other costs. Insurance regulators disapprove rates, based upon this methodology, if the profit provision is too high, the projected claims costs are too high, or expenses, including commissions, are too high. With component rating, the reasonable rate is the sum of the reasonable component values.

There are problems using the component rating methodology for insurance subject to reverse competition, including LPI. The component rating methodology requires the identification and determination of reasonable expenses. In a normally competitive market, one might conclude that actual expenses incurred are reasonable expenses because competitive forces practically prevent an insurer from making unreasonable expenditures. In a competitive market, an insurer would not be able to recoup unreasonable expenses in competitively-determined rates.

In markets characterized by reverse competition, however, insurers compete by providing considerations to the lender/servicer and, in the process of such competition, incur expenses which are unreasonable to include in the rate. Stated differently, in a reverse-competitive market, the fact that an insurer incurred an expense does not mean that the expense is reasonable to include in the rate.

The loss ratio method methodology for setting rates establishes a minimum loss ratio and the rate is simply claim costs divided by that minimum loss ratio. For example, if the claim costs for LPI were $0.32 per $100 of coverage and the minimum loss ratio was 80%, the maximum rate would be $0.32/0.8 which equals $0.40 per $100 of coverage.

The loss ratio methodology is based is based on a rate standard that premium charges must be reasonable in relation to benefits provided. As a matter of public policy, some loss ratios, even if justified by a component rating analysis, are too low to meet the standard of reasonable benefits in relation to premium charge. It is not uncommon for insurers to use component rating to justify very low loss ratios for many credit-related insurance products – typically relying on high expenses for such justification.

A second reason regulators use the loss ratio methodology is because of the difficulty in obtaining necessary information from insurers to evaluate the reasonableness of insurer expenses in reverse-competitive product markets. The discussion above provides an indication of the types of information necessary to evaluate actual insurer expenses -- data on personnel and non-personnel expenses by activity to determine what expenses are servicer subsidies, captive reinsurance administrative expenses, unreasonable affiliated transaction expenses and unreasonable servicer compensation, to name a few.

22

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

With the loss ratio methodology, the regulator identifies the reasonable expenses associated with the LPI insurance and establishes the minimum loss ratio as 1 minus the percentage of premium represented by the sum of reasonable expenses. Such an analysis is provided below.

## 9.    Derivation of Permissible or Minimum Loss Ratio

Table 9 shows the derivation of a reasonable expected loss ratio. The table shows the derivation of the profit provision and provides reasonable ranges for profit provision, other acquisition expenses, general and administrative expenses and taxes, licenses and fees. The table presents percentage of premium ranges for certain expense items, recognizing that the expense percentage may vary based on size of insurer or other factors. However, the reality of the market is that two insurer groups write virtually all the LPI business in New York and every other state.

The derivation of the profit provision starts with an after-tax return on equity of 11% to 13%, which is reasonable in the current very low interest rate climate. The after-tax return is grossed up to a before-tax return using a tax rate of 35%. The before-tax return on equity is converted to a return on premium by dividing by the premium/equity ratio. A conservative leverage ratio of 2.0 is used, which is consistent with the premium/surplus ratio of American Security. The projected investment gain, as a percentage of premium, is subtracted from the before-tax return on premium to produce the profit provision. A range of 6% to 7% investment gain as a percentage of premium is used, consistent with the results of American Security. The indicated profit provision is a range of 1.5% to 4.0%.

No provision for commissions is included. Many servicer-affiliated producers have already stopped accepting commissions on LPI because of the new Fannie Mae policy and other servicer-affiliated producers will soon stop accepting commissions on LPI insurance. Further, servicer-affiliated producers do nothing to warrant a commission. Industry testimony about the activities of servicer-affiliated producers indicates the activities of these producers are really vendor management oversight by the servicers. The costs of these vendor management activities are servicer responsibilities and not a reasonable LPI insurance expense. In 2011 in New York, the average commission for the homeowners line was 14.7%.[9]

A range of 2% to 4% is provided for other acquisition expense. Unlike personal lines insurance, there is no advertising to consumers (borrowers). Many mortgage servicers – and certainly the larger mortgage servicers – operate in many or all states.   Given that there are only two national LPI insurers and servicers know who these insurers are, the LPI insurers do not require significant expense to solicit business; rather, the LPI insurers will typically respond to solicitations.

---

[9]  Source or New York homeowners average commission is Annual Statement State Page data provided by NAIC and compiled by Birnbaum.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

In addition, the following activities, present for homeowners insurance, are not found for LPI.

- Development of complex underwriting and rating models
- Development of complex premium calculation models and software
- Underwriting of individual properties and policyholders, including credit reports, credit scores, claims history reports and other property-or-consumer specific data
- Interaction with individual policyholders to determine appropriate coverage amount and coverages for the policy
- Sales and underwriting activity not resulting in a policy, including, for example, obtaining credit scores and loss history reports for applicants who do not purchase a policy.

In 2010, the total selling expense in NY for homeowners insurance, as reported in the NAIC Profitability Report was 22.6%. If we subtract 15% for commissions, other acquisition expenses account for about 8% of New York homeowners premium. Given the far fewer activities and lesser other acquisition expenses for LPI than homeowners, the proposed LPI range for other acquisition of 2% to 4% is reasonable.

A range of 3% to 4% is provided for general and administrative expense. The expenses associated with a non-underwritten group blanket policy must be significantly less than general and administrative expenses associated with homeowners insurance. The following expenses for homeowners insurance are not found for LPI:

- Maintenance of detailed underwriting, rating and coverage information on individual policyholders
- Billing of individual policyholders

In 2010, the general expenses in New York for homeowners insurance, again as reported in the NAIC Profitability Report was 4.5% A smaller provision for LPI general expenses is reasonable.

A range of 2.5% to 3.0% is used for taxes, licenses and fees. This range is consistent with the amounts reported for homeowners insurance in the 2010 NAIC Profitability Report and the 2011 annual statement for American Security.

The result is a non-claims expense provision of 9% to 15%, leaving 85% to 91% for claim-related expenses, which includes expected loss and loss adjustment expense. Loss and loss adjustment expense includes a provision for catastrophe claims and catastrophe reinsurance expenses.

This analysis demonstrates that a permissible or minimum loss ratio of 80% is certainly reasonable for insurers and may be too low based on a more detailed analysis of actual LPI insurer expenses.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**Table 9**
**Derivation of Permissible or Minimum Loss Ratio**

|   |   | Low | High |
|---|---|---|---|
| 1 | Selected After-Tax Return on Equity | 11% | 13% |
| 2 | Tax Rate | 35% | 35% |
| 3 | Before Tax Return on Equity | 17% | 20% |
| 4 | Premium/Equity Ratio | 2.0 | 2.0 |
| 5 | Needed Return on Premium (3/4) | 8.5% | 10.0% |
| 6 | Investment Income % of Premium | 7% | 6% |
| 7 | Profit Provision (6-7) | 1.5% | 4.0% |
| 8 | Commission | 0.0% | 0.0% |
| 9 | Other Acquisition | 2.0% | 4.0% |
| 10 | General Admin | 3.0% | 4.0% |
| 11 | Taxes, Licenses, Fees | 2.5% | 3.0% |
| 12 | Sum of Non-Claim Expenses | 9.0% | 15.0% |
| 13 | Provision for Loss and LAE | 91.0% | 85.0% |

25

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 9.1    An Updated NAIC Model Would Supports a Minimum Loss Ratio Standard of 80%

The NAIC Creditor-Placed Model Act provides, as one regulatory approach, a minimum loss ratio of 60%. However, within the remaining 40% of premium, the model allows up to 20% commission to producers plus expenses associated with loan servicing, such as insurance tracking and profit-sharing with the servicer.[10] When these unreasonable expenses are excluded, the reasonable minimum loss ratio is over 80%.

### 10.    Evaluation of Claim Costs

Servicers and LPI insurers testifying at this hearing have argued that high LPI rates are justified because, among other reasons, there is no underwriting of individual LPI properties. The servicers and LPI insurers have argued that they must insure vacant properties and properties that would otherwise be uninsurable. While it is logical that claims per unit of exposure would be higher for non-underwritten insurance than for underwritten insurance, whether that is actually the case is an empirical question.

Offsetting the higher expected claims resulting from lack of individual underwriting is the lesser coverage of LPI relative to homeowners insurance. LPI typically provides hazard coverage only and does not include coverage for theft, liability, personal property or additional living expense (ALE) in the event of a claim. The absence of personal property and ALE can make a significant difference in the event of catastrophe claims.

Table 5, above, shows that LPI loss ratios are roughly one-third of homeowners loss ratios on a countrywide basis and roughly one-half in New York. If we assume that LPI rates are, on average, twice as much as homeowners rates, then LPI loss ratios that are one-half of homeowners loss ratios indicate that claims per unit of exposure are roughly the same for both products.

---

[10]  NAIC Creditor-Placed Insurance Model Act, Section 8
D. Prohibited rebates or inducements do not include:
(1) The providing of insurance tracking and other services incidental to the creditor-placed insurance program;
(2) The paying of commissions and other compensation to a duly licensed and appointed insurance producer, whether or not affiliated with the creditor;
(3) The paying to the creditor policyholder of group experience rated refunds or policy dividends; and
(4) The paying to the creditor of amounts intended to reimburse the creditor for its expenses incurred incidental to the creditor-placed insurance program (such as costs of data processing, mail processing, telephone service, insurance tracking, billing, collections and related activities); provided that these payments are approved in a manner consistent with the procedures in Section 8 and are calculated in a manner that does not exceed an amount reasonably estimated to equal the expenses incurred by the creditor.
E. An insurer that pays commissions to producers for creditor-placed insurance that are greater than twenty percent (20%) of the net written premium shall be required to demonstrate the commissions are not unreasonably high in relation to the value of the services rendered.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

In addition to lesser coverage, LPI claims per unit of exposure may be lower than for homeowners because of the distribution of LPI exposures and the lack of territorial rating for LPI in most states. Servicers and LPI insurers have testified at this hearing that their LPI exposures are concentrated in catastrophe-prone areas. The data in Table 5 and Figure 1 are inconsistent with this claim. If LPI exposures were concentrated in catastrophe-prone areas, then LPI loss ratios would be increase more during years with major catastrophe events and be higher than homeowners loss ratios in those years. In fact, LPI loss ratios remain low during years in which homeowners loss ratios spike because of catastrophe events.

## 10.1   REO vs. non-REO Experience

When a loan goes into default and the property is foreclosed, the property becomes owned by the bank or investor and is referred to as Real Estate Owned or REO. When a property becomes REO, there is no longer a borrower involved. The REO property typically continues to be serviced by mortgage servicer on behalf of the property owner (investor) and LPI remains on that property.

It is reasonable to expect that LPI claim costs per unit of exposure are higher on REO properties than on non-REO properties because the properties are more likely to be vacant and more likely to be neighborhoods ravaged by foreclosures. If this is the case, the claims experience for LPI coverage for REO and non-REO should be evaluated separately with lower rates for the non-REO LPI coverage charged to borrowers than the LPI rates charged to servicers only for REO LPI coverage. Borrowers should not be paying inflated LPI rates to subsidize coverage for REO properties owned by the servicer or investors.

## 10.2   LPI Premiums Could Reasonably Be the Same or Less than Homeowners Premiums for the Same Property

Even if we assume that LPI claims are more frequent than homeowners claims, the lesser coverage and higher reasonable loss ratios for LPI than for homeowners could produce a lower LPI premium than homeowners premium for the same property. Table 10 starts with a homeowners premium of \$1X. With an expected loss ratio of 65%, the expected claims on this coverage are 0.65X. If we assume that LPI claims are 1.5 times more frequent than homeowners claims and that the lesser LPI coverage is 80% of homeowners coverage, the expected LPI claims on this property are .65X * 1..5* 0.8 which equals 0.78X. With an expected loss ratio of 80%, the indicated premium for this property is 0.98X or slightly less than the homeowners premium for the property.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**Table 10**
**LPI versus Homeowners Premium for Same Property**

| | | |
|---|---|---|
| 1 | Homeowners Premium | 1X |
| 2 | Expected HO Loss Ratio | 0.65 |
| 3 | Expected HO Claims (2 * 3) | 0.65X |
| 4 | LPI Coverage / HO Coverage | 80% |
| 5 | Higher LPI Pure Premium | 150% |
| 6 | LPI Expected Claims (3 * 4 * 5) | 0.78X |
| 7 | Expected LPI Loss Ratio | ,8 |
| 8 | LPI Premium (6 / 7) | 0,98X |

**11.    Insurer Excuses for Maintaining Excessive Rates Are Unsupported By Any
Evidence and Without Merit**

During this hearing, servicers and LPI insurers have offered excuses for their failure to
lower LPI rates despite actual loss ratios less than half of the expected loss ratios presented in
rate filings to the Department. These explanations are illogical, unsupported by empirical
evidence and without merit.

**11.1    *"LPI is subject to catastrophes"***

Servicer and LPI insurer witnesses in this hearing argued that LPI is subject to massive
low-frequency, high-severity catastrophe losses and such risk requires low loss ratios. This
argument is contradicted by several facts. First, Table 5 and Figure 1 show that LPI loss ratios
have not been impacted by catastrophe events in the same manner as homeowners loss ratios.
The explanation for this may be the specific coverage excluded from LPI but present in
homeowners or the actual distribution of LPI exposures.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Second, in all but a few states – Florida being a notable exception – LPI insurers do not use territorial rating to reflect higher catastrophe risk for properties in certain locations. If catastrophe risk was actually the great concern expressed by witnesses, we would expect to see territorial rating to help address that concern.

Third, long-term experience from 2000 to present has not produced a single year with huge loss ratios. American Security's LPI hazard incurred loss ratios have ranged from 17.3% to 41.6% with all recent years under 30%. Over a 12-year period, catastrophe events have not produced high loss ratios for American Security in NY.

Provision for catastrophe claims is a reasonable component of LPI rates. But such risk must be quantified and the catastrophe risk component evaluated for reasonableness. In New York, LPI catastrophe risk could not reasonably explain loss ratios averaging 25% over 12 years.

## 11.2   *"We are waiting for the real estate market to stabilize"*

LPI insurers testified that they are waiting for the real estate market to stabilize before filing new rates and argue that it is difficult to evaluate rates this real estate market. This argument is not credible. If, instead of loss ratios 30 points below the filed expected loss ratio, LPI insurers were experiencing loss ratios 30 points above the filed expected loss ratio, the LPI insurers would not wait a few more years for the "real estate market to stabilize" before filing new, higher rates. This claim is also contradicted by American Security's own actions. American Security filed for a 20% rate increase in 1994 in New York after only a few years of limited experience and with experience loss ratios in less than 30 points above the permissible loss ratio. In 2010 American Security filed for a 4.6% rate increase for LPI in Florida because of an increase in catastrophe reinsurance costs,[11] indicating that American Security was attentive and responsive to even small changes in LPI expenses.

Insurers routinely file rates in uncertain economic and legal climates. When tort laws are modified by states, insurers routinely make assumptions about likely claims impact of such law changes. More important, the LPI insurers offered no evidence or logic why the growth in LPI premium and foreclosures should impact claims, other than argument of "unrealized losses," discussed below.

## 11.3   *"We expect large unrealized losses"*

American Security testified that another reason for failure to reduce rates is their knowledge that a significant amount of unrealized losses are around the corner when delinquent properties go into foreclosure. American Security provided no evidence to support this claim and the argument is contradicted by facts and logic. American Security has already created reserves for "unrealized losses" in the form of Incurred But Not Reported (IBNR) reserves. As Appendix C shows, American Security has routinely over-estimated future claims costs, indicating that American Security has already built this concern over "unrealized claims" into its claim reserve estimates.

---

[11]   Florida Office of Insurance Regulation, Filing No. 10-10031

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 11.4 *"We are waiting for the recent rate change to work through"*

Balboa testified that they filed a rate decrease a few years ago and is waiting for the rate decrease to "work through" before filing new rates. This argument has no merit. Insurance companies routinely file new rates with a year or two of past rate changes to reflect changes in clams experience and external factors which may impact future claims. Historical premiums are recast to premiums at current rate levels for the analysis. For example, if on January 1, 2011, an LPI insurer reduced rates by 10%, then premiums for experience prior to that date would be reduced by 10% in the rate analysis. If the actual loss ratio in 2010 was 20%, then the rate analysis would convert that loss ratio to 22.2% at current rate level.

## 12.   Recommended Actions

Current LPI rates are clearly excessive and in violation of statutory rate standards. The very low loss ratios alone indicate excessive rates. Further, as soon as servicer-affiliated producers stopped accepting commissions, the LPI rates became excessive because an expense included in the filed rates was eliminated. The Department should act immediately to disapprove current LPI rates and force LPI insurers to file new rates which meet the statutory rate standards and exclude unreasonable expenses. In forcing LPI insurers to file new rates, the Department should define "commercially reasonable" LPI prices as rates that produce an expected loss ratio of 80% or greater.

The single most effective action by the Department to stop LPI abuses and to better align the interests of the servicer with the borrower are require LPI insurers to reduce rates to levels sufficient to cover the expected costs associated with the provision of insurance and to wring out unreasonable expenses associated with other servicing activities. By doing this, the Department will eliminate LPI as a profit center for servicers, eliminate the market incentives for servicers to unnecessarily place LPI and eliminate incentives for unnecessary activities whose purpose is to share LPI revenue with servicers.

CEJ fully supports the recommendations of NEDAP regarding rates, disclosure, servicers continuing the borrowers' voluntary coverage, timeliness of refunds and limits on retroactive billing of borrowers. In addition, CEJ recommends that the Department and LPI vendors utilize focus-group testing and the insights of behavioral economics to dramatically improve the effectiveness of LPI notices and disclosures to borrowers.

**Testimony of Birny Birnbaum on behalf of the Center for Economic Justice**

**Public Hearing on Force-Placed Insurance before the**
**New York Department of Financial Services**

**May 21, 2012**

**Appendix A**

**Lender Loss Payee Endorsement**

S.F. FORM

Form 438BFU NS
(Rev. May 1, 1942)

### LENDER'S LOSS PAYABLE ENDORSEMENT

1.    Loss or damage, if any, under this policy, shall be paid to the Payee named on the first page of this policy, its successors and assigns, hereinafter referred to as "the Lender" in whatever form or capacity its interest may appear and whether said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

2.    The insurance under this policy, or any rider or endorsement attached thereto, as to the interest only of the Lender, its successors and assigns, shall not be invalidated nor suspended: (a) by any error, omission, or change respecting the ownership, description, possession, or location of the subject of the insurance or the interest therein, or the title thereto; (b) by the commencement of foreclosure proceedings or the giving of notice of sale of any of the property covered by this policy by virtue of any mortgage or trust deed; (c) by any breach of warranty, act, omission, neglect, or non-compliance with any of the provisions of this policy, including any and all riders now or hereafter attached thereto, by the named insured, the borrower, mortgagor, trustor, vendee, owner, tenant, warehouseman, custodian, occupant, or by the agents of either or any of them or by the happening of any event permitted by them or either of them, or their agents, or which they failed to prevent, whether occurring before or after the attachment of this endorsement, or whether before or after a loss, which under the provisions of this policy of insurance or of any rider or endorsement attached thereto would invalidate or suspend the insurance as to the named insured, excluding herefrom, however any acts or omissions for the Lender while exercising active control and management of the property.

3.    In the event of failure of the insured to pay any premium or additional premium which shall be or become due under the terms of this policy or on account of any change in occupancy or increase in hazard not permitted by this policy, this Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from, and within one hundred and twenty (120) days after, due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefore. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said premium written notice by the Lender.

4.    Whenever this Company shall pay to the Lender any sum for loss or damage under this policy and shall claim that as to the insured no liability therefore exists, this Company, at its option, may pay to the Lender the whole principal sum and interest and other indebtedness due or to become due from the insured, whether secured or unsecured, (with

refund of all interest no accrued), and this Company, to the extent of such payment, shall thereupon receive a full assignment and transfer, without recourse, or the debt and all rights and securities held as collateral thereto.

5.  If there be any other insurance upon the within described property, this Company shall be liable under this policy as to the Lender for the proportion of such loss or damage that the sum hereby insured bears to the entire insurance of similar character on said property under policies held by, payable to and expressly consented to by the Lender. Any Contribution Clause included in any Fallen Building Cause Waiver or any Extended Coverage Endorsement attached to this contract of insurance is hereby nullified, and also any Contribution Clause in any other endorsement or rider attached to this contract of insurance is hereby nullified except Contribution Clauses for the compliance with which the insured has received reduction in the rate charged or has received extension of the coverage to include hazards, other than fire and compliance with such Contribution Clause is made a part of the consideration for insuring such other hazards. The Lender upon the payment to it of the full amount of its claim, will subrogate this Company (pro rata with all other insurers contributing to said payment to all of the Lender's rights of contribution under said other insurance).

6.  This Company reserves the right to cancel this policy at any time, as provided by its terms, but in such case this policy shall continue in force for the benefit of the Lender for ten (10) days after written notice of such cancellation is received by the Lender and shall then cease.

7.  This policy shall remain in full force and effect as to the interest of the Lender for a period of ten (10) days after its expiration unless an acceptable policy in renewal thereof with loss thereunder payable to the Lender in accordance with the terms of this Lender's Loss Payable Endorsement, shall have been issued by some insurance company and accepted by the Lender.

8.  Should legal title to and beneficial ownership of any of the property covered under this policy become vested in the Lender or its agents; insurance under this policy shall continue for the term thereof for the benefit of the Lender but, in such event, any privileges granted by this Lender's Loss Payable Endorsement which are not also granted the insured under the terms and conditions of this policy and/or under other riders or endorsements attached thereto shall not apply to the insurance hereunder as respects such property.

9.  All notices herein provided to be given by the Company to the Lender in connection with this policy and this Lender's Loss Payable Endorsement shall be mailed to or delivered to the Lender or its office or branch described on the first page of this policy.


Approved: Committee on Insurance, California Bankers Association, Board of Fire
               Underwriters of the Pacific

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice

Public Hearing on Force-Placed Insurance before the
New York Department of Financial Services

May 21, 2012

Appendix B

Detailed LPI Home Experience, New York, 2004-2011

New York LPI Experience

| | | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2004-2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| Amer Bankers IC FL | Gross Written Premium | 756,441 | 684,023 | 727,931 | 726,906 | 757,104 | 681,904 | 631,923 | 587,946 | 5,554,178 |
| | Net Written Premium | 504,453 | 446,148 | 494,085 | 502,037 | 495,823 | 487,265 | 482,554 | 446,170 | 3,858,536 |
| | Earned Premium | 455,515 | 461,375 | 471,761 | 489,720 | 503,864 | 500,536 | 488,644 | 460,769 | 3,832,185 |
| | Claims Paid | 148,080 | 256,591 | 258,554 | 242,551 | 207,457 | 365,967 | 394,638 | 564,259 | 2,438,097 |
| | Claims Incurred | 137,315 | 255,496 | 261,114 | 220,954 | 242,389 | 440,112 | 429,188 | 417,399 | 2,403,967 |
| | LR Paid to Written | 29.4% | 57.5% | 52.3% | 48.3% | 41.8% | 75.1% | 81.8% | 126.5% | 63.2% |
| | LR Incurred to Earned | 30.1% | 55.4% | 55.3% | 45.1% | 48.1% | 87.9% | 87.8% | 90.6% | 62.7% |
| American Security IC | Gross Written Premium | 46,058,985 | 64,533,322 | 91,537,284 | 122,157,455 | 158,285,691 | 171,925,729 | 200,019,533 | 204,639,875 | ########## |
| | Net Written Premium | 24,471,075 | 28,937,693 | 43,682,799 | 64,341,746 | 84,822,984 | 96,202,187 | 103,572,030 | 117,720,072 | 563,750,586 |
| | Earned Premium | 24,230,994 | 26,103,686 | 37,301,650 | 53,879,283 | 74,961,693 | 88,098,251 | 99,462,687 | 109,025,616 | 513,063,860 |
| | Claims Paid | 7,837,072 | 5,441,676 | 8,075,456 | 8,207,950 | 9,163,802 | 15,834,335 | 19,781,214 | 28,749,909 | 103,091,414 |
| | Claims Incurred | 7,202,057 | 5,389,716 | 8,604,481 | 9,565,460 | 10,402,022 | 16,179,042 | 22,745,772 | 30,048,522 | 110,137,072 |
| | LR Paid to Written | 32.0% | 18.8% | 18.5% | 12.8% | 10.8% | 16.5% | 19.1% | 24.4% | 18.3% |
| | LR Incurred to Earned | 29.7% | 20.6% | 23.1% | 17.8% | 13.9% | 18.4% | 22.9% | 27.6% | 21.5% |
| Assurant Total | Gross Written Premium | 46,815,426 | 65,217,345 | 92,265,215 | 122,884,361 | 159,042,795 | 172,607,633 | 200,651,456 | 205,227,821 | ########## |
| | Net Written Premium | 24,975,528 | 29,383,841 | 44,176,884 | 64,843,783 | 85,318,807 | 96,689,452 | 104,054,584 | 118,166,242 | 567,609,121 |
| | Earned Premium | 24,686,509 | 26,565,061 | 37,773,411 | 54,369,002 | 75,465,557 | 88,598,787 | 99,951,331 | 109,486,385 | 516,896,044 |
| | Claims Paid | 7,985,152 | 5,698,267 | 8,334,010 | 8,450,501 | 9,371,259 | 16,200,302 | 20,175,852 | 29,314,168 | 105,529,511 |
| | Claims Incurred | 7,339,372 | 5,645,212 | 8,865,595 | 9,786,414 | 10,644,411 | 16,619,154 | 23,174,960 | 30,465,921 | 112,541,040 |
| | LR Paid to Written | 32.0% | 19.4% | 18.9% | 13.0% | 11.0% | 16.8% | 19.4% | 24.8% | 18.6% |
| | LR Incurred to Earned | 29.7% | 21.3% | 23.5% | 18.0% | 14.1% | 18.8% | 23.2% | 27.8% | 21.8% |
| Balboa IC | Gross Written Premium | 8,750,801 | 7,469,456 | 8,488,655 | 12,803,430 | 14,363,094 | 13,173,644 | 10,570,612 | 7,097,641 | 82,717,313 |
| | Net Written Premium | 3,819,918 | 3,332,101 | 4,066,009 | 7,536,601 | 8,898,382 | 8,347,097 | 5,588,899 | 5,270,656 | 46,859,663 |
| | Earned Premium | 4,147,157 | 3,427,815 | 3,995,651 | 6,467,571 | 8,166,933 | 8,848,823 | 6,049,118 | 5,365,716 | 46,468,784 |
| | Claims Paid | 1,712,807 | 1,471,612 | 2,047,954 | 1,673,850 | 1,643,964 | 2,545,502 | 1,849,393 | 1,958,962 | 14,904,044 |
| | Claims Incurred | 1,550,643 | 1,358,450 | 1,804,347 | 1,695,341 | 1,621,464 | 3,104,156 | 1,698,034 | 2,403,527 | 15,235,962 |
| | LR Paid to Written | 44.8% | 44.2% | 50.4% | 22.2% | 18.5% | 30.5% | 33.1% | 37.2% | 31.8% |
| | LR Incurred to Earned | 37.4% | 39.6% | 45.2% | 26.2% | 19.9% | 35.1% | 28.1% | 44.8% | 32.8% |

New York LPI Experience

| | | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2004-2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| Meritplan IC | Gross Written Premium | | | | | | 52,117,934 | 51,360,363 | 57,343,737 | 160,822,034 |
| | Net Written Premium | | | | | | 36,576,271 | 34,940,908 | 45,046,543 | 116,563,722 |
| | Earned Premium | | | | | | 21,746,031 | 37,832,191 | 37,329,511 | 96,907,733 |
| | Claims Paid | | | | | | 2,870,782 | 3,980,516 | 7,242,483 | 14,093,781 |
| | Claims Incurred | | | | | | 4,453,246 | 4,586,130 | 8,975,037 | 18,014,413 |
| | LR Paid to Written | | | | | | 7.8% | 11.4% | 16.1% | 12.1% |
| | LR Incurred to Earned | | | | | | 20.5% | 12.1% | 24.0% | 18.6% |
| | | | | | | | | | | |
| QBE/Balboa Total | Gross Written Premium | 8,750,801 | 7,469,456 | 8,488,635 | 12,803,430 | 14,363,094 | 65,291,578 | 61,930,975 | 64,441,378 | 243,539,347 |
| | Net Written Premium | 3,819,918 | 3,332,101 | 4,066,009 | 7,536,601 | 8,898,382 | 44,923,368 | 50,529,807 | 50,317,199 | 163,423,385 |
| | Earned Premium | 4,147,157 | 3,427,815 | 3,995,651 | 6,467,571 | 8,166,933 | 30,594,854 | 43,881,309 | 42,695,227 | 143,376,517 |
| | Claims Paid | 1,712,807 | 1,471,612 | 2,047,954 | 1,673,850 | 1,643,964 | 5,416,284 | 5,829,909 | 9,201,445 | 28,997,825 |
| | Claims Incurred | 1,550,643 | 1,358,450 | 1,804,347 | 1,695,341 | 1,621,464 | 7,557,402 | 6,284,164 | 11,378,564 | 33,250,375 |
| | LR Paid to Written | 44.8% | 44.2% | 50.4% | 22.2% | 18.5% | 12.1% | 14.4% | 18.3% | 17.7% |
| | LR Incurred to Earned | 37.4% | 39.6% | 45.2% | 26.2% | 19.9% | 24.7% | 14.3% | 26.7% | 23.2% |
| | | | | | | | | | | |
| State Total | Gross Written Premium | 55,566,227 | 72,686,801 | 100,753,850 | 135,687,791 | 173,405,889 | 237,899,307 | 262,582,431 | 269,669,199 | ############ |
| | Net Written Premium | 28,795,446 | 32,715,942 | 48,242,893 | 72,380,384 | 94,217,189 | 141,612,916 | 144,579,586 | 168,483,441 | 731,027,797 |
| | Earned Premium | 28,833,666 | 29,992,876 | 41,769,062 | 60,836,573 | 83,632,490 | 119,193,737 | 143,830,768 | 152,178,816 | 660,267,989 |
| | Claims Paid | 9,697,959 | 7,160,826 | 10,381,964 | 10,124,351 | 11,015,223 | 21,616,586 | 26,060,882 | 38,515,613 | 134,573,404 |
| | Claims Incurred | 8,890,015 | 6,994,609 | 10,669,942 | 11,481,755 | 12,271,453 | 24,171,220 | 29,515,338 | 41,843,150 | 145,837,483 |
| | LR Paid to Written | 33.7% | 21.9% | 21.5% | 14.0% | 11.7% | 15.3% | 18.0% | 22.9% | 18.4% |
| | LR Incurred to Earned | 30.8% | 23.3% | 25.5% | 18.9% | 14.7% | 20.3% | 20.5% | 27.5% | 22.1% |

**Testimony of Birny Birnbaum on behalf of the Center for Economic Justice**

**Public Hearing on Force-Placed Insurance before the
New York Department of Financial Services**

**May 21, 2012**

**Appendix C**

**Financial Highlights of American Security Insurance Company
from 2011 Annual Statement**

**American Security Insurance Company**
**Key Financial Results 2007-2011**

| | Line # | 2011 | 2010 | 2009 | 2008 | 2007 |
|---|---|---|---|---|---|---|
| NPW | 12 | $1,280,606,288 | $1,217,146,713 | $1,382,514,888 | $1,542,747,718 | $1,307,869,612 |
| Net Inv Gain | 14 | $95,036,798 | $101,112,901 | $103,755,853 | $48,291,180 | $47,264,996 |
| Net Income Before Taxes | Calculated | $406,768,146 | $511,159,923 | $462,839,144 | $477,690,500 | $364,289,046 |
| Before-Tax Income / NPW | Calculated | 31.8% | 42.0% | 33.5% | 31.0% | 27.9% |
| Inv Income / NPW | Calculated | 7.4% | 8.3% | 7.5% | 3.1% | 3.6% |
| Federal & Foreign Taxes | 17 | $122,368,086 | $170,542,759 | $147,980,508 | $180,022,075 | $150,865,105 |
| Net Income | 18 | $284,400,060 | $340,617,164 | $314,858,636 | $297,668,425 | $213,423,941 |
| Net Income / NPW | Calculated | 22.2% | 28.0% | 22.8% | 19.3% | 16.3% |
| Surplus | 26 | $634,578,930 | $674,007,241 | $754,399,942 | $785,343,138 | $715,785,160 |
| NWP/Surplus | Calculated | 2.02 | 1.81 | 1.83 | 1.96 | 1.83 |
| After-Tax Return on Surplus | Calculated | 44.8% | 50.5% | 41.7% | 37.9% | 29.8% |
| Dividends | 51 | $325,000,000 | $450,000,000 | $368,000,000 | $216,000,000 | |
| One Year Loss Development | 74 | -3.0% | -4.0% | -3.3% | -3.8% | -4.2% |

| | |
|---|---|
| Sum of Dividends 2009-11 | $1,143,000,000 |
| Sum of NPW 2009-11 | $3,880,267,889 |
| Dividends / NPW 2009-11 | 29.5% |

Source:  American Security Insurance Company
2011 Annual Statement, Five-Year Historical Data

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice

Public Hearing on Force-Placed Insurance before the
New York Department of Financial Services

May 21, 2012

Appendix D

LPI Requirements, Settlement Between Bank of America and
State Attorneys Geneeral and U.S. Department of Justice, 2012

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. _____ |
| BANK OF AMERICA CORPORATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) ) ) ) | |

**CONSENT JUDGMENT**

WHEREAS, Plaintiffs, the United States of America and the States of Alabama, Alaska,

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii,

Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming,

the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of

Columbia filed their complaint on March 12, 2012, alleging that Bank of America Corporation,

Bank of America, N.A., BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans

Servicing, LP, Countrywide Home Loans, Inc., Countrywide Financial Corporation,

Countrywide Mortgage Ventures, LLC, and Countrywide Bank, FSB (collectively, for the sake

foreclosure valuation process.

2. Default, foreclosure and bankruptcy-related services performed by third parties shall be at reasonable market value.

3. Servicer shall not collect any fee for default, foreclosure or bankruptcy-related services by an affiliate unless the amount of the fee does not exceed the lesser of (a) any fee limitation or allowable amount for the service under applicable state law, and (b) the market rate for the service. To determine the market rate, Servicer shall obtain annual market reviews of its affiliates' pricing for such default and foreclosure-related services; such market reviews shall be performed by a qualified, objective, independent third-party professional using procedures and standards generally accepted in the industry to yield accurate and reliable results. The independent third-party professional shall determine in its market survey the price actually charged by third-party affiliates and by independent third party vendors.

4. Servicer shall be prohibited from collecting any unearned fee, or giving or accepting referral fees in relation to third-party default or foreclosure-related services.

5. Servicer shall not impose its own mark-ups on Servicer initiated third-party default or foreclosure-related services.

D. Certain Bankruptcy Related Fees.

1. Servicer must not collect any attorney's fees or other charges with respect to the preparation or submission of a POC or MRS document that is withdrawn or denied, or any amendment thereto that is required, as a result of a substantial misstatement by Servicer of the amount due.

2. Servicer shall not collect late fees due to delays in receiving full remittance of debtor's payments, including trial period or permanent modification payments as well as post-petition conduit payments in accordance with 11 U.S.C. § 1322(b)(5), that debtor has timely (as defined by the underlying Chapter 13 plan) made to a chapter 13 trustee.

VII. FORCE-PLACED INSURANCE.

A. General Requirements for Force-Placed Insurance.

1. Servicer shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance. For escrowed accounts, Servicer shall continue to advance payments for the homeowner's existing policy, unless the borrower or insurance company cancels the existing policy.

A-37

For purposes of this section VII, the term "force-placed insurance" means hazard insurance coverage obtained by Servicer when the borrower has failed to maintain or renew hazard or wind insurance on such property as required of the borrower under the terms of the mortgage.

2. Servicer shall not be construed as having a reasonable basis for obtaining force-placed insurance unless the requirements of this section VII have been met.

3. Servicer shall not impose any charge on any borrower for force-placed insurance with respect to any property securing a federally related mortgage unless:

    a. Servicer has sent, by first-class mail, a written notice to the borrower containing:

        i. A reminder of the borrower's obligation to maintain hazard insurance on the property securing the federally related mortgage;

        ii. A statement that Servicer does not have evidence of insurance coverage of such property;

        iii. A clear and conspicuous statement of the procedures by which the borrower may demonstrate that the borrower already has insurance coverage;

        iv. A statement that Servicer may obtain such coverage at the borrower's expense if the borrower does not provide such demonstration of the borrower's existing coverage in a timely manner;

        v. A statement that the cost of such coverage may be significantly higher than the cost of the homeowner's current coverage;

        vi. For first lien loans on Servicer's primary servicing system, a statement that, if the borrower desires to maintain his or her voluntary policy, Servicer will offer an escrow account and advance the premium due on the voluntary policy if the borrower: (a) accepts the offer of the escrow account; (b) provides a copy of the invoice from the voluntary carrier; (c) agrees in writing to reimburse the escrow advances through regular escrow payments; (d) agrees to escrow to both repay the advanced premium and to pay for the future premiums necessary to maintain any required insurance policy; and (e) agrees Servicer shall manage the escrow account in

A-38

accordance with the loan documents and with state and federal law; and

vii.   A statement, in the case of single interest coverage, that the coverage may only protect the mortgage holder's interest and not the homeowner's interest.

b.   Servicer has sent, by first-class mail, a second written notice, at least 30 days after the mailing of the notice under paragraph VII.A.3.a that contains all the information described in each clause of such paragraph.

c.   Servicer has not received from the borrower written confirmation of hazard insurance coverage for the property securing the mortgage by the end of the 15-day period beginning on the date the notice under paragraph VII.A.3.b was sent by Servicer.

4.   Servicer shall accept any reasonable form of written confirmation from a borrower or the borrower's insurance agent of existing insurance coverage, which shall include the existing insurance policy number along with the identity of, and contact information for, the insurance company or agent.

5.   Servicer shall not place hazard or wind insurance on a mortgaged property, or require a borrower to obtain or maintain such insurance, in excess of the greater of replacement value, last-known amount of coverage or the outstanding loan balance, unless required by Applicable Requirements, or requested by borrower in writing.

6.   Within 15 days of the receipt by Servicer of evidence of a borrower's existing insurance coverage, Servicer shall:

a.   Terminate the force-placed insurance; and

b.   Refund to the consumer all force-placed insurance premiums paid by the borrower during any period during which the borrower's insurance coverage and the force placed insurance coverage were each in effect, and any related fees charged to the consumer's account with respect to the force-placed insurance during such period.

7.   Servicer shall make reasonable efforts to work with the borrower to continue or reestablish the existing homeowner's policy if there is a lapse in payment and the borrower's payments are escrowed.

8.   Any force-placed insurance policy must be purchased for a commercially reasonable price.

A-39

9.    No provision of this section VII shall be construed as prohibiting Servicer from providing simultaneous or concurrent notice of a lack of flood insurance pursuant to section 102(e) of the Flood Disaster Protection Act of 1973.

VIII.  **GENERAL SERVICER DUTIES AND PROHIBITIONS.**

A.    Measures to Deter Community Blight.

1.    Servicer shall develop and implement policies and procedures to ensure that REO properties do not become blighted.

2.    Servicer shall develop and implement policies and procedures to enhance participation and coordination with state and local land bank programs, neighborhood stabilization programs, nonprofit redevelopment programs, and other anti-blight programs, including those that facilitate discount sale or donation of low-value REO properties so that they can be demolished or salvaged for productive use.

3.    As indicated in I.A.18, Servicer shall (a) inform borrower that if the borrower continues to occupy the property, he or she has responsibility to maintain the property, and an obligation to continue to pay taxes owed, until a sale or other title transfer action occurs; and (b) request that if the borrower wishes to abandon the property, he or she contact Servicer to discuss alternatives to foreclosure under which borrower can surrender the property to Servicer in exchange for compensation.

4.    When the Servicer makes a determination not to pursue foreclosure action on a property with respect to a first lien mortgage loan, Servicer shall:

a.    Notify the borrower of Servicer's decision to release the lien and not pursue foreclosure, and inform borrower about his or her right to occupy the property until a sale or other title transfer action occurs; and

b.    Notify local authorities, such as tax authorities, courts, or code enforcement departments, when Servicer decides to release the lien and not pursue foreclosure.

B.    Tenants' Rights.

1.    Servicer shall comply with all applicable state and federal laws governing the rights of tenants living in foreclosed residential properties.

2.    Servicer shall develop and implement written policies and procedures to ensure compliance with such laws.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice

Public Hearing on Force-Placed Insurance before the
New York Department of Financial Services

May 21, 2012

Appendix E

Selected Pages from *NAIC Report on Profitability by State by Line in 2010*



National Association of Insurance Commissioners

# Report on Profitability
# By Line By State in 2010

**2011**

10/04/2011

## 2010 Profitability Report
## New York
## Percent of Direct Premiums Earned
## Losses Incurred

| Line Of Business | (1) 2001 | (2) 2002 | (3) 2003 | (4) 2004 | (5) 2005 | (6) 2006 | (7) 2007 | (8) 2008 | (9) 2009 | (10) 2010 | (11) AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Private Passenger Auto Liability | 82.5 | 79.4 | 58.6 | 51.4 | 47.8 | 51.0 | 62.7 | 65.0 | 70.1 | 70.7 | 63.9 |
| Private Passenger Auto Physical | 57.5 | 54.9 | 51.4 | 46.8 | 50.1 | 51.2 | 58.2 | 60.5 | 58.6 | 61.2 | 55.0 |
| Private Passenger Auto Total | 74.1 | 71.4 | 56.3 | 49.9 | 48.5 | 51.1 | 61.2 | 63.5 | 66.2 | 67.5 | 61.0 |
| Commercial Auto Liability | 97.6 | 80.3 | 67.1 | 56.2 | 52.8 | 50.9 | 51.7 | 51.1 | 55.3 | 57.0 | 62.0 |
| Commercial Auto Physical | 59.1 | 36.1 | 35.7 | 37.0 | 38.8 | 40.2 | 45.3 | 48.2 | 46.3 | 50.3 | 43.7 |
| Commercial Auto Total | 90.5 | 72.8 | 62.1 | 53.3 | 50.7 | 49.3 | 50.8 | 50.7 | 54.1 | 56.1 | 59.0 |
| Homeowners Multiple Peril | 55.6 | 47.8 | 51.5 | 47.7 | 43.3 | 42.7 | 41.1 | 39.8 | 40.7 | 48.4 | 45.9 |
| Farmowners Multiple Peril | 58.6 | 57.6 | 54.0 | 67.0 | 51.0 | 39.2 | 48.3 | 45.0 | 48.2 | 57.3 | 52.6 |
| Commercial Multiple Peril | 236.0 | 76.6 | 46.4 | 44.2 | 34.2 | 43.5 | 36.3 | 41.8 | 38.9 | 47.0 | 64.5 |
| Fire | 1,288.8 | (93.9) | 23.6 | (51.7) | 34.7 | 12.6 | 4.7 | 22.1 | 22.9 | 29.0 | 129.3 |
| Allied Lines | 2,468.0 | (21.7) | 45.0 | 152.9 | (20.8) | 92.4 | 90.6 | 20.1 | 30.3 | 30.5 | 288.7 |
| Inland Marine | 194.6 | 39.3 | 46.3 | 34.7 | 26.6 | 43.5 | 30.6 | 41.0 | 51.6 | 43.7 | 55.2 |
| Medical Professional Liability*** | 105.2 | 103.9 | 100.5 | 114.1 | 84.7 | 86.9 | 75.7 | 68.4 | 60.7 | 60.0 | 86.0 |
| Other Liability** | 100.7 | 133.3 | 91.4 | 101.5 | 72.8 | 55.9 | 53.2 | 65.4 | 70.3 | 63.6 | 80.8 |
| Products Liability | NR | NR | NR | NR | NR | NR | NR | NR | 63.6 | 110.8 | NR |
| Workers Compensation | 123.1 | 74.0 | 73.4 | 74.2 | 77.7 | 73.6 | 69.2 | 73.0 | 83.4 | 95.8 | 81.7 |
| Mortgage Guaranty | NR | NR | NR | NR | NR | NR | NR | NR | 142.2 | 51.6 | NR |
| Financial Guaranty | NR | NR | NR | NR | NR | NR | NR | NR | 435.4 | 316.4 | NR |
| Accident and Health | NR | NR | NR | NR | NR | NR | NR | NR | 65.9 | 81.3 | NR |
| Warranty | NR | NR | NR | NR | NR | NR | NR | NR | 89.8 | 96.2 | NR |
| All Other** | 71.8 | 36.6 | 28.6 | 61.5 | 54.0 | 34.3 | 120.9 | 518.5 | 48.4 | 41.6 | 101.6 |
| Total All Lines | 136.3 | 71.5 | 60.4 | 62.9 | 54.3 | 52.5 | 60.6 | 98.1 | 72.2 | 68.7 | 73.7 |

©2011 National Association of Insurance Commissioners

281

**Prior to 2009, results for Other Liability include Products Liability and results for All Other include Mortgage Guaranty, Financial Guaranty, Accident and Health and Warranty.
Users of this report should be aware of the explanations and qualifications contained in the introduction.
***See technical notes

10/04/2011

## 2010 Profitability Report
### Countrywide - Direct
#### Percent of Direct Premiums Earned
#### Losses Incurred

| Line Of Business | (1) 2001 | (2) 2002 | (3) 2003 | (4) 2004 | (5) 2005 | (6) 2006 | (7) 2007 | (8) 2008 | (9) 2009 | (10) 2010 | (11) AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Private Passenger Auto Liability | 76.6 | 72.1 | 66.4 | 62.5 | 62.3 | 59.4 | 63.6 | 65.6 | 68.5 | 67.9 | 66.5 |
| Private Passenger Auto Physical | 67.4 | 61.3 | 58.0 | 53.1 | 57.0 | 55.6 | 57.8 | 60.7 | 58.0 | 58.1 | 58.7 |
| Private Passenger Auto Total | 72.7 | 67.5 | 62.8 | 58.6 | 60.1 | 57.9 | 61.2 | 63.6 | 64.3 | 64.0 | 63.3 |
| Commercial Auto Liability | 80.3 | 70.8 | 61.3 | 55.9 | 54.2 | 52.4 | 53.7 | 54.0 | 53.1 | 51.8 | 58.8 |
| Commercial Auto Physical | 63.3 | 54.1 | 47.8 | 47.2 | 50.0 | 50.4 | 51.2 | 57.6 | 53.9 | 57.8 | 53.3 |
| Commercial Auto Total | 75.4 | 66.2 | 57.7 | 53.7 | 53.1 | 51.9 | 53.1 | 54.9 | 53.3 | 53.2 | 57.3 |
| Homeowners Multiple Peril | 77.2 | 65.8 | 59.2 | 66.0 | 75.2 | 48.2 | 50.4 | 70.7 | 59.3 | 60.5 | 63.3 |
| Farmowners Multiple Peril | 75.1 | 66.7 | 60.7 | 56.4 | 52.6 | 59.3 | 58.1 | 82.8 | 69.0 | 67.0 | 64.8 |
| Commercial Multiple Peril | 81.7 | 54.7 | 49.8 | 53.3 | 60.6 | 42.5 | 41.1 | 55.7 | 44.7 | 49.1 | 53.3 |
| Fire | 141.2 | 30.5 | 38.6 | 33.2 | 54.6 | 37.7 | 32.4 | 51.8 | 36.3 | 33.1 | 48.9 |
| Allied Lines | 150.9 | 64.6 | 55.6 | 85.2 | 274.0 | 52.4 | 39.7 | 79.1 | 48.9 | 39.8 | 89.0 |
| Inland Marine | 62.7 | 45.0 | 43.1 | 42.9 | 63.9 | 43.2 | 36.4 | 51.6 | 46.2 | 42.6 | 47.8 |
| Medical Professional Liability*** | 100.0 | 93.0 | 80.7 | 62.9 | 51.9 | 43.0 | 41.4 | 34.8 | 35.6 | 32.2 | 57.6 |
| Other Liability** | 81.6 | 100.5 | 78.1 | 74.7 | 63.2 | 50.0 | 50.4 | 52.8 | 52.0 | 54.6 | 65.8 |
| Products Liability | NR | NR | NR | NR | NR | NR | NR | NR | 57.3 | 70.3 | NR |
| Workers Compensation | 85.9 | 78.3 | 73.3 | 67.3 | 64.8 | 60.6 | 61.3 | 62.9 | 67.7 | 74.7 | 69.7 |
| Mortgage Guaranty | NR | NR | NR | NR | NR | NR | NR | NR | 214.0 | 160.3 | NR |
| Financial Guaranty | NR | NR | NR | NR | NR | NR | NR | NR | 267.0 | 205.6 | NR |
| Accident and Health | NR | NR | NR | NR | NR | NR | NR | NR | 69.7 | 77.7 | NR |
| Warranty | NR | NR | NR | NR | NR | NR | NR | NR | 64.6 | 68.5 | NR |
| All Other** | 69.0 | 59.8 | 52.1 | 53.1 | 52.6 | 40.3 | 63.9 | 127.5 | 40.6 | 33.1 | 59.2 |
| Total All Lines | 79.0 | 69.3 | 62.5 | 61.2 | 67.4 | 52.1 | 54.1 | 66.3 | 60.0 | 59.3 | 63.1 |

©2011 National Association of Insurance Commissioners

149

**Prior to 2009, results for Other Liability include Products Liability and results for All Other include Mortgage Guaranty, Financial Guaranty, Accident and Health and Warranty.
Users of this report should be aware of the explanations and qualifications contained in the introduction.
***See technical notes

09/29/2011

## 2010 Profitability Report
### New York

| Line Of Business | Direct Premiums Earned (000s) (1) | Percent of Direct Premiums Earned | | | | | | | Invest Gain On Ins Trans (8A) | Tax On Ins Trans (8B) | Profit On Ins Trans (8C) | Percent of Net Worth | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Losses Incurred (2) | Loss Adjust Expense (3) | General Expense (4) | Selling Expense (5) | Taxes License Fees (6) | Divs To Plcyhldr (7) | Under-Writing Profit (8) | | | | Earned Prem To Net Worth (9) | Inv Gain On Net Worth (10) | Tax On Inv Gain On Net Worth (11) | Return On Net Worth (12) |
| Private Passenger Auto Liability | 6,705,616 | 70.7 | 16.4 | 5.4 | 16.1 | 2.6 | 0.2 | (11.5) | 6.9 | (2.3) | (2.3) | 78.2 | 4.6 | 1.1 | 1.7 |
| Private Passenger Auto Physical | 3,362,523 | 61.2 | 10.1 | 5.1 | 16.0 | 2.4 | 0.4 | 4.8 | 1.0 | 1.9 | 3.9 | 141.5 | 4.6 | 1.1 | 9.0 |
| Private Passenger Auto Total | 10,068,138 | 67.5 | 14.3 | 5.3 | 16.1 | 2.6 | 0.3 | (6.1) | 4.9 | (0.9) | (0.2) | 91.9 | 4.6 | 1.1 | 3.3 |
| Commercial Auto Liability | 1,540,614 | 57.0 | 15.0 | 7.0 | 20.7 | 3.5 | 0.1 | (3.2) | 8.7 | 1.0 | 4.4 | 61.8 | 4.6 | 1.1 | 6.2 |
| Commercial Auto Physical | 242,226 | 50.3 | 7.7 | 7.8 | 21.2 | 2.7 | 0.1 | 10.2 | 1.1 | 3.8 | 7.5 | 110.9 | 4.7 | 1.1 | 11.8 |
| Commercial Auto Total | 1,782,840 | 56.1 | 14.0 | 7.1 | 20.8 | 3.4 | 0.1 | (1.4) | 7.7 | 1.4 | 4.9 | 65.8 | 4.6 | 1.1 | 6.7 |
| Homeowners Multiple Peril | 4,288,969 | 48.4 | 7.5 | 4.5 | 22.6 | 2.5 | 0.1 | 14.2 | 3.4 | 5.8 | 11.8 | 96.0 | 4.7 | 1.2 | 14.8 |
| Farmowners Multiple Peril | 34,304 | 57.3 | 7.2 | 5.5 | 26.0 | 1.5 | 0.1 | 2.4 | 4.3 | 1.9 | 4.8 | 89.4 | 4.7 | 1.2 | 7.8 |
| Commercial Multiple Peril | 3,051,851 | 47.0 | 13.9 | 6.7 | 25.0 | 2.5 | 0.1 | 4.8 | 8.5 | 3.8 | 9.5 | 59.8 | 4.6 | 1.2 | 9.2 |
| Fire | 745,577 | 29.0 | 4.0 | 7.7 | 18.6 | 1.9 | 0.1 | 38.7 | 2.3 | 14.1 | 26.8 | 96.7 | 4.7 | 1.2 | 29.5 |
| Allied Lines | 597,655 | 30.5 | 5.9 | 4.2 | 13.4 | 1.6 | 0.1 | 52.3 | 3.2 | 19.1 | 36.4 | 100.8 | 4.6 | 1.1 | 40.2 |
| Inland Marine | 985,715 | 43.7 | 6.7 | 6.7 | 18.1 | 2.2 | 0.1 | 23.4 | 0.5 | 8.3 | 15.6 | 127.3 | 4.6 | 1.1 | 23.3 |
| Medical Professional Liability | 1,661,183 | 60.0 | 30.8 | 8.0 | 5.6 | 2.7 | 0.1 | (7.1) | 23.8 | 3.4 | 13.3 | 33.0 | 4.6 | 1.1 | 7.8 |
| Other Liability | 5,256,975 | 63.6 | 22.4 | 6.3 | 19.0 | 2.0 | 0.0 | (13.3) | 18.2 | (0.1) | 5.1 | 33.3 | 4.6 | 1.1 | 5.3 |
| Products Liability | 133,318 | 110.8 | 56.2 | 8.7 | 21.3 | 2.0 | 0.0 | (99.5) | 99.1 | (10.3) | 10.0 | 35.3 | 4.6 | 1.1 | 4.4 |
| Workers Compensation | 3,527,986 | 95.8 | 17.5 | 7.5 | 10.6 | 9.6 | 5.2 | (46.1) | 24.7 | (10.0) | (11.4) | 30.1 | 4.6 | 1.1 | 0.1 |
| Mortgage Guaranty | 198,258 | 51.6 | 2.1 | 14.0 | 3.7 | 2.0 | 0.0 | 26.6 | 29.7 | 16.7 | 39.7 | 40.4 | 4.6 | 1.1 | 19.5 |
| Financial Guaranty | 973,593 | 316.4 | 30.0 | 26.1 | 0.1 | 2.9 | 0.0 | (275.5) | 44.2 | (85.5) | (145.8) | 21.9 | 4.6 | 1.1 | (28.5) |
| Accident and Health | 232,817 | 81.3 | 8.6 | 9.6 | 22.7 | 4.0 | 0.0 | (24.5) | 9.4 | (6.3) | (8.9) | 34.6 | 4.6 | 1.1 | 0.4 |
| Warranty | 45,659 | 96.2 | 2.0 | 5.0 | 5.6 | 4.0 | 0.1 | (12.8) | 5.2 | (3.2) | (4.5) | 58.0 | 4.6 | 1.1 | 0.9 |
| All Other | 1,298,383 | 41.6 | 8.2 | 7.8 | 24.0 | 2.0 | 0.1 | 16.4 | 6.2 | 7.3 | 15.3 | 69.0 | 4.6 | 1.1 | 14.1 |
| Total All Lines | 34,883,223 | 68.7 | 15.2 | 6.7 | 17.2 | 3.2 | 0.7 | (11.8) | 11.6 | (1.3) | 1.1 | 52.8 | 4.6 | 1.1 | 4.0 |

Users of this report should be aware of the explanations and qualifications contained in the introduction.

# EXHIBIT 15

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
FINANCIAL FRAUD & CONSUMER PROTECTION DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of

AMERICAN SECURITY INSURANCE
COMPANY, AMERICAN BANKERS INSURANCE
COMPANY OF FLORIDA, and ASSURANT, Inc.

Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## CONSENT ORDER

On October 3, 2011, the New York State Department of Financial Services ("DFS"),

commenced an investigation, pursuant to the New York Insurance Law and Financial Services

Law ("FSL"), of Assurant, Inc. ("Assurant") and its subsidiaries, including but not limited to

American Security Insurance Company ("ASIC") and American Bankers Insurance Company of

Florida ("ABIC"), concerning force-placed insurance policies issued in New York State by ASIC

and ABIC (the "Investigation"). This Consent Order contains the findings of the Investigation,

allegations of DFS resulting from the Investigation, and the relief agreed to by DFS, ASIC,

ABIC and Assurant.

## FINDINGS

The findings of DFS's Investigation ("Findings") are as follows:

### Relevant Entities

1. Assurant, a Delaware corporation that is an insurance holding company, is the parent

   company of ASIC, the largest force-placed insurer in New York. Assurant Specialty

   Property, a division of Assurant, provides force-placed homeowners' insurance to mortgage

servicers throughout the United States, including New York. Industry participants also refer to force-placed insurance as "lender-placed insurance." In New York, two subsidiaries of Assurant, ASIC and ABIC, write force-placed insurance. The bulk of the policies are written through ASIC. ASIC and ABIC write force-placed insurance policies for hazard and flood coverage in New York State. ASIC also writes a small amount of wind coverage through a program which commenced in 2010.

**Background on Force-Placed Insurance**

2. Force-placed insurance is insurance taken out by a bank, lender or mortgage servicer when a borrower does not maintain the insurance required by the terms of the mortgage. This can occur if the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Homeowners have reported that when they are charged for force-placed insurance, the premiums are far in excess of the premiums those homeowners were charged for voluntary homeowners insurance. Yet force-placed insurance often provides far less protection for the homeowner, while protecting the lender's or investors' interest in the property.[1] The high cost of force-placed insurance, including ASIC's and ABIC's force-placed policies, is due at least in part to relationships between mortgage servicers and their affiliates and payments by force-placed insurers, including ASIC and ABIC, to such servicers and their affiliates. While servicers choose the force-placed product for their mortgage loan portfolio, the high premiums are charged to homeowners, and in the event of foreclosure, costs are passed onto investors.

---

[1] In the case of ASIC's and ABIC's New York policies, homeowners are not protected for contents of their homes or for third-party liability.

3. Force-placed insurance involves a number of different actors. To start, there are the homeowners whose voluntary homeowner's policies have either been cancelled, have lapsed, or have not been renewed, most often because a homeowner is facing financial hardship. In some instances, insurance is force placed in error or due to a dispute about required coverage. Lenders (banks) from whom homeowners obtained their mortgages employ mortgage servicers as their agents, collecting and distributing payments from borrowers and handling defaults, modifications, settlements, and foreclosure proceedings. Servicers may or may not be subsidiaries of or otherwise affiliated with lenders, and may or may not also own portfolios of mortgage loans.

4. Some lenders and/or mortgage servicers have affiliated insurance agencies or brokers that receive commissions from force-placed insurers for services the agencies or brokers purportedly provide. To the extent those agencies or brokers provide any services, most of those services are not ones that insurance agencies or brokers typically provide.

5. Force-placed insurers perform insurance tracking and placement of force-placed policies. The mortgage servicer provides access to the necessary information for the force-placed insurer to monitor homeowners' insurance policies to ensure that there is adequate coverage in the case of damage or destruction. The force-placed insurers are also generally responsible for corresponding with homeowners to provide necessary information and update records.

6. The two dominant companies that perform these services and write force-placed policies in New York as well as nationwide are ASIC (together with its affiliates, including ABIC) and QBE, which together comprise at least 90% of the force-placed insurance market. The force-placed insurers, in turn, cede some of their risk to reinsurers, some of which are also

3

subsidiaries or affiliates of lenders or mortgage servicers.  Reinsurance arrangements with lenders or servicers are pursuant to quota share agreements.

### ASIC's Rates and Loss Ratios

7.  As discussed below, ASIC's actual losses for force-placed hazard insurance have been extremely low for more than a decade, and have been consistently below the expected loss ratios in its rate filings with the New York Insurance Department.[2]  Despite those facts, ASIC has never adjusted its rates downward to reflect its actual loss experience.[3]

8.  ASIC submitted its initial rate filing for force-placed hazard insurance to the Insurance Department on December 21, 1987.  ASIC's initial rate filing requested a rate of $1.20 per $100 of coverage.  The request was denied by the Insurance Department on the grounds that the rate was not justified. ASIC resubmitted its filing with a rate of $1.00 per $100 of coverage, and the Insurance Department approved that rate on August 31, 1988.  ASIC's rate filing included a 66.4% expected loss ratio.  ASIC included the following expenses in its expected loss ratio calculation: 12.5% for commission, 8.2% for general expenses, 5% for other acquisition expenses, 5% for underwriting profit, and 2.9% for taxes, licenses and fees.

9.  In 1994, based upon very limited experience from 1991 through 1993, ASIC filed for a 20% rate increase.  ASIC's total earned premium from that period was $3.9 million.  In comparison, ASIC wrote more than $110 million in premium in New York in 2012 alone.  The Insurance Department approved ASIC's rate increase request based upon an experience exhibit ASIC submitted showing actual loss ratios from 1991 to September 30, 1994 that averaged 86.1%.  ASIC's filing reduced the expected loss ratio from 66.4% to 58.1% and

---

[2] DFS was created by transferring the functions of the New York State Banking Department and the New York State Insurance Department into a new department. This transfer of functions became official on October 3, 2011.
[3] At least in the case of off-premises liability coverage, an option offered to homeowners through the force-placed program, ASIC acknowledged in a February 7, 2000 letter to the Insurance Department that it would "track our premium and loss experience relative to this coverage to support or modify the rate accordingly."

doubled the amount of premium to be attributed to commission, from 12.5% in its 1988 filing to 25% in its 1994 filing. Other expenses in the 1994 filing were similar to the 1988 filing: 8.8% for general expenses, 3.5% for other acquisition expenses, 5% for underwriting profit, and 2.6% for taxes, licenses and fees. That rate currently remains in effect.

10. ASIC has experienced consistently low loss ratios for force-placed hazard insurance during the past several years. From 2006 through 2011 respectively, ASIC's loss ratios for force-placed hazard insurance were 24.7%, 19.4%, 17.3%, 22.8%, 24.3%, and 24.7%. Even in 2012, a year with a severe storm, ASIC's loss ratio for force-placed hazard insurance was just 42.8%, substantially lower than the expected loss ratio in its rate filing. Despite years of actual loss ratios far below the 86.1% loss ratio on which ASIC based its 1994 rate filing and significantly lower than the 58.1% expected loss ratio in that 1994 filing, ASIC did not support or modify its rates over the past 18 years to reflect its actual premium or loss experience.

## Commissions to Insurance Producers Affiliated with Mortgage Servicers

11. In some cases, ASIC and ABIC pay commissions to insurance agencies and brokers that are affiliates of mortgage servicers. Typically, the commissions are ten to twenty percent of the premium written on the servicer's mortgage loan portfolio, a percentage that is in line with standard property and casualty commissions. The evidence from the Investigation indicates that the affiliated agencies and brokers do little or no work for the commissions ASIC and ABIC pay them. ASIC, ABIC and their affiliates do much of the work associated with force-placed insurance, including tracking insurance coverage and communicating with homeowners. These arrangements could create an incentive for mortgage servicers to purchase higher priced force-placed insurance and for mortgage servicers to place more

5

homeowners into force-placed insurance, because their affiliates earn more commission as premiums increase.

12. Commissions paid to affiliates of servicers is a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-placed insurance premium rates. Commissions are paid to affiliates of servicers because they are a cost of staying in the market, not for any particular work the affiliates perform. Commissions on force-placed insurance have been reduced in recent periods.

### Quota Share Reinsurance Arrangements with Servicers' Captive Reinsurers

13. ASIC has also entered into quota share reinsurance arrangements with mortgage servicers' captive reinsurers under which the captive reinsurer receives a percentage of the premium and assumes the same percentage of the risk. Because of the low loss ratios for force-placed hazard insurance, such reinsurance arrangements have been highly profitable for servicers.

14. For example, ASIC has a 75% quota share reinsurance agreement with Banc One Insurance Company, a captive reinsurance affiliate of JPMorgan Chase, under which Banc One has made approximately $600 million nationally since 2006 through reinsuring the insurance ASIC placed on homes securing JPMorgan Chase's mortgage loan portfolio.

15. These reinsurance agreements could incentivize higher premium rates. ASIC receives a ceding fee (typically a percentage of the premium ceded to the reinsurer) as a part of the reinsurance transaction; the higher the premium rate, the more ASIC receives as a ceding fee. The arrangements also create conflicts of interest for servicers. While servicers maintain that they are interested in ensuring that their homeowner customers' claims are properly handled, the reinsurance arrangements could create an incentive for servicers to refrain from

submitting claims and to delay or inhibit the claims process, because their affiliated reinsurers earn more when claims are not paid.

### Payments to Servicers and their Affiliates

16. ASIC pays some mortgage servicers what it characterizes as the servicers' "qualified expenses" related to force-placed insurance.  These payments are typically an amount capped at a percentage of the premium force placed on the servicer's portfolio and appear to be substitutes for commissions; ASIC typically pays the "qualified expenses" only to servicers that do not have affiliated insurance agencies or brokers.

17. ASIC has also made lump sum payments to servicers' affiliates.  In January 2008, ASIC paid $1 million to a servicer's affiliate to cover the servicer's early termination fee under the servicer's agreement with another force-placed insurer and to thereby obtain the business.

### Violations

18. DFS alleges that the foregoing acts and practices of ASIC and ABIC violate Insurance Law §§ 2303, 2324 and 2403.

### AGREEMENT

**WHEREAS,** ASIC and ABIC neither admit nor deny DFS's Findings and allegations set forth above;

**WHEREAS,** the terms of this Consent Order apply to ASIC, ABIC and any subsidiary or affiliate of Assurant through which they are acting in New York or may hereafter act in New York with respect to the subject matter of this Consent Order (collectively, the "New York FPI Companies");

7

**WHEREAS**, Assurant is a party to this Consent Order solely for the purpose of binding the New York FPI Companies;

**WHEREAS**, DFS is willing to accept the terms of this Consent Order pursuant to the Insurance Law and FSL, and to discontinue, as described in paragraph 46 below, its Investigation;

**IT IS HEREBY UNDERSTOOD AND AGREED**, by and between the parties, insofar as force-placed insurance is written on New York properties, that:

### I.     Loss Ratios, Rate Filings and Reporting

1. Within ten (10) days of the Effective Date of this Consent Order, ASIC shall file, and within thirty (30) days of the Effective Date of this Consent Order, ABIC shall file with DFS corresponding force-placed hazard premium rates with a permissible loss ratio of sixty-two (62) percent, supported by the required data and actuarial analysis that is acceptable both professionally and to DFS, together with any new forms for its force-placed hazard insurance.

2. On April 1, 2016, and every three years thereafter, the New York FPI Companies shall re-file their force-placed hazard premium rates with DFS, supported by required data and actuarial analysis that is acceptable both professionally and to DFS, taking into account the loss experience over the preceding period and an appropriate rating factor for catastrophe exposure and other factors.

3. Commencing in 2015 and continuing annually, the New York FPI Companies shall, within 30 days after filing their NAIC Annual Statements, re-file with DFS their force-placed hazard premium rates for any force-placed hazard insurance policy form that has

had an Actual Loss Ratio[4] of less than 40 percent for the immediately preceding calendar year.

4.  The New York FPI Companies shall have separate rates for (a) force-placed hazard insurance and (b) hazard insurance obtained by a mortgage servicer on real estate owned property.

5.  No later than April 1st of each year, the New York FPI Companies shall report to the superintendent, for each of their force-placed insurance policy forms for the preceding calendar year:

    a.  Actual Loss Ratio;

    b.  earned premium;

    c.  itemized expenses;

    d.  paid losses;

    e.  loss reserves;

    f.  case reserves; and

    g.  incurred but not reported losses.

II.   **Prohibited Practices**

6.  The New York FPI Companies shall not issue force-placed insurance on mortgaged property serviced by a servicer affiliated with Assurant.

7.  The New York FPI Companies shall not pay commissions to a servicer or a person or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.

---

[4] For purposes of this Consent Order, "Actual Loss Ratio" shall mean the sum of paid losses, case reserves and incurred but not reported losses, expressed as a percentage of earned premium

8. The New York FPI Companies shall not reinsure force-placed insurance policies with a person or entity affiliated with the servicer that obtained the policies.

9. The New York FPI Companies shall not pay contingent commissions based on underwriting profitability or loss ratios.

10. The New York FPI Companies shall not provide free or below-cost outsourced services to servicers, lenders, or their affiliates, provided, however, that outsourced services do not include expenses associated with tracking functions that the New York FPI Companies incur for their own benefit to identify and protect themselves from (a) exposure to lost premium and losses on properties on which no other insurance coverage is in effect or (b) administrative costs associated with providing and subsequently canceling force-placed insurance on properties on which force-placed insurance is not required.

11. The New York FPI Companies shall not make any payments, including but not limited to the payment of expenses, to servicers, lenders, or their affiliates in connection with securing business.

12. The requirements and prohibitions of this section II shall take effect only if and when they apply to every New York licensed insurance company writing force-placed insurance on New York properties, whether by legislation, regulation, or agreement.

13. If any subsequently effective New York statute or regulation prescribes requirements inconsistent with the provisions set forth in this section II, the New York FPI Companies may request that DFS modify this Consent Order to conform to such statute or regulation, and DFS shall not unreasonably deny the requested modification.

III.  **Notice**

14. To the extent that the New York FPI Companies mail or deliver notices relating to force-placed insurance to a borrower on behalf of a mortgage servicer, the New York FPI Companies shall use all commercially reasonable efforts to obtain their servicer clients' consent to provide:

   a.  A clear and conspicuous[5] disclosure in all notices provided to a borrower if Assurant or an affiliate is staffing the mortgage servicer's telephones; and

   b.  A clear and conspicuous disclosure, to be approved by DFS, on the front of envelopes that the mailing contains important homeowners' insurance information.

15. Any contract entered by the New York FPI Companies with mortgage servicers to provide force-placed insurance subsequent to the Effective Date of this Consent Order shall include requirements that the New York FPI Companies provide the disclosures set forth in 14.a., if applicable, and 14.b. above.

IV.  **Coverage Amount**

16. The amount of coverage that the New York FPI Companies force place on any homeowner shall not exceed the last known amount of coverage, provided that if the last known amount of coverage did not comply with the mortgage, then the amount of coverage shall not exceed the replacement cost of improvements on the property.

V.  **E-mail Retention**

17. The New York FPI Companies shall retain for a period of six years from the Effective Date of this Consent Order all e-mail communications of: (a) all employees involved in negotiating agreements between the New York FPI Companies and mortgage servicers

---

[5] For purposes of this Consent Order, the term "clear and conspicuous" means that the statement, representation or term being disclosed is of such size, color, and/or contrast and is so presented as to be readily noticed and understood by the person to whom it is disclosed.

11

and their affiliates, and (b) all employees involved in the solicitation, marketing, or

pricing of force-placed insurance.

**VI.**   **Restitution**

18. Each Eligible Claimant (defined below) who submits a timely and complete claim form

with the required supporting documentation to the Claims Administrator (defined below)

shall be entitled to restitution in an amount calculated as set forth below.

19. "Eligible Claimant" is hereinafter defined to mean the following:

a.   Any New York consumer who demonstrates that:

(1) the placement of force-placed insurance issued by ASIC or ABIC with an

effective date on or after January 1, 2008 caused, directly to indirectly, the

consumer to (a) default on his or her mortgage payments, or (b) incur the

foreclosure of that mortgage, including loss of possession and title to the property,

and

(2) he or she either (a) paid some or all of ASIC's or ABIC's force-placed premium

to the mortgagee or loan servicer, or (b) remains liable to pay some or all of the

force-placed insurance premium to the mortgagee or its assignee, as a part of a

deficiency judgment following the foreclosure.

(3) For this category of claims:

(a) it shall be conclusively presumed that a force-placed insurance placement did

not cause a default or foreclosure, if the force-placed placement occurred:

(i) six or more months before the claimant defaulted on his or her loan

payments, or

12

(ii) after either (a) the date of the claimant's first default on his or her loan

payments, or (b) the Effective Date of the Consent Order, whichever

comes first;

(b) eligibility must be established by (a) a properly completed claim form and (b)

available bank records and other bona fide documentation supporting the

claim;

(c) claimants who satisfy the requirements for eligibility will receive a refund

equal to the difference between the force-placed premium amount and the

premium that would have been assessed for the period in question under the

consumer's last known voluntary policy, had it remained in effect.

b.  Any New York homeowner who demonstrates that the premium that he or she paid to

ASIC or ABIC for force-placed insurance with an effective date on or after January 1,

2008 that exceeded the amount authorized by the mortgage instrument. For this

category of claims:

(1) eligibility must be established by (a) a properly completed claim form, (b) a copy

of the mortgage instrument, and (c) supporting documentation evidencing facts

sufficient to demonstrate premium payments in excess of the amount authorized

by the mortgage instrument;

(2) claimants who satisfy the requirements for eligibility will receive a refund amount

equal to the difference between ASIC's or ABIC's force-placed premium that he

or she paid and the amount authorized under the mortgage instrument.

c.  any New York homeowner who demonstrates that he or she has incurred actual out-

of-pocket premium expenses as a result of one of the placements of force-placed

13

insurance issued by ASIC or ABIC on New York properties after January 1, 2008 if either (i) acceptable continuous voluntary coverage was in effect and, despite the presentation of written confirmation thereof, ASIC or ABIC charged and did not subsequently credit back or refund force-placed insurance premiums, or (ii) ASIC or ABIC charged commercial force-placed insurance rates on a one-to-four family residence that should have been rated using residential force-placed insurance rates.

(1) For this category of claims, eligibility must be established by (a) a properly completed claim form and (b) supporting documentation evidencing facts sufficient to satisfy the criteria in subsections VI.17.c.(i) or c.(ii), above, and (c) either (1) a certificate of coverage or policy declaration page evidencing the voluntary insurance coverage that was in effect, or (2) real property records showing the single-family residence status of the property, as the case may be, provided, however, that, (A) within 10 business days of receipt, the Claims Administrator shall forward a copy of any such claim form by post-paid U.S. mail to the address specified in the Consent Order for notices to ASIC or ABIC, as appropriate, and (B) no payment shall be made to the claimant if, within 10 business days after receipt of such claim form, ASIC or ABIC provides to the Claims Administrator documentary evidence that (i) after receipt of confirmation of acceptable continuous coverage, ASIC or ABIC cancelled the force-placed insurance and refunded or credited back any force-placed insurance premiums charged for the period when other acceptable coverage was in effect, or (ii) the property was, in fact, a commercial property, as the case may be.

(2) Claimants who satisfy the requirements for eligibility under this category will receive a payment in the amount of either (1) the force-placed insurance premium actually paid by the claimant and not subsequently refunded for periods when other acceptable coverage was in effect, or (2) the difference between the commercial force-placed insurance premiums actually paid by the claimant and the ASIC or ABIC residential force-placed insurance premiums that should have been charged, as the case may be.

d. Eligible Claimants shall not include persons whose force-placed insurance policies were cancelled and the full force-placed insurance premium was refunded or credited back to them.

20. As soon as practicable, but no later than thirty (30) days from the effective date of the Consent Order, DFS shall select and retain an independent third party administrator to review Claim Forms submitted pursuant to this Consent Order (the "Claims Administrator"). ASIC and ABIC shall be fully and solely responsible for all proper fees, expenses and disbursements of the Claims Administrator in connection with the claims process prescribed in this Consent Order. The Claims Administrator shall make the final determination concerning each claim's timeliness, completeness, adequacy of supporting documentation and eligibility for refund in accordance with the procedures, requirements and standards set forth in this Consent Order.

21. Within ten (10) days after the appointment and retention of the Claims Administrator, ASIC or ABIC, as appropriate, shall mail to all residents of New York who were force placed by ASIC or ABIC at any time commencing January 1, 2008 through and including the Effective Date of this Consent Order ("Eligible Notice Consumers") -- not including

15

any residents whose force-placed policies were cancelled as of the inception date and as to whom any premium charged was fully refunded or credited back -- a Notice and Claim Form in the form annexed hereto as Exhibit A, in an envelope whose return address shall be "New York State Department of Financial Services / American Security Insurance Company (or American Bankers Insurance Company, as appropriate) Settlement Restitution Program, P.O. Box _____, [City], [State] _____." The Claims Administrator shall identify the Claims Administrator's return address, including any P.O. Box, on the envelopes containing the mail notice. After the Claims Administrator has posted the mail notices with the United Postal Service, for any mail notices returned as undeliverable, the Claims Administrator shall use the National Change of Address database (the "NCOA") and attempt to obtain current mailing addresses for such returned Notices. Should the NCOA show a more current address, the Claims Administrator shall re-post the returned Mail Notice to such more current address, and the applicable time frames for Eligible Notice Consumers to submit a claim and for the Claims Administrator to determine the validity of the claims shall be extended accordingly. After doing so, no further action shall be required by the Claims Administrator to complete the mailing process.

22. No later than 45 days following the date of this Agreement, ASIC, ABIC or the Claims Administrator on their behalf shall launch a website on which will be posted for public access the Consent Order, a set of agreed-upon Frequently Asked Questions ("FAQs") and answers concerning the refund opportunity and the claims process and a claim form. These materials shall be printable and downloadable. The identifying Uniform Resource Locator will be NY-AmericanSecurityFPIRefund.com. The website will remain open

16

and accessible through the deadline for submission of claims. The information on the website will include instructions for submitting claims, either by fax (if original documentation is required, with such documents to be mailed to the Claims Administrator at a specified address) or by mail, at the election of the consumer.

23. ASIC, ABIC or the Claims Administrator shall establish a toll-free interactive voice response telephone number with recorded information about the settlement and the claims process, using abbreviated language from the FAQs and responses referred to in the section above. The IVR toll free number will be posted on the website and remain open through the deadline for submission of claims.

24. Blank claim forms may also be posted on DFS's website and on the NY-AmericanSecurityFPIRefund.com site.

25. Claim Forms completed by Eligible Notice Consumers must be postmarked within ninety (90) days of the date of the postmarked date of mailing by ASIC or ABIC (the "Claims Deadline") and further be received by the Claims Administrator within an additional ten (10) days thereafter to be eligible for restitution pursuant to this Consent Order, except that any Claim Form rejected solely for untimeliness and received by the Claims Administrator after the Eligible Notice Consumer's deadline above shall be submitted by the Claims Administrator to DFS and if DFS determines that good cause exists for accepting the untimely Claim Form in its sole discretion DFS shall direct ASIC or ABIC to make appropriate restitution to said consumers.

26. ASIC or ABIC shall provide to the Claims Administrator access to all relevant information including, but not limited to, consumer records within ten (10) days of receiving a request for information from the Claims Administrator.

17

27. Within forty-five (45) days of the Claims Deadline, the Claims Administrator shall:

   a. Determine the validity of each Claim Form it has received; and

   b. Submit to DFS, ASIC and ABIC a detailed summary of claims received, its determination for each claim, and the amounts it has determined to be payable for each such claim.

28. Within sixty (60) days of the Claims Deadline, ASIC and ABIC shall wire-transfer to the Claims Administrator the total amount of the claims to be paid to Eligible Claimants.

29. Within seventy (70) days of the Claims Deadline, the Claims Administrator shall deposit in the facilities of the U.S. Post Office, for delivery by prepaid first-class mail to each claimant a written notice stating (a) whether the claim has been accepted or denied; (b) if accepted, the amount of the proposed payment; and (c) if denied, the reasons for the denial; and (d) for each accepted claim, a check in the required amount, payable to the Eligible Claimant.  Such payment shall be accompanied by a letter from DFS, the language of which shall not be inconsistent with the language contained in the Notice Letter and Claim Form.

30. Within thirty (30) days of making the applicable restitution payments under this Consent Order, the Claims Administrator shall provide a list to DFS showing (a) the total amount of restitution provided to consumers through the restitution process, (b) the number of consumers provided with restitution through the restitution process, and (c) the number of restitution claim forms that were rejected.

## VII.   Penalty and Remedial Procedures

31. No later than April 1, 2013, ASIC shall pay a civil penalty of FOURTEEN MILLION ($14,000,000) DOLLARS to the New York State Department of Financial Services to

address all underlying conduct relating to force-placed insurance policies issued in New York State by ASIC and ABIC.  The payment shall be in the form of a wire transfer in accordance with DFS instructions or a certified or bank check made out to "State of New York Department of Financial Services" and mailed to:  New York State Department of Financial Services, One State Street, New York, New York, 10004-1511, Att: Joy Feigenbaum, Executive Deputy Superintendent, Financial Frauds & Consumer Protection Division.

32. Neither Assurant, ASIC, ABIC nor any of their subsidiaries or affiliates shall, collectively or individually, seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, payment made pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to this Consent Order.

**VIII.**   **Other Relief**

33. Assurant, ASIC and ABIC admit to the authority of DFS to effectuate this Consent Order. ASIC and ABIC will cease and desist from engaging in any acts in violation of the Insurance Law and FSL and will comply with the Insurance Law and FSL.

**IX.**   **Breach of the Consent Order**

34. In the event that the Department believes Assurant, ASIC or ABIC to be materially in breach of the Consent Order ("Breach"), DFS will provide written notice to Assurant, ASIC or ABIC of the Breach and Assurant, ASIC or ABIC (as the case may be) must, within ten (10) business days from the date of receipt of said notice, or on a later date if so determined in the sole discretion of DFS, appear before DFS and shall have an opportunity to rebut the evidence, if any, of DFS that a Breach has occurred and, to the extent pertinent, to demonstrate that  any such Breach is not material or has been cured.

19

35. The Parties understand and agree that Assurant's, ASIC's, or ABIC's failure to appear before DFS to make the required demonstration within the specified period as set forth in paragraph 33 is presumptive evidence of Assurant's, ASIC's or ABIC's Breach. Upon a finding of Breach, DFS has all the remedies available to it under the New York Insurance Law and FSL and may use any and all evidence available to DFS for all ensuing hearings, notices, orders and other remedies that may be available under the New York Insurance Law and FSL.

## X.   Other Provisions

36. If ASIC or ABIC defaults on their monetary obligations under this Consent Order, DFS may terminate this Consent Order, at its sole discretion, upon 10 days' written notice to ASIC or ABIC (as the case may be).  In the event of such termination, ASIC and ABIC expressly agree and acknowledge that this Consent Order shall in no way bar or otherwise preclude DFS from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Consent Order, against them, or from using in any way statements, documents or other materials produced or provided by ASIC or ABIC prior to or after the date of this Consent Order, including, without limitation, such statements, documents or other materials, if any, provided for purposes of settlement negotiations, except as may otherwise be provided in a written agreement with DFS.

37. DFS has agreed to the terms of this Consent Order based on, among other things, the representations made to DFS by Assurant, ASIC, ABIC or their counsel and DFS's own factual Investigation.  To the extent that representations made by Assurant, ASIC, ABIC

or their counsel are later found to be materially incomplete or inaccurate, this Consent

Order is voidable by the DFS in its sole discretion.

38. Assurant, ASIC, and ABIC shall, upon request by DFS, provide all documentation and

information reasonably necessary for the DFS to verify compliance with this Consent

Order.

39. All notices, reports, requests, and other communication to any party pursuant to this

Consent Order shall be in writing and shall be directed as follows:

If to DFS:

     New York Department of Financial Services
     One State Street
     New York, New York 10004-1511
     Attention: Joy Feigenbaum, Executive Deputy Superintendent

If to Assurant:

     Assurant, Inc.
     One Chase Manhattan Plaza
     New York, NY 10005
     Attention: Chief Legal Officer

     with a copy to:

     Paul, Weiss, Rifkind, Wharton & Garrison
     1285 Avenue of the Americas
     New York, NY 10019

     Attention: Michele Hirshman, Esq.

If to ASIC or ABIC:

     Assurant Specialty Property
     11222 Quail Roost Drive
     Miami, FL  33157

     Attention: Gregory DeChurch, Esq.

     with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

Attention: Michele Hirshman, Esq.

40. This Consent Order and any dispute thereunder shall be governed by the laws of the State of New York without regard to any conflicts of laws principles.

41. ASIC and ABIC waive their right to further notice and hearing in this matter as to any allegations of past violations up to and including the Effective Date of this Consent Order and agree that no provision of the Consent Order is subject to review in any court or tribunal outside the Department.

42. This Consent Order may not be amended except by an instrument in writing signed on behalf of all the parties to this Consent Order.

43. This Consent Order constitutes the entire agreement between DFS, Assurant, ASIC and ABIC and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of this Consent Order.  No representation, inducement, promise, understanding, condition, or warranty not set forth in this Consent Order has been relied upon by any party to this Consent Order.

44. In the event that one or more provisions contained in this Consent Order shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Consent Order.

45. This Consent Order may be executed in one or more counterparts, and shall become effective when such counterparts have been signed by each of the parties hereto and So Ordered by the Superintendent of Financial Services or his designee.

22

46. Upon execution by the parties to this Consent Order, the DFS will discontinue the Investigation as and against ASIC and ABIC solely with respect to force-placed insurance policies issued in New York State by ASIC and ABIC. No further action will be taken by DFS against ASIC or ABIC for the conduct set forth the Consent Order provided that ASIC and ABIC comply with the terms of the Consent Order.

47. The Effective Date of this Consent Order is the date on which it is fully executed by the parties to the Consent Order.

48. This Consent Order includes Findings of and allegations made by DFS. These Findings and allegations have not been subject to an adjudicatory hearing or judicial process in which ASIC or ABIC have had an opportunity to present evidence and examine witnesses.

**WHEREFORE,** the signatures evidencing assent to this Consent Order have been affixed hereto on the dates set forth below.

Dated: March __, 2013

DEPARTMENT OF FINANCIAL SERVICES

By:_____
   Joy Feigenbaum
   Executive Deputy Superintendent
   Financial Frauds & Consumer Protection Division

March __, 2013

ASSURANT, Inc.

By:_____
   President

March __, 2013

23

AMERICAN SECURITY INSURANCE COMPANY

By: _____

    John Frobose,
    President

March ___, 2013


AMERICAN BANKERS INSURANCE COMPANY
OF FLORIDA
By: _____

    Gene Mergelmeyer,
    President

March ___, 2013

THE FOREGOING CONSENT ORDER IS HEREBY APPROVED.


Dated: New York, NY
       March __, 2013


_____
BENJAMIN M. LAWSKY
Superintendent of Financial Services

## EXHIBIT A

[ON CLAIM ADMINISTRATOR'S LETTERHEAD]

### Notice and Claim Form

Re: NYS Department of Financial Services/American Security Insurance Company
    and American Bankers Insurance Company of Florida
    Force-Placed Insurance Program

Dear            :

We are writing to you pursuant to a settlement between the New York State Department of Financial Services and American Security Insurance Company ("ASIC") and American Bankers Insurance Company of Florida ("ABIC") concerning force-placed insurance policies issued in New York State by ASIC and ABIC. You are receiving this Notice and Claim Form because you were charged for force-placed insurance by ASIC or ABIC.

Force-placed insurance is insurance taken out by your bank, lender or mortgage servicer when you do not maintain the insurance required by the terms of your mortgage. This can occur if you allow your homeowners' insurance policy to lapse or if your bank or mortgage servicer determines that you do not have a sufficient amount of coverage. On some occasions, homeowners have been force-placed erroneously. In many instances, the premiums for the force-placed coverage are far in excess of the premiums you were charged for your voluntary homeowners' insurance. Force-placed insurance is also sometimes referred to as lender-placed insurance.

Under the terms of the settlement, you may be entitled to a refund for some of the charges you incurred in connection with your force-placed insurance. Please complete the below questionnaire and provide copies of supporting documents, where applicable, if you believe you may qualify for a refund. **DO NOT SEND ORIGINAL DOCUMENTS.**

**To qualify for a refund, you must have been force-placed by ASIC or ABIC on or after January 1, 2008 and meet the eligibility criteria for one of the following three categories of claimants:**

1. **You defaulted on your mortgage or were foreclosed upon because of the forced placement.**
2. **You were charged for force-placed insurance at an amount higher than the amount permitted by your mortgage.**
3. **You had voluntary homeowner's coverage in effect or were charged commercial force-placed insurance rates on a one-to-four family residence.**

1

Please note that you are not eligible if the force-placed insurance policies for which you were charged were cancelled and if the **full** charge for the force-placed insurance premium was refunded or credited back to you or your escrow account with your lender.

For additional information regarding force-placed insurance and the settlement, please visit www.NYDFSLender-PlacedRefundOpportunity.com.

### Eligibility 1

1. Did the placement of force-placed insurance issued by ASIC or ABIC on or after January 1, 2008 cause you to default on (i.e., miss) your mortgage payments or cause the foreclosure of your mortgage, including losing possession and title to your home?

    _____Yes     _____No

2. Did you pay some or all of ASIC's or ABIC's force-placed insurance premium?

    _____Yes     _____No

3. If your home was foreclosed on, do you remain liable to pay some or all of the force-placed insurance premium to your lender as part of a deficiency judgment?

    ___Yes ____No  ____Not Applicable

4. When did you stop making your loan payments?

    _____

5. When did the force-placement by ASIC or ABIC first occur?

    _____

6. Did the force-placement occur after the date of your first default on your loan payments?

    _____Yes _____No

7. Did the force-placement occur after the [**effective date of the Consent Order**]

8. Do you have available bank records and other documentation supporting the above? If yes, please include copies of the supporting documents. Do not send originals.

    _____Yes _____No

2

If you satisfy the requirements for eligibility in this category, you will receive a refund equal to the difference between the force-placed premium amount and the premium that would have been assessed for the period in question under your last known voluntary policy had it remained in effect.

### Eligibility 2

1. Did you pay premiums to ASIC or ABIC for force-placed insurance on or after January 1, 2008 for a coverage limit that exceeded the amount permitted by your mortgage?

    ____Yes ____No

2. Do you have a copy of the mortgage instrument and supporting documentation demonstrating you made premium payments in excess of the amount permitted by your mortgage? If yes, please include copies of all supporting documents. Do not send originals.

    _____ Yes ____No

If you satisfy the requirements for eligibility in this category, you will receive a refund in the amount equal to the difference between ASIC's or ABIC's force-placed premium that you paid and the amount authorized under your mortgage.

### Eligibility 3

1. Did you pay out-of-pocket premiums as a result of force-placed insurance issued by ASIC or ABIC after January 1, 2008?

    _____Yes ____No

2. Did you have acceptable continuous voluntary homeowners' coverage in effect at the time you were charged for force-placed insurance premiums by ASIC or ABIC?

    _____Yes ____No

3. Did you receive from ASIC or ABIC a full refund or credit for the force-placed insurance premiums you paid?

    ____Yes ____No

4. Did you provide ASIC or ABIC written confirmation that you have voluntary homeowners' insurance in effect? _____Yes ____No

3

If yes, did ASIC or ABIC nevertheless charge you for force-placed insurance?
____Yes   ____No

5. Did ASIC or ABIC charge commercial force-placed insurance rates on a one-to-four family residence owned by you?
____Yes ___No

6. Do you have supporting documentation evidencing facts sufficient to satisfy the above?
___Yes ____No

If yes, please enclose copies of all supporting documents.  Do not send originals.

7. Do you have a certificate of coverage or policy declaration page evidencing the voluntary insurance coverage that was in effect?
___Yes ___No

If yes, please enclose a copy of the certificate of coverage or policy declaration page.  Do not send originals

8. Do you have any real property records showing a single-family residence status of the property?

___Yes ___No

If yes, please enclosed a copy of the relevant real property records.  Do not send originals.

If you satisfy the requirements for eligibility under this category you will receive a payment in the amount of either (1) the force-placed insurance premium actually paid by you and not subsequently refunded for periods when other acceptable coverage was in effect, or (2) the difference between the commercial force-placed insurance premiums actually paid by you and the ASIC or ABIC residential force-placed insurance premiums that should have been charged, as the case may be.

4

I state that the information provided above is true and accurate to the best of my knowledge.

_____
Name

_____
Signature

_____
Address

_____
Date

THIS NOTICE AND CLAIM FORM AND ALL SUPPORTING DOCUMENTS SHOULD BE MAILED TO '[THIRD PARTY ADMINISTRATOR] AT [ADDRESS] AND SHOULD BE POSTMARKED NO LATER THAN _____, 2013 FOR YOUR REFUND CLAIM TO BE CONSIDERED.

If you have a copy of your prior voluntary homeowner's insurance policy or declaration page, please provide a copy with your submission.

5

# EXHIBIT 16



# Consumer Federation of America

**1620 I Street, N.W., Suite 200 \* Washington, DC 20006**

**TESTIMONY OF
J. ROBERT HUNTER[1], DIRECTOR OF INSURANCE
BEFORE THE NEW YORK DEPARTMENT OF FINANCIAL SERVICES
ON FORCE-PLACED INSURANCE IN NEW YORK
MAY 17, 2012**

Mr. Superintendent and members of the Department, I appreciate the opportunity to speak to you this morning. The work you are undertaking to uncover the abuses in force-placed insurance (FPI) is of vital importance to New Yorkers, many of whom are being harmed today. Your hearing also offers hope to consumers who have paid excessive rates for force-placed coverage across America.

<u>Background</u>

Force-placed insurance (FPI) is an insurance policy placed by a lending institution on a borrower's property, when a borrower does not keep his or her hazard insurance in force. The lender is typically the named insured party. The borrower also usually listed as an "insured" on a force-ordered (FO) policy. The majority of FPI policies are issued when the borrower loses normal insurance due to non-payment of premium.

Lenders use FO insurance to assure continuous coverage on properties. In some instances, lenders use FO insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or brokers or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost services from affiliated service providers.

Because of the recent tough economic and housing situation, many more policies have become force-placed. For instance, according to data American Security Insurance Company[2] (ASIC) supplied for this hearing, they track 1,502,567 loans in New York, of which 33,287 are force-placed. The use of FPI in New York grew by 66 percent from the fourth quarter of 2006 to the third quarter of 2011, from 1.3 percent of loans to 2.2 percent.

---

[1] Mr. Hunter formerly served as Federal Insurance Administrator under Presidents Ford and Carter and as Texas Insurance Commissioner. He is an actuary, a Fellow in the Casualty Actuarial Society and member of the American Academy of Actuaries.
[2] ASIC is a division of Assurant.

1

A major problem with the use of FPI insurance is "reverse competition." Reverse competition is a market structure in which insurers compete for the lenders' business by providing financial considerations to the lender, including commissions, subsidized services, and other things of value. These expenses are included in the premiums charged to borrowers, which significantly drives up the price. In other words, reverse competition is a market condition that drives up prices to the consumers, as opposed to normal competition, which drives down prices to consumers. Market forces do not discipline insurers to remove unreasonable expenses when reverse competition exists.

Normal competition exists when the purchaser of insurance is the insured party who pays for the coverage. He or she therefore shops for the lowest possible price. The competition is reversed when the "buyer" (lender) is not the ultimate payer of the premium but, instead, has a financial interest in the insurance through commissions or other financial benefits. In this case, the lender, who is not the ultimate payer, has an incentive to seek higher cost insurers that offer bigger kickbacks and benefits, rather than the lowest cost option. This financial incentive may explain why low-cost options for force-ordered borrowers -- such as establishing an escrow account and paying the voluntary premium, in the case of non-escrowed insureds being terminated for non-payment -- do not appear to be a high priority for lenders.

**FPI Rates are Excessive**

Reverse competition manifests itself in FPI through the payment of commissions to agents or brokers affiliated with the lender or servicer, the provision of below-cost or free tracking services provided by the FPI insurer to the lender, and through FPI carriers that reinsure FPI insurance (either in whole or in part) with captive reinsurers owned by lenders. Thus, FPI rates are much higher than normal insurance rates.

Data demonstrating the excessiveness of FPI prices is shown in Appendices 1 and 2. Appendix 1 is a detailed review I made of the rate filings of the two leading FPI insurers, American Security (ASIC) and QBE First. The rate filings show no competition in rates. Indeed QBE has adopted the same rates that ASIC received approval for in 1996 (flood) and 1997 (dwelling fire.) Neither insurer undertook anything near a full-fledged actuarial analysis of the rates they proposed to use. Appendix 2 shows data for ASIC and Balboa, the largest FPI insurer, which is owned by QBE.[3]

Both companies predicted expected loss ratios that were fairly reasonable. (An "expected loss ratio" is the percentage of each premium dollar that an insurer expects to pay out in claims under the rates they are proposing.) But these relatively high expected loss ratios were a deception, allowing the insurers to charge far more for the coverage than they should have. Here

---

[3] Best's Aggregates and Averages has only very limited data on QBE Insurance Company. Best's cites only $7,800 in national dwelling fire written premiums in 2010, with a surprising loss ratio of negative 27.6 percent and commissions of 25.3 percent of written premium. Best's also has 2005-2010 data for QBE Insurance Co. in allied lines, which had an average written premium of about $11 million and an average loss ratio of 25.5 percent over the six-year period. Commissions in allied lines averaged 14 percent but the 2010 commission jumped to over 40 percent.

is a comparison of the expected loss ratios ASIC filed with the actual loss ratios ASIC reported to New York that the company has actually experienced in the state over the last 12 years:

| Insurer | Expected Loss Ratio | Actual NY Loss Ratio[4] |
|---|---|---|
| ASIC – Dwelling Fire | 58.1% | 28.5% |
| ASIC – Flood | 60.0% | 17.8% |

Note: See footnote 3 for limited information from QBE Insurance Company, which shows that the 55.0 percent expected loss ratio used in their filing was not realistic.

The sale of FPI in New York seems limited to two major carriers using the same pricing structure -- a very concentrated market. However, even if the market were more competitively structured, borrowers who ultimately purchase FPI coverage would be at a major disadvantage because reverse competition controls the market, leading to excessive prices.

## New York is Uniquely Positioned to Lead the Nation on FPI Reform

Reverse competition abuses fall into the cracks between insurance and banking regulation. Looked at purely from the typical insurance regulator's perspective over recent decades, FPI is commercial insurance between a sophisticated seller (the FPI insurance company) and a sophisticated buyer (the lender or servicer.) In addition, the expenses that occur because of reverse competition may be unjustifiably high, but they are real. Commissions really are paid to agents, below-cost tracking costs can be documented and reinsurance arrangements with lender affiliates do exist.

Insurance regulators look at these facts and approve the rates to be charged *to the lender*. However, until recently, insurance regulators didn't do more than a superficial analysis to see where those expenses were flowing. If they did, they would uncover a hidden rebate to the named insured party, such as a lender. Overt rebates are illegal in almost every state.

Further, insurance regulators did not look beyond the insurer/buyer transaction to assess the impact on others who might be actually paying the bill, such as the borrowers who pay for FPI. This lack of attention to consumer impact is also true for automobile FPI, title insurance and various forms of credit insurance, where reverse competition is rampant. Individual consumers are significantly harmed by these cozy reverse competition arrangements.

Banking regulators appear to have done little to control these abuses either. They often see this as an insurance issue; in other words, somebody else's problem. Besides, what could be better for safety and soundness than the huge profits FPI generates?

New York's holistic financial services regulatory structure holds the key to reform. Because the Financial Services Department oversees both insurance and banking, the state is uniquely suited to investigating "gap abuses" that inhabit the space between insurance and

---

[4] See Page 2 of Appendix 2 for data supplied by ASIC upon which these loss ratios are based.

lending regulation. The nation is looking to New York for leadership on this critical matter. Consumers need your help!

### Insurer/Servicer Explanations for High Rates are not Valid

Insurers have justified excessive FPI rates on two basic grounds:

1. Insurers do not underwrite FPI, and, therefore, cannot adequately consider the insurance risk of each borrower, and

2. Insurance departments approve all FPI rates.

Data demonstrates that the lack of underwriting only explains, at most, a small fraction of the higher FPI prices. Some borrowers do not have home insurance – and must be force placed – because they are higher risk and cannot get the coverage. However, most of the higher price charged for FPI is because of non-payment of premium, not higher insurance risk.

Consider this chart showing how each premium dollar for FPI and normal home insurance is allocated:



Data underlying this chart are shown in Appendix 2. "HO" is Homeowners Insurance.

Note that the loss ratios (the part of the dollar used up by losses) are much lower for Balboa and American Security, which sell FPI, than for the home insurance industry overall. If an insured can't pay his or her homeowner's insurance premium and is thus force-placed, the expected payouts in losses per-dollar-of-premium drops sharply from 62.7 percent for the average industry homeowners' policy to 24.0 percent for American Security and 18.3 percent for Balboa.

Hypothetically, if a homeowner being force-placed were paying a rate of $1,000 for the average industry homeowners' policy, the insured's expected losses would be $627.00. Compare that figure to the much lower losses experience by FPI insurers. If both FPI carriers

4

charged $2,000 for the new policy the borrower is forced into, the expected payouts would be $366 for American Security and $480 for Balboa, much less than was paid out under the homeowners policy. If the premium was $3,000, the figures would be $549 and $720 respectively.

Lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance. For this and other reasons, it is unclear if overall FPI rates should legitimately be much different than normal rates, when adjusted to use proper commissions (if any at all are justified), to remove unjustified tracking costs from pricing and to eliminate profit kickbacks through captive reinsurance arrangements. I expect it they would be only marginally higher if they were properly priced.

Approval of rates charged by a FPI insurer to lenders by New York should not be seen as approval of what lenders can charge borrowers. This is because borrowers should not have to pay for expenses that are not related to the insurance risk being covered for that individual. For example, the 2 percent of borrowers who are force-placed pay all or much of the cost of tracking 100 percent of the portfolio of lender loans, including escrowed loans that will not be force-placed for non-payment. Further, expenses that are clearly excessive, such as the commissions paid for many force-placed policies, should be controlled. Likewise excessive profits for bank-affiliated reinsurers should be eliminated. In other words, FPI profits flowing to the lender should be excluded from the price charged to the borrowers for FPI. The amount a borrower pays for FPI should be only that which is reasonably necessary to cover the risk, expenses and profit of that individual's insurance.

## Suggestions for Reform

Use escrow to keep voluntary coverage in place. In cases of non-payment leading to a need for coverage to protect the collateral, lenders should use the escrow (or set up escrow if it is not in place) to pay the original carrier and thus continue the voluntary policy in force.

Eliminate or substantially reduce kickbacks. I recommend requiring a minimum loss ratio (MLR) as the best way to control the adverse consequences to consumers of reverse competition. However, to be meaningful, the MLR must be vigorously enforced. The loss ratios that insurers claimed they would meet in New York rate filings were never realized. Indeed, as demonstrated above, the actual loss ratio results were often less than half of what the insurers said they would be (see Appendix 1).

Commissions to lender-affiliated agents or brokers are problematic and appear to be falling out of use, as some lenders have recently eliminated them. There is little for an agent or broker to do in a force-placed situation and little need for commissions. Realistically, a fair commission for FPI insurance is well under 2 percent, using industry norms and considering the higher price of FPI. Even if FPI rates come down to the proper level -- a fraction of today's rates -- it is unlikely that the fair commission rate would reach 5 percent of premiums. Other acquisition and general expenses should also be minimal; perhaps another 5 percent when

5

tracking costs are not included.[5] A minimum loss ratio of no less than 80 percent seems reasonable as an enforceable standard, in order to remove the adverse effects of reverse competition from FPI insurance.

The alternative approach is to allow only reasonable expenses associated with the provision of FPI insurance and prohibit expenses associated with servicing and profits that flow to lenders. Given the existence of reverse competition and the history of low loss ratios and inflated expenses, the burden should be on insurers to demonstrate the legitimacy and reasonableness of expenses, not just the fact that they incurred them. However, this standard is much more difficult to enforce than a MLR, since it requires regulators to continually dig beneath expenses and profits to find out where these dollars are flowing. It is possible to do, but very complex. Moreover, it is not a very effective way of countering the reverse competition dynamic that is prevalent in this market place.

If a MLR is not adopted and enforced, then I urge the department to demand <u>immediate rate filings</u> for all FPI insurance rates and do a complete statistical and actuarial analysis of these filings. Your market conduct examiners, actuaries and other experts will have to, for the first time, delve beneath the surface of expenses and affiliate arrangements, such as reinsurance, to determine fair levels of expenses and profits and root out the vestiges of reverse competition abuses.

Finally, on behalf of millions of consumers around the nation who are being harmed today by unfair and excessive insurance rates, I urge you to use the results of your investigation of FPI abuses to <u>expand the scope of your reform efforts</u> to examine other types of insurance where reverse competition abuses are also rampant, such as auto FPI, credit insurance, debt cancellation products and title insurance.

Conclusion

Mr. Superintendent, I congratulate you and the department for your groundbreaking work to highlight and reform abusive FPI practices that harm millions of consumers. Your hard work is overcoming decades of neglect regarding the plight of the borrowers who are force-placed in New York. Your actions in this matter will set the stage for reform not only here in the Empire State but across the nation.

I would be happy to answer any questions you might have.

Appendices

1. Analysis of current FPI rate filings by American Security (Assurant) and QBE First in New York.
2. Insurance statistics for FPI and voluntary home insurance for the last decade.
3. Items of interest from testimony of insurers and servicers.
4. Responses to NY DFS questions 1 to 4, if not covered in the body of the testimony.

---

[5] Appendix 3 shows that ASIC puts tracking costs in other acquisition expense; other insurers seem to also put these expenses in general expense where the expense ratio for that item can exceed 30 percent.

APPENDIX 1

### REVIEW OF RATE FILINGS JUSTIFYING THE CURRENT
### FORCE-PLACED INSURANCE RATES OF AMERICAN SECURITY
### INSURANCE COMPANY AND QBE FIRST INSURANCE COMPANY

American Security Insurance Company (ASIC) Dwelling Fire

The rates were filed in 1997 and are still in use, producing a loss ratio in New York of 24.6 percent over the last decade, according to data in the company's Annual Statements, and of 28.5 percent from 2000 through 2011, according to information ASIC filed for this hearing. (See Appendix 2.) The rates have consistently been excessive, yet they have not changed for 15 years.

The filing claims that the Permissible Loss Ratio expected under the 1997 rates was 58.1 percent. Obviously, the company has not come close to achieving this loss ratio. Here is a breakdown of the how ASIC has allocated each premium dollar over the last decade in New York, compared with what they predicted:

| Item | Filing | Actual |
|------|--------|--------|
| Loss Ratio | 58.1% | 24.6% |
| LAE | Incl. | 3.5 |
| Commissions | 25.0 | 12.6 |
| Other acquisition | 3.5 | 2.5 |
| General | 8.8 | 23.7 |
| Taxes | 2.6 | 2.6 |
| Profit | 3.0* | 30.6 |

*After inclusion of investment income.

The rates filed were $1.20 per $100 of dwelling coverage and $2.00 per $100 for mobile homes. (Base deductibles were $100 at the 1.00 factor. $250 was a factor of .875, $500 = .80 and $1,000 = .70.) Although the rates were approved, no real actuarial analysis of the rates was conducted. The company has not filed new rates or analyses since 1997.

7

American Security Insurance Company (ASIC) – Flood

The flood insurance filing was made in 1996. From 2000 to 2011, the loss ratio was 17.8 percent. This included large flood losses in 2011, presumably from Hurricane Irene. Even so, the loss ratio is well below the Permissible Loss Ratio in the 1996 filing (60.0%). Here is a breakdown of how each premium dollar was allocated in the filing[6] compared with the loss ratio actually achieved:

| Item | Filing | Actual Loss Ratio |
|------|--------|-------------------|
| Loss Ratio | 60.0% | 48.7% |
| LAE | 1.3 | |
| Commissions | 0.0* | |
| Other acquisition | 3.5 | |
| General | 28.7 | |
| Taxes | 1.5 | |
| Profit | 5.0 | |

*The filing says "we do not pay commissions on this program."

The proposed rates for residential coverage were $0.90 per $100 of flood coverage except in flood-prone V Zones, where the rate was $3.00. Deductible = $750.00.

Tillinghast did a non-actuarial analysis of the NFIP prices, using no loss and expense data from the company and just looking at the NFIP rates alone to propose a rate for dwelling of $0.80. However, ASIC rates proposed by the insurer were and remain ten cents higher than that: $0.90. Tillinghast did point out that NFIP used a deductible discount of 25 to 30 percent for a $5,000 deductible, with lesser discounts for lower deductibles.

QBE Insurance Corp – Dwelling Fire

QBE filed "me too" rates in 2009, copying the rates of Empire Fire and Marine. I understand from the New York DFS that Empire's rates were also a "me too" filing, copying ASIC. So, for all intents and purposes, there is no rate competition between the leading FPI providers, although both companies have filed Schedule Rating plans where the lenders and insurers can negotiate rates up or down by up to 15 percent without insurance regulatory approval. These Schedule Rating Plans allow the insurer to charge different prices to lenders based on very loose criteria, such as who tracks the loans, average home insured value, (higher values get a discount) who originated the loans and expense differences. Competition does not exist in pricing, at least regarding prices filed with New York State. The competition is focused on kickbacks to the lenders, which drives up the rates paid by borrowers.

---

[6] I have seen no data on expenses under the flood program.

The QBE filing contains no insurance experience, ike claims and expense information. QBE charges $1.20 per $100 for hazard insurance, the same as Empire and ASIC. QBE does allow deductibles of up to $10,000, with a factor of .33 percent for that deductible, which represents a 67 percent discount.

<u>QBE Insurance Corp – Flood</u>

QBE filed rates in 2009. It also was a "me too" filing copying the rates of Empire Fire and Marine (and, thus, ASIC since I understand from the New York DFS that Empire also did a "me too" filing, copying ASIC.) The residential flood rate is $0.90 per $100 of value, the same as ASIC. QBE offers bigger deductibles than ASIC, up to $5,000, for which the factor to be applied to the base rate is 0.71, a discount of 29 percent. Additional "costs of compliance" coverage -- such as having to elevate the first floor of the home to meet flood zoning requirements after a home is 50 percent damaged, which is a FEMA flood insurance requirement -- costs $0.05 per hundred, a total of $0.95 per $100 of home valuation for full coverage. The Schedule Rating Plan is also available for flood coverage.

<u>Permissible Loss Ratios</u>

The filings by QBE were made in 2009. There are no data or actuarial analysis from QBE. The filing had a premium allocation breakdown of:

|  | Filing Proposed | 2005-2007 Data in Filing Used to "support" the selected Provisions | Balboa Dwelling Fire Actual L/R |
|---|---|---|---|
| Loss Ratio | 55.0%* | Not Shown | 18.3% |
| Commissions | 27.5 | 13.2% |  |
| Other acquisition | 5.0 | 6.0 |  |
| General | 4.5 | 4.5 |  |
| Taxes | 3.0 | 10.8 |  |
| Investment Income | 0.0 | 0.0 |  |
| Profit | 5.0 | Not Shown |  |

Note: The source for the expense data is not disclosed in the filing. It is not clear exactly what expense data are shown here. Presumably, it is QBE data but it is unclear what lines of insurance the filing refers to. Obviously, the expected loss ratio produced using these data had no relation to the actual loss ratio. In 2010, the only year of data for QBE Insurance Company in Best's Aggregates and Averages for dwelling fire, the loss ratio was actually negative, minus) 27.6 percent. The flood loss ratio in 2010 (also the only year in Best's) was 32.0 percent and the six-year average loss ratio (2005-2010) for Allied lines was 25.5 percent. The 55.0 percent Expected Loss Ration was obviously not anywhere close to being a legitimate projection.

* In accordance with form CRDPRP. The adoption of this 55.0 percent expected loss ratio by QEB seems a pro forma step simply to comply with the requirements of the form. It s not verified by data in the filing nor achieved in practice.

9

Comment

Not a single insurer providing FPI appears to have ever provided the state with an actuarially based filing, using real data. ASIC filed for excessive rates (as their loss ratios prove) 15 years ago. Other insurers simply adopted the same excessive rating structure. No justification for these prices has ever been presented to the New York Insurance Department, to my knowledge. Worse, other FPI carriers have adopted ASICs pricing scheme, with no real actuarial analysis, including QBE, as late as 2009. The lack of review and updated information based on experience is very troubling and has cost New York consumers dearly.

Even if the prices were established based on a real actuarial study, the end result of what is charged to borrowers would not necessarily be different. This is because the insurers both have an extensive Schedule Rating Plan that allows the insurer and lender great flexibility to negotiate any rate they want within a range of plus and minus 15 percent. The problem is the people not at the negotiating table – borrowers – pay the premium that is being negotiated. The negotiators can both gain by selecting high prices to the detriment of borrowers.

10

|  | FIRE INDUSTRY | FIRE BALBOA | FIRE AMER. SEC |  |
|---|---|---|---|---|
| Loss Ratio (EP) | 44.9% | 18.3% | 24.0% |  |
| LAE Ratio (EP) | 5.5% | 2.2% | 2.8% |  |
| Commission Ratio (WP) | 12.7% | 9.0% | 11.1% |  |
| Other Und Expense (WP) | 14.0% | 14.8% | 29.0% |  |
| Profit | 22.9% | 55.7% | 33.1% |  |
| Total | 100.0% | 100.0% | 100.0% |  |
|  | ALLIED INDUSTRY | ALLIED BALBOA | ALLIED AMER SEC | HOMEOWNERS INDUSTRY |
| Loss Ratio (EP) | 76.7% | 39.1% | 43.1% | 62.7% |
| LAE Ratio (EP) | 7.9% | 8.9% | 3.5% | 10.0% |
| Commission Ratio (WP) | 12.4% | 7.8% | 9.3% | 13.8% |
| Other Und Expense (WP) | 13.7% | 14.7% | 33.8% | 14.3% |
| Profit | -10.7% | 29.5% | 10.3% | -0.8% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

**New York 2000-2012 loss ratios: ASIC fire and allied lines = 28.5% (See next page of this Appendix); 2002-2011 Best's data for Balboa fire = 33.0%; allied lines = 54.9%**

Sources: 2001-2010 Industry National Data from Best's Aggregates and Averages, 2011 Edition.
American Security and Balboa: 2002 to 2011 national data from Statutory Page 14 of the Annual Statements of the insurer for loss ratios, Commissions and taxes. Other expenses from Best's Aggregates and Averages, taken from multiple editions.



**American Security Insurance Company**

**Program:**    Residential Mortgage Service Program
**Policy Form:**   MSP-RES-INV-2

| Calendar Year | Earned Premium | Incurred Losses | Loss Ratio |
|---|---|---|---|
| 2000 | 13,766,690 | 4,998,891 | 36.3% |
| 2001 | 16,178,238 | 5,889,453 | 36.4% |
| 2002 | 17,161,415 | 7,138,754 | 41.6% |
| 2003 | 20,375,954 | 7,748,193 | 38.0% |
| 2004 | 21,392,323 | 7,242,182 | 33.9% |
| 2005 | 23,607,808 | 5,194,734 | 22.0% |
| 2006 | 31,942,923 | 7,889,496 | 24.7% |
| 2007 | 48,034,529 | 9,307,311 | 19.4% |
| 2008 | 65,321,418 | 11,300,777 | 17.3% |
| 2009 | 77,002,025 | 17,577,492 | 22.8% |
| 2010 | 85,086,530 | 20,676,696 | 24.3% |
| 2011 | 97,556,093 | 24,073,540 | 24.7% |

The above 12 years of NY dwelling fire data averages 28.5%
USA Loss Ratio 2001 – 2011 averages 31.1% for dwelling fire

**Program:**    Residential & Commercial Flood Program
**Policy Form:**   MSP-R-INV-FL

| Calendar Year | Earned Premium | Incurred Losses | Loss Ratio |
|---|---|---|---|
| 2000 | 590,417 | 1,653 | 0.3% |
| 2001 | 698,476 | 22,267 | 3.2% |
| 2002 | 751,906 | 10,207 | 1.4% |
| 2003 | 907,526 | 15,953 | 1.8% |
| 2004 | 1,362,500 | 69,354 | 5.1% |
| 2005 | 1,684,339 | 209,994 | 12.5% |
| 2006 | 1,940,350 | 619,741 | 31.9% |
| 2007 | 2,825,337 | 325,872 | 11.5% |
| 2008 | 4,958,451 | 153,166 | 3.1% |
| 2009 | 5,314,100 | 66,463 | 1.3% |
| 2010 | 9,526,858 | 478,272 | 5.0% |
| 2011 | 9,460,139 | 12,884,099 | 136.2% |

The above 12 years of NY flood data averages 17.8% (No national data available)

12

## ITEMS OF SPECIAL INTEREST FROM OTHER TESTIMONY

### Chase Insurance Agency (CIA) & Banc One Insurance Company

Claims higher costs are due to lack of underwriting.

In 2005, Assurant was selected as sole provider of FPI for Chase/Banc One.  It also does the tracking of insurance.

Assurant cedes quota share reinsurance on the FPI account to Banc One.  75 percent of the risk goes to Banc One, along with 75 percent of the premium, less an 18 percent ceding fee.

Until recently Chase Agency received a commission on flood and wind policies (20 percent flood – lowered to 10 percent in 2010, 4 percent wind).   No commissions are received today, a recent change.

Interestingly, Chase says, "the premium rate paid by borrowers for LPI (FPI) policies…was the same, regardless of whether CIA received a commission."  By eliminating the commission, Banc One apparently still gets 75 percent of what would have been commission, but now is profit flowing from the reinsurance arrangement.

Only 1.3 percent of borrowers are force-placed.  Since tracking seems at least partially paid for in premiums at Assurant, (see page 10 of Assurant testimony in this matter) 1.3 percent of the borrowers pay 100 percent of that part of the tracking cost.

70 percent of loans use escrow.

### American Security Insurance Company (ASIC – part of Assurant)

2 percent of loans are FPI, a "significant increase" due to recent economic conditions.  According to data ASIC supplied in a spreadsheet, they track 1,502,567 loans in New York of which 33,287 are force-placed.  In the fourth quarter of 2006, 1.3 percent of loans were FPI, in the third quarter of 2011, 2.2 percent were, a growth of 66 percent.

The huge growth in the insurer's FPI business is not limited to New York.  According to a Delaware Market Conduct Examination, as of December 2008, "Assets of the Company increased 126% from 2005 to 2008; premiums increased 158%; and net income increased 239%.  Surplus as Regards Policyholders increased 194% during this examination period."

The data supplied by ASIC also showed experience from 2000 through 2011, where the overall loss ratio in New York was 28.5 percent.  Data from 2006 through 2011 showed commissions were averaging 9.5 percent, other underwriting expenses (including any tracking cost) was 32.5 percent (exceeding losses!) and profit was 34.8 percent (also exceeding losses!)  The loss ratio

13

breakdown during 2006 - 2011 was hazard insurance loss ratio = 25.1 percent, flood = 48.7 percent and wind = 5.0 percent (wind has very limited experience since 2010).

Assurant claims that higher cost of FPI policies is due to lack of underwriting.

Assurant also says New York approved the rates it uses.

Assurant claims that New York loss ratios are low because of growth and no weather catastrophes in New York.

Assurant claims to pay commissions "comparable to those in the standard market." (It does not, however, discuss the much different workload for the agents of the two markets. Agents normally spend a lot of money securing and retaining clients for voluntary home insurance. FPI agents receive clients automatically/electronically).

Tracking costs are described by ASIC in their testimony at Page 10 as follows:

"'Other acquisition expenses' are expenses of acquiring business other than commissions and expense reimbursements. Costs associated with mailings to prospective insureds and salaries of employees who do not work on a commission basis are included in this category. For ASIC, this category includes the cost of exposure tracking, processing and activities to monitor insurance coverage, which are prerequisites for lender-placed insurance."

Regarding captive reinsurance, another way to share profits with lenders and servicers, ASIC says (page 11):

"ASIC has reinsurance agreements with certain property and casualty reinsurance companies affiliated with our mortgage servicer clients. All of ASIC's current reinsurance agreements with such entities are on a quota share basis. In other words, the servicer-affiliated reinsurers share in the premiums earned and proportionally in the losses that arise from the policies on which the premiums were paid. ASIC also requires these reinsurers to have adequate capital or to post collateral, such as funds withheld or letters of credit."

### GMAC Mortgage

Has used QBE First since 2003 "as the exclusive" FPI insurer (became QBE when Balboa acquired by QBE from Bank of America).  QBE also does the tracking.

GMAC does not receive commissions and has no reinsurance arrangement with QBE.

### Select Portfolio Servicing, Inc., Pelatis Insurance Agency Corp. and Pelatis Limited Insurance

SBS uses Assurant for tracking and FPI.

14

Pelatis Agency did get 15 percent commissions until December 15, 2011. No longer accepts commissions.

Pelatis Insurance (Bermuda) is the reinsurer under a quota-share arrangement with Assurant. The details of the deal are not disclosed in the testimony. Nor was it disclosed if the rates were changed when the commissions were eliminated. I assume not, since I expect that would have been made clear in their testimony. If the rates did not change, by eliminating the commission, Pelatis still gets a large part (based on the quota-share percentage) of what would have been commission but now is profit flowing from the reinsurance arrangement.

### American Home Mortgage Servicing, Inc. and AHMSI Insurance Agency, Inc. (AHMSI)

Uses QBE First for FPI and tracking. Pays 8¢ per loan per month for tracking (note: this is likely not the full cost of tracking). The agent gets commissions of 15 percent.

AHMSI got a "one-time marketing services payment from QBE First" upon entering into the exclusive contract in 2008. At the time they did the deal they did it with ZC Sterling, which later became QBE through acquisition. AHMSI shareholders also got "warrants giving them the right to purchase up to 15% of the fully diluted common shares of what had been ZC Sterling." When QBE acquired ZC Sterling, "the warrants held by AHMSI's shareholders were converted…to receive cash consideration."

Says New York approved the rates it uses.

AMHSI has no reinsurance deal at play here.

APPENDIX 4

## NYDFS QUESTIONS 1 – 4:  DISCUSSION

The New York Department of Financial Services posed six questions to those invited to testify.  I have commented on some aspects of the first four questions throughout my testimony. The questions the Department posed are:

1.  How are rates and expected loss ratio for force-placed insurance policies are calculated?

2   What are expenses relating to force-placed insurance?

3.  What is the purpose of payment of insurance commissions to banks, mortgage servicers or their affiliates relating to force placed insurance?

4.  How is reinsurance ceded to an affiliate of a bank or mortgage servicer?

What follows are short answers to these questions; greater detail is found in the body of the testimony.

**Response to Q 1:**

Expected loss ratios, also called "permissible loss ratios" in the documents I reviewed, are used in the filings of ASIC and QBE.  They are not important for FPI in New York and are irrelevant to the actual results of the insurers.  The insurers have not done real actuarial analyses of these products in the filings.  Rates utilized by both American Security and QBE are based on American Security's filings from 1996 and 1997.  There is no competition in pricing.

Even if the prices were based on genuine actuarial study, the use of extremely flexible Schedule Rating Plans by both companies allows lender and insurers to negotiate almost any rates they want -- within 15 percent up or down -- from the rates proposed in the filings.  The borrower who ultimately pays the FPI premium has no say in how Schedule Rating might be used in setting the price.

**Response to Q 2:**

As I demonstrate in the testimony and exhibits, the FPI expenses are often greater than the claims' payouts to borrowers and/or FPI profits of are larger than the payouts.  American Security (Assurant) has higher expense ratios than Balboa (QBE) but higher profits.  I believe this is likely because Balboa was owned by Bank of America, its largest client.  As a result, kickbacks like commissions and below-cost tracking are unnecessary, in that the profits flowed directly to the lender's affiliated insurance company.

16

**Response to Q 3:**

Commissions appear to be a disappearing element in FPI, at least for those lenders that have a captive reinsurer in place to capture the dollars in a more subtle way.

Normal (or even super-normal) commissions never made much sense. FPI agents have nowhere near the same workload as normal agents because of the much different workload for the agents in the two markets. (Agents normally spend a lot of time and money securing and retaining clients for voluntary home coverage; FPI agents receive clients automatically from the insurance tracking mechanism of the servicer or insurer). If commissions are paid to FPI agents, they should be a small fraction of normal commissions.

Finally, even if the FPI agent did the same amount of work and deserved the same commission, the commission percentage should not be the same as in the normal market. If an agent's effort was worth $100 a policy for homeowners insurance and the insurer's average homeowners' insurance premium was $1,000, the insurer would pay a 10 percent commission to produce the proper dollar commission. If that same home were force-ordered, the premium would jump markedly, typically to double the premium or much more than that. Assume the new FPI premium was $3,000. A 10 percent commission would produce $300 – three times what the "voluntary" market was paying for such work. Much higher commissions for much less work can only exist when reverse competition is at play.

Even if reforms lower FPI insurance rates to near-normal pricing, the commission percentage in rates should be much less -- as low as zero -- because the workload of any FPI agent or broker is much less, as low as no work load.

**Response to Q 4:**

Ceding of reinsurance to an affiliate of the lender or servicer often appears to be done as a way to direct profits back to the lender, because a more honest and transparent, straight rebate is not allowed by state law. A combination of excessive rates and using a licensed insurer as a fronting operation to get the premium dollars back to the lender or servicers is a classic reverse competition arrangement that presents difficult regulatory issues, as reinsurance is essentially unregulated in places that host these captives, like Vermont or Bermuda.

# EXHIBIT 17

Testimony of Birny Birnbaum
Executive Director
Center for Economic Justice

Before the

Subcommittee on Insurance, Housing and Community Opportunity
Committee on Financial Services
U.S. House of Representatives

"Insurance Oversight:  Policy Implications for U.S. Consumers, Businesses and Jobs"

July 28, 2011

Chairman Biggert, Ranking Member Gutierrez and members of the Subcommittee, my name is
Birny Birnbaum.  I am the Executive Director of the Center for Economic Justice, a non-profit
organization advocating on behalf of consumers on insurance, credit and utility issues.  I have
been intimately involved in insurance regulatory policy issues for 20 years as a regulator and as a
consumer representative.  I have been an active participant at the National Association of
Insurance Commissions (NAIC) and the National Conference of Insurance Legislators (NCOIL)
for many years.

The vast majority of state insurance regulators – particularly those in market regulation – are
incredibly dedicated to consumer protection.  I have had the honor of working with hundreds of
these state insurance regulators over the past 20 years.  But these regulators are limited by a lack
of essential tools – data for market analysis – and by a regulatory structure that favors insurers
over consumers.  There are some clear actions states can take to level the insurance regulatory
playing field and make regulators and insurers more accountable to consumers.

My testimony today will cover:

- Accountability and Responsiveness of Insurance Regulators and Insurers to Consumers
- The Limitations of State Insurance Market Regulation Efforts
- The Dodd Frank Requirements for Studies of Insurance Availability
- Problems with Force-Placed Homeowners Insurance

Testimony of Birny Birnbaum
"Insurance Oversight: Policy Implication for U.S. Consumers, Businesses and Jobs"
July 28, 2011
Page 2

Accountability of Regulators and Insurers to Consumers

The insurance regulatory system has limited accountability to consumers and routinely favors insurance industry interests over consumer interests.

There is a tremendous imbalance in the ability of the insurance industry – versus consumers – to influence insurance regulatory policy and regulatory performance. The insurance industry spends hundreds of millions of dollars of funds provided by consumers – paid as part of the insurance premiums – to lobby regulators and legislators at the NAIC, NCOIL and in individual states. In the vast majority of states, there are no consumer organizations focusing on insurance issues other than health insurance. So, for the vast majority of regulatory issues, there are no consumer perspectives to balance out the many industry voices pushing for the industry policies. Even when there is a consumer voice, it is typically outnumbered and outspent by massive amounts.

Today's hearing is an example of this imbalance. Six industry representatives representing nine industry trade associations are testifying today. I am the sole consumer representative.

The absence of consumer insurance advocates – individuals and institutions with resources necessary to participate in the regulatory process – contributes to an insurance regulatory system that is far more accountable to industry than to consumers. This is most pronounced for state insurance regulatory administrative actions – rulemaking, enforcement and market surveillance. Industry has virtually unlimited funds to press their views and fund research to serve their cause – funds provided by policyholders from premium payments. As a result, insurance regulatory policy and actions routinely favors insurers over consumers.

The regulatory bias towards industry is exacerbated by weak conflict of interest requirements regarding movement of regulators to industry. When regulators leave public service, the vast majority go to work for the industry they regulated – often lobbying their former colleagues on behalf of industry. Few go to work on behalf of consumers because there are few jobs available for insurance consumer advocates.

Testimony of Birny Birnbaum
"Insurance Oversight:  Policy Implication for U.S. Consumers, Businesses and Jobs"
July 28, 2011
Page 3

To level the playing field and make insurance regulation more accountable to consumers, insurers should be prohibited from including lobbying expenses in insurance premiums. Alternatively, insurers should be required to obtain affirmative agreement – opt-in – by consumers for use of premium dollars for lobbying.  In addition, there should be mechanisms in place to fund independent insurance consumer advocates.  There are a number of models for this, ranging from state agencies like the Texas Office of Public Insurance Counsel to consumer-funded Consumer Insurance Boards.  Of course, conflict of interest requirements should also be strengthened to ensure that today's regulatory actions are not influenced by tomorrow's job prospect.

Another critical tool to improve the accountability of insurers and regulators to consumers is the public availability of insurer market performance data – the insurance equivalent of Home Mortgage Disclosure Act Data.

State Insurance Market Regulation

Market regulation is the term used to describe regulators' activities to monitor insurance markets, identify market problems and consumer abuses and remedy those problems.  Although one of the most oft-heard arguments for state-based insurance regulation is that the states better understand and are closer to their markets than a federal regulator, the fact is that state regulators have a poor track record of identifying the worst market problems.  Indeed, many of the worst insurance consumer abuses were identified by others – state attorneys general, news media or consumers going to lawyers for assistance.  The list of market problems not identified by state insurance regulators is impressive:

- Bid Rigging Associated With Contingent Compensation of Brokers
- Homeowners and Auto Insurance Redlining
- Financed Single Premium Credit Insurance Sold With Real Estate Loans
- Churning of Life Insurance Policies
- Unsuitable Sales of Annuities to Seniors
- Life Insurer Claim Settlement Practices and Retained Asset Accounts
- Unfair Underwriting and Rating Factors

Testimony of Birny Birnbaum
"Insurance Oversight:  Policy Implication for U.S. Consumers, Businesses and Jobs"
July 28, 2011
Page 4

The limitations of state insurance market regulation have been recognized by the Government Accountability Office (GAO) and by Congress.  The GAO has issues several reports examining state insurance regulation.  In a 2003 report[1], the GAO stated:

> While all states do some kinds of market regulation, including issuing licenses and responding to consumer complaints, two key tools—market analysis and on-site examinations—are used inconsistently, if at all. The result is inconsistent and often spotty coverage from state to state and potential gaps in consumer protection. Formal and rigorous market analysis, which could be used to determine which companies to examine and how broad the examination should be, is in its infancy among state regulators, and states that do perform examinations vary widely in the way they choose companies to examine and the scope of the examinations they conduct. These inconsistencies in performing market conduct examinations make it difficult for the states to depend on each other for regulation, leaving each state with the virtually impossible task of examining every company within its borders. And with each state conducting its own examinations, some insurance companies find themselves undergoing simultaneous examinations by several states, while other companies may not be examined at all.

In a follow up report in 2009[2], the GAO found limited improvement and stated, "NAIC and the states have taken steps to improve reciprocity and uniformity of market regulation, but variation across states has limited progress."

Congress has also taken note of the states' failure to examine insurance markets for unfair discrimination.  In the 2003, Congress passed the Fair and Accurate Credit Transactions Act, which required the Federal Trade Commission, in consultation with the Office of Fair Housing and Equal Opportunity of HUD to study the effects of credit-based insurance scores on the availability and affordability of property and casualty insurance, the statistical relationship

---

[1]  "Insurance Regulation:  Common Standards and Improved Coordination Needed to Strengthen Market Regulation," General Accounting Office, September 2003

[2]  "Insurance Reciprocity and Uniformity:  NAIC and State Regulators Have Made Progress in Producer Licensing, Product Approval, and Market Conduct Regulation, but Challenges Remain," Government Accountability Office, April 6, 2009

between credit-based insurance scores and actual losses, and the extent to which credit-based insurance scores are a proxy for prohibited factors, such as race, color, or religion. Despite being responsible for regulating insurers' use of consumer credit information for underwriting and rating, state regulators have collected very little information on, for example, the impact of the great recession on insurance scores and premiums.

More recently, in the Dodd Frank Act, Congress created the Federal Insurance Office (FIO) and authorized the FIO to monitor the extent to which traditionally underserved communities and consumers, minorities and low- and moderate-income persons have access to afford able insurance products regarding all lines of insurance, except health insurance. Congress also gave the FIO the authority to collect data from insurers, to the extent the data is not already collected by state insurance and other regulators.

These directives by Congress are a result of the failure of state insurance regulators to collect meaningful market performance data about insurers. Currently, state regulators receive and review consumer complaints and have started to collect a few pieces of data through the Market Conduct Annual Statement (MCAS). But these data are grossly inadequate for rigorous market surveillance and analysis. The absence of consumer complaints is <u>not</u> a reliable indicator of fair treatment of consumers; some market problems did not produce consumer complaints because the consumer was not aware of the problem (bid rigging/broke compensation, retained asset accounts) or did not know to file a complaint with the insurance department. The MCAS, which has great potential to assist regulators in improving market regulation, fails to meaningfully help regulators because there are so few data elements and the data elements collected are so highly summarized.

The failure of state insurance regulators to collect – and publish – insurer market performance data contrasts starkly with market performance data available to regulators and the public for mortgage and other lending through the Home Mortgage Disclosure Act (HMDA). With HMDA, lenders report information on all loan applications and resulting loans. The availability of HMDA data allowed fair lending organizations to identify predatory lending abuses in the

subprime mortgage market as early as the late 1990's and the reckless mortgage lending practices that led to the financial crisis of 2008 in the early 2000's.

One of the most important actions state insurance regulators can take to improve market regulation, consumer protection and accountability of insurers and regulators to the public is to collect and publish detailed market performance data about individual insurers in the same way that HMDA data are collected and published for lenders' market performance.

<u>Force-Placed Insurance</u>

Lender-placed insurance (LPI) is also known as force-placed insurance, is insurance placed by a lender on collateral supporting a consumer loan in the event the borrower fails to maintain required insurance coverage.  For example, a mortgage lender will require property insurance to protect the real estate serving as collateral for the loan.  Lenders (or, more typically, the insurer providing the LPI and administering the program for the lender) monitor the insurance status of the property and auto loans to ensure the required insurance is in place.  If the lender or insurer/program administrator determines the insurance is not in place, an insurance policy (or certificate on a group policy) is issued to cover the property or auto.  The cost of the force-placed insurance is added to the loan.

The incentives and potential for abuse in the administration of LPI are great.  Consumers do not request the insurance, but are forced to pay for it.  The cost of LPI is much higher than a policy the borrower would purchase on his or her own.  Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage.

With the great problems in the mortgage market and the crushing impact on low- and moderate-income consumers of the recession caused by the financial market collapse, the amount of force-placed homeowners insurance has exploded in recent years.  According to Credit Insurance Experience Exhibit (CIEE) Data, insurers wrote $1.5 billion of gross premium in 2004.  By

2009, that amount had grown to over $5 billion and, in 2010, LPI gross written premium grew to over $5.5 billion.

The prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission – totaling hundreds of millions of dollars – out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance – so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place insurance.

The problems with force-placed insurance illustrate a number of state regulatory failures. In this instance, regulators collect the data to indicate a problem with overcharges. But, state regulators have not taken action on their own initiative to reduce the rates for LPI. The problems with LPI have been brought to regulators' attention – at NAIC meetings and in correspondence with individual state regulators – but regulators have not taken action in response to the problems raised by consumers. Problems other than excessive rates were not identified by regulators, but by reporters[3] and consumer representatives because regulators collect no data on the sales practices and servicing practices of the handful of insurers writing the vast majority of the LPI business.

While the problems with insurance market regulation are significant, there are some clear actions, as described in my testimony, states can take to level the insurance regulatory playing field and make regulators and insurers more accountable to consumers.

---

[3] "Ties to Insurers Could Land Mortgage Services in More Trouble," Jeff Horwitz, *American Bankers*, November 10, 2010.

# Birny Birnbaum

Center for Economic Justice
1701 A South Second Street
Austin, TX  78704
(512) 448 3096

Birny Birnbaum is a consulting economist and former insurance regulator whose work focuses on insurance regulatory issues.  Birny has served as an expert witness on a variety of economic and actuarial insurance issues in California, New York, Texas and other states.  Birny serves as an economic adviser to and Executive Director for the Center for Economic Justice (www.cej-online.org), a Texas non-profit organization, whose mission is to advocate on behalf of low-income consumers on issues of availability, affordability, accessibility of basic goods and services, such as utilities, credit and insurance.

Birny has authored reports on insurance markets, credit scoring, redlining, title insurance and credit insurance for CEJ and other organizations.  Birny served on the National Association of Insurance Commissioners Consumer Board of Trustees.  Birny has been particularly active on issues involving data collection for market surveillance and market analysis, the role and effectiveness of consumer disclosures and insurance market conduct issues.  He has authored reports to numerous public agencies, including the California Department of Insurance, the Florida Insurance Commissioner's Task Force on Credit Scoring, the Ohio Civil Rights Commission and the Cities of New York and Philadelphia.

Birny served for three years as Associate Commissioner for Policy and Research and the Chief Economist at the Texas Department of Insurance.  At the Department, Birny provided technical and policy advice to the Commissioner of Insurance and performed policy research and analysis for the Department.  Birny was also responsible for the development of data collection programs for market surveillance.

Prior to coming to the Department, Birny was the Chief Economist at the Office of Public Insurance Counsel (OPIC), working on a variety of insurance issue.  OPIC is a Texas state agency whose mission is to advocate on behalf of insurance consumers.  Prior to OPIC, Birny was a consulting economist working on community and economic development projects.  Birny also worked as business and financial analyst for the Port Authority of New York and New Jersey.  Birny was educated at Bowdoin College and the Massachusetts Institute of Technology.  He holds two Master's Degrees from MIT in Management and in Urban Planning with concentrations is finance and applied economics.

United States House of Representatives

# Committee on Financial Services

"TRUTH IN TESTIMONY" DISCLOSURE FORM

Clause 2(g) of rule XI of the Rules of the House of Representatives and the Rules of the Committee on Financial Services require the disclosure of the following information. A copy of this form should be attached to your written testimony.

| 1. Name: | 2. Organization or organizations you are representing: |
|---|---|
| Birny Birnbaum | The Center for Economic Justice |

| 3. Business Address and telephone number: |
|---|
| ███████████████████ |

| 4. Have you received any Federal grants or contracts (including any subgrants and subcontracts) since October 1, 2008 related to the subject on which you have been invited to testify? | 5. Have any of the organizations you are representing received any Federal grants or contracts (including any subgrants and subcontracts) since October 1, 2008 related to the subject on which you have been invited to testify? |
|---|---|
| ☐ Yes   ☑ No | ☐ Yes   ☑ No |

| 6. If you answered yes to either item 4 or 5, please list the source and amount of each grant or contract, and indicate whether the recipient of such grant was you or the organization(s) you are representing. You may list additional grants or contracts on additional sheets. |
|---|
| |

| 7. Signature: |
|---|
| *Birny Birnbaum* |

*Please attach a copy of this form to your written testimony.*

# EXHIBIT 18

# AMERICAN BANKER.

## Ties to Insurers Could Land Mortgage Servicers in More Trouble

By Jeff Horwitz
NOV 9, 2010 12:00pm ET

**Correction:** *An earlier version of this story incorrectly stated that Bank of America did not comment for the record. The bank's comment is now included.*

**When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal. Just not for the homeowners and investors who have to pay for it.**

Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan.

Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.

Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

"There's no arm's-length transaction here, and that creates all sorts of incentives for the servicer to force-place excessive insurance and overcharge consumers for policies that provide minimal benefit," said Diane Thompson, of counsel for the National Consumer Law Center. "Servicers and insurers have turned this into a gravy train."

Sometimes the arrangements resemble simple kickbacks: Court documents show that a subsidiary of the country's largest specialty insurer paid undisclosed "commissions" for the rights to a servicer's force-placed business.

State court filings show alleged abuse in which banks charged borrowers for unnecessary insurance and backdated policies providing coverage retroactively. Often the insurance was acquired only after banks stopped advancing the premiums of delinquent borrowers' escrowed policies, causing those cheaper and more comprehensive policies to expire. In response to questions from American Banker, federal and state officials said that some practices that industry trade groups defend may not be legal.

"It is clear that [the Real Estate Settlement Procedures Act] prohibits fee splitting and unearned fees for services that are not performed," said Brian Sullivan, spokesman for the Department of Housing and Urban Development. Foreclosure defense and legal aid attorneys say force-placed insurance is found on most of the severely delinquent loans in this country. If so, the cost to investors may well be in the billions of dollars.

"This is clearly not in the investors' interest," said Amherst Securities analyst Laurie Goodman, who in May noted the potential for misconduct with Bank of America's force-placed-insurer subsidiary, Balboa Insurance Group. "Servicers are getting a huge chunk of money from force-placed insurance, and investors pay for it by higher loss severity at the liquidation of the loan."

With little regulatory oversight or even private investor awareness, force-placed insurance has helped make drawn-out foreclosures lucrative for servicers — far more so, in some cases, than helping a borrower return to performing status. As the intermediary between borrower and investor, servicers appear to be benefiting themselves at the expense of both.

**Backdated Coverage**
When attorney Jeffrey Golant took on his first forced-placement case, he thought he was looking at an administrative mistake.

A solo practitioner in Pompano Beach, Fla., Golant splits his time between foreclosure defense and insurance cases. He had been referred his first forced-placement case by his mother, Margery Golant — also a longtime foreclosure defense attorney — in May of 2008 when the dispute veered into insurance territory.

The problems should have been quick to sort out, Golant recalls. His client was current on her mortgage and claimed the lapse of insurance coverage on her home was the result of her previous insurer's error. Much of the new policy's coverage was redundant, Golant said, duplicating flood and wind policies that had remained in place. Moreover, billing her for expensive retroactive hurricane protection, for a year when there had been no significant storms, struck Golant as inherently ridiculous.

"I really thought they'd added an extra digit," he said.

But the servicer that had requested the policy — nominally Zions Bancorp., though like many regional banks, the company outsources its servicing and does not involve itself in loan-level decisions — wouldn't back down. The backdating was appropriate because "Had there been damage to your property during the uninsured time … you would have benefited significantly," the servicer said in one letter.

The Mortgage Bankers Association told American Banker that retroactive coverage is necessary to prevent gaps in insurance. But asked for an opinion on backdating a policy by nine months, the National Association of Insurance Commissioners told American Banker that insurance is "prospective in nature." Therefore, policies "should not be back-dated to collect premiums for a time period that has already passed," the trade group for state insurance regulators said.

The case got stranger when Golant's client visited the address listed for the insurer in an unsuccessful attempt to sort things out, he said. While the people there claimed to represent the servicer, they were operating out of an office belonging to a force-placed policy insurer since acquired by QBE Insurance Group.

Golant didn't understand why the insurer would be speaking on behalf of the servicer. But shortly after he began asking questions about the relationship between servicer and insurer, the case settled. Confidentially. At the insurer's request.

With the matter resolved, it would have made sense for a Florida solo practitioner who handles as many as 50 cases at any one time to move on. Golant, however, started investigating the connections between multibillion-dollar banks and specialty insurers.

"Frankly, it was their speed and willingness to settle that made me think they were not at all confident about the arrangement," Golant said. "I was still in the dark. But I got curious."

Collaborating with his mother, Golant says he began to take on more force-placed insurance cases, often agreeing to bill the borrower only if he won. Cases he pointed out to American Banker show no shortage of questionable alleged practices. In some instances, servicers force-placed insurance on borrowers in excess of their mortgage's face value and property's overall worth. (A representative of the Mortgage Bankers Association said the industry often is required to reinsure a property up to the cost of its replacement value, even if that's in excess of the mortgage.)

In other instances, servicers force-placed duplicative insurance on residents of condominium associations that insured their members' properties. In yet more, servicers had stopped advancing the premiums for a delinquent borrower's escrowed private insurance, allowing it to expire. When it did, they bought far more expensive force-placed insurance to replace it, and began advancing the premiums on that. This — a common practice, Golant says — was not just harmful to borrowers. It was inexplicable from the point of view of protecting investors.

What all the cases had in common was astronomically priced force-placed insurance, he said. There is no doubt that borrowers who aren't paying for their own insurance pose a heightened insurance risk. But servicers were billing Golant's clients for policies that cost as much as 10 times as much as the insurance they replaced. In one example confirmed by American Banker, an $80,000 property standing on a $40,000 lot was force-placed with a policy costing $10,000. Put another way, one year of insurance payments would strip away 13% of the structure's total value.

It wasn't just off-brand and subprime servicers who were tacking the high-priced policies on to borrowers' mortgage bills. It was the country's biggest banks, from JPMorgan Chase & Co. to Wachovia, now part of Wells Fargo & Co. Why did they seem so eager to purchase high-priced insurance on the homes of already struggling borrowers?

Golant got his answer in a case in which EverBank Financial Corp's servicing arm had allegedly allowed a borrower's $4,000 escrowed insurance to lapse in error and then replaced it with a policy costing more than $33,000. In response to written questions, a subsidiary of Assurant, one of the country's biggest specialty insurers, revealed that it hadn't kept all the money that EverBank's

servicing operation had paid it. Instead it immediately paid EverInsurance, the servicer's subsidiary, a $7,100 "commission" and left the door open to further compensation.

For Golant, this set off alarm bells: instead of trying to place affordable insurance on his client's home, EverBank had taken what was at minimum a $7,100 cut. That was more money than EverBank would ever collect from actually servicing the loan, and EverBank had done nothing to earn it — except let Assurant write a high-priced policy on his client's house. (According to the MBA data cited by MortgageDaily.com, servicers earned on average $51 per loan last year.)

"The 'commissions' that [Assurant] paid ... were in fact kickbacks," the attorney wrote in a complaint still being litigated. "This incentivized EverHome to select the most expensive force-placed coverage available, and to force-place insurance as frequently as possible."

EverBank is in the process of going public, and could not comment because of SEC restrictions on its public statements, a spokeswoman for the bank said. But, at least in substance, its relationship with an insurer is hardly unique. Agreements providing banks with commissions on force-placed insurance appear to be standard for many players, including one of the country's largest — Wells Fargo.

Wells declined an on-record interview for this story, though it acknowledged relationships with three force-placed insurers and provided other guidance. JPMorgan Chase did not speak on record with *American Banker.* A spokesman for Bank of America said by email it buys forced-placed insurance only "after several attempts have been made to notify borrowers that their insurance has lapsed and to remind them of their obligation to maintain continuous coverage." B of A is seeking a buyer for Balboa, which it inherited with its 2008 acquisition of Countrywide Financial Corp.

But the MBA defended commissions on force-placed business. It is common practice for an insurer to pay fees for business referrals, said Vicki Vidal, a vice president at the trade group. Asked if those commissions inflated the price that homeowners or investors ultimately paid, she said they did not.

"The rate is separate from the commission," Vidal said, adding that state insurance regulators can set limits on what premiums are allowed.

### Circular Arrangement
Commission fees aren't the only way major servicers profit on the force-placed policies in their portfolio. Some, including JPMorgan Chase, have adopted a roughly equivalent if slightly more sophisticated method of profiting from force-placed reinsurance: They reinsure it.

Evidence of the practice comes from Assurant's Securities and Exchange Commission filings as well as the banking companies' boilerplate language for notifying borrowers of their intent to bill them for a force-placed policy.

JPMorgan Chase's force-placed insurance "will have significantly higher premiums than standard insurance premiums," the banking company noted in one letter to a borrower last year, and "Some or all of these premiums will be reinsured through an insurance company that is an affiliate of Chase."

JPMorgan Chase declined to specify what insurer it typically works with, but Assurant's annual report describes precisely such a relationship from an insurer's perspective. In an effort to align its interests with its servicer customers, the company will often reinsure the policies it writes with the same servicer that requested them.

"Such arrangements allow significant flexibility in structuring the sharing of risks and profits on the underlying business," Assurant notes.

The interests of the two parties are so aligned, in fact, that in many cases there ceases to be a clear difference between the entity purchasing insurance and the entity selling it.

According to both Assurant's SEC filings and the marketing materials of a subsidiary of rival QBE Insurance Group, the insurers don't just write policies on request — they also enter into long-term agreements to detect uninsured properties in their clients' servicing portfolios and perform other back-office functions. It was precisely such an arrangement that Golant's first client ran into when she tried to visit her servicer, he says — the insurance company employees had taken over the servicer's role.

Like the direct commission payments that Golant discovered, reinsurance deals cut servicers in on insurer profits. They also come with another potential advantage for the insurer: they provide an incentive for the servicer not to pursue claims, creating an apparent conflict of interest. As a representative of investors, the servicer should vigorously pursue any and all claims arising from its forcibly insured portfolio. But because the servicer reinsures the policies it purchases, any claims it brings could potentially come out of its own profits.

For insurers, opening the door to this circular arrangement has its drawbacks. Assurant warns in investor filings that having reinsuring business with the client that provided the policy, rather than a reinsurer of the company's own choosing, can pose a credit risk: the bank fails to eat its share of claims. Assurant mitigates this danger, it says, by requiring some of its client-counterparties to obtain letters of credit from other financial institutions.

The more vexing issue for Assurant, however, seems to be that giving the servicers part of the deal leaves less for the company. In a section discussing risks arising from servicer industry consolidation, Assurant warns that giant servicers are compressing margins and that it may receive a lower share of premiums if it provides them with bigger reinsurance deals.

Nonetheless, Assurant sees force-placed insurance as its future. The unit handling force-placed insurance has accounted for $811 million of its $879 million in profits during the last two years, and its "business strategy is to pursue long-term growth in creditor-placed homeowners insurance" as well as expand that business into auto insurance and related areas.

Assurant declined to be interviewed for this story, and did not address questions on conflict of interest concerns. But the company, which also provides health, corporate and other types of insurance, issued a statement defending its general force-placed business practices.

"Lender-placed insurance programs are regulated in all states and we comply with those regulations," the statement reads in part. "We believe our rates to be among the lowest in the industry."

QBE Insurance, the parent of the insurer involved in Golant's first force-placed case, did not respond to requests for comment.

The MBA's Vidal denied that reinsurance deals posed a conflict of interest, suggesting they may only cover catastrophic losses.

"Don't get the impression that everyone has reinsurance capacity," she said. "But to the extent they do, they're obviously getting paid for absorbing a portion of the risk."

## "No Incentive" To Shop

Force-placed insurance isn't inherently objectionable. It makes sense that the coverage's price must be higher than on voluntarily purchased insurance to account for a higher risk — if a hurricane comes through, a homeowner with a stake in a property is more likely to board up the windows than one in foreclosure. In many states regulators provide at least some oversight and limits on acceptable rates. Moreover, force-placing insurance isn't optional for servicers: investor contracts usually require it.

"Realistically, we're doing whatever investors are telling us to do," Vidal said.

But it would be possible for servicers to treat force-placing as a last-ditch form of investor protection conducted at the lowest cost possible. Instead, they have consistently chosen force-placed insurance deals that reward themselves at the expense of their clients — and have sometimes given insurers unfettered access to write policies on their portfolios. Banks have put little effort into justifying their force-placed practices because they were rarely asked about them.

"[T]he cost may be considerably more expensive than insurance you can obtain," says a September letter from SunTrust Banks Inc.'s mortgage unit to a borrower, which cites the baffling — but often repeated — line that high prices are necessary because the policy is underwritten "without inspection." (As a general matter, insurers do not routinely inspect residential properties in the course of underwriting, according to Thompson of the National Consumer Law Center, though a representative of one large insurer told American Banker that it always reserves the right to.) SunTrust declined to comment for this story.

Such practices have been in place for years, yet force-placed insurance has received very little attention outside of the servicing industry. Given the current volume of foreclosure activity and the unprecedented attention that ground-level servicing operations are now receiving, however, that could change.

The Dodd-Frank Act stipulates that charges for force-placed insurance must be "bona fide and reasonable," and correspondence with the National Association of Insurance Commissioners suggest that state regulators are aware of the potential for conflicts of interest in insurer selection. Asked whether pricing in the field is competitive, a representative of the NAIC responded that servicers have "no incentive to select a competitively priced product, but instead would be more

concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction."

In response to a query by American Banker on possible interest in the force-placed insurance market, the Office of the U.S. Trustee, which oversees bankruptcy trustees and the administration of cases, referred without comment to an Indiana bankruptcy case in which it has asked Wells Fargo to produce documents "that support the belief that Debtors had failed to maintain insurance" and "premium notices; invoices; canceled checks; policies of insurance; insurance binders; and, requests for quotes or bids for insurance."

Wells is obligated to respond later this month.

Neither the U.S. Trustee's query of Wells nor the views of other regulators have filtered down to ground-level servicing practices, said consumer advocates like Thompson.

Golant, who hopes to begin deposing insurance industry officials in his force-placed cases within a few months, said he didn't believe the industry would willingly accept change.

"The banks' profits aren't connected to the performance of the loan," he said. "The people making policy, thinking the servicers are part of the solution to the foreclosure problem, need to understand that."



© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT 19

# Star-Telegram

## Everyone profits off force-placed insurance, except homeowner

Posted Saturday, Oct. 01, 2011

**BY DAVE LIEBER**

watchdog@star-telegram.com



Her husband always handled their home mortgage payments, so when Beatrice Stevenson finally took a look at the papers, she was shocked to see that her homeowners insurance premium was more than double what it should have been.

Her husband had let the insurance lapse, so the loan-servicing company put what's called force-placed insurance on their home. She was paying close to $2,000 a year for insurance that should have cost her around $800.

"They were overcharging me," said the Lancaster woman, who estimates that she has overpaid $6,000 since 2005. "I'm a fighter. I may be in my 70s, but I will fight you as long as I can because I'm not afraid."

But this was too big, even for her. In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions.

Policies are sometimes backdated to cover periods that have already passed. In essence, critics say, high-priced insurance policies cover a time when no events happened.

And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that.

Critics call the arrangement a kickback.

Here's how it works: A homeowner struggles to pay his mortgage. Maybe he's in default and drops his house insurance to try to make ends meet. Or maybe the insurance company cancels his policy, perhaps claiming that it is empty.

The mortgage company or its loan-servicing company chooses an insurance company to insure its stake in the house, often at two or three times the cost of regular insurance.

But the policy provides significantly less coverage for the homeowner than the lower-cost policy had. The insurer and mortgage firm can profit; the homeowner pays.

Roland Tellis, a Los Angeles attorney for Baron & Budd, said force-placed premiums can cost as much as 10 percent of the home's value. "That's outrageous," he said.

Premiums are added to the outstanding balance of mortgage debt. Many homeowners don't know or understand what's going on.

"They get a letter in the mail, and the next thing you know, their mortgage goes up because of the high insurance premiums," Tellis said.

Often, this happens when a home is on the verge of foreclosure. "The next buyer or bank who buys that note ends up paying the outstanding indebtedness on it, which includes the inflated insurance premiums," he said.

No question that all homes should have insurance to protect the lender and owner, Tellis said. "The problem is, it's being placed with an affiliate who is not disclosed, on a policy that's inflated in price, and it's backdated. That's how they make their money."

Federal and state regulators are trying to figure out what to do. In July testimony before a U.S. House subcommittee, Birny Birnbaum, director of the Center for Economic Justice, said insurers wrote over $5.5 billion in force-placed-

insurance premiums last year. Insurers paid only 17 percent of collected premiums back in claims. That leaves more than $4 billion for associated costs, fees and profit.

"Incredibly, lenders get a commission -- totaling hundreds of millions of dollars -- out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral," Birnbaum testified.

The biggest move to curtail the problem is a 50-state settlement effort led by state attorneys general. Their targets are the five biggest mortgage lenders -- Bank of America, JPMorgan Chase, Wells Fargo, Citigroup and Ally Financial (previously GMAC).

The group intends to start with those major players "and then work down," said Geoff Greenwood, spokesman for Iowa Attorney General Tom Miller, who leads the settlement negotiations.

Texas is one of about a dozen states represented on the executive committee. A settlement, if reached, could be in the tens of billions of dollars with proceeds going to victims. But progress is slow.

Meanwhile, Stevenson, the self-described fighter, did what she said: She complained about her loan company, Ocwen Loan Servicing, to the Texas Insurance Department. But the department, like many state regulators, can't, under current law, stop the practice.

"So I settled," she explained wearily. "They know they can do us this way. They know we don't have the money to fight them."

Ocwen Executive Vice President Paul Koches said insurance companies, not loan companies such as Ocwen, increase the premiums. Homeowners are notified of their insurance lapse by mail, and they are expected to act responsibly. As soon as they get proper insurance, Ocwen drops the force-placed policy, he said.

This wasn't always the case. Seven years ago, Ocwen entered into an agreement with federal regulators in which it was forbidden from charging homeowners for force-placed insurance without giving them the chance to demonstrate that they had coverage. Ocwen was also ordered to provide better customer dispute resolution and was prohibited from charging certain fees.

But that doesn't help Stevenson, Koches said. "Generally, in cases where a husband or wife is not sharing information with the other spouse, obviously, we can't control that," he said. "It would appear that does happen."

The Watchdog column appears Fridays and Sundays.

Dave Lieber, 817-390-7043

Twitter @DaveLieber

Looking for comments?

# EXHIBIT 20

**OPENING STATEMENT – SUPERINTENDENT OF FINANCIAL SERVICES
BENJAMIN M. LAWSKY**

**FORCE PLACED INSURANCE HEARINGS**

**THURSDAY, MAY 17, 2012**

- Good morning everyone. Welcome to the first of three days of hearings that the Department of Financial Services is holding on the workings of the force placed insurance industry.

- Thank you to all of our witnesses today who have agreed to come testify at these hearings. We look forward to hearing from all of you and engaging in a dialogue with you.

- Thank you also to the team here at DFS that has worked so hard to put these hearings together. Joining me up here to participate in the hearings are Joy Feigenbaum, Executive Deputy Superintendent for the Department's FFCPD, and Daniel Alter, the General Counsel of the Department. They will both be participating in the dialogue we have with witnesses as well.

- Force placed insurance, as most of you probably know, is insurance placed on a home by a lending institution when the homeowner's insurance lapses. It is designed to maintain continuous coverage and protection for properties and does serve an important purpose.

- In recent years, the force placed insurance market has grown immensely. Largely as a result of the downturn in the housing market and the foreclosure crisis, premiums have risen from $1.5 billion in 2004 to $5.5 billion in 2010. The numbers are likely even higher now. With this massive spike in premiums have come enormous profits for the insurers and the banks. At Balboa, for example, profits went from $177 million in 2006 to $1.178 billion in 2010 (on premiums of $1.545 billion).

- This inquiry into the force placed insurance market is incredibly important. It impacts homeowners and investors, and falls, really, at the intersection of banking and insurance. DFS, as you all know, is the product of the merging of the banking and insurance departments into a larger and more robust, overall financial regulator – so force-placed insurance is smack in the middle of our jurisdiction as it spans both the banking, mortgage and insurance industries.

- These hearings are intended to be fact-driven and exploratory. This will not be an inquest or a witch hunt. We want to hear all sides of the issues and delve deeply into the subject in a fair and balanced way.

Red Flags

- With that said, our initial inquiry into the operation of the force placed insurance market has raised a number of serious concerns and red flags.

1. Premiums for force placed insurance seem high and in many cases are exponentially higher than regular homeowners insurance.

2. Loss ratios (or the percent of premiums actually spent to cover claims) seem extraordinarily low. On a typical homeowner's policy, at least 63 cents of every dollar goes to pay claims. But for force placed policies, the loss ratios drop precipitously often below 25 cents and sometimes as little as 17 or 18 cents on the dollar is going to pay claims. The rest is mostly profit.

3. The high premiums can push distressed homeowners over the foreclosure cliff; they also impact investors in mortgage securities. That's because the banks often advance the high premium payments themselves and then pull the funds back out of the property's value once there is a foreclosure or a short sale, etc.

4. There appears to be a severe lack of competition among the few firms that provide force placed insurance. In New York, just two companies, Assurant and QBE, represent more than 90 percent of the market. (So we're seeing high premiums, low loss ratios, and very little if any competition to keep rates down.) And it's no different nationwide.

5. As I mentioned, in the wake of the financial crisis and the bursting of the housing bubble there has been a huge uptick in force placed insurance and it has become a major profit center for both banks and insurers. Force placed premiums increased to $5.5 billion, a more than 265 percent increase between 2004 and 2010.

6. Amidst this boom in premiums and profits, there also appears to be a web of tight relationships between the banks, their subsidiaries and insurers that have the potential to undermine normal market incentives and may contribute to other problematic practices.

o In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those big profits revert right back to the banks through reinsurance agreements.

o JP Morgan Chase, for example, pays very high premiums to a single insurance company, Assurant. Assurant then turns around and reinsures 75 percent of the risk through JP Morgan's Vermont-based captive insurance subsidiary. JPM is, in effect, paying itself high premiums and making big profits without having to provide much coverage, all seemingly at the expense of homeowners and investors.

- In sum, when you combine this close and intricate web of relationships between the banks and insurance companies on the one hand, with the high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions that we need to explore in these hearings.

Issues Raised

- During these hearings we would like to explore whether these apparent red flags are indeed indicative of a problem, and if so, what conclusions we can draw from them.

- On the surface at least, our initial investigation raises the question of whether the normal insurance market incentives to keep prices down are upside down when it comes to force placed insurance. In other words, the banks purchasing this insurance seem to have little incentive to keep prices down and often, depending on their relationships with the insurers, they may have an incentive to find the most expensive coverage. This perverse incentive, if it exists, would appear to harm both homeowners and investors while enriching the banks and the insurance companies.

- If these inverted incentives exist, and we combine that the scant competition in the market, then we may have a situation where certain dominant players have become dominant, not by offering the best prices, but by offering the best deals back to the banks through commissions or reinsurance quota shares or other services and benefits. This again enriches the banks but keeps premiums charged to homeowners who are already in distress very high.

Root Causes

- All of this also raises the question of how did the market get this way. While force placed insurance is, on the one hand, an insurance product, at the same time has clearly become a profit center for the banks.

- Insurance regulators are used to seeing insurance companies competing for customers by keeping prices low. Thus, insurance regulators are usually focused primarily on whether insurance companies are keeping premiums high enough to ensure the future solvency of the companies which protects all policyholders.

- When the insurers last submitted rates to the Insurance Department, they estimated loss ratios of approximately 55 percent. In fact the actual loss ratios turned out to be far lower and usually less than half of what the Department was led to believe they would be. For example, Assurant filed an expected loss ratio of 58.1% to justify its rates. Its actual loss ratios from 2000-2011 was less than 25%.

- This raises the very important question of whether the insurers had an obligation to reassess their prices and business models and resubmit their rates given that

their predicted loss ratios were turning out to bear little resemblance to reality year after year after year.

- As for bank regulators, it appears that until recently force placed insurance was viewed primarily as an insurance product issue best left to the insurance regulators. Bank regulators have thus been largely unfocussed on banks' conduct within this market even as it boomed into a major profit center for the banks.

- The fear then is that over the years the conduct of the force placed insurance market has been operating in the shadows with little regulatory oversight or supervision.

- The Department of Financial Services was created to avoid these types of regulatory blind spots and gaps, and hopefully these hearings will shine a bright light on all of the conduct in this industry. Our hope, again, is to look deeply, carefully, and fairly at this markets to consider what if any fixes and reforms are appropriate.

Potential Reforms

- Some potential reforms are fairly obvious – the affiliated relationships appear to be driving a lot of the inverted incentives and promote little competition. We should consider whether banning these relationships makes sense.

- Separately, we should explore at these hearings whether we should be requiring a minimum loss ratio ("MLR") like we do in the health insurance marketplace. On the health insurance side, we also require insurers who fail to meet their MLR to refund premiums back to consumers to make up the difference. This would obviously be more complicated in a situation with many investors and a foreclosed property but it is worth considering and discussing during the course of these hearings.

- So, we are very much looking forward to probing these issues and many others as we proceed through these hearings and hear from all sides of these issues. Thank you.

- Our first panel today will consist of homeowners who have been impacted by force placed insurance. Then we will hear from Robert Hunter, the Director of Insurance from the Consumer Federation of America, and an expert on force placed insurance. Our third panel will consist of several foreclosure prevention advocates. And our fourth panel will be representatives from the two biggest force placed insurers in New York, Assurant and QBE, who together make up more than 90 percent of the market. Tomorrow, we will hear from several of the banks and reinsurers, including JP Morgan Chase, Bank of America, and their affiliates.

- I would now like to turn it over to Joy Feigenbaum to set forth the procedures and rules for the hearings and then we will hear from our first panel.

# EXHIBIT 21

**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES**

**TESTIMONY OF JOHN FROBOSE**

**PRESIDENT OF AMERICAN SECURITY INSURANCE COMPANY**

John Frobose, President of American Security Insurance Company ("ASIC"), submits this written testimony to the Department of Financial Services, in response to the April 12, 2012 Notice of Public Hearings, issued pursuant to N.Y. Financial Services Law §§ 305 and 306 and the Department's request for written testimony pursuant to N.Y. Insurance Law § 308.

**I.    Lender-Placed Insurance Fulfills an Important Need**

Homeownership in America is possible because of mortgage lending.  A necessary foundation for residential mortgage lending is maintaining insurance on the underlying collateral for the loan: the home.  Mortgage lenders have always required homeowners to carry insurance on the mortgaged property.  Under the terms of virtually all mortgage loan agreements, homeowners are required to carry such insurance coverage.

All originators and purchasers of home mortgages, including Fannie Mae and Freddie Mac, require mortgage servicers to ensure that insurance coverage "is in place at all times."  To meet this requirement, mortgage servicers engage insurance companies, such as ASIC, to provide insurance coverage on properties when no other coverage is in place because no standard insurer will provide coverage or the homeowner has failed to maintain coverage. The most critical feature of this type of insurance is that it ensures continuous coverage as of the date a standard policy lapses or is canceled.  This insurance is referred to as Lender-Placed Insurance ("LPI").  Without the safety net of LPI, mortgage loan interest rates would rise and mortgage lenders would make fewer loans.

ASIC LPI covers homeowners and lenders.  To protect both, LPI policy limits historically have been set at the coverage amount of the previous policy, which is the best estimate of the replacement cost of the home.  As a result, homeowners have the means to repair or rebuild in the event of a covered loss (for example, damage from fire, wind or hail).  LPI policies are automatically effective from the date the prior standard coverage lapses or is canceled, providing homeowners with continuous coverage.  So, for example, if the home is damaged or destroyed by a covered peril immediately after the standard policy lapses or is canceled, the LPI insurance carrier pays the loss.  This coverage also assures the lender that damage or destruction of the property from a covered peril will not wipe out the security for the loan.

Historically, LPI has helped many homeowners who did not have standard insurance coverage to rebuild their homes in the face of catastrophe.  For instance, ASIC incurred $94 million in losses covering more than 9,400 homeowners for catastrophes occurring in 2011.  Approximately $38 million of this amount, including $20 million in flood claims, arose from Hurricane Irene, which soaked the Eastern Seaboard and devastated communities in 34 New York counties.

Many claims are paid on properties in areas in which standard insurers have reduced their coastal and other high risk exposure.  Following the destructive hurricane seasons of 2004 and 2005, standard insurers continued a trend of withdrawing from certain high-risk areas, leaving homeowners with fewer options in the standard insurance market.  New York is not immune from this market dislocation.   In recent years some of the largest standard insurers publicly announced their intention not to renew over 50,000 policies covering homes in

New York City and on Long Island. In contrast with these standard carriers, ASIC is required to provide coverage in all states and in all areas, regardless of the risks.

## II.     LPI – The Insurance of Last Resort, Rarely Placed

Lender-Placed Insurance is not "forced" on anyone. ASIC has developed thorough processes to ensure that homeowners have ample opportunity to avoid LPI whenever other coverage is available to them and they choose to buy it. LPI is a safety net, and ASIC dedicates substantial resources to *avoid* placing coverage where standard coverage may be obtained or is already in force. And for good reason: ASIC has every financial incentive to avoid placing LPI that is not needed. When ASIC issues a policy on a home that is covered by standard insurance, it incurs all of the costs of placing and removing the policy but retains none of the premium. Upon receipt of proper documentation, every single policy placed on a home already covered by standard insurance is canceled, and the premium is refunded, at ASIC's expense.

Under its agreements with mortgage servicers, ASIC serves as the contact for all matters related to the homeowner's insurance coverage. Servicers instruct insurance carriers and agents to route all correspondence regarding insurance coverage, such as renewals, expirations, and cancellations, directly to ASIC. Each year, ASIC receives more than 83 million insurance notices and other documents from homeowners' insurers and their agents. ASIC also fields six million phone calls annually from homeowners, their insurers and agents from all over the country regarding homeowners' insurance coverage.

### A.     Avoiding LPI Placement

ASIC uses sophisticated technology to process the communications it receives regarding the status of insurance on the properties securing loans in its servicer clients' portfolios. These communications are processed through a proprietary system that extracts data

3

and uses it to update the servicers' systems, apprising the servicers on a daily basis of the insurance coverage on millions of homes and businesses nationwide.

ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's standard policy has been canceled or is about to expire. If ASIC then confirms that it has not received proof of continuing coverage, it undertakes an extensive "open items" process. It is at this point that ASIC attempts to obtain renewal information or other evidence of valid insurance coverage. Starting about 15 days prior to the expected coverage lapse, ASIC initiates multiple calls and other communications with homeowners' insurers, their agents, and borrowers themselves to find proof of insurance coverage. Through this "open items" process, ASIC avoids unnecessarily placing homeowners into the next phase of the process, called the "letter cycle." ASIC does not take into account loan characteristics such as delinquency to identify potential lapses in coverage, and delinquency status does not affect the rates that ASIC charges on individual policies under its currently filed New York products.

If – and only if – proof of insurance coverage has not been received after the "open items" process is completed, ASIC begins the "letter cycle" process, which typically includes the following steps:

- At the date of expiration of the existing standard policy: ASIC sends a letter to the homeowner, informing him or her that the servicer does not yet have proof of coverage, as required, and reminding the homeowner to provide the proof of coverage. This letter also explains several ways for the homeowner to provide such proof to ASIC.

- 30 days after expiration of the existing policy: ASIC sends a second letter informing the homeowner that the mortgage lender still has not received proof of coverage and that a policy will be purchased if ASIC does not receive a response within a stated period, typically 24 to 30 days. This letter states that LPI coverage *will be more expensive* than the homeowner's prior standard coverage and will not cover liability or contents, as a standard policy generally does, and it encloses a binder that sets forth the annual premium to be charged in the event that an LPI

4

policy is issued. This letter again explains several ways for the homeowner to provide proof of coverage to ASIC.

- **60 days after expiration**: The servicer places the ASIC LPI policy and sends the homeowner a complete policy package.[1] This package includes a letter that again encourages the homeowner to obtain standard coverage and explains that if the homeowner does so, the LPI policy *will be canceled and the homeowner will be charged only for the period when no other coverage was in place.*

And the system works. Historically, of more than 28 million home loans nationwide for which ASIC tracks insurance coverage, it identifies about 13% annually as being at risk of a potential lapse in coverage, triggering the "open items" process. After the open items process, about 9% of loans enter the "letter cycle." For about 3% of loans tracked, borrowers receive the second letter enclosing the binder, and LPI is placed for about 2% of such loans. Thus, as a result of ASIC's processes, standard coverage is maintained on the vast majority of properties with policies at risk of lapse or cancellation, and LPI is placed only on a small fraction.

Even when a homeowner stops making mortgage payments, LPI is not always placed. For home loans for which the borrower has established an escrow account to cover insurance and taxes, as is most common, the servicer will advance the necessary funds to pay the premium to the standard insurer, so as long as the policy remains valid and an invoice for renewal can be obtained. If such a homeowner does not intentionally cancel the standard policy and the standard carrier does not cancel or non-renew it, it should remain in effect throughout the delinquency period. It is impossible for the servicer to secure a new standard policy for the homeowner, because that would require knowledge of the underwriting data to rate the policy, homeowner involvement, and a signed application.

---

[1] Although premiums may not be charged until the end of the letter cycle, the policy is effective from the date of expiration of the prior policy, providing the homeowner with continuous coverage. So, if a homeowner suffers a covered loss during this period, ASIC pays the appropriate amount to satisfy the claim so that the home can be repaired or rebuilt or the loan can be repaid.

**B.     Removal of LPI**

In its communications with homeowners, ASIC clearly explains that, once an LPI policy is placed, the homeowner can cancel it at any time by providing proof of other coverage or simply the name and telephone number of the current agent or carrier, whom ASIC then contacts directly to verify coverage. If there is a gap in coverage, the homeowner is charged LPI premium just for the period when the LPI was the only policy in effect. If ASIC receives proof that there was no gap in coverage, it cancels the LPI policy and refunds all LPI premiums paid.

**III.    The Cost of LPI**

ASIC provides coverage without regard to risk because that is the purpose of LPI: to ensure continuous insurance coverage on *all* mortgaged properties. Unlike standard insurers, which evaluate the risks associated with insuring individual properties, ASIC is required to provide coverage for all exposed properties in the servicer's portfolio. ASIC provides this coverage without inspection or underwriting of the risks associated with any insured home. As a result, ASIC insures a broader range of risks than do standard insurers, including homes in the most catastrophe-prone areas and those that are vacant, unoccupied, or have other negative underwriting factors. Thus, ASIC and other LPI insurers face greater risks than standard insurers and price for that volatility. For this reason, LPI is necessarily more expensive than standard hazard insurance.

**A.     Rates**

The New York Department of Insurance approved the rates ASIC charges for each of its New York LPI products. The base rate filings for ASIC's LPI programs in New York employ standard actuarial ratemaking methodologies. For programs with historical loss experience, ASIC uses the loss ratio method of actuarial ratemaking. That method measures historical loss experience against an expected loss ratio, to produce an indicated rate level change

from the prior approved rates.  In the case of a new program being filed for the first time with the Department, rates from other products providing similar coverage are often used as a starting point, and then adjusted appropriately.

The most recent base rate filing for ASIC's Residential Mortgage Service Program, which is the insurance product through which ASIC provides hazard insurance and is ASIC's largest product by volume, employed the loss ratio method and was based on approximately four years of premium and loss experience.  The Department's approval of the original base rate filing recognized that the higher risks associated with properties on which LPI is placed, such as vacancy, are a proper basis for setting LPI rates.

The original base rate filing for ASIC's Residential and Commercial Flood Program was based on an analysis of the Federal Emergency Management Agency's (FEMA) National Flood Insurance Program insurance product, performed by an external actuarial consulting firm.  Hazard policies generally exclude flood coverage, which is legally required for homes in a FEMA-designated flood zone; this ASIC product fills the gap when no other flood coverage is in effect on such homes (after the homeowner has received the letters mentioned above, but has not renewed or obtained other flood insurance).  The base rate filing for ASIC's MSP Residential Windstorm Policy Program, was supported with a New York adjusted wind exclusion credit calculated by the Insurance Services Office, Inc. (ISO), a provider of insurance rating services and standard policy forms.

**B.    Loss Ratios**

ASIC publicly reports its premiums and losses, from which the loss ratio is derived, in its statutory annual statement and the associated supplemental exhibits.  The New York Insurance Department (now the Insurance Division of the Department of Financial

Services) receives a copy of this filing annually. ASIC's annual statutory filings show premiums and losses by statutory line of business and by state.

Actual loss ratios may vary from expected loss ratios for several reasons. In property insurance, a principal reason for the variance is catastrophe experience. ASIC may experience loss ratios lower than expected in non-catastrophe years, offset by loss ratios higher than expected in catastrophe years. The expected loss ratio reflects a long-term average view of the expected results for a product line.

As economic conditions affecting the housing sector have changed, the LPI market has also changed. An important factor underlying this change has been an unanticipated and significant increase in the volume of LPI on properties for which homeowners have stopped making mortgage payments. Homeowners who do not make payments for principal, interest, and taxes may also fail to maintain insurance coverage on their properties, triggering the placement of LPI. As a result, the number of LPI policies placed has increased along with ASIC's collection of premium.

As the foreclosure process has lengthened in recent years, so, too, has the period of time during which LPI policies have remained in force. Historically, serious loan delinquencies were resolved by foreclosure within a relatively predictable period of time after the first payment default. At foreclosure completion, the standard homeowners policy or LPI policy typically is canceled. However, delays and moratoriums in the foreclosure process – which have allowed some borrowers to remain in their homes when they are no longer making mortgage payments – have lengthened the period in which LPI remains in force, increasing the premiums ASIC has collected.

8

Some of the increase in premium has also been driven by the fact that more high-value homes are entering the LPI process. The average insured amount on homes with seriously delinquent loans is much higher than historical norms, resulting in a higher average premium per policy.

As premiums have increased, losses have not increased at the same pace. Generally speaking, losses lag premium; losses may be reported months or even years after the policy premium has been fully earned. Another reason losses have not kept pace with premium is that catastrophe losses in New York have been minimal over the period, save for the extreme flooding which took place after Hurricane Irene and that resulted in a substantial number of claims under ASIC's flood program. The lack of hurricane basin activity affecting the United States since the active 2004 and 2005 seasons has led to lower than average loss ratios across the entire homeowners sector of the insurance market in recent years, as A.M. Best has reported. On the basis of recent catastrophe modeling, ASIC estimates that, if New York took a direct hit from a Category 3 Hurricane – such as Irene had been for a period of time – ASIC's expected New York losses would be approximately 20 to 40 times those it incurred as a result of Irene.

A third reason losses are significantly lagging premiums is that delays in the foreclosure process also result in delays in reporting losses. Many properties with seriously delinquent loans are at greater risk of loss, either because they are vacant or because the occupants have little incentive to maintain the property. The realization of those losses is often delayed as fewer claims are filed on such properties before foreclosure. Because it does not underwrite individual policies or inspect homes for vacancy or condition, ASIC faces significant risks, which standard insurers can more readily avoid.

9

ASIC has been expecting a return to historical placement levels, as noted in its public disclosures. Unanticipated industry-level events have delayed this reversion to the norm, which ASIC still expects to occur. Nevertheless, great uncertainty remains. Increasingly, ASIC has assumed risks on homes dropped by standard carriers and residences whose owners are seriously delinquent in their mortgage loan payments.

### C.   Expenses

The rate filings that the Department approved include a disclosure of expenses. ASIC incurs the following categories of expenses:

- **Commissions to Agencies and Expense Reimbursements to Servicers**: This category consists of commissions paid to licensed insurance agencies and payments to servicers or their affiliates for reimbursement of placement-related expenses, typically up to a capped amount. Commissions paid to servicer affiliated agencies have historically been comparable to those in the standard homeowners market.

- **Other underwriting expenses**: This category encompasses "other acquisition expenses" and "general expenses." "Other acquisition expenses" are expenses of acquiring business other than commissions and expense reimbursements. Costs associated with mailings to prospective insureds and salaries of employees who do not work on a commission basis are included in this category. For ASIC, this category includes the cost of exposure tracking, processing and activities to monitor insurance coverage, which are prerequisites for lender-placed insurance. ASIC's "general expenses" include the costs of insurance operations, including policy issuance, servicing insurance policies, claims processing, IT, and administrative overhead.

- **Taxes, licenses and fees**: This category includes all taxes and miscellaneous fees that ASIC pays, excluding federal income taxes.

- **Ceded reinsurance expense**: A significant cost of the LPI business is ceded catastrophe premium paid to reinsurers not associated with mortgage servicers. As an integral part of its enterprise risk management program, ASIC purchases this coverage to manage its overall catastrophic risk exposure and to ensure its ability to pay claims.

**D.      Reinsurance Ceded to Servicer-Affiliated Reinsurers**

ASIC has reinsurance agreements with certain property and casualty reinsurance companies affiliated with our mortgage servicer clients.  All of ASIC's current reinsurance agreements with such entities are on a quota share basis.  In other words, the servicer-affiliated reinsurers share in the premiums earned and proportionally in the losses that arise from the policies on which the premiums were paid.  ASIC also requires these reinsurers to have adequate capital or to post collateral, such as funds withheld or letters of credit.

**E.      Fees ASIC Earns**

ASIC charges fees to some of its mortgage servicer clients, in addition to LPI premiums on policies placed on their behalf.

- ASIC receives fee income from some clients to provide insurance related services. These fees relate primarily to support services provided to lenders for hazard insurance processing.

- As is customary in the industry, ASIC retains a ceding commission to compensate it for various expenses relating to the premium it cedes to reinsurers.

**IV.    Conclusion**

        LPI exists because it meets important needs of homeowners, lenders, and investors.  It provides a safety net when standard insurance is simply not available.  It is a critical component of the national residential mortgage system.  But it is not "forced" on anyone.  Yes, LPI is more expensive than standard insurance, but the difference in price reflects the greater risk that LPI carriers assume.  The Department has indicated that it is interested in looking at all aspects of the market for LPI and in addressing any problems that it may find there.  As the leader of the industry, we look forward to a constructive dialogue with the Department aimed at exploring ways to address any concerns the Department identifies in the course of its investigation.

                                      Respectfully submitted,

                                      John Frobose

                                      President, American Security Insurance Company

# EXHIBIT 22

Press Release - March 21, 2013: Cuomo Administration Settles With Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort And Saving Homeowners, Taxpayers, And Investors Millions Of D...



**Press Release**

For Immediate Release: March 21, 2013

## CUOMO ADMINISTRATION SETTLES WITH COUNTRY'S LARGEST FORCE-PLACED INSURER, LEADING NATIONWIDE REFORM EFFORT AND SAVING HOMEOWNERS, TAXPAYERS, AND INVESTORS MILLIONS OF DOLLARS

*Cuomo Administration Settlement with Assurant Includes Restitution for Homeowners, a $14 Million Penalty, and Industry-leading Reforms*

*Cuomo Administration Says Other Force-placed Insurers, Including QBE, Need to "Step Up to the Plate Now" and Put in Place These Reforms*

**NEW YORK, NY** – Governor Andrew M. Cuomo today announced that a New York State Department of Financial Services (DFS) investigation has produced a major settlement with the country's largest "force-placed" insurer, Assurant, Inc., which will help lead a nationwide reform effort for this industry. The settlement includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates.

"The force placed insurance industry has for too long been plagued by an intricate web of relationships between insurers and banks that pushed distressed families over the foreclosure cliff," said Governor Andrew M. Cuomo. "Today's agreement starts us on the road to reform, which will clean up this industry and truly protect working people."

Benjamin M. Lawsky, Superintendent of Financial Services said: "Our investigation found that insurers and banks built a network of troubling relationships and payoffs that helped drive premiums sky high. Those improper practices created significant conflicts of interest and saddled homeowners, taxpayers, and investors with millions of dollars in unfair and unnecessary costs. This settlement includes major reforms that will put a stop to those practices at Assurant, provide restitution to homeowners who were harmed, and save millions of dollars for homeowners, taxpayers, and investors going forward through lower rates."

**The Findings of DFS's Investigation of Assurant**

In October 2011, DFS launched an investigation into the force-placed insurance industry, including Assurant and its subsidiaries. Force-placed insurance is insurance taken out by a bank, lender, or mortgage servicer when a borrower does not maintain the insurance required by the terms of the mortgage. This can occur if the homeowner allows their policy to lapse (often due to financial hardship), if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage, or if the homeowner is force-placed erroneously.

The DFS investigation revealed that the premiums charged to homeowners for force-placed insurance can be two to ten times higher than premiums for voluntary insurance -- despite the fact that force-placed insurance provides far less protection for homeowners than voluntary insurance.

Indeed, even though banks and servicers are the ones who choose which force-placed insurance policy to

purchase, the high premiums are ultimately charged to homeowners, and, in the event of foreclosure, the costs are passed onto investors. And when the mortgage is owned or backed by a government-sponsored enterprise, such as Fannie Mae or Freddie Mac, those costs are ultimately borne by taxpayers.

DFS's investigation found that Assurant competed for business from the banks and mortgage servicers through what is known as "reverse competition." That is, rather than competing by offering lower prices, the insurers competed by offering what is effectively a share in the profits. This profit sharing pushed up the price of force-placed insurance by creating incentives for banks and mortgage servicers to buy force-placed insurance with high premiums. That's because the higher the premiums, the more that the insurers paid to the banks. This was done by:

- Paying commissions to insurance agents and brokers affiliated with the banks even though the agents and brokers did not perform the customary tasks that would justify a commission.

- Paying banks' "expenses" related to force-placed insurance. These expenses were typically a percentage of premium and were paid to banks that did not have agents or brokers that would collect a premium.

- Paying lump sum amounts, such as one bank's $1 million termination fee for switching its business to Assurant from another insurer.

- Allowing a reinsurance company owned by a bank to take as much as 75 percent of the premium and therefore 75 percent of the profit. A reinsurance company provides insurance to insurance companies by sharing risk. But since there was little risk in force-placed insurance relative to the high premiums, this was effectively a way to transfer profits. Thus, the bank put itself on both sides of the transaction, paying an inflated premium that hurt the homeowner and then reaping 75 percent of those gains back from Assurant through a reinsurance agreement. For example, JPMorgan Chase has made approximately $600 million since 2006 by taking 75 percent of the profits from the force-placed business it gave Assurant.

One measure of how profitable force-placed insurance has been for Assurant is how little it has paid in claims—what is known as the loss ratio. In its 1994 rate filing with DFS, one of Assurant's subsidiaries based its rate on the expectation that it would pay 58 percent of premium on claims. In fact, from 2006 through 2011, that subsidiary actually paid only 24.7 percent, 19.4 percent, 17.3 percent, 22.8 percent, 24.3 percent, and 24.7 percent, respectively. Despite years when it paid out claims less than half of what it projected, Assurant did not file for lower rates. For voluntary homeowners insurance the loss ratio has historically been around 63 percent nationally.

## Key Terms of the Settlement

The settlement that Assurant and the New York State Department of Financial Services signed today includes restitution for homeowners who were harmed, a $14 million penalty, and a set of major reforms for force-placed insurance at Assurant.

Superintendent Lawsky said: "By agreeing to implement these critical reforms, Assurant is serving as an industry leader. These reforms will make Assurant a stronger and better company focused on its customers. Other force-placed insurers, including QBE, need to step up to the plate now and put in place these reforms. Our work on this issue is far from done and we expect that this settlement will help lead a nationwide reform effort for this industry."

The key terms of the settlement include:

*To lower the cost of force-placed insurance going forward for all non-flood business:*

- Assurant shall file with DFS a premium rate with a permissible loss ratio of 62 percent, supported by the required data and actuarial analysis that is acceptable both professionally and to DFS. This will substantially reduce homeowners' premiums.

- Every three years, Assurant will be required to re-file its rates with DFS for review.

- If Assurant's actual rates in any year result in an actual loss ratio of less than 40 percent for the immediately preceding calendar year, Assurant will be required to re-file its rates for the next year for DFS review in order to bring the loss ratio back up.

- Assurant must report annually to DFS on its actual loss ratio, earned premiums, itemized expenses, losses, and reserves.

Press Release - March 21, 2013: Cuomo Administration Settles With Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort And Saving Homeowners, Taxpayers, And Investors Millions Of D...

*To put a stop to the improper practices found in DFS's investigation, many of which helped Assurant support inflated premiums:*

- Assurant shall not issue force-placed insurance on mortgaged property serviced by a bank or servicer affiliated with Assurant.

- Assurant shall not pay commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on force-placed insurance policies obtained by the servicer.

- Assurant shall not reinsure force-placed insurance policies with a person or entity affiliated with the banks or servicer that obtained the policies.

- Assurant shall not pay contingent commissions based on underwriting profitability or loss ratios.

- Assurant shall not provide free or below-cost, outsourced to banks orservices to servicers or their affiliates.

- Assurant shall not make any payments, including but not limited to the payment of expenses, to servicers, lenders, or their affiliates in connection with securing business.

*To provide restitution to those who were harmed by Assurant's practices:*

- Refunds will be provided to consumers through a claims process and a third-party administrator selected by DFS and paid for by Assurant for homeowners who have been force-placed at any time after January 1, 2008 and meet the eligibility criteria for one of the following three categories of claimants:

  - Homeowners who defaulted on their mortgage or were foreclosed because of force placement.

  - Homeowners who were charged for force placement at a coverage limit higher than permitted by their mortgage.

  - Homeowner's who were erroneously charged for force-placed insurance: either because they had voluntary insurance in effect, or they were charged commercial rates for a residence.

Additionally, under the terms of the settlement, Assurant will pay a civil penalty of $14 million to the State of New York; provide improved disclosures and notices to homeowners; improve its email retention policy; and ensure that the amount of coverage force placed on any homeowner shall not exceed the last known amount of coverage, provided that if the last known amount of coverage did not comply with the mortgage, then the amount of coverage shall not exceed the replacement cost of improvements on the property.

To read a full copy of the Department of Financial Services' settlement with Assurant, please visit, **link**.

###



Andrew M. Cuomo, Governor          Benjamin M. Lawsky, Superintendent

Accessibility Contact Us Disclaimer Privacy Policy Site Map

# EXHIBIT 23

# Property Casualty 360

Connect:

# Twitter

# Facebook

# LinkedIn

# RSS

# NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules

*BY* MARK E. RUQUET, PROPERTYCASUALTY360.COM
August 10, 2012 • Reprints

**NU Online News Service, Aug. 10, 12:25 p.m. EST**

ATLANTA—Regulators promised to delve more deeply into lender-placed insurance, saying there may need to be more regulation of that line of business.

The comments came after a public hearing held here during the National Association of Insurance Commissioners' Summer National Meeting. The hearing was held as the federal Consumer Financial Protection Bureau proposed rules on the sale of lender-placed insurance.

Lender-placed insurance—also known as force-placed insurance—is property insurance put on a home by a mortgage lender when the owner's insurance lapses.

"Before this came up in the last several months, I was unaware of this issue," said Sharon P. Clark, Kentucky insurance commissioner and chair of the NAIC's Market Regulation and Consumer Affairs Committee. "We have not received any complaints and this has not been an area of discussion. Several of the sister states are in the same position. We are not nearly as informed as Florida, Texas and New York."

Florida Insurance Commissioner and NAIC President Kevin M. McCarty said because there are only two companies that dominate the market, the focus needs to be on whether rates for the coverage are justified.

The commissioners also promised greater scrutiny of compensation paid to agents, lending institutions, and costs associated with administration of placements.

Similar to testimony he gave before a fact-finding committee in New York, Birny Birnbaum, executive director of the Center of Economic Justice, told regulators here that the rates force-placed insurers charge are not justified when examining the companies' performance and profits over the years.

Consumers, he said, are not offered the same insurance protections they receive from the admitted markets, where coverage includes liability and personal property indemnification.

Birnbaum also took issue with reinsurance agreements that often involve ceding premium to the lenders as part of the insurance program, thereby calling into question the integrity of the underwriting.

"The purpose is not for risk management, but to share the premium and to charge for more services," said Birnbaum, adding that the current insurer-lender relationship is "an incentive for abuse."

Robert Hartwig, president of the Insurance Information Institute, and Kevin McKechnie, executive director of the American Bankers Insurance Association, defended the rates force-placed insurers charge, saying carriers do not underwrite individual risks, but rather provide a portfolio of coverage to lenders where the insurers are taking on risks "sight unseen," with virtually no information about them.

Hartwig said the recent rise in force-placed insurance coincides with the economic crisis and increase in foreclosures. As the economy and housing market improve, he said, the premium volume will drop because fewer consumers become delinquent on their mortgages, which he cited as the reason for triggering the coverage.

McKechnie defended the payments that the lenders—acting as servicers or agents on the risks—receive. He said the compensation is small, and necessary for the work lenders do during the process.

James Novak, senior vice president and general counsel for QBE First, disputed Birnbaum's assertion that QBE and Assurant comprise over 99 percent of the force-placed insurance market. He also said QBE gives consumers ample warning when the coverage is about to be imposed, and urges them to obtain insurance elsewhere before it happens.

Insurers also defended the higher rates they charge, saying that because the risks are primarily in catastrophe zones, higher premiums are needed to prepare for what they say is the inevitability of major losses.

John Frobose, president, lending solutions with Assurant Specialty Property, also said rates are closer to two times higher than the voluntary market, and not ten times as consumer advocates said.

The carrier representatives also noted that few carriers are in the force-placed market because they do not want the high level of exposure without detailed underwriting.

While the debate raged over the adequacy of rate, Birnbaum said the issue is really the need for better regulation of the market.

"I don't think there is malice on the part of the industry," said Birnbaum. "A handful of servicers dominate. [The problem] I think has more to do with the structure of the market."

Meanwhile, the Consumer Financial Protection Bureau, created under the Dodd-Frank Act, has proposed new rules regarding the sale of force-placed insurance, requiring servicers to give advance notice and pricing information before charging consumers for the coverage.

Servicers would also be required to terminate the insurance within 15 days if it receives evidence that the borrower has the necessary insurance and the insurer would refund the force-placed insurance premiums.

There will be a 60-day comment period on the rules, until Oct. 9. The agency says it will issue final rules in January.


## COMMENTS

**Like**

## Showing 0 comments

## Trackback URL

http://disqus.com/forums/pc360/naic_promises_greater_focus_on_force_placed_insurance_as_cfpb_proposes_rules/trackback/

© 2012 PropertyCasualty360, A Summit Business Media website

# EXHIBIT 24

Page 3 of 26

 **California Casualty**
AUTO & HOME INSURANCE

| | |
|---|---|
| P.O. BOX 39700 | |
| COLORADO SPRINGS    CO 80949 | |

| Customer Service: | 800-800-9410 |
|---|---|
| Monday - Friday | 8:00 A.M. 6:00 P.M |
| Saturday | 8:00 A.M. 12:00 P.M. (PT) |

**IMPORTANT INSURANCE DOCUMENTS ENCLOSED**

12/13/07

**RE:**   REDACTED

Dear Valued Customer:

Thank you for choosing to renew your homeowners insurance policy with us. We appreciate your business and the opportunity to serve you. If you have any questions or want to make changes to your policy, please contact Customer Service at 800-800-9410. For secure, private access to your insurance policy documents and billing information, visit us online at www.MyAplus.com.

---

**Insurance Checklist:**

• If you are age 55+ and retired, verify that your Policy Declarations reflects this discount.

• Verify the information and coverages listed in the Policy Declarations.

• Be sure the coverages meet your current needs.

• Retain the enclosed documents for your records.

---

### IMPORTANT COVERAGE REMINDER

We have partnered with Identity Theft 911[®], America's leader in identity theft resolution, to provide you with expert assistance in resolving your situation should you fall victim to this crime. To learn more about this free service, please visit www.aplus.com/idtheft.html. The web site not only gives you complete details about the services available, but also provides ongoing education, fraud alerts and scams to look out for. It also is a resource library on how to protect yourself against this crime.

If you believe you may be a victim of identity theft, please contact our customer service department, who will assist you in getting the help you need.

### Important Information Regarding Late Payments

Effective September 1, 2007, a $10.00 late fee will be assessed for policy payments received after the billing due date. To avoid this late fee, we suggest that you mail your payment at least 5-7 business days before the due date to allow for mail time. If you currently pay through E-Z Pay, be sure to have the funds available for deduction through your bank or credit union.

For 50 years we have been providing group auto and home insurance to responsible community members. We thank you for placing your trust in us.

Attorney in Fact and Manager
California Casualty Indemnity Exchange          California Casualty Insurance Company
California Casualty and Fire Insurance Company    California Casualty General Insurance Company of Oregon

M-120 (05/05)

Sincerely,

Frank Jones

Frank Jones
Executive Vice President
Managing Director
California Casualty Management Company

Attorney in Fact and Manager

California Casualty Indemnity Exchange          California Casualty Insurance Company
California Casualty and Fire Insurance Company   California Casualty General Insurance Company of Oregon

M-120 (05/05)

Page 5 of 26



# California Casualty

## AUTO & HOME INSURANCE

Coverage provided by: CALIFORNIA CASUALTY INDEMNITY EXCHANGE

Home Office:
San Mateo, CA

RENEWAL

### Property Policy Declarations

HOMEOWNER

**NAMED INSURED(S):**

MCNEARY-CALLOWAY, PATRICIA AND
JAMES B
3286 BLANDON RD
OAKLAND        CA   94605

For questions on your policy, call

800-800-9410

To report an accident or loss, call

800-800-9410

YOUR POLICY IS BILLED BY
INSTALLMENTS. Billing
information will be mailed
separately.

| POLICY NUMBER | POLICY PERIOD (As of 12:01 a.m. Standard time at the premises covered by this policy.) | |
|---|---|---|
| REDACTED | Effective | Expiration |
| | 02/01/08 | 02/01/09 |

**THE PREMISES COVERED BY THIS POLICY IS LOCATED AT:**

3286 BLANDON RD                OAKLAND                CA 94605

**RATING INFORMATION:**

AUTOMATIC VALUE-UP AT RENEWAL, FRAME, PRIMARY RESIDENCE, PROTECTION CLASS 02,
TERRITORY 97, $1,000 SECTION I LOSS DEDUCTIBLE,     1 FAMILY,        OUTSIDE CITY
LIMITS

**COVERAGE AT THE ABOVE DESCRIBED LOCATION IS PROVIDED ONLY WHERE A LIMIT OF LIABILITY IS
SHOWN OR A PREMIUM IS STATED.**

| SECTION I COVERAGE | LIMIT OF LIABILITY | PREMIUMS |
|---|---|---|
| DWELLING | $   341,000 | $   1467.00 |
| OTHER STRUCTURES | $   34,100 | INCLUDED |
| PERSONAL PROPERTY | $   170,500 | INCLUDED |
| LOSS OF USE | $   132,300 | INCLUDED |

| SECTION II COVERAGE | | |
|---|---|---|
| PERSONAL LIABILITY | $   300,000  EACH OCCURRENCE | $    39.00 |
| MEDICAL PAYMENTS TO OTHERS | $   1,000  EACH PERSON | INCLUDED |

**ADDITIONAL COVERAGES**

| | |
|---|---|
| HO0420  SPECIFIED ADD'L AMOUNT OF INSURANCE FOR COV A - DWLG | $45.00 |
| HO0427  LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA COVERAGE | INCLUDED |
| HO0495  WATER BACK UP AND SUMP OVERFLOW | $80.00 |
| HO2490  WORKER'S COMPENSATION RESIDENCE EMPLOYEES - CALIFORNIA | $9.00 |

| TOTAL POLICY PREMIUM | $ 1,640.00 |
|---|---|

LOAN #   REDACTED
CHASE BANK USA, NA
C/O CHASE HOME FIN ISAOA/ATIMA
PO BOX 81507
ATLANTA            GA  30366

Your Property policy consists of the Declarations and documents listed below. Please keep this information
for your records.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 438BFU | C542 | HCCA99 | 0905 | HC0097 | 1106 | HC0098 | 1000 | HC0099 | 0905 |
| HC0996 | C802 | HO0003 | 1000 | HO0104 | 0906 | HC0416 | 1000 | HO0420 | 1000 |
| HO0427 | C402 | HO0490 | 1000 | HO0495 | 1000 | HC0496 | 1000 | HO2490 | 0801 |
| CFMSIG | C307 | | | | | | |

THE LIMIT OF LIABILITY FOR THIS STRUCTURE (COVERAGE A) IS BASED ON AN ESTIMATE OF THE COST
TO REBUILD YOUR HOME, INCLUDING AN APPROXIMATE COST FOR LABOR AND MATERIALS IN YOUR
AREA, AND SPECIFIC INFORMATION THAT YOU HAVE PROVIDED ABOUT YOUR HOME.

UP1144 (04/00)                INSURED COPY                12/13/07  Page: 1  of 2

# California Casualty

## AUTO & HOME INSURANCE

**Home Office:**
San Mateo, CA

Coverage provided by:  **CALIFORNIA CASUALTY INDEMNITY EXCHANGE**
**THIS POLICY DOES NOT PROVIDE EARTHQUAKE COVERAGE**

Your premium for this policy reflects the following additional coverages and discounts:

AUTO-HOME DISCOUNT APPLIES

PERSISTENCY RATING APPLIES

AGE 55 AND RETIRED DISCOUNT APPLIES

EDUCATORS EXCESS LIABILITY & EDUCATIONAL EQUIPMENT AND  MATERIALS COVERAGE APPLIES

SPECIAL COVERAGE ENHANCEMENTS APPLY

SPECIFIED ADDL AMOUNT OF INS COV A - 25%

LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA COVERAGE

    SECTION I AMOUNT OF COVERAGE IS $  5000

    SECTION II AGGREGATE SUBLIMIT OF LIABILITY IS $    5000

HOME ALERT PROTECTION

    COMPLETE SMOKE/FIRE ALARM

PERSONAL PROPERTY REPLACEMENT COST

WATER BACK UP AND SUMP OVERFLOW

WORK COMP AND EMPLOYERS LIAB FOR RESIDENCE EMPLOYEES

    COVERAGE FOR OCCASIONAL SERVANT

UP1144 (04/00)    INSURED COPY    12/13/07  Page: 2  of 2

# EXHIBIT 25



CHASE

**Chase Home Finance LLC**
P.O. BOX 47020
DORAVILLE, GA  30362
Insurance Processing Center

September 5, 2010

JAMES B CALLOWAY
PATRICIA A MCNEARY-CALL
3286 BLANDON RD
OAKLAND, CA  94605

### NOTICE OF PLACEMENT OF INSURANCE
### PLEASE READ CAREFULLY

SUBJECT:    Loan Number:    **REDACTED**
            Property Location:  3286 BLANDON RD
                                OAKLAND, CA  94605

Dear Customer(s):

Enclosed is a policy that renews your lender-placed insurance policy. We originally placed this policy on your house because acceptable proof of coverage was not provided to us. The annual renewal premium is shown below and on the enclosed policy. This premium will be charged to your escrow account.

Your mortgage or deed of trust permits us to obtain this insurance at your expense. The terms and conditions of your mortgage require you to maintain hazard insurance coverage on your property that is acceptable to the lender. We obtained this insurance for you, which will remain in place until you provide us with a copy of acceptable hazard insurance coverage for your property. For the reasons discussed in this letter, we urge you to obtain your own insurance. This will allow you to choose a policy that meets your needs from a company that you select. You are likely to save a substantial amount if you do so. Your choice of an insurance company or agent will not affect our credit decisions in any way. The insurance company must, however, have a minimum rating from A.M. Best Company of "A" or better.

As a reminder to you:

- The cost of the insurance we obtained for you is likely to be much higher than insurance you purchase on your own. A major reason for the higher cost is that the insurance we obtained is issued automatically, without evaluating the risk characteristic of the property. The premium for the insurance coverage is $4,233.00. You should compare this cost to what an insurance company would charge you for your own insurance policy.

- The insurance coverage we obtained is primarily for the benefit of the person or company who presently owns your mortgage loan. If you incur property damage or loss, you may not have adequate coverage for any damages that you suffer.

- The coverage we obtained covers only the structure of your home (i.e., the walls, floor, roof and anything permanently attached).

    - It will not cover your furniture or any of your other personal belongings.
    - It will not cover the cost of temporarily living outside your home because it was damaged and is being repaired.
    - It will not cover any liability to you personally for someone who is injured while on your property.

2102H4-0810

The coverage we obtained will not cover any amounts you feel your home is worth in excess of the last amount of insurance coverage that you obtained and we received.  If we did not know the last amount of insurance coverage you obtained, we obtained coverage in the amount of the unpaid principal balance of your loan on the date we requested the insurance coverage to be issued.

When Chase purchases insurance for you, an affiliate of Chase may receive an economic benefit. This may occur because the insurance company will transfer some or all of the risk under the policy to a Chase affiliate in return for a portion of the insurance premium. This is called reinsurance and may result in a financial gain to the Chase affiliate. The reinsurance arrangement will not affect your insurance premium.

Even though a renewal policy has been issued, you may still obtain your own insurance coverage. We strongly recommend that you do so. If you obtain your own insurance, you must send proof immediately to the address below or you may fax a copy of your policy to 1-678-475-8799. Your proof must include evidence that the "standard mortgagee clause" is included in your insurance policy. A correct mortgagee clause, including your loan number, will ensure that insurance notices are received in a timely manner and will enable the prompt payment of insurance premiums on your behalf. The "standard mortgagee clause" should read exactly as follows:

> CHASE HOME FINANCE LLC
> ITS SUCCESSORS AND/OR ASSIGNS
> PO BOX 47020
> DORAVILLE, GA  30362

Once you obtain your own insurance, we will cancel the insurance we obtained and replace it with yours. We will charge you for the coverage we obtained only for the time the coverage was in effect (i.e., prior to the effective date of the coverage you obtain). If you are due a refund, your escrow account will be credited.

If you or your insurance agent have any questions about your obligations to provide evidence of insurance or any information in this letter, please call the Insurance Processing Center at 1-877-530-8951.  A Chase representative is available to assist you Monday through Friday.

Sincerely,

Insurance Processing Center

**Important Bankruptcy Information**

If you or your account is subject to pending bankruptcy proceedings, or if you received a bankruptcy discharge, this letter is for informational purposes only and is not an attempt to collect a debt.

2102H4-0810